UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS POLLOCK, et al., | Case No. 21-cv-09975-JCS |
| Plaintiffs, | |
| v. | **ORDER GRANTING MOTION TO COMPEL ARBITRATION** |
| FEDERAL INSURANCE COMPANY, | Re: Dkt. No. 27 |
| Defendant. | |

## I.    INTRODUCTION

This is an insurance coverage action for breach of contract, declaratory judgment, breach of the implied covenant of good faith and fair dealing, and negligence, brought by Plaintiffs Thomas Pollock and Eileen Tabios (collectively, "Homeowners") against Defendant Federal Insurance Company ("Federal"). Homeowners have filed a motion to compel arbitration on claims regarding the amount of loss to a total-loss guesthouse on the insured property, seeking an appraisal in accordance with the terms of the applicable insurance policy. Federal contends that Homeowners cannot enforce the mandatory arbitration provision in the parties' agreement because the fire that burned down the guesthouse was a government-declared disaster, and because unresolved coverage issues preclude appraisal. The Court held a hearing on the motion on Friday, July 8, 2022, at 9:30 AM. For the reasons explained below, Homeowners' motion is GRANTED.[1]

## II.    BACKGROUND

### A.    Allegations of the Complaint and Terms of the Agreement

Homeowners have resided at 256 North Fork Crystal Springs Road, St. Helena, California

---

[1] The parties have consented to the jurisdiction of a magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

1    (the "Property") for two decades.  Compl. (dkt. 1) ¶ 2.[2]  The Property is a 46.5-acre estate with

2    several buildings, including an 8,260-square-foot main residence and a guesthouse which was 950

3    square feet before it burned down.  *Id.* ¶¶ 18–19.  Because of the nature of the construction of each

4    building, as well as the particular building materials used, the Property is highly susceptible to

5    thermal, non-thermal, and contamination damage from fire.  *Id.* ¶ 22.

6           At approximately 4:20 a.m. on September 27, 2020, Homeowners were forced to evacuate

7    from their home due to a massive fire known as the Glass Fire, which burned on the Property and

8    filled their home with fire residue and contaminants.  *Id.* ¶ 2.  Specifically, the Glass Fire burned

9    to the ground Homeowners' guesthouse and its contents, burned against the walls of the nearby

10   garage and wine cellar through which Homeowners gained access to the guesthouse, and burned

11   within twenty feet on the north side and ten feet on the south side of the main residence.  *Id.* ¶¶ 3,

12   25.  The fire continued burning on the Property and in the surrounding area for several weeks,

13   causing ongoing damage to underground infrastructure, soils, landscaping, and land, both upslope

14   and downslope from Homeowners' home.  *Id.* ¶¶ 3, 24.  Homeowners' home, other permanent

15   structures, infrastructure, landscaping, equipment, and contents also suffered severe non-thermal

16   and contamination damage; all of the structures, infrastructure, and contents are coated with

17   combustion by-products as well as toxic chemicals.  *Id.* ¶¶ 4, 24.  At the time this action was filed,

18   Homeowners had been unable to return to their home for over a year.  *Id.* ¶ 2.

19          Federal insured Homeowners against all risk of loss caused by fire to their real property

20   and contents, resulting from damage and loss of use, and for additional coverages, under a

21   residential fire insurance policy covering the Property (the "Policy").  *Id.* ¶ 7 & Ex. 1 at 7.

22   Homeowners provided timely notice to Federal of the covered loss under the Policy, requesting

23   that Federal pay benefits under the Policy.  *Id.* ¶ 8.  Federal assigned an outside adjuster, JS Held,

24   to investigate the loss, and presented an estimate from Held for replacement of the guesthouse for

25   $1,249,080.39.  Schaffer Decl. (dkt. 27-1) ¶¶ 8–10.  Federal paid that amount, but Homeowners

26   presented a competing sworn proof of loss claiming benefits of $7,375,568.51 to replace the

27

28   _____
     [2] For context, this background section summarizes Homeowners' allegations as if true. Nothing in
     this background section should be construed as resolving any issue of fact that might be disputed.

United States District Court
Northern District of California

2

United States District Court
Northern District of California

guesthouse. *Id.* ¶¶ 10–11. Through December 2021, Federal had paid no further benefits for the

guesthouse replacement. *Id.* ¶ 13.

On December 9, 2021, Homeowners demanded appraisal to resolve the dispute relating to

the cost to replace the total-loss guesthouse, pursuant to the contractual arbitration provision in the

Policy, which reads as follows:

> **APPRAISALS:** If you or we fail to agree on the amount of loss, you
> or we may demand an appraisal of the loss. Each party will select a
> competent, independent appraiser within 20 days after receiving
> written request from the other. The two appraisers will select a third,
> competent appraiser. If they cannot agree on a third appraiser within
> 15 days, you or we may request that the selection be made by a judge
> of a court having jurisdiction. Written agreement signed by any two
> of the three appraisers shall set the amount of the loss. However, the
> maximum amount we will pay for a loss is the applicable amount of
> coverage even if the amount of the loss is determined to be greater by
> appraisal. Each appraiser will be paid by the party selecting the
> appraiser. Other expenses of the appraisal and the compensation of
> the third appraiser shall be shared equally by you and us. We do not
> waive our rights under this policy by agreeing to an appraisal.

*Id.* Ex. A at 1. On December 13, 2021, Federal refused to proceed with contractual arbitration,

stating that because "there has been no determination that [Homeowners'] claim is a covered loss,

appraisal of a single portion of the claim is not appropriate at this time." *Id.* ¶ 14 & Ex. B at 2.

On March 7, 2022, Homeowners once again requested an appraisal; once again, Federal refused,

this time on the basis that, because the loss was a government-declared disaster, Homeowners

were precluded from compelling contractual arbitration to resolve the amount of the guesthouse

loss. *Id.* ¶¶ 16–17 & Ex. C at 2.

Thereafter, Homeowners filed this action on December 23, 2021. On February 15, 2022,

Federal moved to dismiss and to strike the complaint, both of which were denied. *See* dkt. 14, 25.

Homeowners now move to compel arbitration based on the Policy's appraisal provision. *See* dkt.

27.

