1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6
7

THOMAS POLLOCK, et al.,

Case No. 21-cv-09975-JCS

Plaintiffs,

8

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANT'S
MOTION TO VACATE APPRAISAL
AWARD AND GRANTING
PLAINTIFF'S MOTION TO DISMISS**

v.

9
10

FEDERAL INSURANCE COMPANY,

Defendant.

Re: Dkt. Nos. 102, 115

11
12
13

**I.      INTRODUCTION**

14

Plaintiffs Thomas Pollock and Eileen Tabios ("Homeowners") bring this action against

15

Defendant Federal Insurance Company ("Federal")[1] seeking compensation under a homeowners'

16

insurance policy issued by Federal on their home in St. Helena, California, which was severely

17

damaged in the 2020 Glass Fire. The Court ordered an appraisal under the policy, which has now

18

been completed.  In the wake of the appraisal, Federal filed an amended answer in which it has

19

asserted a counterclaim against Homeowners for breach of the implied covenant of good faith and

20

fair dealing based on facts Federal says it learned during the appraisal.  Presently before the Court

21

are: 1) Defendant Federal Insurance Company's Motion to Vacate Appraisal Award ("Motion to

22

Vacate"); and 2) Thomas Pollock and Eileen Tabios's Motion to Dismiss Federal Insurance

23

Company's Counterclaim ("Motion to Dismiss").  A hearing on the motions was held on October

24

30, 2024.   For the reasons stated below, the Court GRANTS in part and DENIES in part the

25
26

_____

[1] Plaintiffs refer to Defendant Federal Insurance Company as "Chubb" while Defendant uses the

27

short form "Federal."  The parties have stipulated that both short forms refer to the same entity and
may be used interchangeably.  The Court uses the short form "Federal" except when quoting from

28

briefs and documents that refer to the defendant as "Chubb."

1  Motion to Vacate.  The motion to Dismiss is GRANTED.[2]

2  ## II.    BACKGROUND

3         On September 27, 2020, the Glass Fire caused damage to Homeowners' property in St.

4  Helena ("the Property"), California, including burning a guest house to the ground and causing

5  damage to the main house from smoke and toxic chemicals.  Declaration of Dylan Schaffer in

6  Support of Plaintiffs' Motion to Compel Contractual Arbitration, dkt. no. 27-1 ("Schaffer

7  Arbitration Motion Decl.") ¶¶ 6,9;  Compl. ¶¶ 2-4.  Homeowners sought coverage under an

8  insurance policy for the Property that had been issued to them by Federal ("the Policy"). *See* dkt.

9  no. 1 (Policy).

10        The Policy provided for "Extended Replacement Cost Coverage[,]" described as follows:

11            EXTENDED REPLACEMENT COST COVERAGE is intended to
             provide for the cost to repair or replace the damaged or destroyed
12           dwelling without a deduction for physical depreciation. Many policies
             pay only the dwelling's actual cash value until the insured has actually
13           begun or completed repairs or reconstruction on the dwelling.
             Extended Replacement Cost provides additional coverage above the
14           dwelling limits up to a stated percentage or specific dollar amount.

15  *Id.* at ECF p. 110. It also provided for "Building Code Upgrade Coverage[,]" described as

16  follows:

17            BUILDING CODE UPGRADE COVERAGE, also called Ordinance
             and Law coverage, is an important option that covers additional costs
18           to repair or replace a dwelling to comply with the building codes and
             zoning laws in effect at the time of loss or rebuilding. These costs may
19           otherwise be excluded by your policy. Meeting current building code
             requirements can add significant costs to rebuilding your home. Refer
20           to your policy or endorsement for the specific coverage provided and
             coverage limits that apply.

21  *Id.* at ECF p. 111. The Policy states that "[n]ot all causes of damage are covered by common

22  homeowners or residential fire policies. You need to read your policy to see what causes of loss or

23  perils are not covered." *Id.* at ECF p. 112.

24        Some coverage is subject to a deductible that is charged per occurrence.  *See, e.g., id.* at

25  ECF p. 31.  Coverage also may be reduced if the insured has a "covered partial loss" to their home

26  "and do not begin to repair, replace, or rebuild the lost or damaged property within 180 days from

27  _____

28  [2] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28
    U.S.C § 636(c).

United States District Court
Northern District of California

the date of loss." *Id.* at ECF p. 34.

In a section of the Policy entitled "Payment for a Loss" the Policy defines "reconstruction cost" as "the lesser of the amount required at the time of loss to repair, replace, or rebuild, at the same location, your house or any other permanent structure, using like design, and materials and workmanship of comparable kind and quality." *Id.* at ECF p. 32.

The Policy also contains the following appraisal provision:

> **APPRAISALS**: If you or we fail to agree on the amount of loss, you or we may demand an appraisal of the loss. Each party will select a competent, independent appraiser within 20 days after receiving written request from the other. The two appraisers will select a third, competent appraiser. If they cannot agree on a third appraiser within 15 days, you or we may request that the selection be made by a judge of a court having jurisdiction. Written agreement signed by any two of the three appraisers shall set the amount of the loss. However, the maximum amount we will pay for a loss is the applicable amount of coverage even if the amount of the loss is determined to be greater by appraisal. Each appraiser will be paid by the party selecting the appraiser. Other expenses of the appraisal and the compensation of the third appraiser shall be shared equally by you and us. We do not waive our rights under this policy by agreeing to an appraisal.

*Id.* at ECF p. 104 (Y-5) (hereinafter, "Appraisal Provision").

Disputes arose between Homeowners and Federal over the amount of the covered loss. Schaffer Arbitration Motion Decl. ¶¶ 3-4, 7-14. After Federal refused Homeowners' request for an appraisal of the loss associated with the guesthouse under the Appraisal Provision, Homeowners initiated this action. *Id.* ¶¶ 13-14.

On July 14, 2022, the Court ordered an appraisal "of the loss with respect to all manmade structures on the Property, but . . . exclude[ing] soil, landscaping, contents, and loss of use." Order Granting Motion to Compel Arbitration, dkt. no. 47, at 22; *see also id.* at 21 ("an itemized appraisal consisting of all manmade structures on the Property but excluding soil, landscaping, contents, and loss of use, accompanied by 'the disclaimer that the award does not establish coverage or the insurer's liability to pay,' will efficiently determine the amount of loss in advance of different conclusions this Court might reach as to Homeowners' coverage under the Policy.") (quoting *Lee v. California Cap. Ins. Co.*, 237 Cal. App. 4th 1154, 1174 (2015)).

In its order, the Court rejected Federal's argument that the appraisal should be stayed because there were unresolved disputes relating to coverage, reasoning that "[w]here, as here, the dispute is factual rather than legal and simply involves whether a loss is covered, 'an appraisal

panel may assign a value to items as to which coverage is disputed with the disclaimer that the award does not establish coverage or the insurer's liability to pay.'" *Id.* at 16-20 (quoting *Fed. Ins. Co. v. Anderson*, No. 18-CV-06920-JST, 2019 WL 8128570, at *5 (N.D. Cal. Sept. 27, 2019)). The Court concluded that "regardless of whether Homeowners refused to cooperate to the extent that Federal claims, the disputed items must be submitted to an appraiser for valuation under the terms of the parties' agreement, and coverage can be litigated afterwards if necessary." *Id.* at 20.

The parties subsequently submitted competing protocols for the appraisal. Dkt. nos. 50, 51. The Court adopted the procedures on which the parties agreed and resolved the parties' dispute about required disclosures by the party-selected appraisers, ruling that "Party-selected appraisers shall make appropriate disclosures, including disclosure of all non-trivial business dealings with any party in the last ten years." Dkt. no. 52.

On August 8, 2022, Homeowners' appraiser, Robert Bresee, circulated his disclosures. Declaration of Kurt Brown in Support of Defendant Federal Insurance Company's Motion to Vacate Appraisal Award ("Brown Decl."), Ex. 9 (Bresee disclosures). In his disclosures, Bresee "estimate[d] that ninety-five percent of both [his] jobs and income comes from construction, repair, insurance-loss related contents/pack out/storage, and real estate investment" and that "[t]he other five percent . . . is from consulting, appraisals (both as party appraiser and umpire) and expert testimony." *Id.* ¶ 2. He stated further that "[m]ost of that five percent is from referrals from volunteer work with United Policyholders[,] . . . a nonprofit that assists policyholders with education and other outreach efforts." *Id.*

Bresee stated in his disclosures that he has had no prior business dealings with any party in this case and disclosed the following past dealings with the Kerley Schaffer firm, which represents Homeowners in this action:

> I have no financial interest in or financial relationship with the Kerley Schaffer firm. I have worked as both an expert and appraiser in matters in which the Kerley Schaffer firm was involved as legal counsel. I have broken the matters by year and type of assignment which are: 2017 - expert (2 matters), 2018 - expert (1 matter), 2019 - expert (1 matter), appraiser (2); 2020 - expert (1 matter), appraiser (2); 2021 - expert (3 matters), appraiser (2); 2022 - expert (3 matters),

appraisal (1 ).

> Although I do not keep a record of referrals or related income, I can estimate that less than one percent of my total income over the past five years has come from matters where the Kerley Schaffer firm was involved. I am not dependent on any income from referrals or involvement where Kerley Schaffer represented policyholders. Other than appraisal and expert work, Kerley Schaffer does not refer or recommend me or my companies' construction or any other type of work.

*Id.* ¶ 3.

Federal's party-appraiser, James Wilson, sent his disclosures on August 10, 2022. Declaration of Dylan L. Schaffer in Support of Plaintiffs' Opposition to Motion to Vacate ("Schaffer Decl."), Ex. 7 (Wilson disclosures). Wilson disclosed that he had had no prior dealings with the Homeowners. *Id.* at p. 1. However, he has served as an appraiser for "the Chubb family of companies" (of which Federal is one) in four matters between 2011 and 2019, not including this one. *Id.* at 2.

On August 26, 2022, Federal brought a motion to disqualify Bresee based on his relationship with Kerley Schaffer, arguing that Bresee was not a "disinterested" appraiser under California Insurance Code section 2071 because he has served as a party appraiser for numerous Kerley Schaffer clients in the past. Dkt. no. 63. The Court denied the motion, finding that because the dispute had already been ordered to arbitration, it could intervene to disqualify a party appraiser only under extreme circumstances and Federal had not demonstrated that that standard was met. *Id.* at 8. The Court further found that the appropriate time to challenge Bresee's appointment was after the appraisal was complete. *Id.*

Having disposed of Federal's motion to disqualify, the Court appointed the Hon. Charlotte Woolard to serve as the umpire appraiser. Dkt. no. 70. The appraisal process then went forward, including inspections by the parties' consultants and the appraisal panel and a five-day hearing, from June 20-24, 2023. On March 29, 2024, the panel issued an appraisal award signed by Bresee and Judge Woolard; Federal's appraiser did not sign the award. Brown Decl., Ex. 16 ("Appraisal Award") at 1.

The Appraisal Award concluded that the "[c]ost of repairs to return the Man-Made structures to their pre-loss condition as of the Date of Loss" was $32,122,214.15. *Id.* at 1. It

5

found that the period of construction was 36 months and it valued "[i]nvestigation and pre-construction costs" at S1,048,215.43.  *Id.*  The Appraisal Award incorporates two exhibits; Exhibit A itemizes "value and loss to all man-made structures on the Property, excluding soil, landscaping, contents, and loss of use."  *Id.*   Exhibit B "[i]s the statement of awarded preconstruction and investigative costs."  The Appraisal Award states that "[a]ll values arc determined as of the date of loss, based upon evidence submitted by the parties and the Panel's site inspections."  *Id.*  It contains the following disclaimer:

> This appraisal award is made without consideration or any coverage issues, policy limits, deductible amounts, prior payments, non-covered items, or other provisions of the policy which might affect the insurer's liability. This appraisal award docs not establish coverage or the insurer's liability to pay.

*Id.*

On June 20, 2024, Federal filed its First Amended Answer and Counterclaim, dkt. no. 106 ("Amended Answer"). In support of its counterclaim, it offers the following factual allegations:

1. Plaintiffs filed their Complaint in this case in December 2021, and Federal filed its initial Answer to the Complaint in April 2022. Shortly thereafter, in August 2022, the Court ordered an appraisal of Plaintiffs' alleged losses under the appraisal provision of the insurance policy at issue in this case ("Policy"). Pursuant to the parties' joint stipulation, the Court also stayed these proceedings until 90 days after the appraisal award. The appraisal award was issued on March 29, 2024. On June 5, 2024, the parties appeared before the Court and jointly requested that the Court lift the stay and enter a schedule for the case. The Court agreed and ordered the stay lifted.

2. During the pendency of the stay and the appraisal process, Federal discovered a myriad of new facts and evidence related to the Plaintiffs' claim and Federal's defenses, which were not previously disclosed to Federal, despite Federal's repeated requests for all material information related to its investigation of the Plaintiffs' claim.

3. During the appraisal process, Plaintiffs presented facts and evidence that indicate that much of their claimed damage pre-dated the Glass Fire. For example, during the appraisal, Plaintiffs claimed that the Fire caused "efflorescence," or deposits of salts that are usually white, on walls and other surfaces of the property. To support that claim, Plaintiffs presented testimony at the appraisal hearing from expert Bernard Crimmins, who pointed to various pre- and post-loss photos of the Property that he claimed showed post-fire efflorescence. But analysis conducted by Federal's credentialed thermal-damage experts indicates that this

efflorescence was caused not by the Fire, but by rain and other weather conditions. And pre-loss photos of the property also suggest that this damage pre-dated the Glass Fire. Similarly, Plaintiffs claimed before the appraisal panel that the Glass Fire caused discoloration on walls and surfaces of the property. Again, analysis conducted by Federal's experts likewise confirms that this discoloration was caused not by the Glass Fire, but by weather conditions, organic growth, and other gradual causes.