**B.    The Parties' Arguments**

Homeowners assert in their motion that, in general: (1) an agreement to appraise in an

insurance policy is an arbitration agreement subject to the Federal Arbitration Act ("FAA"); (2)

the FAA permits a party to petition a court for an order compelling appraisal; (3) the inquiry to

3

resolve such a motion is limited to determining whether an agreement to appraise exists and whether the agreement encompasses the dispute at issue; and (4) both conditions are satisfied with respect to the present dispute regarding the amount of loss. Mot. (dkt. 27) at 9. Thus, they argue, an order compelling appraisal should issue because there is a valid arbitration agreement in the Homeowners' policy, the FAA applies, and a dispute over amount of loss has occurred, triggering Homeowners' right to demand an appraisal. *Id.*

Homeowners argue further that both of Federal's justifications for refusing to resolve the dispute via appraisal are unavailing. *Id.* at 10. In its response to the initial December request for appraisal, Federal had contended that it had not, as of then, determined whether Homeowners' claim was a covered loss; thus, appraisal of a single portion of the claim was not appropriate at the time, because appraisers are limited to determining the amount of damage to items that make up the claim and cannot resolve questions of coverage or interpret provisions of the policy or relevant statutes. *Id.* (citing Schaffer Decl. ¶ 14 & Ex. B (email from Eric Freed, counsel for Federal, December 13, 2021)).

Homeowners contend that disputes over coverage do not alter a court's obligation under the FAA to order contractual appraisal of the amount of loss because the provision is valid and applies to that dispute. *Id.* In such instances, "Section 4 of the FAA applies," meaning that "the Court lacks the authority to adopt the reverse order and litigate coverage first, regardless of any efficiency concerns." *Id.* (quoting *Anderson*, 2019 WL 8128570, at *5).

Homeowners argue further that there was in fact coverage of the guesthouse claim, since, after it burned down in September 2020, Federal investigated, valued the loss, and paid benefits equaling its loss valuation. *Id.* at 11. In addition, Homeowners claim that, notwithstanding the coverage determination, Federal's rationale for refusing to arbitrate miscites the law. *Id.* In the cases Federal used in support of its argument, there were coverage issues common to a class of insureds and statutory interpretation problems that so heavily bore on the outcome of the appraisal that the Court stayed the appraisals pending resolution of the underlying legal issues. *Id.* (citing *Doan v. State Farm Gen. Ins. Co*, 195 Cal. App. 4th 1082 (2011); *Alexander v. Farmers Ins. Co.*, 219 Cal. App. 4th 1183 (2013)). Here, by contrast, Homeowners contend that there is no common

4

1    coverage or statutory interpretation issue, as this is simply a straightforward dispute over amount

2    of loss between a single policy holder and their insurer.  *Id.*

3        Homeowners also argue that their policy contains no declared disaster exception to their

4    rights to arbitrate.  *Id*. at 12.  Homeowners agree that California Insurance Code section 2071

5    contains a form fire policy that carriers may use and, pursuant to section 2070, provides the

6    minimum coverage afforded by California fire policies.  *Id.*  Homeowners also agree that the

7    appraisals provision in the form policy states that if the loss results from a government-declared

8    disaster, demands for arbitration may be refused.  *Id.*  However, Homeowners assert that their

9    "Masterpiece" policy contains no declared disaster exception, and statutory provisions cannot be

10   read into an insurer's policy when said policy offers coverage that is "substantially equivalent to

11   or more favorable to the insured than that contained in" the standard form.  *Id*. at 13 (quoting Cal.

12   Ins. Code § 2070).  According to Homeowners, because the Policy offers more favorable coverage

13   than that of the standard form, the terms of the Policy control, not those of the statute.  *Id.* at 13–

14   14.  Homeowners further argue that Federal is bound by the terms of the policy it sold, even if the

15   policy failed in some manner to conform to the requirements of section 2070.  *Id.* at 14 (citing Cal.

16   Ins. Code. § 2083).

17       Finally, Homeowners request approval of an appraisal protocol, at the heart of which is an

18   Invitation to Bid ("ITB").  *Id.* at 14–15.  Under the ITB framework, which closely follows that

19   proffered by Federal in the *Anderson* case, Homeowners would have the appraisers determine the

20   cost of rebuilding the guesthouse by submitting the hypothetical rebuilding project to multiple

21   Napa-area contractors and basing their measurement of the loss on the lowest bid.  *Id.* at 15.

22   Homeowners argue that this appraisal method will ensure that the received bids accurately reflect

23   the scope and nature of the project, as well as the reasoned judgment of qualified and experienced

24   builders.  *Id.*

25       In its opposition, Federal argues that appraisal of Homeowners' claim is contrary to the

26   legislative intent of the standard fire form provided in section 2071.  Opp'n (dkt. 16) at 5.  Federal

27   argues that, even though the "government-declared disasters" exception is not contained within

28   Homeowners' policy, substantial California case law indicates that the provision must be

5

incorporated via statutory mandate.  *Id.* at 6 (citing *20th Century Ins. Co. v. Superior Ct.*, 90 Cal. App. 4th 1247, 1265 (2001); *Wildman v. Gov't Emps.' Ins. Co.*, 48 Cal. 2d 31, 40 (1957); *Fire Ins. Exch. v. Superior Ct.,* 16 Cal. App. 4th 446, 459 (2004); *Samson v. Transamerica Ins. Co.*, 30 Cal. 3d 220, 231 (1981)).  Moreover, Federal claims that the Policy itself contains language supporting incorporation of the statutory provision, particularly the General Conditions section, which reads: "[i]f any provision of this policy conflicts with the laws of the state in which it is written, this policy is amended to conform to those laws."  *Id.* at 8.  As such, Federal contends that the "government-declared disasters" exception must be included in Homeowners' policy.  *Id.*

Responding to Homeowners' arguments against incorporating the disaster exception, Federal disputes that its policy contains more favorable coverage than the form policy because limitations on appraisals have little, if anything, to do with coverage; instead, in Federal's view, the "favorable coverage" language of section 2070 is intended to prevent limits on total amounts recoverable and exclusions that bar coverage.  *Id.* at 8–9 (citing *Century-Nat'l Ins. Co. v. Garcia*, 51 Cal. 4th 564, 573 (2011)).