4. Further, in December 2021, Plaintiffs hired industrial hygienist Dr. C.E. Schmidt to conduct "flux chamber" testing to identify chemical contaminants, such as volatile organic compounds ("VOCs"), in the Main Residence. Dr. Schmidt's flux chamber reports show that there are no VOCs of concern in the Main Residence. On the contrary, the reports indicate that the chemicals found in the Main Residence are consistent with "background" chemicals commonly found in homes and businesses in Northern California—which suggests that the Plaintiffs' losses (if any) were caused not by the Glass Fire, but by pre-existing contamination, which is excluded from coverage under the Policy. Yet Plaintiffs delayed disclosing the results of Dr. Schmidt's testing until months after Dr. Schmidt completed the testing and until after the Plaintiffs' examinations under oath were completed.

5. Dr. Schmidt's findings directly undermine the results of prior testing conducted by Dawn Bolstad-Johnson, another expert hired by Plaintiffs, who purported to identify VOCs in the Main Residence through a less-reliable methodology known as "GASMET" testing, and opined that the main residence was unfit for occupancy as a result. Plaintiffs had access to and knowledge of Dr. Schmidt's testing, which they solicited and financed. But Plaintiffs nevertheless maintained throughout the claims-handling process that the Main Residence was unsafe based on Ms. Bolstad-Johnson's testing. Plaintiffs likewise reiterated these assertions throughout the appraisal process.

6. Plaintiffs also delayed disclosing the results of soil testing conducted on the Property and a report discussing those results, which indicates that the Glass Fire did not cause any VOCs in the soil. Moreover, these results also suggest that any chemicals found in the soil on the property are generally in line with background chemicals commonly found in Northern California. This report and its underlying data were not disclosed to Federal prior to the stay.

7. Further, during the appraisal process, Plaintiffs substantially reduced their claimed losses from those previously claimed in their proofs of loss, in their examinations under oath, and throughout the claims-adjustment process. For example, in their sworn proofs of loss, Plaintiffs initially claimed losses of $110 million, including $77.9 million for the Main Residence, purporting to base these estimates on figures from Tricore Construction and McMinn & Associates. Plaintiffs also affirmed these figures during their examinations under oath. Then, in their March 2023 preliminary appraisal brief, Plaintiffs claimed an

even higher range of "$80 million to $125 million" for alleged losses to manmade structures on the Property. But Plaintiffs only ever offered during the appraisal hearing bids totaling $44.5 million for manmade structures—tens of millions of dollars less than what Plaintiffs claimed in their proofs of loss and examinations under oath. These reduced figures were based on estimates from an entirely different construction company, Wright Residential.

8.  Plaintiffs' abandonment of their prior inflated figures—as soon as those figures were subjected to third-party scrutiny—suggests they never had credible support for those claims in the first place. Moreover, despite Federal's requests during the claims-handling process, Plaintiffs also refused to issue an amended proof of loss for the purported rebuilding costs to account for the reduced claims.

Amended Answer at 11-13, Counterclaim ¶¶ 1-8.

Federal's counterclaim against the Homeowners is based on the allegation that they breached the implied covenant of good faith and fair dealing by:

a.  Claiming damage that existed at the Property before the Glass Fire was caused by the fire;

b.  Delaying disclosure of the results of flux chamber testing performed by Dr. Schmidt, as well as soil testing and other testing performed on the Property, which undermined Plaintiffs' positions, including their position that the main residence was unfit for occupancy;

c.  Maintaining throughout the claims-handling process positions that were inconsistent with Dr. Schmidt's and other experts' findings, despite Plaintiffs' knowledge of those findings; and

d.  Claiming grossly inflated losses in their proofs of loss and examinations under oath without credible support.

Amended Answer at 16-17, Counterclaim ¶ 19.

Federal alleges that it has been damaged by Homeowners' conduct because it "has been forced to investigate claims that are not covered under the Policy, which has required Federal to spend substantial sums to adjust improper claims with improper support (including hiring expert consultants)." Amended Answer, Counterclaim ¶ 21. It further alleges that it was "forced to expend significant sums associated with the appraisal of Plaintiffs' inflated and improper claims." *Id.* Federal seeks compensatory damages and a declaration "that coverage is not available under the Policy for Plaintiffs' claim and that Federal owes no further compensation to Plaintiffs." *Id.*, Prayer.

### III.     MOTION TO VACATE APPRAISAL AWARD

#### A.     Contentions of the Parties

##### 1.     Motion

In the Motion, Federal asks the Court to vacate the Appraisal Award for two reasons. First, Federal contends the award should be vacated under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10(a)(2), and section 2071 of the California Insurance Code, based on Bresee's "extensive work with Plaintiffs' counsel" and because "failure to disclose relevant impression-of-possible-bias information would lead a reasonable person to entertain doubts about his impartiality." Motion to Vacate at 2. Second, Federal contends the award must be vacated because the panel exceeded the scope of its authority under the FAA, 9 U.S.C. § 10(a)(4), "given the terms of the policy, the Court's submission, and California law, by addressing issues of causation, purporting to award investigation costs, and determining a period of actual construction, none of which was properly before the panel." *Id.*

With respect to Bresee's alleged lack of impartiality, Federal cites the FAA's requirement that an arbitration award must be vacated "where there was evident partiality or corruption in the arbitrators, or either of them." *Id.* at 13 (quoting 9 U.S.C. § 10(a)(2)). According to Federal, this provision means that "an arbitrator's dealings that give rise to 'an impression of possible bias' require vacatur of the award." *Id.* (quoting *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 149 1968); and citing *Gebers v. State Farm Gen. Ins. Co.*, 38 Cal. App. 4th 1648, 1653 (1995)). Here, that standard is met, Federal asserts, based on "Bresee's 18 separate engagements with the [Homeowners'] counsel in the five years leading up to this appraisal, plus his undisclosed connections that include ongoing expert litigation work during the pendency of the appraisal, clearly give rise to an impression of possible bias." *Id.* at 14. In particular, Federal points to five additional matters it learned of through publicly available information that involved Kerley Schaffer, including at least one "which was ongoing during the pendency of this appraisal." *Id.* at 11 (citing Brown Decl., Exs. 9, 11-13). Federal contends "there are bound to be even more" and contends Brown's disclosures were insufficient, pointing to Brown's and Kerley Schaffer's refusal to provide more details about the disclosed engagements and to provide disclosures about

1    Bresee's engagements with Kerley Schaffer going back an additional five years. *Id.* (citing Brown

2    Decl., Exs. 10, 15).

3          Federal further contends that even under the "independent standard" contained in the

4    Policy's Appraisal Provision, Bresee's partiality requires that the award be vacated. *Id.* at 14-15.

5    According to Federal, while the Policy requires that party appraisers must be "independent,"

6    California Insurance Code section 2071[3] "imposes a higher standard for the impartiality of

7    appraisers than is expected of arbitrators outside the appraisal context[,]" specifying that party

8    appraisers must be "competent and disinterested[.]" *Id.* at 15 (citing *Mahnke v. Superior Ct.*, 180

9    Cal. App. 4th 565, 579 (2009)). That standard is incorporated into the Policy here, Federal

10

11   _____

12   [3] Section 2071 is a form insurance policy that is, with some exceptions, read into all California fire
     insurance policies, *see* Cal. Ins. Code section 2070. Section 2070 provides:

13
          All fire policies on subject matter in California shall be on the standard form, and, except
14        as provided by this article shall not contain additions thereto. No part of the standard form
          shall be omitted therefrom except that any policy providing coverage against the peril of
15        fire only, or in combination with coverage against other perils, need not comply with the
          provisions of the standard form of fire insurance policy or Section 2080; provided, that
16        coverage with respect to the peril of fire, when viewed in its entirety, is substantially
          equivalent to or more favorable to the insured than that contained in such standard form
17        fire insurance policy.

     Cal. Ins. Code section 2070. The appraisal provision in Cal. Ins. Code section 2071 provides:
18
          In case the insured and this company shall fail to agree as to the actual cash value or the
19        amount of loss, then, on the written request of either, each shall select a competent and
          disinterested appraiser and notify the other of the appraiser selected within 20 days of the
20        request. Where the request is accepted, the appraisers shall first select a competent and
          disinterested umpire; and failing for 15 days to agree upon the umpire, then, on request of
21        the insured or this company, the umpire shall be selected by a judge of a court of record in
          the state in which the property covered is located. Appraisal proceedings are informal
22        unless the insured and this company mutually agree otherwise. For purposes of this
          section, "informal" means that no formal discovery shall be conducted, including
23        depositions, interrogatories, requests for admission, or other forms of formal civil
          discovery, no formal rules of evidence shall be applied, and no court reporter shall be used
24        for the proceedings. The appraisers shall then appraise the loss, stating separately actual
          cash value and loss to each item; and, failing to agree, shall submit their differences, only,
25        to the umpire. An award in writing, so itemized, of any two when filed with this company
          shall determine the amount of actual cash value and loss. Each appraiser shall be paid by
26        the party selecting him or her and the expenses of appraisal and umpire shall be paid by the
          parties equally. In the event of a government-declared disaster, as defined in the
27        Government Code, appraisal may be requested by either the insured or this company but
          shall not be compelled.

28   Cal. Ins. Code section 2071.

United States District Court
Northern District of California

1    contends, and supports vacatur of the award because Bresee's ongoing litigation work for Kerley

2    Schaffer constitutes a "business relationship between the arbitrator and a party, its counsel or a

3    witness[,]" that gives rise to an impression of possible bias.  *Id.* at 15, 16 (citing *Mahnke*, 180 Cal.

4    App. 4th at 579; *Gebers*, 38 Cal. App. 4th at 1652; and *Wheeler v. St. Joseph Hosp.*, 63 Cal. App.

5    3d 345, 369-70 (1976)).

6            Furthermore, Federal asserts, failure to disclose any dealings that might create an

7    impression of possible bias is a further ground for disqualification of an appraiser and applies here

8    because Bresee did not disclose that he served as an expert witness for another Kerley Schaffer

9    clients during the pendency of the appraisal proceeding in this case.  *Id.* at 16 (citing *Gebers*, 38

10    Cal. App. 4th at 1652; *Wheeler*, 63 Cal. App. 3d at 369-70; *Figi v. N.H. Ins. Co.*, 108 Cal. App. 3d

11    772, 777-778 (1980)). Federal argues that "Bresee's possible bias must be evaluated in light of all

12    the circumstances, including Kerley Schaffer's maneuvering at every turn to avoid any disclosure

13    of its connections with Mr. Bresee." *Id.* at 18 (citing *Mahnke*, 180 Cal. App. 4th at 579).   Federal

14    requests that in the event "the Court is not inclined to grant Federal's motion on the available facts

15    regarding Mr. Bresee's bias," it be permitted to "issue a subpoena to Mr. Bresee, seeking a list of

16    all of his prior connections with Plaintiffs and their counsel." *Id.*  at 18 n. 3.  According to

17    Federal, "[g]iven Mr. Bresee's refusal to-date to provide a fulsome disclosure, a subpoena is

18    appropriate to ascertain the full extent of Mr. Bresee's entanglement with Plaintiffs and their

19    counsel." *Id.* [4]

20            Next, Federal argues that the Appraisal Award must be vacated under 9 U.S.C. § 10(a)(4)

21    "because the panel exceeded the scope of its authority by improperly considering causation, by

22    baselessly awarding over $1 million in investigation costs, and by determining a 36-month 'period

23    of actual construction' without the power to do so." *Id.* at 14, 20-24.  Federal points to the

24    language in the Policy, in which the parties agreed only to an appraisal of "the amount of the loss"

25    and argue that they did *not* agree to submit to an appraisal panel any issues of coverage or

---

[4] Federal has attached a proposed subpoena to the Motion to Vacate as Exhibit A. It seeks "documents sufficient to show all engagements between [Bresee] and Plaintiffs or Kerley Schaffer or Covington & Burling, including documents sufficient to show the case name, parties, date, disposition, and nature of each engagement."  Motion to Vacate, Ex. A.

United States District Court
Northern District of California

1    causation, or "factual determinations like the period of actual construction or any consideration of

2    investigation costs." *Id.* at 20. Federal further contends this narrow scope is consistent with

3    California law, which limits appraisal panels to "valuing the amount of 'the loss, stating separately

4    actual cash value and loss to each item.'" *Id.* (quoting *Kirkwood v. Cal. State Auto. Ass'n Inter-*

5    *Ins. Bureau*, 193 Cal. App. 4th 49, 58 (2011) (quoting Cal. Ins. Code § 2071)).

6          According to Federal, California law does not permit appraisal panels to make

7    determinations of causation and an appraisal panel exceeds its authority by making "causation or

8    other coverage determinations." *Id.* at 21 (citing *Guarachi v. Aspen Specialty Ins. Co*., 2021 WL

9    6427658, at *6 (C.D. Cal. July 16, 2021); *Lee*, 237 Cal. App. 4th at 1173). Thus, it asserts,

10   California courts "regularly vacate appraisal awards where a panel exceeds its authority by delving

11   into issues of coverage or causation or by awarding on an issue not submitted to appraisal." *Id.*

12   (citing *Kacha v. Allstate Insurance Co*., 140 Cal. App. 4th 1023, 1036 (2008); *Safeco Ins. Co. v.*

13   *Sharma*, 160 Cal. App. 3d 1060, 1066 (1984); *Lee*, 237 Cal. App. at 1173).