Alternatively, Federal claims that, even if exceptions do bear on the favorability of coverage, the lack of this particular exception is actually worse for the insured.  *Id.* at 9.  Federal offers legislative history indicating that the exception was created in 2001 in response to insurers utilizing arbitration to draw out litigation and force policyholders to accept low-ball settlement offers, *id.* & Ex. 9 at 3 (Assembly Committee on Insurance analysis of Senate Bill 658), and caselaw holding that the exception was thus an attempt by the legislature "to equalize the positions of insurers and insureds and to . . . reduc[e] the opportunity for delaying tactics by insurers."  *Id.* (quoting *Kirkwood v. Cal. State Auto Ass'n. Inter-Ins. Bureau*, 193 Cal. App. 4th 49, 58 (2011)).  As a result, Federal contends, the absence of this exception in Homeowners' policy indicates that their coverage was worse than that of the statute, so the statutory exception must be read into the policy.  *Id.* at 10.

Federal also argues that unresolved coverage issues preclude appraisal.  *Id.* at 11.  Namely, Federal asserts that Homeowners have not fulfilled all of the policy-mandated post-loss duties and obligations.  *Id.*  Federal also states that Homeowners have delayed in responding or failed to

United States District Court
Northern District of California

respond entirely to Federal's request for documents and Examinations Under Oath ("EUOs"), which has made it impossible for Federal to conclude its investigation and adjustment of Homeowners' claim. *Id.* at 12; Freed Decl. (dkt. 32-1) ¶¶ 5–10. Federal requires these documents and examinations as part of its investigation into defenses to coverage to resolve discrepancies between Homeowners' estimates and those of Federal's own consultants. Opp'n at 12. Federal also claims that the fact that it paid its estimate of the guesthouse loss to Homeowners does not prove coverage because this payment was made pursuant to a full reservation of rights, pending the conclusion of the investigation of claims and defenses to coverage. *Id.*

Federal thus argues that submission of the matter to an appraiser would be inappropriate, since the role of appraisers is merely to determine the amount of loss, and this dispute contains matters outside the scope of that limited role. *Id.* at 11 (citing, *e.g.*, *Kacha v. Allstate Ins. Co.*, 140 Cal. App. 4th 1023 (2006)). In addition, Federal cites decisions from California and multiple other states holding that appraisal proceedings should be deferred until plaintiffs fulfill all post-loss duties, and until underlying legal issues relating to coverage are resolved. *Id.* at 13 (citing, *e.g.*, *Tavilla v. Emp. Mut. Cas. Ins. Co.*, No. 06-cv-0764, 2008 WL 2154800, at *3 (Ariz. Ct. App. May 20, 2008)[3]; *Doan*, 195 Cal. App. 4th at 1104). Federal argues that, if appraisal were allowed before the fulfillment of post-loss duties, then these obligations would have no effect, since, after incurring a loss, "a policyholder . . . could immediately invoke appraisal and secure a binding determination" which "could be enforced in the courts," striking "agreed-upon terms . . . from the contract by way of judicial fiat" and rendering them "surplusage." *Id.* at 14 (quoting *U.S. Fid. & Guar. Co. v. Romay,* 744 So. 2d 467, 471 (Fla. Dist. Ct. App. 1999)). Because, as Federal asserts, Homeowners should not be allowed to compel appraisal while evading Federal's multiple requests for additional information related to the claim, appraisal should not be compelled until Federal's investigation is complete. *Id.* at 15.

Federal distinguishes the instant case from *Anderson*, on which Homeowners rely, on the

---

[3] Rule 28(f) of the Arizona Rules of Civil Appellate Procedure, as well as Rule 111(c)(1) of the Rules of the Supreme Court of Arizona, prohibit citation of this unpublished memorandum decision. Those rules are incorporated by this Court's Civil Local Rule 3-4(e). The Court therefore disregards *Tavilla*.

United States District Court
Northern District of California

1    grounds that *Anderson* did not involve a government-declared disaster, adjustment in that case had

2    concluded, and all necessary documents, testimony, and information from the insured had been

3    provided to the insurer.  *Id.*; *see* Freed Decl. ¶ 14.  In a footnote, Federal asks that if the Court is

4    inclined to grant Homeowners' motion, the parties should be directed to meet and confer as to an

5    appraisal protocol.  Opp'n at 12 n.9.

6         In their reply, Homeowners assert that there is no valid basis to incorporate into the policy

7    the government-declared disaster exception in the form fire policy.  Reply (dkt. 34) at 5.  First,

8    contrary to Federal's claim that section 2070 requires all fire policies to comply with the section

9    2071 standard form, Homeowners argue that the statute requires either compliance with the exact

10   standard policy form or "coverage with respect to the peril of fire" which "when viewed in its

11   entirety, *is substantially equivalent to or more favorable to the insured* than that contained in such

12   standard form fire insurance policy."  *Id.* at 7 (quoting § 2070) (emphasis added in Reply).  If, as

13   Federal argues, the policy's omission of the disaster exception has no bearing on coverage, then

14   Homeowners' policy is substantially equivalent to that of the statutory form in section 2071.  *Id.* at

15   8–9.

16        Additionally, even if section 2070's "substantially equivalent" language does in fact

17   require inclusion of the declared-disaster exception in all insurance policies, Homeowners claim

18   that, in California, "statutory provisions may not be read into a policy to the insured's detriment,

19   even where the statutory language appears mandatory."  *Id*. at 5 (quoting *Cal. Fair Plan Ass'n. v.*

20   *Garnes*, 11 Cal. App. 5th 1276, 1305 (2017)).  Thus, regardless of how insureds in the abstract

21   might feel about the government-declared disaster exception, incorporating the exception into

22   Homeowners' policy would work to their detriment, since they would be precluded from utilizing

23   arbitration to bring about an expedient resolution of the dispute with Federal over damage to the

24   Property and cost of repairs.  *Id.* at 8.

25        Moreover, Homeowners point to section 2083, which requires that any policy that

26   impermissibly varies from the form policy of section 2071 is nonetheless "binding upon the

27   issuing insurer."  *Id*. at 9 (quoting § 2083).  Thus, notwithstanding the validity of Homeowners'

28   policy, and even if Federal might not be able to enforce the appraisal provision against them,

United States District Court
Northern District of California

8

Homeowners argue that they are entitled to enforce it as written against Federal.  *Id.*

Homeowners also contend that Federal's argument for delay—that appraisal should be put off until Homeowners provide additional documentation allowing Federal to determine whether coverage exists for Homeowners' claims—is erroneous, because there is no core legal issue to be decided that justifies a delay.  *Id.*  Relying again on *Anderson*, Homeowners reaffirm their position that courts must enforce a valid and applicable appraisal provision regardless of any disputes over coverage and regardless of whether doing so will lead to piecemeal litigation.  *Id.* (citing *Anderson*, 2019 WL 8128570, at *5).