14         Here, Federal contends, the panel decided issues of causation by determining that

15   approximately $32 million is the "[c]ost of repairs to return the Man-Made structures to their pre-

16   loss condition as of the Date of Loss." *Id.* at 16 (citing Brown Decl., Ex. 16 at 1 (Appraisal

17   award)). Because the "Date of Loss" is defined as September 27, 2020, which is the date of the

18   fire, Federal contends the panel must have determined "the Property's pre-loss condition as of the

19   date of the fire—including, in the panel's view, what damage already existed versus what damage

20   was caused by the fire on or after that date." *Id.* This is a disputed issue, however, and goes

21   beyond the scope of the panel's authority, Federal asserts, based on both the Policy language and

22   this Court's order, and requiring that the award be vacated. *Id.* at 23.

23         Federal also argues that the panel exceeded the scope of its authority by "improperly

24   awarding more than $1 million in investigation costs for various consultants hired by the Property

25   Owners to investigate and bolster their claims and by determining a 36-month 'period of actual

26   construction.' " *Id.* at 23-24 (citing *Sharma*, 160 Cal. App. 3d at 1066; *Comprehensive Med. Ctr.,*

27   *Inc. v. State Farm Mut. Auto. Ins*., 2023 WL 7312970, at *4 (C.D. Cal. Sept. 5, 2023)); *see also*

28   Brown Decl., Ex. 16 (Appraisal Award) at Ex. B (chart providing itemized "Investigation and Pre-

United States District Court
Northern District of California

Construction Cost").

### 2. Opposition

In their Opposition, Homeowners argue that Federal applies the wrong standard with respect to disqualification of Bresee, ignoring the "evident bias" requirement under the FAA in favor of the standard under California Insurance Code section 2071 ("competent and disinterested") even though it is undisputed that the FAA applies in this case and the Policy establishes a different standard ("independent"). Opposition at 6-7. Even if the "disinterested" standard applies, however, Homeowners argue that disqualification of Bresee would be improper and that the cases Federal cites in support of its position are distinguishable. *Id.* at 7-9. Furthermore, Homeowners assert, Federal's nondisclosure argument has no merit because Federal "points to no facts that were not disclosed by Mr. Bresee and that, if disclosed, would indicate that Mr. Bresee might reasonably be thought biased in favor of Homeowners and against" Federal. *Id.* at 10. Homeowners assert that Federal "has tried to manufacture bias on the part of Mr. Bresee where there is none." *Id.* at 11. Given that Federal, which is a *party* in this litigation, has retained its appraiser in multiple other cases and has not disclosed any of those cases, Homeowners assert that Federal "cannot be heard to complain that it did not have notice of a few of Mr. Bresee's engagements by Homeowners." *Id.* at 11 (citing Schaffer Decl. ¶ 12).[5]

Homeowners also reject Federal's argument that the Appraisal Award must be vacated because the panel exceeded the scope of its authority. With respect to the panel's determination of

---

[5] In paragraph 12 of her declaration, Schaffer states:

> In or about October 2023, I became aware that James Wilson, party-appraiser for Federal Insurance Company ("Chubb") in this appraisal had been appointed by Chubb in another Federal appraisal, *Vandaveer v. Federal Insurance Company*, JAMS Ref No. 1100117492, a water loss at a home in Corte Madera, California. That appraisal is ongoing. Federal/Chubb is represented in that matter by Jonathan Gross of the firm Mound Cotton Wollan & Greengrass LLP. The insured is represented by Joel Gumbiner of the firm Williams & Gumbiner. The umpire is retired superior court judge Rebecca Westerfield (Ret.). I learned of the new appointment of Mr. Wilson both from Mr. Bresee and from counsel for the insured. As far as I am aware Chubb has never disclosed in this matter— either in the claim or in the litigation—its new appointment of Mr. Wilson in the *Vandaveer* matter.

Schaffer Decl. ¶ 12.

1    causation, Homeowners argue that the "invited error" doctrine bars Federal from arguing that the

2    panel could not make findings as to what damage was caused by the fire because Federal

3    repeatedly asked the panel to make such findings, including in their pre-hearing communications

4    with the panel, their pre-appraisal briefing, the evidence they submitted to the panel and their post-

5    hearing brief. *Id.* at 12-19.

6           Homeowners further contend an appraisal award can be vacated only where the panel's

7    decision was "completely irrational" and it acted in "manifest disregard of the law" – a standard

8    that is not met here as to its findings related to causation because the panel's interpretation of the

9    Policy language, providing for appraisal of "the loss[,]" is plausible. *Id.* at 19-21.  In particular,

10   Homeowners assert, "[u]nder the policy, a 'loss' is an event occurring at a particular time, as

11   shown by numerous policy provisions referring to the 'time of loss.' " *Id.* at 20 (citing as an

12   example Schaffer Decl., Ex. 13 (Policy Excerpt including provision entitled "Payment Basis"

13   stating that "'Reconstruction cost' means the lesser of the amount required at the time of loss to

14   repair, replace, or rebuild . . . . ").  "Accordingly," Homeowners assert, "the appraisal prescribed

15   by the policy is limited to an assessment of the amount of 'the loss' in question—not, as Chubb

16   would have it, an assessment of all damage that may have been accumulated by the property over

17   all time." *Id.*   Homeowners argue further that "[e]ven if the policy were ambiguous as to whether

18   'the loss' refers to a particular event or to all damage[ ] suffered by a piece of property over all

19   time—which it is not—that ambiguity must be construed in the insureds' favor." *Id.* at 20 n. 97

20   (citing *Primary Color Sys. Corp. v. Hiscox Ins. Co.*, 654 F. Supp. 3d 982, 988 (C.D. Cal. 2023)).

21   Because the panel's award is not in manifest disregard of the law, Homeowners assert, it should

22   not be vacated. *Id.*  at 21.

23          Even if the Court were to conclude that the panel exceeded the scope of its authority,

24   Homeowners argue that the error can be remedied under 9 U.S.C. § 11(b) by "leav[ing] the

25   damage and valuation findings intact but remov[ing] the portion of the award referring to the cost

26   of repairs 'to return the Man-Made structures to their pre-loss condition.' " *Id.*  at 21-22.  This

27   result would be appropriate, according to Homeowners, because Federal "does not contend

28   that the Panel did not properly decide the amount of damage to manmade structures or properly

1  value the repairs. Chubb argues only that the Panel erred by finding that the damage resulted from

2  the Glass Fire." *Id.*

3        Finally, Homeowners argue that the panel's award of investigation fees and its 36-month

4  period of restoration ("POR") findings should not be vacated because neither is "completely

5  irrational" or in "manifest disregard of the law." Rather, they argue, the POR is necessary to

6  determine the cost of repairs. *Id.* at 22-23. Homeowners point to the expert report offered in the

7  appraisal proceeding by Federal's expert, Kevin Salvagni, in which Salvagni argued that reduction

8  of the "construction duration" assumption from 42 months to 30 months would significantly

9  reduce the cost of reconstruction. Opposition at 22 (citing Schaffer Decl., Ex. 3 (Salvagni Report)

10  at 205.0051). Homeowners further contend the investigation costs and pre-construction costs listed

11  in Exhibit B of the panel's appraisal were properly included because these costs were a necessary

12  part of rebuilding the manmade structures. *Id.* at 23-24.

13        **3.  Reply**

14        In its Reply, Federal rejects Homeowners' assertion that the "disinterested" standard does

15  not apply, arguing that Homeowners have ignored its argument that California Insurance Code

16  section 2071 is incorporated into every California fire insurance policy, including the Policy here.

17  Reply at 1. Federal reiterates its assertion that Bresee does not meet that requirement due to "the

18  staggering number of connections between Mr. Bresee and Plaintiffs' counsel." *Id.* at 1, 4-6.

19  Even if the FAA's "evident partiality" standard applied, Federal asserts, Bresee should be

20  disqualified because that standard does not require actual bias but instead, is met where the parties

21  have had any dealings that "might create an impression of possible bias," as is the case here. *Id.* at

22  3 n. 1.

23        Federal also rejects Homeowners' argument that the "invited error" doctrine applies to the

24  panel's findings related to causation, arguing that that doctrine only applies "when a party has

25  'both invited the error' and 'intentionally relinquished or abandoned a known right.' " Reply at 7

26  (quoting *United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997) (en banc)). According to

27  Federal, it made clear from the outset that "[s]cope-of-coverage and causation issues (among

28  others) [were] not before the Appraisal Panel [and that] [a]ny reference by Chubb to issues or

United States District Court
Northern District of California

United States District Court
Northern District of California

1  evidence that relate to scope-of-coverage or causation issues [were] not intended to be a

2  concession that the Panel should consider those issues." *Id.* (quoting Supplemental Declaration of

3  Kurt Brown, Esq. in Support of Defendant Federal Insurance Company's Motion to Vacate

4  Appraisal Award ("Brown Supp. Decl."), Ex. 20 (Federal's May 19, 2023 Pre-Hearing Brief,

5  submitted in connection with the appraisal of manmade structures) at 2 n. 1.  Moreover, Federal

6  asserts, Homeowners themselves made arguments about causation, to which Federal needed to

7  respond.  *Id.* at 8.  In doing so, it asserts, it was not "inviting" error but merely protecting its

8  rights lest Homeowners later contended Federal had conceded the issue by its silence.  *Id.*

9  Therefore, Federal argues, it did not "intentionally relinquish" its right to have issues of causation

10  and coverage decided by this Court.  *Id.*  In any event, Federal argues, Homeowners have cited no

11  authority for the proposition that the invited error doctrine even applies in arbitration, "much less

12  an off-the record, 'informal appraisal proceeding' like the one at issue here."  *Id.* at 9-10.

13      Federal also rejects Homeowners' argument that the panel's interpretation of "the loss" in

14  the Policy was plausible and therefore must be upheld.  *Id.* at 12.  According to Federal,

15  "California courts interpreting appraisal provisions virtually identical to the appraisal provision

16  here have consistently held that an appraisal panel's determination of the amount of 'the loss' may

17  not encroach on causation." *Id.* (citing *Kacha*, 140 Cal. App. 4th at 1032, 1035-36).  Furthermore,

18  Federal asserts, "the language set forth in Section 2071 of the California Insurance Code—i.e., the

19  same language that courts have held prohibits appraisers from making 'causation or other

20  coverage determinations,' *Lee*, 237 Cal. App. 4th at 1173—is incorporated into 'every fire

21  insurance policy issued in California,' *Mahnke*, 180 Cal. App. 4th at 575, including the policy

22  here." *Id.* at 13. Federal also contends that by exceeding the scope of the Policy, the panel

23  manifestly disregarded the law, which requires that the award be vacated.  *Id.*

24      As to the panel's award of investigation expenses, Federal argues that "[n]one of these

25  expenses (or any of the others listed in Exhibit B) are required to 'repair, rebuild,

26  or replace' the property, nor are they within the panel's mandate to appraise the loss to manmade

27  structures on the property."  *Id.* at 14.  Federal also asserts that the case cited by Homeowners

28  actually "illustrates that a POR is outside the appraisers' authority."  *Id.* at 14-15 (citing

16

*Comprehensive Med. Ctr., Inc. v. State Farm Mut. Auto. Ins*., 690 F. Supp. 3d 1104, 1117-23 (C.D. Cal. 2023)). Federal argues further that "[e]ven if Plaintiffs are correct that the appraisers may consider a POR to arrive at the amount of the loss, at minimum, the panel lacked the authority to separately award a POR—an issue the parties never agreed to arbitrate, and which Plaintiffs will deploy to support aspects of their claim (such as living expenses) that likewise fall outside the panel's authority." *Id.* at 15.

Finally, Federal argues that the award cannot be saved by modification under 9 U.S.C. § 11(b) because "vacatur is the only appropriate remedy 'if there is evidence of [an appraiser's] partiality.'" *Id.* (quoting *White v. Mayflower Transit, L.L.C.,* 543 F.3d 581, 584 (9th Cir. 2008); and citing *Lucent Techs. Inc. v. Tatung Co*., 379 F.3d 24, 28 (2d Cir. 2004)). Federal further asserts that striking aspects of the award will not be a sufficient remedy because even if the POR and investigative costs might be stricken from the award, the consideration of causation permeates the award and cannot be separated from it. *Id.* (citing *Comedy Club, Inc. v. Improv W. Assocs*., 553 F.3d 1277, 1288 (9th Cir. 2009)).

### B. Whether the Appraisal Award Should Be Vacated on the Basis that Bresee Was Not a Disinterested Appraiser

Before deciding whether Bresee's past and ongoing dealings with Homeowners' counsel, including undisclosed dealings, requires vacatur of the Appraisal Award, the Court must determine whether the applicable standard is the "evident partiality" standard set forth in the FAA, the "disinterested" standard set forth in California Insurance Code section 2071 or the "independent" requirement stated in the Appraisal Provision of the Policy. For the reasons set forth below, the Court concludes that the correct standard is the one set forth in the Policy and that under that standard, vacatur is not appropriate. The Court further concludes that even if the "disinterested" standard applies, Bresee's disclosed dealings with Kerley Schaffer – and his failure to disclose some of his dealings with Kerley Schaffer – do not warrant vacatur.