Furthermore, Homeowners point out that there is no "compliance with Policy terms" condition precedent required to trigger appraisal; all that is unambiguously required is that the parties "fail to agree on the amount of the loss," which is exactly what has happened here.  *Id.* at 10.  Homeowners also attack the cases on which Federal relies, arguing that: (1) no California case has ever read into a policy a "cooperation" condition precedent to appraisal; and (2) the out-of-California cases that Federal cites are factually dissimilar to the instant case, as they either do not arise in the context of a motion to compel or contain plaintiffs who, unlike Homeowners, substantially failed to comply with the terms of their policies.  *Id.* at 10–11 & n.14.

Finally, Homeowners contest Federal's depiction of the history of the claim, arguing that their effort to assist Federal in resolving it ranks "among the most extensive in the history of residential insurance claims."  *Id.* at 11.  Homeowners state that they have already provided to Federal multiple sworn proofs of loss, large quantities of testing data, and thousands of photographs relating to the loss and claim.  *Id.* at 12 (citing Schaffer Decl. ¶ 4).  They also assert that, as of the hearing date of this motion, they will have completed the EUOs and complied with Federal's requests for all outstanding documents and testing data.  *Id.*  Thus, they argue, there is no failure to cooperate which justifies delaying appraisal.  *Id.*

## III.     ANALYSIS

### A.     Legal Standard

Under the FAA, a "written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or

United States District Court
Northern District of California

1   transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law

2   or in equity for the revocation of any contract."  9 U.S.C. § 2.  Because arbitration is a matter of

3   contract, the question of arbitrability is, in principle, an issue for judicial determination.  *Howsam*

4   *v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84, (2002).  The court's role in addressing a question

5   of arbitrability is "limited to determining (1) whether a valid agreement to arbitrate exists, and if it

6   does, (2) whether the agreement encompasses the dispute at issue."  *Chiron Corp. v. Ortho*

7   *Diagnostic Sys. Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).  If the court finds that both of these

8   requirements are met, the FAA requires it to enforce the provision in accordance with its terms.

9   *Id.*

10      The FAA "was created to counter prevalent judicial refusal to enforce arbitration

11   agreements . . . and has been interpreted to embody 'a liberal federal policy favoring arbitration.'"

12   *Mortenson v. Bresnan Commc'ns, LLC*, 722 F.3d 1151, 1157 (9th Cir. 2013) (quoting *Moses H.*

13   *Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), and citing *AT&T Mobility*

14   *LLC v. Concepcion*, 563 U.S. 333, 339 (2011)).  Thus, the Supreme Court has held that "any

15   doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether

16   the problem at hand is the construction of the contract language itself or an allegation of waiver,

17   delay, or a like defense to arbitrability."  *Moses H. Cone*, 460 U.S. at 24–25.  Nonetheless,

18   "[a]rbitration is strictly a matter of consent and thus is a way to resolve those disputes—*but only*

19   *those disputes*—that the parties have agreed to submit to arbitration."  *Granite Rock Co. v. Int'l*

20   *Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) (internal quotation marks omitted).  Consequently,

21   courts may apply the "presumption favoring arbitration . . . only where it reflects, and derives its

22   legitimacy from, a judicial conclusion that arbitration of a particular dispute is what the parties

23   intended because their express agreement to arbitrate was validly formed and . . . is legally

24   enforceable and best construed to encompass the dispute."  *Id.* at 303.  Even where such a

25   presumption arises, arbitration should be ordered only if the presumption is not rebutted.  *Id.* at

26   301.  Where the presumption applies, courts "compel arbitration 'unless it may be said with

27   positive assurance that the arbitration clause is not susceptible of an interpretation that covers the

28   asserted dispute.'"  *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 746 (9th Cir. 2014)

1   (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (internal

2   quotation marks and citation omitted)).

3          The Supreme Court in *Granite Rock* explained that the presumption in favor of arbitration

4   "is merely an acknowledgment of the FAA's commitment to 'overrule the judiciary's

5   longstanding refusal to enforce agreements to arbitrate and to place such agreements upon the

6   same footing as other contracts.'"  561 U.S. at 299 (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of*

7   *Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989)).  Put another way, the policy is to "make

8   arbitration agreements as enforceable as other contracts, but not more so."  *Morgan v. Sundance,*

9   *Inc.*, 142 S. Ct. 1708, 1713 (2022) (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388

10  U.S. 395, 404 (1967)).  The Supreme Court acknowledged that it has "never held that this policy

11  overrides the principle that a court may submit to arbitration 'only those disputes . . . that the

12  parties have agreed to submit.' . . .  Nor [has the Court] held that courts may use policy

13  considerations as a substitute for party agreement."  *Granite Rock*, 561 U.S. at 302 (quoting *First*

14  *Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)) (first ellipsis in original).

15         Where the parties "clearly and unmistakably" indicate their intent to do so, an agreement

16  may delegate "threshold issues" of arbitrability, including the "enforceability, revocability or

17  validity" of an arbitration clause, to the arbitrator rather than to a court.  *See Mohamed v. Uber*

18  *Techs., Inc.*, 848 F.3d 1201, 1208–09 (9th Cir. 2016) (citations omitted).

19         As a general rule, courts apply state contract law in determining the validity and scope of

20  an arbitration agreement.  *Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1210 (9th Cir. 1998).

21  Thus, in determining whether there is a valid agreement to arbitrate, "courts must 'apply ordinary

22  state-law principles that govern the formation of contracts.'"  *Id.* (quoting *First Options*, 514 U.S.

23  at 944).