It is undisputed that the FAA applies to the enforcement of the Appraisal Provision in the Policy issued to Homeowners by Federal, as the Court has already held. *See* dkt. no. 47 at 20. Under the FAA, a court may vacate an arbitration award where "there was evident partiality or

17

corruption in the arbitrators[.]"  9 U.S.C. § 10(a)(2).  To show "evident partiality" in an arbitrator, the party seeking an order vacating the award "either must establish specific facts indicating actual bias toward or against a party or show that [the arbitrator] failed to disclose to the parties information that creates '[a] reasonable impression of bias'." *Lagstein v. Certain Underwriters at Lloyd's, London,* 607 F.3d 634, 645–46 (9th Cir. 2010) (quoting *Woods v. Saturn Distribution Corp.*, 78 F.3d 424, 427 (9th Cir.1996)).

The standard established under the FAA is only a "presumptive rule," however, "subject to variation by mutual consent." *Sphere Drake Ins. Ltd. v. All Am. Life Ins. Co.*, 307 F.3d 617, 620 (7th Cir. 2002).  Thus, for example, in *Sphere Drake*, cited by Federal in its Reply brief, the court found that the parties had agreed to a more lenient standard as to partiality of a party-appointed arbitrator on a three-arbitrator panel, reversing the district court's order vacating an arbitration award based on the "evident partiality" of a party-appointed arbitrator.  307 F.3d at 620.  The Court observed:

> As far as we can see, this is the first time since the Federal Arbitration Act was enacted in 1925 that a federal court has set aside an award because a party-appointed arbitrator on a tripartite panel, as opposed to a neutral, displayed "evident partiality." The lack of precedent is unsurprising, because in the main party-appointed arbitrators are supposed to be advocates.

*Id.*  Indeed, as Federal points out, "courts in the Ninth Circuit regularly enforce different impartiality standards set forth in parties' agreements."  Reply at 3 (citing *ATSA of Cal., Inc. v. Cont'l Ins. Co.*, 754 F.2d 1394 (9th Cir. 1985); *Nieves v. Travelers Cas. Ins. Co. of Am.*, 2015 WL 4484176, at *2-*3 (C.D. Cal. July 20, 2015)).

The inquiry does not end there, however, because there are two different standards that may be drawn from the Policy: the "independent" standard that is actually stated in the Appraisal Provision of the Policy and the more stringent "disinterested" standard that Federal contends is read into the parties' insurance agreement by operation of law, taken from California Insurance Code Section 2071.  Of course, if the "disinterested" standard is read into the Policy, the more lenient "independent" standard will become irrelevant as the appraisers will have to satisfy the stricter requirement.

The parties did not meaningfully address this issue in their briefs, but it is not the first time the Court has encountered the question of incorporation of Section 2071 into the Policy.  In particular, when Federal sought to avoid the appraisal requested by the Homeowners, one of the arguments it made was that the government-declared disaster exception to the appraisal requirement in the form insurance contract under California Insurance Code Section 2071 was incorporated into the Policy and therefore excused Federal from the appraisal requirement.  *See* dkt. no. 47 at 12.  The Court disagreed, however, looking to California Insurance Code Section 2070, which governs incorporation of section 2071's standard form into California insurance policies and specifies that incorporation does *not* occur where the coverage provided for in an insurer's policy is "substantially equivalent to or more favorable to the insured" than that contained in the standard form.  Here, to the extent that Federal seeks to override the "independent" standard set forth in the Policy in favor of Section 2071's "disinterested" requirement, the Court concludes that incorporation of the "disinterested" standard into the Policy is improper because it is detrimental to Homeowners.

*Gebers v. State Farm Gen. Ins. Co*., 38 Cal. App. 4th 1648, 1651 (1995),  a case upon which Federal places great weight, is instructive.  There, the plaintiffs were homeowners who sought coverage for the loss of their home due to fire under a homeowners' policy issued to them by State Farm.  38 Cal. App. 4th at 1650.  As in this case, the homeowner's policy issued to the plaintiffs provided for an appraisal by three appraisers – including two party appraisers, who were required to be "competent, independent" appraisers, and an umpire, who would be selected by the party appraisers or, if the party appraisers could not agree, the court.  *Id.* Following the appraisal, the homeowners asked the court to vacate the award based on the State Farm appraiser's past dealings with State Farm.  The trial court not only denied the motion but also sanctioned the homeowners for what it deemed to be an improper discovery request in connection with its motion to vacate, but the court of appeal reversed.  *Id.*  at 1651, 1653.  The court of appeal found that State Farm could not "dilute" California Insurance Code Section 2071's "disinterested" appraiser requirement and therefore rejected State Farm's reliance on "a line of decisions upholding contracts establishing arbitration conducted by presumably biased representatives selected by the

1    parties." *Id.* at 1653 (citing *Tate v. Saratoga Savings & Loan Assn.*, 216 Cal.App.3d 843, 858

2    (1989)).

3            The court in *Gebers* further held that under Section 2071, State Farm's appraiser was not

4    "disinterested" because at the time of the appraisal, the appraiser was "currently retained by State

5    Farm as an expert witness in two pending court actions." *Id.* at 1652. The court explained, "[t]his

6    ongoing litigation work is a direct pecuniary interest which casts considerable doubt on the

7    appraiser's ability to act impartially" and concluded that this evidence was "more than ample to

8    satisfy the 'impression of possible bias' test" that applies to the "disinterested appraiser

9    requirement. *Id.* The *Gebers* court relied on *Figi v. New Hampshire Ins. Co.*, 108 Cal.App.3d 772

10   (1980) in support of its conclusion. *Id.* at 1652.

11           In *Figi*, the insured sought to have an appraisal award vacated based on an ongoing

12   relationship between the umpire appraiser and the party appraiser retained by the insurance

13   company, which he asserted gave the "appearance of bias." 108 Cal. App. 3d at 774. The court

14   concluded that vacatur was warranted based on the "disinterested" standard in Section 2071 and

15   the duty of good faith and fair dealing owed by the insurer to the insured, "which duty specifically

16   includes conduct of the insurance company during an appraisal procedure." *Id.* at 776. The court

17   held, "[w]e believe that duty, coupled with the statutory mandate the appraiser be disinterested,

18   compels the conclusion that despite the appraiser's more limited function in these cases involving

19   an insurance contract, he is held to a higher standard of impartiality than are arbitrators generally."

20   *Id.* at 777. In *Gebers*, the court acknowledged that *Figi* involved a challenge to the impartiality of

21   an umpire rather than a party appraiser, as in *Gebers*, but found this distinction to be "immaterial"

22   because "although the *Figi* court's focus was upon the umpire, its analysis applied to all members

23   of an appraisal panel." 38 Cal. App. 4th at 1652.

24           *Gebers* and *Figi* support the conclusion that the standard established under Section 2071 as

25   to the impartiality of appraisers is more stringent than the "independent" requirement set forth in

26   the Policy between Federal and Homeowners. Indeed, *Gebers* characterized the same

27   "independent" requirement in the policy in that case as a "dilut[ion]" of Section 2071's

28   "disinterested" requirement. 38 Cal. App. 4th at 1653. This matters because Federal is invoking

1    Section 2071's "disinterested" requirement *to the detriment* of Homeowners, in contrast to *Gebers*

2    and *Figi*, in which Section 2071 was relied upon to protect the insureds.  As discussed above,

3    however, Section 2070 creates an exception to the incorporation of Section 2071 where the

4    coverage provided for in an insurer's policy is "substantially equivalent to or more favorable to the

5    insured."  Thus, to the extent that the "disinterested" requirement of Section 2071 is more

6    stringent than the "independent" requirement in the Policy, the Court concludes that the latter

7    prevails and not the former, as Federal contends.

8         Having reached this conclusion, the Court is faced with scant case authority to guide its

9    interpretation of the "independent" appraiser requirement in the Policy as applied to the challenge

10   Federal brings here based on Bresee's relationship with Kerley Schaffer.   However, the handful of

11   cases from other jurisdictions cited by Homeowners lend support to the conclusion that Bresee's

12   numerous disclosed engagements by the Kerley Schaffer firm (and potentially a handful of

13   additional undisclosed engagements) do not violate the "independent" requirement or require

14   vacatur.  *See* Opposition at pp. 8-9 (citing *White v. State Farm Fire & Casualty Co*., 809 N.W.2d

15   637, 639 (Mich. Ct. App. 2011);  *Rios v. Tri-State Ins. Co*., 714 So. 2d 547, 549 (Fla. Dist. Ct.

16   App. 1998);  *Royal Crest Dairy, Inc. v. Continental West Insurance Co*., 2017 WL 6819886 (D.

17   Colo. Dec. 18, 2017), report and recommendation adopted, 2018 WL 317465 (D. Colo. Jan. 8,

18   2018); *Gardner v. State Farm Lloyds*, 76 S.W.3d 140, 143 (Tex. App. 2002)).

19        In *White* and *Rios*, for example, the courts interpreted similar "competent, independent"

20   appraiser requirements (the former under a Michigan statute and the latter under the terms of the

21   insurance policy) and found that party appraisers could be "independent" even if they were

22   working under a contingency-fee agreement as an adjuster for that party.  *White*, 293 Mich. App.

23   at 426; *Rios*, 714 So. 2d at 549.  In both cases, the courts noted that the term "independent" was

24   not defined in the statute (*White*) or contract (*Rios*) and that there appeared to be no case law that

25   was on point.  Therefore, they looked to case law from other jurisdictions as well as dictionary

26   definitions.  The *Rios* court found:

27                  Dictionary definitions of "independent" include "not subject to
                    control, restriction, modification, or limitation from a given outside
28                  source," Black's Law Dictionary 770 (6th ed.1990), and "not subject

                                              21

to control by others...." Webster's Third New International Dictionary 1148 (1986). We conclude that this language calls for the appointment of an outside appraiser, unaffiliated with the parties. This means that a party cannot appoint himself, herself, or itself, *see Finkelstein v. Smith*, 326 So.2d 39, 40 (Fla. 1st DCA 1976), nor can a party appoint the party's employee. If a firm is designated to do the appraisal, it must be unaffiliated with the appointing party, that is, it cannot be a firm in which the appointing party has an ownership interest.

714 So. 2d at 549.

Similarly, the court in *White* found that the party appraiser was "independent" under the standard set forth in *Rios*, despite a contingent fee agreement with the party with respect to his work as an adjuster, because the appraiser "clearly [was] ' "not subject to control, restriction, modification, or limitation" ' by anyone." 293 Mich. App. at 428 (citing *Auto-Owners Ins. Co. v. Allied Adjusters & Appraisers, Inc.*, 238 Mich. App. 394, 400-401 (1999) (quoting Black's Law Dictionary (6th ed.)). The court explained further, "He is not an employee of plaintiffs or under any other legal duty to them with the exception of the public-adjusting contract. As such, he is capable of exercising his own judgment regarding the value of the loss in this proceeding and should not be disqualified to serve as plaintiffs' appraiser in this dispute under the "competent [and] independent" standard set forth in [the statue]." *Id.*

In *Gardner*, a case involving coverage of damage from a hailstorm, the court found that the insurance company's party appraiser was a "competent, independent appraiser" under the insurance policy even though he had written training programs for the insurer, had long served as a consultant to the insurer regarding the evaluation of hailstorms, and had been paid by various of the insurer's affiliated companies for assignments across the United States over seven years. 76 S.W.3d at 143. Applying a standard similar to the one applied in *Rios* and *White*, the court based its holding on findings that the insureds "presented no evidence that State Farm influenced or exercised control over [the party appraiser][;] . . . no evidence that [the appraiser] ever was an employee of State Farm or had a financial interest in the claim[;] [and no] evidence relate[d] to [the appraiser], the [plaintiffs'] claim, or the particular hailstorm. Instead, their evidence involve[d] an arm's length business relationship, which is unrelated to this specific claim, between various State Farm companies and [the appraiser's employer]." *Id.*

Finally, in *Royal Crest Dairy*, the court rejected a challenge to the insured's party appraiser

United States District Court
Northern District of California

similar to Federal's challenge here. In that case, the insurance policy provided that each party would "select a competent, independent appraiser" and the party appraisers (or the court if they could not agree) would select an umpire. 2017 WL 6819886, at *3. The insurer argued that the party appraiser selected by insureds was not "competent and independent" in light of his "longstanding business relationships with Plaintiff's attorneys[,]" but the court disagreed. *Id.* at *2-3. The court looked to the Black's Law Dictionary definition of "independent" as " '1. Not subject to the control or influence of another; 2. Not associated with another (often larger) entity; 3. Not dependent or contingent on something else.' " *Id.* at * 4 (quoting Black's Law Dictionary (10th ed. 2014)). Applying that definition, the court found that under the plain meaning of the policy language, the insureds' party appraiser was "independent" because he was not "subject to the control of Plaintiff, associated with Plaintiff, or dependent on Plaintiff." *Id.*

All of these cases suggest a plain-meaning interpretation of the "independent" requirement at issue here that looks to whether the party appraiser is subject to the control of, associated with, or dependent on the party who designated that appraiser. Here, there is no evidence that Bresee falls within this definition vis-à-vis the Homeowners in this case. Nor has Federal demonstrated that additional undisclosed engagements of Bresee by Kerley Schaffer would meet this standard. Rather, Federal has, at most, demonstrated an ongoing business relationship between Bresee and Kerley Schaffer that accounts for a negligible portion of Bresee's income and does not render Bresee financially dependent on Kerley Schaffer. Under the plain meaning of the terms of the Policy, this is not sufficient to establish that Bresee was not an "independent appraiser[,]" as required under the Policy.