24         It is the burden of the party moving to compel arbitration to prove, by a preponderance of

25  the evidence, that a valid arbitration agreement exists.  *Bruni v. Didion*, 160 Cal. App. 4th 1272,

26  1282 (2008).  If the moving party carries this burden, the opposing party must prove any defense

27  to arbitration by the same burden.  *Id.*  ("The petitioner bears the burden of proving the existence

28  of a valid arbitration agreement by the preponderance of the evidence, and a party opposing the

United States District Court
Northern District of California

petition bears the burden of proving by a preponderance of the evidence any fact necessary to its defense."). "In these summary proceedings, the trial court sits as a trier of fact, weighing all the affidavits, declarations, and other documentary evidence, as well as oral testimony received at the court's discretion, to reach a final determination." *Id.*; *see also Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal. 4th 394, 413 (1996) ("[W]hen a petition to compel arbitration is filed and accompanied by prima facie evidence of a written agreement to arbitrate the controversy, the court itself must determine whether the agreement exists and, if any defense to its enforcement is raised, whether it is enforceable.").

"Under Ninth Circuit precedent, whether an appraisal constitutes arbitration for purposes of the FAA is a question of state law." *Anderson*, 2019 WL 8128570, at *3 (citing *Portland Gen. Elec. Co. v. U.S. Bank Tr. Nat. Ass'n.,* 218 F.3d 1085, 1086 (9th Cir. 2000)). In California, whose laws the parties appear to agree govern this dispute, "[a]n agreement to conduct an appraisal included in a standard fire insurance policy constitutes an 'agreement' within the meaning of Code of Civil Procedure section 1280, subdivision (a), and thus is considered an arbitration agreement subject to the statutory contractual arbitration law." *Kirkwood*, 193 Cal. App. 4th at 57. Accordingly, such an appraisal provision is the proper subject of a motion to compel arbitration under the FAA. *Anderson*, 2019 WL 8128570, at *4.

**B.    The "Government-Declared Disasters" Exception Cannot be Read into the Policy**

The parties appear to agree that the appraisals provision is a valid agreement to arbitrate, but Federal contends that the agreement does not encompass the dispute at issue because the government-declared disasters exception in section 2071 precludes Homeowners from compelling arbitration in this case. Though this particular provision cannot be found in the Policy, Federal maintains, citing language in section 2070 and caselaw applying that statute, that it nevertheless must be read into the Policy as a matter of law.

Federal's argument is unconvincing. Section 2070's incorporation of section 2071's standard form does not apply where the coverage provided for in an insurer's policy is "substantially equivalent to or more favorable to the insured" than that contained in the standard form. § 2070. Federal makes two arguments on this point. First, Federal contends that appraisals

exceptions have no bearing on coverage, since the "favorable coverage" language in 2070 is meant to "prevent insurers from providing less coverage whether by limiting the total amounts recoverable under a policy or expanding the scope of exclusions that bar coverage for certain claims." Opp'n at 8 (citing *Century-Nat'l Ins. Co. v. Garcia,* 51 Cal. 4th 564, 573 (2011)). Additionally, Federal argues that the lack of this exception is actually worse for the insured, since the California legislature added that language in response to insurance companies forcing expensive, time-consuming arbitration to prolong insurance disputes and thereby force insureds to accept low-ball settlement offers. Opp'n at 9.

The problem for Federal is that, either way, the conclusion is the same: statutory incorporation should not occur in the instant case. If the government-declared disasters exception does not in any way affect coverage (and Federal does not contest that the actual coverage is substantially equivalent to the statutory form coverage except for the government disasters exception), then the actual coverage in the Policy is substantially equivalent to that of the standard form and the exception should be left out. Alternatively, if Federal is correct that, in general, the exception benefits insureds, this language still cannot be included via statutory mandate because "statutory provisions may not be read into a policy to the insured's detriment, even where the statutory language appears mandatory." *Utah Prop. & Cas. Ins. Guar. Ass'n v. United Serv. Auto. Ass'n,* 230 Cal. App. 3d 1010, 1019 (2011). If, in the abstract, the exception benefits insureds, then perhaps in most cases it should be read into policies. However, doing so here would be to the detriment of Homeowners, since they would be precluded from utilizing arbitration on which they wish to rely to bring about a speedy resolution of the dispute regarding amount of loss to the guesthouse (and the Property in general).

This "detriment" exception to mandatory statutory incorporation stems from California law's robust protections of the insured. In this state, "serious public policy considerations" are involved in the enactment of statutory insurance regulations. *20th Century Ins. Co. v. Superior Ct.*, 90 Cal. App. 4th 1247, 1255 (2001). This is because the field of insurance so greatly affects the public interest that the industry is viewed as a "quasi-public" business. *Id.* In addition, "the adhesive nature of insurance contracts places the insurer in a superior bargaining position" leading

1    to an "inherently unbalanced" relationship.  *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal. 3d 809,

2    820 (1979).  Thus, statutes pertaining to, and contractual provisions contained within, insurance

3    policies must be construed in light of applicable public policy, promoting the protection of the

4    insured and the public at large.  *Barrera v. State Farm Mut. Ins. Co.*, 71 Cal. 2d 659, 683–684

5    (1969).  In other words, the object of California insurance law generally, and statutory

6    incorporation more specifically, is to protect the insured, not the insurer.  It would not serve that

7    purpose to allow Federal here to leave the government-declared disasters exception out of the

8    Policy it wrote and sold, only to force its inclusion to prevent Homeowners from seeking appraisal

9    of disputed losses.

10          The language of other sections of the California Insurance Code bolsters this point: section

11   2079, in particular, provides multiple avenues through which clauses may be *added* to (but not

12   subtracted from) the standard form, such as by covering subject matter and risks not otherwise

13   covered, assuming greater liability than is otherwise imposed on the insurer, granting insured

14   permits and privileges not otherwise provided, or waiving any of the requirements imposed on the

15   insured after loss. § 2079(a)–(e).

16          Additionally, as Homeowners correctly point out, section 2083 is also relevant here. That

17   provision reads as follows:

18              It is a misdemeanor for any insurer or any agent to countersign or
                issue a fire policy covering in whole or in part property in California
19              and varying from the California standard form of policy otherwise
                than as provided by this article. *Any policy so issued shall,*
20              *notwithstanding, be binding upon the issuing insurer*.

21   § 2083 (emphasis added).