The single case cited by Federal in support of a contrary conclusion, *see* Reply at 4 n. 3 (citing *Holt v. State Farm Lloyds*, No. CA 3:98-CV-1076-R, 1999 WL 261923, at *4 (N.D. Tex. Apr. 21, 1999)), is distinguishable. In that case, the court found that there was a material issue of fact as to whether State Farm's party appraiser was "unbiased and free of control to arrive at [his] own evaluation of the loss" where the insured presented evidence that the party appraiser received *a quarter* of his income from State Farm for appraisal work. 1999 WL 261923, at *4. Here, the income that is at issue is not from a party but instead, the law firm that represents a party, in

23

1    contrast to *Holt*. Furthermore, there is no evidence that the income Bresee has received in

2    connection with his work for Kerley Schaffer over the years constitutes a substantial portion of his

3    income; rather, his disclosures indicate that that income constitutes a negligible portion of his

4    overall income, as noted above. Therefore, *Holt* is not on point.

5          The Court further finds that even if Section 2071's "disinterested" standard applied, it

6    would be satisfied under the facts here. In interpreting this requirement, California courts have

7    taken as a starting point "the United States Supreme Court's benchmark that impartial arbitrators

8    must disclose to the parties any dealings that might 'create an impression of possible bias.' "

9    *Mahnke*, 180 Cal. App. 4th at 579 (2009) (quoting *Commonwealth Coatings Corp. v. Cont'l Cas.*

10    *Co.*, 393 U.S. 145, 149 (1968)). In *Commonwealth*, the Court vacated an arbitration award under

11    Section 10 of the FAA where the contract called for each of the parties to appoint an arbitrator and

12    those two party arbitrators to appoint a "supposedly neutral" third arbitrator. 393 U.S. at 146. The

13    third arbitrator in that case, however, had provided consulting services to one of the parties to the

14    arbitration and that party's "patronage was repeated and significant, involving fees of about

15    $12,000 over a period of four of five years, and . . . even . . . include[d] the rendering of services

16    on the very projects involved in this lawsuit." *Id.* at 146. Furthermore, this business relationship

17    between the third arbitrator and the party was not disclosed to the other party to the arbitration

18    until after an award was made. *Id.* Under those circumstances, the Court concluded:

19        It is true that arbitrators cannot sever all their ties with the business
       world, since they are not expected to get all their income from their
20        work deciding cases, but we should, if anything, be even more
       scrupulous to safeguard the impartiality of arbitrators than judges,
21        since the former have completely free rein to decide the law as well
       as the facts and are not subject to appellate review. We can perceive
22        no way in which the effectiveness of the arbitration process will be
       hampered by the simple requirement that arbitrators disclose to the
23        parties any dealings that might create an impression of possible bias.

24    *Id.* at 148-149.

25          In *Mahnke*, the court considered how the standard articulated in *Commonwealth* applied to

26    disqualification of party appraisers under Section 2071. As a preliminary matter, it found that the

27    "informal proceedings" called for under the appraisal section of Section 2071 must conform to the

28    California Arbitration Act but further concluded, in light of amendments to that Act in 2001, that

United States District Court
Northern District of California

24

United States District Court
Northern District of California

there is no "automatic and unlimited right of disqualification" based on the disclosures of party appraisers, in contrast to the disclosure obligations imposed on "umpires." *Mahnke*, 180 Cal. App. 4th at 578. The court went on to address the circumstances under which there may be an "impression of possible bias" by a party appraiser that gives rise to a disclosure obligation, explaining that that inquiry is governed by an objective standard based on a hypothetical reasonable person. *Id.* at 579-580. Finally, it addressed whether the relationship between the party appraiser and the party's counsel in that case required disqualification of the appraiser and found that it did not. *Id.* at 580-582.

As to the disclosure requirement, the *Mahnke* court observed that "[a] frequent cause for an impression of possible bias is the existence of a present or past business relationship between the arbitrator and a party, its counsel or a witness." *Id.* at 579 (quoting *Betz v. Pankow*, 31 Cal. App. 4th 1503, 1508 (1995)). The court explained that " '[s]uch a relationship suggests a pecuniary interest on the part of the arbitrator or that the arbitrator will place unusual trust or confidence in the party with whom the relationship existed, thus giving the arbitrator reason to favor the party for reasons wholly unrelated to the merits of the arbitration.'" *Id.* (quoting *Betz*, 31 Cal.App.4th at 1508–1509). The court cautioned, however, that "[t]he business relationship . . . must be substantial." *Id.* It went on to hold that "where the arbitrator has a substantial interest in a firm which has done more than trivial business with a party, that fact must be disclosed[,]" adopting the reasoning of Justice White in the his concurring opinion in *Commonwealth*. *Id.* (quoting *Commonwealth*, 393 U.S. at 151-152 (White, J. concurring)). Echoing Justice White, the court noted that "[i]f arbitrators err on the side of disclosure, as they should, it will not be difficult for courts to identify those undisclosed relationships which are too insubstantial to warrant vacating the award." *Id.*

Addressing the question of whether the party appraiser in *Mahnke* was "disinterested" under the standard discussed above, the court found that he was. Although the facts in *Mahnke* are not entirely on point, the reasoning offered by the court in that case is instructive. There, the insurer argued that the party appraiser selected by the insureds was not "disinterested" based on the appraiser's disclosure that he was currently engaged as a construction expert for another client

of the law firm representing the insureds, although he also stated that he lacked any financial interest in the outcome of the proceeding and had no previous dealings with the parties." 180 Cal. App. 4th at 571.

In rejecting this argument, the court distinguished *Gebers*, in which "the court concluded vacation of an arbitration award was required because the appraiser selected by State Farm had failed to disclose he was also under retainer to State Farm as an expert witness in two other litigated matters[,]" on the basis that in *Gebers*, "State Farm was a party in the appraisal proceeding and had a 'substantial and continuing business relationship' with the appraiser" whereas in *Mahnke*, the appraiser was an expert witness in a separate action by a *non-party* to the appraisal and therefore, there was no "substantial and continuing business relationship" between the party appraiser and the party that had designated that appraiser. *Id.* at 581. The same is true here.

Next, the court distinguished *Wheeler v. St. Joseph Hospital,* 63 Cal.App.3d 345, 133 (1976), upon which Federal also relies here. The court explained:

> In *Wheeler* the court vacated an award because the sole physician member of a neutral medical malpractice arbitration panel had failed to disclose his concurrent engagement as an expert witness by defense counsel. [63 Cal. App. 3d at 370–371] In such a situation one could reasonably expect the physician to wield a disproportionate influence over the other members of the panel. In contrast, in [*Michael v. Aetna Life & Cas. Ins. Co*., 88 Cal. App. 4th 925 (2001)], the court concluded the party-selected appraiser's incidental provision of services on several other occasions to the insurer did not require his disqualification. [*Id*. at 943].

*Id.* at 581. The same reasoning also applies to the facts here and therefore, Federal's reliance on *Wheeler* is misplaced.

The court in *Mahnke* concluded:

> Imposing overly rigorous standards on party-selected appraisers in informal proceedings under Insurance Code section 2071 would be both short-sighted and naïve about the realities of modern litigation practices. Viewed as a whole, [the appraiser's] resume  demonstrates that he possesses experience qualifying him to act as a "competent" appraiser and that his broad client base distinguishes him from those professionals who regularly perform services for particular clients (or attorneys) and become financially dependent on them.

1    *Id.* at 581-582.

2        As *Mahnke* demonstrates, the question of whether there is an "impression of possible bias"

3    is a fact-specific inquiry.  There is no bright-line rule that prohibits party appraisers from

4    accepting unrelated engagements by clients represented by the same law firm, even if the

5    engagement occurred simultaneously with the appraisal.  Moreover, California courts generally

6    are more likely to find an appearance of bias based on an ongoing relationship between an

7    appraiser and a party than on a business relationship between the appraiser and a party's counsel.

8    Here, Bresee has no ongoing business relationship with the Homeowners or any other relationship

9    with Homeowners that would give rise to an appearance of bias. Furthermore, his disclosures

10   reflect that the income he derives from working as a party appraiser (and by extension, as a party

11   appraiser for Kerley Schaffer clients) is negligible relative to his total income, even though he has

12   worked on at least eighteen other cases with that firm since 2017 *See* Brown Decl., Ex. 9 (Bresee

13   Disclosures) ¶ 3 (estimating "that less than one percent of [Bresee's] total income over the past

14   five years has come from matters where the Kerley Schaffer firm was involved.").  Nor is there

15   any indication that further discovery will reveal anything more than some additional engagements

16   with Kerley Schaffer that are unrelated to this case.  Therefore, the Court concludes that Bresee

17   meets the "disinterested" standard under Section 2071.

18        Accordingly, the Court rejects Federal's argument that the Appraisal Award should be

19   vacated because of an appearance of bias on the part of party appraiser Bresee.

20   **C.    Whether the Appraisal Award Should be Vacated Because the Panel Exceeded
         the Scope of the Appraisal**

21

22        **1.    Causation Findings**

23        Federal contends the panel exceeded the scope of its authority by making findings related

24   to causation, namely, the finding that certain damage was caused by the Glass Fire rather than by

25   other causes. The Court disagrees.

26        In construing the FAA, the Supreme Court has made clear that "[a]rbitration is strictly a

27   matter of consent . . .  and thus is a way to resolve those disputes—but only those disputes—that

28   the parties have agreed to submit to arbitration."  *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561

United States District Court
Northern District of California

1    U.S. 287, 299 (2010) (internal quotations and citations omitted).   As a general rule, courts apply

2    state contract law in determining the validity and scope of an arbitration agreement. *Wolsey, Ltd.*

3    *v. Foodmaker, Inc*., 144 F.3d 1205, 1210 (9th Cir. 1998). Thus, in determining whether there is a

4    valid agreement to arbitrate, "courts must 'apply ordinary state-law principles that govern the

5    formation of contracts.'" *Id.* (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944

6    (1995)).

7        Here, the appraisal provision in the Policy provides for an appraisal to determine "the

8    amount of loss."  Schaffer Arbitration Motion Decl., ¶¶ 3-4, 7-14; dkt. no. 1-1 (Policy) at ECF p.

9    104, Y-5.  As Homeowners point out, references to a "loss" throughout the Policy are linked to the

10   occurrence of a specific event that occurred at a particular time.  *See, e.g.,* dkt. no. 1-1 (Policy) at

11   ECF p. 30 (defining an "occurrence" as "a loss or accident to which this insurance applies

12   occurring within the policy period."; *id.* at ECF p. 31 (under the heading "Payment for a Loss[,]"

13   providing that some coverage is subject to a deductible that "applies to each occurrence"); *id.* at 32

14   (under the subheading "Payment Basis" in the "Payment for a Loss" section,  defining

15   "reconstruction cost" as "the lesser of the amount required *at the time of loss* to repair, replace, or

16   rebuild, at the same location, your house or any other permanent structure, using like design, and

17   materials and workmanship of comparable kind and quality.") (emphasis added).    On the other

18   hand, there is nothing in the Policy that suggests that "loss" means damage to the Homeowner's

19   insured property untethered to any specific event, as Federal contends.  Indeed, such an

20   interpretation of the Policy language would be nonsensical.

21        By extension, the appraisal panel could not have determined the amount "of the loss with

22   respect to all manmade structures on the Property," as it was charged by this Court to do, without

23   identifying the specific occurrence that gave rise to the damage it was appraising, namely, the

24   Glass Fire. Even assuming the panel's appraisal implies that it found that certain facts were true,

25   *e.g*., that the damage at issue was caused by the Glass Fire, the panel expressly disclaimed making

26   any such findings.  In particular, as discussed above, the Appraisal Award contains a disclaimer

27   stating that the award "is made without consideration or any coverage issues, policy limits,

28   deductible amounts, prior payments, non-covered items, or other provisions of the policy which

might affect the insurer's liability" and "does not establish coverage or the insurer's liability to pay[.]"  As the issue of whether the damage the panel appraised was caused by a covered occurrence or by some other cause is a coverage issue, the panel disclaimed any such finding. Therefore, the findings of the panel do not run afoul of California law.  *See Lee v. California Cap. Ins. Co*., 237 Cal. App. 4th at 1170 ("an appraisal panel may assign a value to items as to which coverage is disputed with the disclaimer that the award does not establish coverage or the insurer's liability to pay").  Accordingly, the Court concludes that the panel did not act improperly to the extent that it appraised the loss as the "[c]ost of repairs to return the Man-Made structures to their pre-loss condition as of the Date of Loss."

Nonetheless, it is also apparent that under California law, where there are disputes about causation of loss in the context of insurance coverage case, the parties are entitled to have those disputes resolved by the court.   For example, in *Safeco Ins. Co. v. Sharma*, the insured sought coverage for the theft of 36 paintings that he claimed were a matched set of "Rembrandt-quality paintings" and an appraisal was carried out under the appraisal provision of the policy, which was substantially the same as the one contained in the form policy in California Insurance Code section 2071. 160 Cal. App. 3d 1060, 1062-1063 (1984).  In reaching a valuation of "the loss[,]" "the panel concluded the paintings were an unmatched set, rather than a matched set." *Id.*  at 1065. The court found, however, that "this determination exceeded the appraisers' powers," explaining as follows:

> When an insurer disputes an insured's description in identification of the lost or destroyed property, it necessarily claims the insured misrepresented —whether innocently or intentionally—the character of the loss in filing a proof of loss. In turn, this claim opens the door to allegations of fraud. Where [sic] an insurer permitted to include the former issue within the scope of an appraisal, a determination in the insurer's favor would foreclose a court from determining one essential element of fraud in any subsequent litigation. Certainly, an insurer is free to litigate whether the insured has misrepresented what he lost but it is beyond the scope of an appraisal. Petitioner repeatedly confuses the question of identity of the property with those questions relating to value, e.g., quality or condition.