22          This language gives rise to two possible interpretations.  The first is that, as Homeowners

23   urge, nonconforming portions of a policy are nonetheless enforceable.  The alternative is that the

24   policy *as a whole* does not become ineffective even though portions of it differ from the form, but

25   the differing portions are unenforceable.[4]  In what might be the only case ever to address this

26   statute, a California appellate court found that the legislature's purpose in its enactment was "to

27   _____

28   [4] Federal addresses section 2083 in a footnote, characterizing it as "simply mak[ing] it a
     misdemeanor" to sell noncompliant fire insurance policies, but overlooks the provision that
     renders such policies enforceable against insurers.  Opp'n at 10 n.6.

protect the insured against highly technical and involved provisions which were inserted in lengthy and intricate policies by the skilled representatives of insurance companies, which became traps for the unwary and resulted in unjust forfeitures." *Ruffino v. Queen Ins. Co.*, 138 Cal. App. 528, 538 (1934) (addressing the intent of the legislature in establishing a standard policy "and making it a misdemeanor to execute a contract of insurance without compliance therewith," but not specifically citing § 2083). The language from *Ruffino*, in combination with the detriment exception to mandatory statutory incorporation and California insurance law's strong presumption in favor of the insured, points towards the first interpretation, that nonconforming portions are still enforceable at the insured's urging.

Federal's own cited cases do not support Federal's argument that insurers can compel statutory incorporation to the detriment of the insured. For instance, Federal uses *Samson v. Transamerica Insurance Co.* to support its assertion that "where insurance coverage is required by law, the statutory provisions are incorporated into the insurance contract." Opp'n at 7 (quoting 30 Cal. 3d 220, 231 (1981)). The central issue in *Samson* was, under a common-carrier policy which was statutorily required to cover "each vehicle used or to be used in conducting the service performed by each highway carrier," whether the insurer could exclude a pickup truck from coverage. *Samson*, 30 Cal. 3d at 232–236. The insurer argued for exclusion even though the insured had used the truck in service as a highway carrier because the actual policy covered only a tractor-trailer, and only that vehicle was named in the policy. *Id.* at 232. The court held, however, that this policy ran afoul of sections 3631 and 3632 of the Public Utilities Code, which the Public Utilities Commission enforced through General Order Number 100-H. *Id.* at 235. As such, the truck was covered as a matter of law. *Id.*

*Samson* thus applied statutory incorporation at the behest of the insured for their benefit. That case did not, however, speak to whether it can be invoked by an insurer. In addition, because *Samson* did not involve fire insurance, it did not implicate sections 2070 and 2083, which provide extra support for enforcing the terms as written *when invoked by an insured*. *Samson* thus does not support Federal's claim for incorporating the government-declared disasters exception into the Policy.

1    *Wildman v. Government Employees' Insurance Co.*, 48 Cal. 2d 31 (1957), from which the

2    statutory incorporation rule originates, also ruled in favor of the insured and found statutory

3    protections where none existed in the insured's policy.  In that case, the court found that a

4    restrictive endorsement was ambiguous, in violation of sections 402 and 415 of the California

5    Vehicle Code, and thus that the insured's vehicle was covered after an accident.  *Wildman*, 48 Cal.

6    2d at 40.  Statutory incorporation was employed, as in *Samson*, for the benefit of the insured, to

7    find protections which the insured otherwise would not have been afforded.  And as in *Samson*,

8    nothing in this case provides support for Federal's assertion that insurers can utilize statutory

9    incorporation to the detriment of the insured.  Thus, given that both of these cases do not implicate

10   the fire insurance statues at issue here and, moreover, say nothing regarding an *insurer's* ability to

11   invoke statutory incorporation, they do not support Federal's argument.

12   Thus, the rule is that "every insurance policy must be read so as to provide the minimum

13   coverage required by law under a policy of that type, even where the policy on its face fails to do

14   so," but it is simply untrue "that an insurance policy which on its face provides *more* than the

15   minimum coverage required by law must be read so as to eliminate that extra coverage."  *Utah*

16   *Prop. & Cas.*, 230 Cal. App. 3d at 1020 (quoting *Samson*, 30 Cal. 3d at 229–36).  The *Utah* court,

17   notably, was unable to find a single case holding that statutory provisions may be incorporated

18   into an insurance policy so as to limit coverage otherwise afforded by the policy.  That was true in

19   1991, and it remains true today; Federal cites no case, and the Court is unable to find any, in

20   which statutory protections were incorporated at the behest of an insurer and to the detriment of

21   the insured.  To do so would undermine the policies of California insurance law and its statutory

22   incorporation doctrine.

23   **C.    Federal Has Not Shown Circumstances that Would Merit a Stay of Appraisal**

24   Federal's second argument, that this dispute involves unresolved coverage issues which

25   preclude appraisal, is similarly unavailing.  First, it is unclear what Federal means by "unresolved

26   coverage issues."  Opp'n at 7.  Federal has not identified any reason why there might not be

27   coverage, instead asserting that Homeowners have "failed to comply with the Policy's mandated

28   post-loss duties and obligations."  *Id.*  Rather than specifying what those duties and obligations

United States District Court
Northern District of California

16

1    are, however, Federal merely states that it is missing "numerous requested documents" as well as

2    the EUOs.  *Id.* at 8.  As such, Federal asserts, appraisal cannot be compelled in this case, because

3    (1) appraisers cannot resolve coverage disputes and (2) appraisal cannot be triggered until the

4    insureds have fulfilled all post-loss duties and obligations.  The parties dispute the facts here, but

5    even assuming that Federal's version of events is correct, Federal still has not shown

6    circumstances that would merit a stay of appraisal.

7        In making its claims, Federal again relies on the language of section 2071's form policy,

8    which constrains the role of appraisers to appraising "the loss, stating separately actual cash value

9    and loss to each item."  § 2071.  Federal then argues that because "it is certainly not" the function

10   of appraisers "to resolve questions of coverage and interpret provisions of the policy," appraisal

11   here should be either denied or stayed pending resolution of the underlying coverage issues, which

12   are outside the purview of an appraiser's authority.  Opp'n at 15 (citing *Lee v. Cal. Capital Ins.*

13   *Co.*, 237 Cal. App. 4th 1154, 1166 (2015)).