*Id.*  at 1066.

In *Kacha*, the court applied the reasoning of *Sharma* to an appraisal of fire damage caused

by the Cedar Fire. *Kacha v. Allstate Ins. Co*., 140 Cal. App. 4th 1023, 1032-1033 (2006).  The insurer argued before the appraisal panel that it should award "nothing for items that were damaged but, according to [the insurer], not in the Cedar Fire" and the panel did, in fact, assign a zero value to numerous items that the insured claimed were damaged in the fire. *Id.* at 1035-1036. The trial court confirmed the award, concluding that the insured had waived his right to rely on *Sharma* and the form policy in California Insurance Code section 2071 and therefore, that the panel had properly determined issues of causation. *Id.* at 1031.  The court of appeal reversed, finding that the insured had not waived the protections of *Sharma* and Section 2071 and that the panel had exceeding the scope of its authority by making coverage determinations as to items where there was evidence of damage but the panel awarded nothing based on its causation findings. *Id.* at 1037.  Therefore, the court reversed the trial court's confirmation of the award directed the trial court to vacate the arbitration award. *Id.*

Homeowners attempt to avoid *Kacha* on the basis that that case was decided under the California Arbitration Act ("CAA"), *see* Opposition at 21 n. 101, but do not explain why this distinction matters. Indeed, numerous courts appear to have looked to California law limiting the scope of appraisals when applying the FAA. *See, e.g., Guarachi v. Aspen Specialty Ins. Co*., No. CV 21-1422 PA (MAAX), 2021 WL 6427658, at *6 (C.D. Cal. July 16, 2021); *Fed. Ins. Co. v. Anderson*, No. 18-CV-06920-JST, 2019 WL 8128570, at *5 (N.D. Cal. Sept. 27, 2019); *Turnstone Consulting Corp. v. U.S. Fid. & Guar. Co*., 2007 WL 1430033, at *1, *4 (N.D. Cal. May 15, 2007).

Homeowners also attempt to distinguish *Kacha* on the basis that in that case, certain items were assigned a zero value, in contrast to the award here.  Opposition at 21, n. 101.  That distinction, however, merely highlights the fact that in this case, the causation determinations by the appraisal panel were in favor of the Homeowners whereas in *Kacha*, they were in favor of the insurer.  Nonetheless, the reasoning of *Kacha* and *Sharma* appear to apply here to the extent that those cases found that under California law, appraisal panels charged with evaluating a "loss" cannot make determinations of causation, which constitute coverage determinations and therefore are outside of the scope of the appraisal. Therefore, the Court concludes that under the terms of the

1    Policy, construed in accordance with California law, the causation findings that are embedded in

2    the panel's appraisal award may be challenged before this Court, which is charged with deciding

3    such issues under the cases discussed above.

4        The Court finds unpersuasive Homeowners' assertion that the panel's causation findings

5    cannot be revisited because Federal invited the panel to address this issue during the appraisal

6    proceedings.  "The invited error doctrine holds that '[O]ne may not complain on review of errors

7    below for which he is responsible[.]' " *Sovak v. Chugai Pharm. Co*., 280 F.3d 1266, 1270 (9th

8    Cir.), opinion amended on denial of reh'g, 289 F.3d 615 (9th Cir. 2002) (quoting *Deland v. Old*

9    *Republic Life Ins. Co*., 758 F.2d 1331, 1336–37 (9th Cir.1985) (internal quotation marks

10   omitted)).  Under this doctrine, if a party "has both invited the error, and relinquished a known

11   right, then the error is waived and therefore unreviewable."  *United States v. Perez*, 116 F.3d 840,

12   845 (9th Cir. 1997).

13       There is no doubt – and likely no dispute – that Federal presented both arguments and

14   extensive evidence related to causation to the arbitration panel. It is, therefore, perhaps

15   disingenuous of Federal to now argue that the appraisal panel erred in making findings on

16   causation.  Nonetheless, Federal stated in its pre-hearing brief that "Scope-of-coverage and

17   causation issues (among others) are not before the Appraisal Panel" and that "[a]ny reference by

18   Chubb to issues or evidence that relate to scope-of-coverage or causation issues is not intended to

19   be a concession that the Panel should consider those issues."  Because Federal expressly reserved

20   the right to object to findings of causation and scope of coverage by the panel, the Court concludes

21   that the invited error doctrine does not apply under the facts here.[6]

22       Nor is the Court persuaded by Homeowners' reliance on the "manifest disregard" standard

23   that applies to 9 U.S.C. § 10(a)(4)[7] to argue that the panel's determination of causation should be

24   _____

25   [6] The Court assumes, without deciding, that the invited error doctrine may be applied to appraisal
     proceedings under appropriate circumstances.  The Court notes, however, that Homeowners have

26   not cited any authority indicating that it is appropriate to apply the doctrine in that context.  Given
     the informal nature of appraisal proceedings under California law, including the fact that the

27   proceedings (including this one) are not reported, the Court questions whether it would be
     appropriate to extend the doctrine to such proceedings.

28   [7] 9 U.S.C. § 10(a)(4) provides that the court may vacate an arbitration award "where the arbitrators

United States District Court
Northern District of California

United States District Court
Northern District of California

1   upheld.  In support of this argument, Homeowners rely on a single case, *Lagstein v. Certain*

2   *Underwriters at Lloyd's*, London, 607 F.3d 634 (9th Cir. 2010).  Opposition at 19-20.  In that case,

3   the trial court vacated an arbitration award on the basis of the large size of the award, which it

4   found "shocked the conscience" and was in "manifest disregard of the law" under 9 U.S.C. §

5   10(a). 607 F.3d at 640.  The Ninth Circuit set forth the following standards for vacating an

6   arbitration award under Section 10(a)(4) of the FAA:

7               Section 10 permits vacatur "where the arbitrators exceeded their
                powers." 9 U.S.C. § 10(a)(4). This is a high standard for vacatur; "[i]t
8               is not enough ... to show that the panel committed an error—or even
                a serious error." *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, ——
9               U.S. ——, 130 S.Ct. 1758, 1767, 176 L.Ed.2d 605 (2010).
                "[A]rbitrators 'exceed their powers' ... not when they merely interpret
10              or apply the governing law incorrectly, but when the award is
                'completely irrational,' or exhibits a 'manifest disregard of law.' "
11              *Kyocera*, 341 F.3d at 997 (citations omitted).

12  *Id.* at 641. The court went on to hold that the district court had erred in vacating the award based

13  on "manifest disregard" of the law because "the district court found 'manifest disregard of the

14  law' without citing any applicable law that the panel recognized and ignored." *Id.* at 641.  In

15  contrast, Federal's assertion that the panel exceeded the scope of its authority by making causation

16  findings that are specifically prohibited under California law.  Therefore, the Court rejects this

17  argument.

18                      **2.  POR Determination**

19          Federal also challenges the panel's finding as to the appropriate period of restoration.

20  Given that the panel was charged with determining the amount of the loss, however, and that

21  amount turns, in part, on how long reconstruction will take, this finding does not exceed the scope

22  of the appraisers' authority. Federal argues that Homeowners did not cite authority for the

23  proposition that the panel could not value the loss to the manmade structures without

24  determining a POR, but its own expert recognized that the amount that it will spend to restore or

25  rebuild the manmade structures depends, in part, on how long it will take to complete the

26  construction.  *See* Schaffer Decl., Ex. 3 (Salvagni Report) at 205.0051. This is also apparent from

27  _____

28  exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award
    upon the subject matter submitted was not made."

the Appraisal Award itself, which reflects in Exhibit A numerous cost determinations that depend, on their face, on the duration of construction.  For example, these costs include cost determinations for temporary fencing; temporary lighting; temporary heat, air and vent; and weekly cleanup, among other things.  Brown Ex. 16 (Appraisal Award).

Federal also contends *Comprehensive Med. Ctr., Inc. v. State Farm Mut. Auto. Ins*., 690 F. Supp. 3d 1104 (C.D. Cal. 2023) "illustrates" that POR is a question for the Court and not the appraisal panel.  But that case involved a question of how much coverage the insured should receive for business loss and a dispute about the length of the POR used to determine that amount.  That case did not address, however, whether an appraisal panel exceeds the scope of its authority by determining, as a factual matter, the POR that should be used to calculate reconstruction costs.  The Court also finds unpersuasive Federal's fallback argument that "at minimum, the panel lacked the authority to separately award a POR—an issue the parties never agreed to arbitrate, and which Plaintiffs will deploy to support aspects of their claim (such as living expenses) that likewise fall outside the panel's authority."  Reply at 15.  Homeowners have not attempted to rely on the POR to establish that they are entitled to any coverage that was not at issue in the appraisal.  Nor has either side cited any authority that suggests that the panel's POR finding has any preclusive effect as to such coverage.  Therefore, the Court concludes Federal has failed to establish that the POR finding should be vacated.

### 3.  Investigation and Pre-Construction Costs

Exhibit B to the Appraisal Award, entitled "Investigation and Pre-construction Cost," lists what appear to be costs incurred by Homeowners to investigate the condition of the Homeowners' Property.  Brown Decl., Ex. 16 (Appraisal Award), Exhibit B.  In their brief, Homeowners asserted that these costs were necessarily incurred as "pre-building" costs but Federal countered that at least some of these costs appeared to have nothing to do with rebuilding and in some cases, related to investigation of losses that were clearly outside of the scope of the appraisal.  At the motion hearing, Homeowners' counsel conceded that at least some of the costs listed in this exhibit appeared not to be preconstruction costs and was unsure of the nature of many of the costs listed in the exhibit.

As the Court is unable to determine the specific nature of the costs listed in Exhibit B – or why they were separated out from the panel's award of reconstruction costs -- it concludes that the panel's award of these costs exceeded the scope of its authority. The Court therefore vacates the panel's award as to the costs listed in Exhibit B.

### 4. Conclusion

In sum, the Court concludes that while the panel did not act improperly in appraising the loss with respect to manmade structures, the disputes related to causation are for the Court (or Jury) and remain to be decided. The Court also vacates the award as to Exhibit B for the reasons stated above.

## IV.     MOTION TO DISMISS COUNTERCLAIM

### A.     Contentions of the Parties

#### 1.     Motion

In the Motion to Dismiss, Homeowners argue that Federal's counterclaim for breach of good faith and fair dealing is insufficiently pled under *Kransco v. Am. Empire Surplus Lines Ins. Co.*, 23 Cal. 4th 390, 402 (2000), which they contend "limits such claims to a claim for contract damages for breach of express policy conditions" when asserted by an insurer against an insured. Motion to Dismiss at 1-2. According to Homeowners, Federal's "counterclaim for breach of the implied covenant of good faith and fair dealing fails to state a claim under the applicable law because [Federal] identifies no express policy condition allegedly breached by Homeowners, nor does the counterclaim contain any factual allegations that support a claim for such breach." *Id.* at 2, 4-5. To the extent Federal relies on "allegations of non-disclosure and non-cooperation[,]" the claim fails because the Policy "contains no express disclosure or cooperation provisions that apply to this claim[,]" Homeowners assert. *Id.* at 2. Nor can Federal state a claim based on "some type of fraud" because it has not pled fraud with specificity under the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure, Homeowners assert. *Id.* Finally, Homeowners argue that Federal's counterclaim fails for the additional reason that Federal has not alleged any prejudice or harm. *Id.*

United States District Court
Northern District of California

**2.  Opposition**

Federal counters in its Opposition that it is not required to allege breach of a specific policy provision to state a claim for breach of implied covenant of good faith and fair dealing and that "California courts consistently hold that insurers may pursue claims for a policyholder's breach of the implied covenant based on, among other things, the policyholder's submission of inflated claims of loss or the policyholder's prosecution, handling, or management of an insurance claim in bad faith."  Opposition at 7-8 (citing *Lennar Mare Island, LLC v. Steadfast Ins. Co*., 139 F. Supp. 3d 1141, 1162 (E.D. Cal. 2015); *Malkin v. Fed. Ins. Co*., 2023 WL 6965003, at *3 (C.D. Cal. Oct. 20, 2023)).

According to Federal, it has stated a claim based on its allegations that Homeowners breached the implied covenant of good faith and fair dealing by "(1) claiming the Glass Fire caused damage that existed at the property before the fire; (2) delaying disclosure of critical test results, which undermined Plaintiffs' positions in the claims-handling process, including their position that the main residence was unfit for occupancy; (3) maintaining throughout the claims-handling process positions that were inconsistent with the findings of Plaintiffs' consultants, despite Plaintiffs' knowledge of those findings; and (4) claiming substantially inflated losses in their proofs of loss and examinations under oath without credible support."  *Id.*  at 8 (citing Am. Answer at 16-17, ¶ 19).  It also points to its allegation that  "Plaintiffs' conduct 'frustrate[d]' Federal's 'rights to the benefits of the agreement,' . . . including by forcing Federal 'to investigate claims that are not covered under the Policy,' requiring 'Federal to spend substantial sums to adjust improper claims with improper support (including hiring expert consultants),' and forcing Federal 'to expend significant sums associated with the appraisal of Plaintiffs' inflated and improper claims.'"  *Id.* (citing *Lennar*, 139 F. Supp. at 1162, Am. Answer at 17, ¶ 21).