14       The cases Federal cites from outside of California are unpersuasive, as they contain factual

15   scenarios and procedural postures unlike those found here.  For instance, while *Darmer v. State*

16   *Farm Fire & Casualty Co.*, No. 17-cv-04309-JRT-KMM, 2018 WL 4443167 (D. Minn. Feb 26,

17   2018), concerns a motion to compel appraisal, the court, due to a peculiarity of Minnesota law

18   which interprets these motions as requests for "a ruling on the merits of a portion of the claims,"

19   treated that motion as a motion for partial summary judgment, not a motion to compel arbitration.

20   *Darmer*, 2018 WL 4443167, at *3–4; *see also St. Panteleimon Russian Orthodox Church, Inc. v.*

21   *Church Mut. Ins. Co.*, No. 13-cv-1977 (SRN/HB), 2015 WL 283044, at *3 (D. Minn. Jan. 22,

22   2015).  Using a very different legal standard from the one here, the court found that there were

23   genuine issues of material fact regarding whether appraisal could be compelled.  The other cases

24   cited involved significantly more recalcitrance by the insureds than Homeowners have

25   demonstrated here.  *See, e.g.*, *Baldwin Mut. Ins. Co. v. Adair*, 181 So. 3d 1033 (Ala. 2014) (only

26   14 of the approximately 130 plaintiff insureds had provided "even some" of the documentation

27   requested by the defendant insurer, and those that did provide some documentation failed to sit for

28   EUOs); *200 Leslie Condo. Ass'n Inc. v. QBE Ins. Co.*, 965 F. Supp. 2d 1386 (S.D. Fla. 2013)

United States District Court
Northern District of California

(plaintiff insureds failed to provide sworn proof of loss and inventory in addition to not sitting for EUOs).  The bottom line from these cases seems to be that the plaintiffs did not provide enough information to allow the insurer even to ascertain whether there was a disagreement over the value of loss in the first place.

That is not the case here.  Federal asserts that Homeowners have not provided "numerous requested documents necessary to allow Federal to evaluate the claim" and that, despite repeated requests, "necessary testing of [Homeowners'] residence and its contents . . . has not yet been completed."  Freed Decl. ¶¶ 9–10.  In addition, Federal states that Homeowners' EUOs had to be postponed.  *Id.* ¶¶ 5–9.  However, at the motion hearing, Homeowners asserted, and Federal conceded, that these testing results and documents had since been provided and the EUOs performed.  Schaffer Decl. ¶ 4.  Federal now asserts instead they have not yet received, again despite repeated requests, Homeowners' contracts with the original contractor and architect of the Property, as well as a certificate of occupancy.  Homeowners do not dispute this, but agreed at the hearing to provide these documents within two weeks of the hearing date.  Homeowners also state that they have provided, among other things, ten separate sworn proofs of loss, detailed responses to more than fifty letters from Federal seeking additional information, over five thousand photographs relating to the loss and claim, and "massive quantities" of testing data.  *Id.*  To decide the present motion, this Court need not reach the question whether Homeowners have complied with *all* of their post-loss duties and obligations, but it is clear that Homeowners have not refused to cooperate to a degree that would necessitate denying or staying appraisal under the reasoning of *Baldwin* or *200 Leslie*.

Federal's California cases are closer to the mark, but again, while they identify circumstances in which staying appraisal is appropriate, none of those circumstances exist here.  In both *Doan* and *Kirkwood*, classes of insureds accused their insurers of utilizing unfair, excessive depreciation schedules when calculating amount of loss to damaged property.  The plaintiffs thus sought a declaration that their insurers violated California Insurance Code section 2051(b), which sets the method of determining actual cash value of lost or injured property under open fire insurance policies.  In both cases, the insurers moved to compel appraisal of the amount of loss to

1   the disputed property items, but the court stayed the appraisals pending the resolution of the

2   declaratory relief claims and statutory interpretation issues.

3          The upshot of both *Doan* and *Kirkwood* is that when a class of insureds seeks declaratory

4   relief[5] to resolve a statutory interpretation dispute, courts are justified in staying motions to

5   compel appraisal, *particularly when resolution would make the appraisal unnecessary*.  Both the

6   limited scope of appraisers' authority and, perhaps more importantly, concerns over judicial

7   economy undergird these holdings.  As stated in those cases, a "judicial declaration that [the

8   insurer's] interpretation of section 2051 . . . *does not* violate the statute would be the end of the

9   line" as "no appraisal would be necessary"; by contrast, "a contrary judicial declaration would

10  inform the appraisal in this case and would have the meritorious effect of staving off future

11  appraisals and litigation based on the same unlawful behavior."  *Doan*, 195 Cal. App. 4th at 1104

12  (quoting *Kirkwood*, 193 Cal. App. 4th at 63).  In other words, appraisal may be stayed pending

13  resolution of certain legal issues (as opposed to factual issues, such as coverage disputes) when

14  resolving these issues precludes the need for an appraisal in the first place.  This is a narrow

15  exception to the general rule that "the court shall order the petitioner and the respondent to

16  arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists."

17  *Doan*, 195 Cal. App. 4th at 1099 (citing Cal. Civ. Proc. Code § 1281.2(a)).

18         Federal's interpretation of *Doan* and *Kirkwood* is therefore overbroad.  Where, as here, the

19  dispute is factual rather than legal and simply involves whether a loss is covered, "an appraisal

20  panel may assign a value to items as to which coverage is disputed with the disclaimer that the

21  award does not establish coverage or the insurer's liability to pay."  *Anderson*, 2019 WL 8128570,

22  at *5.

23         *Anderson* also distinguishes *Doan* and *Kirkwood* based on distinctions between state and

24  federal law.  *Id.* at *5 n.5.  The *Anderson* court noted that Section 4 of the FAA "leaves no place

25  for the exercise of discretion by a district court, but instead mandates that district courts shall

26  direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been

---

[5] *Kirkwood* explicitly treated the presence of a declaratory relief claim as significant and distinguished other decisions where such a claim was not at issue.  *See* 193 Cal. App. 4th at 60–63.