Federal argues that even if it were required to identify a specific policy provision that Homeowners have breached it has done so.  *Id.*  at 9-10.  For example, Federal contends, its allegation that Homeowners "possessed myriad facts and evidence that 'were not previously disclosed to Federal, despite Federal's repeated requests for all material information related to its investigation of the Plaintiffs' claim[ ]'" alleges a breach of a specific provision in the Policy

1    imposing a duty "after a loss" "to produce all records and documents [Federal] request[s] and

2    permit [Federal] to make copies." *Id.* at 9-10 (quoting Am. Answer at 11, ¶ 2; and citing dkt. no.

3    1-1 (Policy) at ECF p. 103, at Y-4). Federal also argues that it has alleged violations of the Policy

4    requirement that Plaintiffs "submit, 'within 60 days after [Federal] request[s],' a 'signed, sworn

5    proof of loss providing all information and documentation [Federal] requests[s].' " *Id.* at 10

6    (citing dkt. no. 1-1 (Policy) at ECF p. 103, at Y-4). Federal points to its allegation that

7    Homeowners   " 'refused to issue an amended proof of loss' to account for their substantially

8    reduced  damage claims, 'despite Federal's requests' for an amended proof of loss 'during the

9    claims handling process.' " *Id.*  (quoting Am. Answer at 13, ¶ 8).

10          Federal also argues that it is not required to allege "substantial prejudice" to state a claim.

11   *Id.*  at 11. It contends Homeowners rely on "cases applying California's 'notice-prejudice' rule,

12   which requires an insurer to allege substantial prejudice to void coverage based on an 'insured's

13   late notice of a claim' or similar breaches of a policy's procedural conditions" but that those cases

14   are distinguishable because "Federal has not asserted Plaintiffs' breach of a mere 'procedural'

15   condition under the Policy." *Id.* (citing *Pitzer Coll. v. Indian Harbor Ins. Co.*, 8 Cal. 5th 93, 101

16   (2019); *Silicon Valley Bank v. New Hampshire Ins. Co.*, 203 F. Supp. 2d 1152, 1159 (C.D. Cal.

17   2002)). Instead, Federal asserts, it has based its claim on allegations that Homeowners submitted

18   "inflated claims . . . in bad faith, [maintained] positions . . . throughout the claims-handling

19   process that were inconsistent with evidence in their possession, and . . . delayed disclosure of that

20   evidence[']" – breaches that  "are neither 'procedural' nor 'harmless[.]' "  *Id.*

21          Federal asserts that "[e]ven if [it] is required to allege substantial prejudice, it has done so."

22   *Id.* Federal points to its allegations that "as a result of Plaintiffs' conduct, Federal was 'forced to

23   investigate claims that are not covered under the Policy,' including as to damage that existed

24   before the Glass Fire" and that "it was forced 'to spend substantial sums to adjust improper claims

25   with improper support (including hiring expert consultants)' and 'to expend significant sums

26   associated with the appraisal of Plaintiffs' inflated and improper claims.' " *Id.*  at 12 (citing Am.

27   Answer at 17, ¶ 21).

28           Finally, Federal rejects Homeowners' argument that it did not allege fraud with sufficient

specificity, stating that it did not bring a claim for fraud or misrepresentation. *Id.* at 12-13.

### 3. Reply

Homeowners reject Federal's assertion that it has stated a claim for breach of implied covenant of good faith and fair dealing based on allegations that they inflated their claim in bad faith, arguing that "although the California courts have recognized the duty of good faith and fair dealing implied in insurance policies goes both ways, *see, e.g., Com. Union Assurance Cos. v. Safeway Stores, Inc*., 26 Cal. 3d 912, 918 (1980), those courts have not sanctioned a 'bad faith' suit by an insurer by any part of its costs to investigate or to appraise a claim based on assertions that the policyholder delayed in providing information or that its claim was unsupported." Reply at 1. According to Homeowners, such a claim is "unprecedented" and inconsistent with the narrow restrictions that have been imposed on insurers' counterclaims for damages, which are limited to "lawsuits seeking recoupment of wrongly obtained benefits, typically in reliance on accusations of policyholder fraud or interference with subrogation efforts." *Id.* According to Homeowners, "[t]o allow otherwise would be to open the door to policyholder 'bad faith' claims any time a policy holder submits a claim, and the insurer decides the claim is uncovered or overstated." *Id.*

Further, Homeowners assert, Federal's "only alleged damages are its costs to investigate portions of the loss it says are not covered under the policy, and to participate in the appraisal" but Federal is obligated to investigate the loss under Cal. Code Regs. Tit. 10, § 2695.7(d) (insurer obligated upon notice of loss to "diligently pursue a thorough, fair and objective investigation . . . .") and the appraisal process is also expressly contemplated under California law, *see Lee v. Cal. Cap. Ins. Co.,* 237 Cal. App. 4th 1154, 1169 (2015), meaning that Federal's " 'overstated claim' theory of bad faith would arise in connection with every appraisal." *Id.* at 2, 7-8; *see also* Declaration of Serena Saffarini in Support of Plaintiffs' Reply in Support of Motion to Dismiss Federal Insurance Company's Counterclaim ("Saffarini Reply Decl."), Ex. A (Federal interrogatory responses reflecting that it spent approximately $800,000 investigating Homeowners' claim). Homeowners also point out that the Policy "expressly provides that each side will bear its own appraisal costs" and therefore, Federal cannot assert a claim "to recoup costs that it is required to pay by contract." *Id.* at 2, 8-9 (citing dkt. no. 1-1 ("Policy"), at ECF p. 104, at

Y-5 ("Each appraiser will be paid by the party selecting the appraiser. Other expenses of the appraisal and the compensation of the third appraiser shall be shared equally by you and us.")).

Homeowners reject Federal's reliance on *Lennar Mare Island, LLC v. Steadfast Insurance Co.*, 139 F. Supp. 3d 1141 (E.D. Cal. 2015) and *Malkin v. Federal Insurance Co.*, 2023 WL 6965003 (C.D. Cal. Oct. 20, 2023) in support of its position that California law recognizes a claim by an insurer for breach of the implied covenant of good faith and fair dealing based on bad faith inflation of a claim. *Id.* at 4. According to Homeowners, *Lennar* stands for the proposition that "bad faith claims for damages by insurers against their customers are limited to recoupment of policy benefits that should not have been paid." *Id.* at 5. Homeowners argue that "*Lennar* provides no support for [Federal's] claim for investigation and appraisal costs based on policyholder conduct that [Federal] deemed unreasonable." *Id.* Likewise, Homeowners assert, *Malkan* "did not involve an insurer's claim for damages, but rather an attempt by the insurer to void coverage." *Id.*

Homeowners also rejects Federal's argument that the two Policy provisions cited in its opposition brief are sufficient to establish a breach of a specific policy provision, assuming that is required. *Id.* at 5-6. In particular, they argue that Federal did not allege any facts showing a breach of either provision. *Id.*

Homeowners argue that Federal's allegation that they overstated their claim or delayed providing certain information does not establish cognizable damage or prejudice under California law because the only remedies available against insureds on the basis of bad faith "go to the essential bargain between the parties to the contract, such as rescission, voiding of coverage, or recoupment of policy benefits improperly obtained." *Id.*

### B. Whether the Counterclaim Should be Dismissed for Failure to State a Claim

#### 1. California Law Governing Claims for Breach of the Implied Covenant of Good Faith and Fair Dealing by Insureds against Insurers

"There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Comunale v. Traders & Gen. Ins. Co.*, 50 Cal. 2d 654, 658 (1958) (citing *Brown v.*

*Superior Court*, 34 Cal.2d 559, 564 (1949)).  This principle is applicable to policies of insurance.

*Id.* (citation omitted).  However, while "the 'duty of good faith and fair dealing in an insurance

policy is a two-way street, running from the insured to his insurer as well as vice versa[,]"  . . . the

scope of the insured's duty of good faith and fair dealing, and the remedies available to the insurer

for a breach of that duty, are fundamentally and conceptually distinct from the insurer's reciprocal

duty, and the remedies available to the insured for breach of that duty, under the insurance policy."

*Kransco v. Am. Empire Surplus Lines Ins. Co.*, 23 Cal. 4th 390, 402 (2000), as modified (July 26,

2000) (quoting *Commercial Union Assurance Companies v. Safeway Stores, Inc.*, 26 Cal.3d 912,

918 (1980)). In particular, "an insurer's breach of the covenant of good faith . . . is governed by

tort principles, at least as concerns the availability of tort damages[,]" because of the "inherently

unequal" relationship between the insurer and the insured.  *Id.* at 403-404 (citing *Gruenberg v.*

*Aetna Ins. Co.*, 9 Cal. 3d 566, 574 (1973)). In contrast, "an insured's breach of the covenant is not

a tort."  *Id.* (citing *California Fair Plan Assn. v. Politi*, 220 Cal.App.3d 1612, 1618 (1990)).

Therefore, "[t]he scope of the insured's duty of good faith and fair dealing . . . is confined by the

express contractual provisions of the policy."  *Id.*  at 405 (citing *Western Polymer Technology,*

*Inc. v. Reliance Ins. Co.*, 32 Cal.App.4th 14, 24 (1995)). Because the duty of good faith and fair

dealing owed by an insured to the insurer is grounded in contract rather than tort, the court in

*Kransco* held that an insurer could not assert comparative bad faith on the part of the insured as a

defense to a bad faith claim asserted by the insured against the insurer.  *Id.* at 402.

       In *Kransco*, the court further explained that an insurer may not assert a bad faith cross-

claim sounding in tort against the insured, citing with approval *Agricultural Insurance Company v.*

*Superior Ct.*, 70 Cal. App. 4th 385, 391 (1999).  *Id.*  In *Agricultural*, the insured brought "a bad

faith action arising out of an insurance claim for earthquake damage" and the insurer "cross-

complained, contending that the insured's claim was in significant part falsified."  *Id.* (citing

*Agricultural*, 70 Cal. App. 4th at 389). "The insurer pleaded various contract theories, and also the

tort theories of fraud and so-called reverse bad faith, *i.e.*, tortious breach of the covenant of good

faith and fair dealing by the insured."  *Id.*  The trial court granted a demurrer as to both tort claims

and the court of appeal affirmed as to the "reverse bad faith" claim, explaining:

> An insurer has no claim against its insured in tort for breach of the covenant of good faith and fair dealing. A breach of this covenant is, at base, a breach of contract. A relationship including specialized circumstances of reliance and dependence is necessary to transmute such a contractual breach into a tort. Such circumstances do not exist in the context of an insured's responsibilities toward its insurer, or in the reciprocal context of an insurer's legitimate expectations from its insured. Although a false claim by an insured might trigger adverse contractual or penal consequences, the obligations undertaken by an insured in entering into an insurance contract are simply not of the same character as the obligations undertaken by an insurer. Hence an insured does not bear a risk of affirmative tort liability for failing to perform the panoply of indefinite but fiduciary-like obligations contained within the concept of 'insurance bad faith.' The trial court therefore correctly sustained the insured's demurrer to the insurer's 'reverse bad faith' claim ...."

*Id.* at 405-406 (quoting *Agricultural*, 70 Cal. App. 4th at 389-390).

On the other hand, the *Agricultural* court found that the trial court had erred in dismissing the fraud claim, observing that "an insured—no different than everyone else—has a duty not to defraud[,]" which means an "insured must not defraud in making a claim on the policy[.]" *Id.* at 406 (quoting *Agricultural*, 70 Cal. App. 4th at 390). The court in *Agricultural* continued:

> When an insured makes a claim to its insurer, the insurer's duty to investigate is triggered. If, because of the insured's false factual assertions, the insurer incurs expenses that would otherwise not have been necessary, justifiable detrimental reliance can be pleaded by the insurer. Although a mere inflated opinion of a claim's value is not fraud, deliberately false factual assertions can be fraud. There is a significant distinction between a mere aggressive claims position and an outright factual fraud.

*Id.* (quoting *Agricultural*, 70 Cal. App. 4th at 390).

In *Kransco*, the court stated that it "agree[d] with the analysis and holding in *Agricultural*." *Id.* It further "observe[d] that rejection of comparative bad faith in this context does not leave the insurer without remedies for an insured's breach of the covenant of good faith and fair dealing[:]"

> Evidence of an insured's misconduct may factually disprove the insurer's liability for bad faith by showing the insurer acted reasonably under the circumstances. (*Blake v. Aetna Life Ins. Co*. (1979) 99 Cal.App.3d 901, 918-924 [160 Cal.Rptr. 528] [no insurer liability]; see also *Campbell v. Allstate Ins. Co*. (1963) 60 Cal.2d 303, 305 [32 Cal.Rptr. 827, 384 P.2d 155] [breach of cooperation clause]; Pryor, Comparative Fault and Insurance Bad Faith (1994) 72 Tex. L.Rev. 1505, 1522-1525 [discussing contract defenses].) The insured's breach of the covenant of good faith and fair dealing is also separately actionable as a contract claim. (*California Fair Plan Assn. v. Politi*, supra, 220 Cal.App.3d at pp. 1614, 1618.) Some forms of

1
2
3
4
5
6
7

> misconduct by an insured will void coverage altogether under the insurance policy. (*See Imperial Casualty & Indemnity Co. v. Sogomonian* (1988) 198 Cal.App.3d 169, 182 [243 Cal.Rptr. 6399] [material misrepresentation of policy application].) Of course, without coverage there can be no liability for bad faith on the part of the insurer. (*Waller v. Truck Ins. Exchange* (1995) 11 Cal.4th 1, 36 [44 Cal.Rptr.2d 370, 900 P.2d 619].) And, as explained in *Agricultural*, supra, 70 Cal.App.4th at page 390, an insured's fraudulent misconduct is separately actionable and can give rise to tort damages. These remedies adequately serve to protect an insurer from the insured's misconduct without creating the logical inconsistencies and troublesome complexities of a defense of comparative bad faith.