United States District Court
Northern District of California

signed." *Id.* at *3 (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)).  In other words, the FAA requires a federal court to enforce an appraisal agreement to determine valuation even if there are coverage issues outstanding.  But *Doan* and *Kirkwood* involved the *California* Arbitration Act (CAA), which "provides that, in certain circumstances, a court may stay an order to arbitrate while allowing litigation to proceed." *Id.*  California courts have thus recognized that delaying appraisals may be appropriate in some circumstances, even when arbitration agreements are valid and apply to the dispute.  Because the instant matter, like *Anderson*, is in federal court rather than state court and involves the FAA and not the CAA, this Court does not have discretion to stay the appraisal.  And even if this case were in state court and involved the CAA, the current matter does not present the conditions that California courts considered important (such as declaratory relief claims involving statutory interpretation disputes) in the cases before them.  Thus, it is not clear whether the outcome would differ—a question this Court need not decide.

As Homeowners point out in their briefs, *Anderson* is an apt analogue to this case.  There, Federal, as plaintiff, moved to compel appraisal of a dispute with defendant insureds over the value of a property destroyed by fire.  Defendants argued, like Federal claims here, that Federal was "seeking to compel appraisal of matters beyond the scope of the appraisal provision." *Id.*  The court granted Federal's motion, reasoning that "where, as here, Section 4 of the FAA applies, the Court lacks the authority to adopt the reverse order and litigate coverage first, regardless of any efficiency concerns." *Id.*  This Court sees no discernable factual or legal differences between this case and *Anderson* mandating the opposite conclusion.

Federal argues that, in *Anderson*, the only dispute related to valuation, as adjustment was not ongoing at the time appraisal was demanded, and there were no outstanding requests for documents, testimony, or information by the insurer to the insureds.  Opp'n at 15.  But regardless of whether Homeowners refused to cooperate to the extent that Federal claims, the disputed items must be submitted to an appraiser for valuation under the terms of the parties' agreement, and coverage can be litigated afterwards if necessary.  In so holding, the Court does not suggest that Homeowners are excused from any outstanding obligations they may have under the Policy.

**D.    The Court Declines to Establish an Appraisal Protocol**

Homeowners seek an appraisal protocol based on an ITB framework.  Mot. at 14–16.  By contrast, Federal asks in a footnote that, should this Court be inclined to grant Homeowners' motion, the parties instead be directed to try to negotiate a mutually agreeable framework.  Opp'n at 16 n.9.  This Court agrees with Federal.  Homeowners have relied heavily on *Anderson* in their briefing, so it should come as no surprise to them that this Court "declines to impose procedural rules on the appraisal process." *Anderson*, 2019 WL 8128570, at *6.  As the *Anderson* court noted, "the procedural rules that govern arbitration (or in this case, an appraisal) are generally a matter of the parties' contract, as supplemented by the appropriate federal or state default rules." *Id.*  Homeowners cite no basis for providing this Court with a "free-floating authority to fill any procedural gaps rather than leaving those decisions to the arbitrator or appraisers." *Id.*

However, as part of compelling appraisal, this Court, in deciding which factual disputes are "encompasse[d]" by the appraisal provision, must necessarily instruct the appraisal panel on what to appraise. *Id.* (citing *Chiron*, 207 F.3d at 1130).  This is especially pertinent given that the proposed appraisal initially involved only the guesthouse, but now, in a footnote in their Reply, Homeowners demand appraisal for the entire Property.  Thus, an itemized appraisal consisting of all manmade structures on the Property but excluding soil, landscaping, contents, and loss of use, accompanied by "the disclaimer that the award does not establish coverage or the insurer's liability to pay," will efficiently determine the amount of loss in advance of different conclusions this Court might reach as to Homeowners' coverage under the Policy. *Id.* (quoting *Lee*, 237 Cal. App. 4th at 1174).

In the interests of fairness and efficiency, this Court will provide the parties an additional opportunity to submit either joint or competing proposals for the Court's directions to the appraisal panel, consistent with the Court's rulings in this Order. *See id.* at *7.  The parties may not use these proposals as an opportunity to reargue any of the issues decided here or advocate inclusion or exclusion of items to be appraised.

1    **IV.     CONCLUSION**

2             For the reasons discussed above, Homeowners' motion to compel arbitration is

3    GRANTED.  Pursuant to the contract, the panel of appraisers shall appraise the loss with respect

4    to all manmade structures on the Property, but shall exclude soil, landscaping, contents, and loss

5    of use.  As stated in the hearing minutes, Homeowners must produce to Federal all construction

6    and architectural documents for the Property, whether in their possession or in the possession of

7    contractors or architects, including all contracts with Tricore Construction and/or McMinn &

8    Associates, as well as certificates of occupancy, by July 22, 2022.  By that same date, the parties

9    are instructed to meet and confer regarding the procedures for the appraisal.  The parties must

10   make reasonable efforts to agree on such procedures, but if they cannot agree, they may each

11   submit their proposed procedures to the Court and accompany their respective proposals with

12   argument not to exceed five pages, in accordance with Local Rule 3-4(c)(2), and the Court will

13   determine the procedures to be followed.  These submissions must be filed by August 5, 2022.

14            Pursuant to the contract, each party shall have twenty (20) days from the date of this Order

15   to select their party appraiser.  If, within two weeks of their selection, the appraisers appointed by

16   the parties cannot agree on the third appraiser ("umpire"), the parties may submit simultaneous

17   briefs – not to exceed five pages – on their preferences for the umpire.  Those briefs will be due

18   one week after the two-week period for selection of the umpire expires. The parties agreed at the

19   hearing that, if the party-appointed appraisers were unable to agree on the umpire, the Court would

20   choose.

21             A case management conference will be held on September 16, 2022, at 2 p.m. via Zoom

22   webinar (id. 161 926 0804, password 050855).  The parties shall provide an updated joint case

23   management statement one week in advance of the conference.

24            The parties shall submit a joint status report to the Court by December 16, 2022, and

25   additional joint status reports every ninety days thereafter, updating the Court on the status of the

26   appraisal proceedings.  Within fourteen days of the conclusion of the appraisal proceedings, the

27   parties shall jointly submit to the Court a report regarding the outcome.  *See Anderson*, 2019 WL

28   8128570, at *7 (using a similar procedure following an order granting a motion to compel

United States District Court
Northern District of California

arbitration).

**IT IS SO ORDERED.**

Dated: July 14, 2022

_____
JOSEPH C. SPERO
Chief Magistrate Judge