8      *Id.* at 408.

9           In *California Fair Plan Assn. v. Politi*, cited in *Kransco*, the court of appeal held that the

10     trial court had erred in awarding an insurer its attorneys' fees in connection with a claim against

11     the insured for breach of the covenant of good faith and fair dealing.  220 Cal. App. 3d at 1617.

12     The court explained that when an *insured* prevails on such a claim against the insurer, they may

13     recover their attorneys' fees because their claim sounds in tort; in contrast, the insurer's claim for

14     breach of the covenant of good faith and fair dealing "only sounds in contract and, thus, any

15     recovery must be limited to contract damages."  *Id.* at 1618.  The court concluded that "[s]ince the

16     insurance contract did not contain an attorney's fee provision, [the insured was] not entitled to

17     attorney's fees under the contract."  *Id.*  at 1619 (citing Civ. Code, § 1717; Code Civ. Proc., §

18     1021.)

19                    **2.  Discussion**

20           Federal contends it is not required to identify an express contract term in connection with

21     its claim for breach of the covenant of good faith and fair dealing to state a claim and that its

22     allegations that the Homeowners submitted an inflated claim and took positions that were

23     inconsistent with the findings of their own experts during the claims handling process are just the

24     sorts of allegations that California courts have consistently found are sufficient to state a claim.

25     Federal's arguments miss the mark.

26           While it is true that a claim for breach of the covenant of good faith and fair dealing does

27     not require an express breach of a contract, " '[i]t is universally recognized . . .[that] the scope of

28     conduct prohibited by the covenant of good faith is circumscribed by the purposes and express

United States District Court
Northern District of California

terms of the contract." *Elkay Int'l Ltd. v. Color Image Apparel, Inc*., No. CV 1408028 MMMVBKX, 2015 WL 13917734, at *7 (C.D. Cal. Feb. 4, 2015) (quoting *Carma Devs. (Cal.), Inc. v. Marathon Dev. California, Inc*., 2 Cal. 4th 342, 373 (1992)). Thus, "the implied covenant does not trump an agreement's express language." *Lennar Mare Island, LLC v. Steadfast Ins. Co*., No. 212CV02182KJMKJN, 2016 WL 829210, at *5 (E.D. Cal. Mar. 3, 2016) ("*LMC II*") (quoting *Steiner v. Thexton*, 48 Cal. 4th 411, 419 (2010) (emphasis omitted)." "It imposes no substantive duties beyond the contract's terms, *Guz v. Bechtel Nat'l, Inc*., 24 Cal. 4th 317, 349–50 (2000), and does not vary express contract terms, *Carma Developers v. Marathon Dev*., 2 Cal. 4th 342, 374 (1992)).

Here, Federal alleges in its counterclaim that it was harmed to the extent that it was required "to spend substantial sums to adjust improper claims with improper support (including hiring expert consultants)" and to "expend significant sums associated with the appraisal of Plaintiffs' inflated and improper claims." Yet the Policy's express terms provide that the costs of appraisal are to be shared by the insurer and the insured. Likewise, Federal is required, under California law, to "conduct and diligently pursue a thorough, fair and objective investigation" of Homeowners' claims. Cal. Code Regs. tit. 10, § 2695.7. Furthermore, nothing in the Policy provides for a shifting of the costs of investigation or appraisal on the basis of "inflated" claims. Thus, Federal's claim for these damages can only sound in tort. *See California Fair Plan Assn. v. Politi,* 220 Cal. App. 3d at 1617 (explaining that where an insurance policy does not contain an attorney fee provision an insured can nonetheless recover attorneys' fees incurred in a lawsuit to obtain coverage from insurer on a claim for breach of the implied covenant of good faith and fair dealing because that claim sounds in tort, whereas the insurer cannot recover fees against the insured on such a claim because the insurer's claim sounds in contract). As *Kransco* teaches, however, an insurer's claim against the insured for breach of the covenant of good faith and fair dealing sounds only in contract. Of course, Federal could recover tort damages on a claim for fraud, were it to assert such a claim, but it has expressly stated that it is *not* asserting such a claim against Homeowners. Moreover, Federal's allegations relating to Homeowners' conduct fall far short of alleging fraud. Instead, it has merely alleged that Homeowners acted unreasonably, which

1    is insufficient to support a claim for breach of the covenant of good faith and fair dealing against

2    an insured given the narrow scope of such a claim under California law.

3        Federal relies on *Lennar Mare Island, LLC v. Steadfast Insurance Co*., 139 F. Supp. 3d

4    1141 (E.D. Cal. 2015) ("*LMC I*") in support of its assertion that an insured's inflated claim is

5    sufficient to support a claim for breach of the covenant of good faith and fair dealing, but that case

6    is distinguishable.   *LMC I* involved a complicated set of facts related to insurance coverage for

7    environmental cleanup of a former navy shipyard under policies issued to the owner of the

8    property ("LMI") and a company that performed clean-up work for the owner ("CMI").  139 F.

9    Supp. 3d at 1146-1149. The insurer ("Steadfast") had issued two policies, one of which was to

10   cover pollution conditions that were "known" at the time the policy was issued ("RSL Policy"),

11   and another to cover "unknown" pollution conditions ("ELI Policy").  *Id.*  at 1147.  These policies

12   only covered the costs of investigation or cleanup that was required by governmental authority.

13   *Id.*  at 1159.

14       Steadfast alleged that LMI and CMI engaged in a variety of forms of misconduct,

15   including submitting claims for "known" pollution conditions as "unknown" pollution conditions

16   under the ELI Policy, and vice-versa; "Overstaffing, overworking and overbilling,"; "Concealing

17   fees in accounting records in order to prevent Steadfast from learning that the fees were

18   improper,"; "Performing and billing for unnecessary, non-required, non-approved, settled and non-

19   covered work,"; "Billing substantive remediation expenses as 'Limited Further Investigation,' ";

20   Concealing other "material misrepresentations" and "critical information,"; "Otherwise failing to

21   cooperate,"; and "Otherwise interfering with Steadfast's contractual rights[.]" *Id.* at 1148 (citations

22   omitted).  Steadfast asserted numerous counterclaims against LMI and CCI, including a claim for

23   breach of contract, many of which sounded in fraud. *Id.* at 1148, 1165.  It did not assert a claim for

24   breach of the covenant of good faith and fair dealing.

25       The court found, *inter alia*, that Steadfast's averments of fraud did not meet the heightened

26   pleading requirement of Rule 9(b) of the Federal Rules of Civil Procedure.  *Id.*  at 1165-1169.  It

27   also found that Steadfast failed to state a claim for breach of contract.  That claim was based on

28   four types of alleged misconduct: 1) submitting known and unknown conditions under the wrong

1    policy; 2)  submitting unreasonable claims; 3) submitting claims for work that was not required by

2    governmental authority and even "ask[ing] the government to require them to investigate and

3    remediate the sites"; and 4)  breaching the duty to cooperate in the policies.  *Id.* at 1158-1162.  The

4    court found that the claim failed as to all four theories.  First, it concluded that the terms of the

5    policies did not prohibit LMI and CCI from submitting unreasonable claims, known and unknown

6    claims under the wrong policy, or claims for work that was not required by governmental

7    authority; instead, the policies provided that the insurer could simply deny those claims.  *Id.*  It

8    further found that under California law, the alleged breach of the cooperation provision in the

9    policies could only be asserted as a defense and not as an affirmative claim for breach of contract.

10    *Id.*  at 1160-1162. The court went on to allow Steadfast to amend to add a counterclaim for breach

11    of the covenant of good faith and fair dealing, stating:

12           Here, it appears the counterclaim could be amended to state a claim
             for LMI's and CCI's breach of the covenant of good faith and fair
13           dealing. Steadfast alleges LMI and CCI attempted to shift claims from
             one policy to another, to conjure government authority, *and to submit*
14           *inflated claims in bad faith*. Steadfast is therefore granted leave to
             amend to allege a claim for breach of the implied covenant of good
15           faith and fair dealing.

16    *Id.* at 1162 (emphasis added).

17         Federal relies on the highlighted language to argue that California courts "*consistently* hold

18    that insurers may pursue claims for a policyholder's breach of the implied covenant based on,

19    among other things, the policyholder's submission of inflated claims of loss . . . ." Opposition at 7

20    (emphasis added).  But *LMI I* involved conduct that went far beyond the submission of inflated

21    claims and simply did not address whether a claim for breach of the covenant of good faith and

22    fair dealing by the insurer can be stated where the only harm alleged is the cost of investigating

23    and appraising the loss. To the extent that *LMI I* can be read to hold that the assertion of inflated

24    claims or late disclosures by an insured can support a claim for breach of the covenant of good

25    faith and fair dealing in the absence of fraud, this Court respectfully disagrees with that holding,

26    which it finds to be  inconsistent with California law, including *Communale*, *Kransco*, and

27    *Agricultural*, discussed above

28         The only other case cited by Federal in support of this assertion, *Malkin v. Fed. Ins. Co.*,

United States District Court
Northern District of California

44

United States District Court
Northern District of California

1    involved a breach of implied covenant claim that was based on a very different theory, namely,

2    that the insured made a false claim for benefits that voided all coverage.  No. 221 CV 00172 CAS

3    PDX, 2023 WL 6965003, at *4 (C.D. Cal. Oct. 20, 2023) (citing Croskey et al., Cal. Practice

4    Guide: Insurance Litigation, § 12:1174).  The section of the California Practice Guide cited in

5    *Malkin* states, in relevant part: "A false claim for benefits may justify denial of the claim or void

6    coverage altogether."  Cal. Practice Guide: Insurance Litigation, § 12:1174.  As discussed above,

7    California courts have recognized that such a claim sounds in fraud.  *See Agricultural*, 70 Cal.

8    App. 4th at 390 ("If, because of the insured's false factual assertions, the insurer incurs expenses

9    that would otherwise not have been necessary, justifiable detrimental reliance can be pleaded by

10   the insurer. Although a mere inflated opinion of a claim's value is not fraud, deliberately false

11   factual assertions can be fraud.").  As Federal has stated that it is not asserting its counterclaim

12   based on fraud or misrepresentation and has not challenged Homeowners' assertion that it has

13   failed to plead fraud with specificity, *Malkin* is distinguishable.

14        Federal's reliance on provisions of the Policy in the "duties after a loss" section is also

15   misplaced.  That section establishes certain duties on the part of the insured that arise when the

16   insured has "a loss [the] [P]olicy may cover[,]" which include 1) "submit[ting] to [Federal], within

17   60 days after [it] request[s], [insured's] signed, sworn proof of loss providing all information and

18   documentation [Federal] requests such as the cause of loss, inventories, receipts, repair estimates

19   and other similar records[;]" and 2) submitting to an examination under oath and "produc[ing] all

20   records and documents [Federal] request[s][.]"  Dkt no. 1-1 at Y-4.  Federal alleges Homeowners

21   breached these provisions by 1) failing to *amend* their proof of loss; and 2) delaying in delivering

22   test results from Dr. Schmidt until after they had been examined under oath. Homeowners' alleged

23   conduct does not appear to violate or frustrate the purposes of either policy provision, however.

24   Instead, Federal seeks to impose additional contractual obligations. Furthermore, Federal has not

25   pointed to any damages that resulted from the alleged breaches that is cognizable under the

26   contract.

27        Finally, "[u]nder California law, it is settled that an insurer, in order to avoid liability on

28   the basis of a breach of a procedural condition such as a notice or cooperation clause, must

United States District Court
Northern District of California

establish actual and substantial prejudice." *Silicon Valley Bank v. New Hampshire Ins. Co.*, 203 F. Supp. 2d 1152, 1159 (C.D. Cal. 2002) (citing *Ins. Co. of the State of Pa. v. Associated Int'l Ins. Co.*, 922 F.2d 516, 523 (9th Cir.1990); *Clemmer v. Hartford Ins. Co.*, 22 Cal.3d 865, 882, 151 Cal.Rptr. 285, 587 P.2d 1098 (1978)).   Federal has not alleged facts showing "substantial prejudice" as a result of Homeowners' failure to provide an amended proof of loss, and given its independent obligation to investigate Homeowners' claim, it will not be able to allege substantial prejudice as to this alleged violation.  Similarly, it has not pointed to substantial prejudice resulting from Homeowners' delaying in producing the Schmidt report until after their examinations.  Given that Federal could have asked Homeowners to submit to a further examination but apparently did not do so, the Court concludes this failure cannot be cured by amendment.  In light of the failure to allege any conduct by the insured that amounts to a breach of the covenant, or to allege substantial prejudice, Federal's counterclaim must be dismissed without leave to amend.

### 3.  Conclusion

For the reasons stated above, the Court finds that Federal fails to state a claim for breach of the implied covenant of good faith and fair dealing.  Therefore, the Motion to Dismiss is GRANTED and Federal's counterclaim is dismissed without leave to amend.

**IT IS SO ORDERED.**

Dated: November 5, 2024

_____
JOSEPH C. SPERO
United States Magistrate Judge

46