United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THOMAS POLLOCK, et al.,

Plaintiffs,

v.

FEDERAL INSURANCE COMPANY,

Defendant.

Case No. 21-cv-09975-JCS

**ORDER RE:**

1. **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
2. **DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERTS**
3. **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Re: Dkt. Nos. 214, 215, 225

## I. INTRODUCTION

Plaintiffs Thomas Pollock and Eileen Tabios bring this action against Defendant Federal Insurance Company ("Federal") seeking compensation under a homeowners' insurance policy issued by Federal on their property in St. Helena, California, which was damaged in the 2020 Glass Fire. Presently before the Court are the following motions: 1) Federal's Motion for Summary Judgment, dkt. no. 214 ("Federal's Summary Judgment Motion"); 2) Federal's Omnibus Motion to Exclude Testimony of Plaintiffs' Experts, dkt. no. 215 ("*Daubert* Motion"); and 3) Plaintiffs' Motion for Partial Summary Judgment, dkt. no. 225 ("Plaintiffs' Summary Judgment Motion"). A hearing on the motions was held on February 18, 2026. The Court's rulings are set forth below.[1]

[1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

## II. BACKGROUND

### A. Factual Background[2]

#### 1. The Policy[3]

According to Plaintiffs, Federal began insuring Plaintiffs' property at 256 N. Fork Crystal Springs Road ("the Property") in 1999, when they purchased the Property. Declaration of Christopher Nidel ("Nidel Decl."), Exhibit IIII, dkt. no. 236-3 at ECF pp. 53-62 (McMinn & Associates: Economic Analysis of Value Engineered Cost Repair, Replace or Rebuild of Insured Buildings, Infrastructure, Land Stabilization and Landscaping Due to Damage Caused by Glass Fire at 256 North Fork Crystal Springs Road, St. Helena, CA 94574 ("McMinn Report")) at ECF p. 54; *see also* Omnibus Declaration of Zachary Dekel ("Dekel Decl."), Ex. 69 (dkt. no. 217 at ECF pp. 1837-1847) at ECF p. 1846 (underwriting documents reflecting "effective date" of July 19, 1999). The policy at issue in this case was a "Deluxe House Coverage" policy and covered the period July 19, 2020 to July 19, 2021. Compendium Vol. 1, Ex. A ("Policy") at 6, dkt. no. 226 at ECF p. 4. It provided for coverage of up to $9,447,000 for the house, $3,778, 800 for the contents of the house, and $4,386,300 for other permanent structures on the Property. *Id*. at ECF pp. 20, 22.

The Policy covered "extended replacement cost." *Id.*, dkt. no. 226 at ECF p.20; *see also id*., dkt. no. 226 at B-2, ECF p. 35 (providing that "[i]f the payment basis is extended replacement

---

[2] The facts set forth below are undisputed unless otherwise stated. The Court has made every effort to thoroughly review all of the thousands of pages of exhibits submitted by the parties in support of the pending motions. This effort has been hampered by the manner in which these documents were filed by both sides, including, but not limited to: exhibits that were entirely gibberish or illegible; massive files containing scores of exhibits that were neither identified in the docket entry nor individually hyperlinked; exhibits confusingly identified using six rounds of the alphabet; and declarations filed without identifying the declarant in the docket entry (*e.g.* docket no. 258). **Going forward, every document in this case, whether it is the main document, a supporting declaration or an exhibit to a supporting document, must be filed as a separate document with its own hyperlink or bookmark and must be clearly identified in the corresponding docket entry. Any document that has more than 26 exhibits attached to it should use numbers rather than letters to identify those exhibits. In addition, citations to declarations and exhibits in any future filings must identify the specific exhibit number or letter *and* the declaration to which the exhibit is attached. The Court will strike any document that does not adhere to these requirements.**

[3] To assist the reader, the Court has highlighted language in the Policy that is particularly salient to the parties' disputes.

cost, we will pay the reconstruction cost even if this amount is greater than the amount of coverage for your house as shown in the Coverage Summary or the amount of coverage for other permanent structure as shown in the Coverage Summary."); *id.*, dkt. no. 226 at ECF p. 113 ("Extended Replacement Cost coverage is intended to provide for the cost to repair or replace the damaged or destroyed dwelling without a deduction for physical depreciation. Many policies pay only the dwelling's actual cash value until the insured has actually begun or completed repairs: or reconstruction on the dwelling. Extended Replacement Cost provides additional coverage above the dwelling limits up to a stated percentage or specific dollar amount.").

Under the Policy, "a 'covered loss' includes all risk of physical loss to [the insureds'] house or other property" "unless stated otherwise or an exclusion applies." *Id.* at B-4, dkt. no. 226 at ECF p. 37.

In addition to the coverage of physical loss to the house, the Policy provided certain "Extra Coverages." *Id.* at B-5 to B-13, dkt. no. 226 at ECF pp. 38-46. Among the "Extra Coverages" were "Additional living expenses" and "Extra living expenses." *Id.* at B-6, dkt. no. 226 at ECF p. 39. These sections provide:

> **Additional living expenses**
> As described below, under certain conditions when your house or other permanent structure cannot be lived in because of a covered loss to your house or other permanent structure or, if applicable, its contents, we provide coverage for additional living expenses which consists of extra living expenses, loss of fair rental value, and forced evacuation expenses. The maximum amount we will pay for all additional living expenses combined for each occurrence is 50% of the amount of house coverage as shown in your Coverage Summary for the location at which the loss occurs. If at the time of a covered loss, your coverage amount for your location is increased because of the application of the extended replacement payment basis, the 50% will be based on the increased amounts. There is no deductible for this coverage.
>
> "Contents" means personal property you, a family member, or a domestic employee owns or possesses covered by us.
>
> **Extra living expenses**. <u>If a covered loss makes your house or other permanent structure uninhabitable, we cover the reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living</u>, including the boarding of domestic animals not primarily owned or kept for business use. We will pay for the boarding of your domestic animals displaced from another permanent structure even when you have not been displaced

United States District Court
Northern District of California

> by the covered loss. We cover these increases to your normal living expenses for a period of time commencing with the date of loss and ending with the earliest of the following:
>
> • the reasonable amount of time required to restore your house or other permanent structure to a habitable condition;
> • the shortest amount of time required to settle elsewhere if you or members of your household permanently relocate;
> • the reasonable amount of time required to restore the house or other permanent structure to the condition it was in prior to the covered loss if you are newly constructing your house or other permanent structure or constructing additions, alterations, or renovations to your house or other permanent structure at the time of a covered loss, but we will only cover the increase in your norma1 living expenses incurred by you; or
> • <u>up to two years from the date of loss</u>, or a later date if agreed to by us.
>
> However, you must inform us of your decision whether you intend to repair, replace, or rebuild the house or other permanent structure, or to permanently relocate, within 180 days from the date of loss, or a later date if agreed to by us. If you do not inform us of your decision by this date, the extra living expenses will cease in 30 days.
>
> This period of time is not limited by the expiration of this policy.

*Id.*[4] (emphasis added). "Forced evacuation expenses," which are a component of ALE, are governed by the following provision:

> **Forced evacuation expenses**. If you evacuate your house or other permanent structure due to a reasonable threat of a loss covered under this policy, or you are forced to evacuate by a civil authority as a direct result of a covered peril, we cover the reasonable increase in your normal living expenses <u>incurred by you</u> that is necessary to maintain your household's usual standard of living, including the boarding of domestic animals not primarily owned or kept for business use. We also cover any loss in fair rental value if your house or other permanent structure is usually held for rental, but we do not cover any loss of rents due to cancellation of a lease or agreement.
>
> However, if we determine after the threat of loss is over that there is no covered loss to your house or other permanent structure that makes it uninhabitable, this extra coverage will cease, unless a civil authority prohibits you from use of your house or other permanent structure due to a peril covered under this policy.
>
> We cover these forced evacuation expenses for up to 30 consecutive days, even if the policy period ends during that time.

*Id.* at B-7, dkt. no. 226 at ECF p. 40 (emphasis added).

---

[4] Because "extra living expenses" are a component of "additional living expenses," the Court refers to these sections, together, as "the ALE provision,"

The Policy also provided extra coverage for "Land[,]" providing as follows:

> **Land**
> Whenever there is a covered loss to your house or other permanent structure and the related repair, replacement, or rebuilding requires excavation, replacement or stabilization of land under or around your house or other permanent structure, we will pay the necessary cost for the excavation, replacement, or stabilization of the land. The amount of coverage is 10% of the amount of the covered loss to your house or other permanent structure, but not less than $10,000.

*Id.* (emphasis added).

In addition, the Policy provided extra coverage for "Rebuilding to Code." *Id.* at B-8, B-9, dkt. no. 226 at ECF pp. 41-42. The "Rebuilding to Code" section provides:

> After a covered loss to covered property, we cover the necessary cost of conforming to any law or ordinance that requires or regulates:
>
> • the repair, replacement, or rebuilding of the damaged portion of your house or other permanent structure made necessary by the covered loss;
>
> • the demolition, replacement, or rebuilding of the undamaged portion of your house or other permanent structure necessary to complete the repair, replacement, or rebuilding of the damaged portion of your house or other permanent structure; or
>
> • the demolition of the undamaged portion of your house or other permanent structure when your house or other permanent structure must be totally demolished.
>
> However, we will not pay the cost you incur to conform to any law or ordinance that is not a direct result of the covered loss.
>
> If the loss is to your house only, or to your house and other permanent structure(s), we will pay up to 100% of the amount of coverage for the house as shown in your Coverage Summary. If the loss is to another permanent structure(s) only on the grounds of your house, we will pay up to 100% of the amount of coverage for other permanent structures.
>
> If at the time of a covered loss, your coverage amount for your house or other permanent structures is increased because of the application of the extended replacement cost payment basis, the 100% will be based on the increased amounts.
>
> If you have a covered total loss to your house and do not replace or rebuild the house at the same location, this coverage will apply to the house and other permanent structures up to the same, amounts of coverage for your house and other permanent structures that would have applied at your original location shown in your Coverage Summary.



United States District Court
Northern District of California

United States District Court
Northern District of California

*Id.*; *see also id.* at ECF p. 114 (stating that Policy includes "Building to Code Upgrade Coverage" that "covers additional costs to repair or replace a dwelling to comply with the building codes and zoning laws in effect at the time of loss or rebuilding" and noting that "[t]hese costs may otherwise be excluded by your policy. Meeting current building code requirements can add significant costs to rebuilding your home.)." *Id.*

The Policy also provides coverage for debris removal, providing as follows:

> **Debris Removal**
>
> Unless covered elsewhere under this policy; we cover the reasonable expenses you incur made necessary by a covered loss to demolish damaged covered property, if necessary, and remove debris, of the covered loss including the property that caused a covered loss. We will pay up to 30% of the amount of coverage for your house at this location as shown in your Coverage Summary. If at the time of a covered loss, your coverage amount for your house is increased because of the application of the extended replacement cost payment basis, the 30% will be based on the increased amounts.

*Id.*

The Policy allows the insured to rebuild at a different location, providing:

> If you have a covered total loss to your house and do not replace or rebuild the house at the same location, this coverage will apply to the house and other permanent structures up to the same amounts of coverage for your house and other permanent structures that would have applied at your original location shown in your Coverage Summary.

*Id.* at B-9, dkt. no. 226 at ECF p. 42.

Among the Policy's exclusions were exclusions for "Gradual or sudden loss," "Contamination" and "Neglect." *Id.* at B-13, B-15, dkt. no. 226 at ECF pp. 46, 48. Those exclusions provide as follows:

> **Gradual or sudden loss**. We do not provide coverage for the presence of wear and tear, gradual deterioration, rust, bacteria, corrosion, dry or wet rot, or warping, however caused, or any loss caused by wear and tear, gradual deterioration, rust, bacteria, corrosion, dry or wet rot, or warping. We also do not cover any loss caused by inherent vice, latent defect or mechanical breakdown. But we do insure ensuing covered loss unless another exclusion applies.
>
> **Contamination**. We do not cover any loss caused by the discharge, dispersal, seepage, migration or release or escape of pollutants. Nor do we cover the cost to extract pollutants from land or water, or the

United States District Court
Northern District of California

> cost to remove, restore or replace polluted or contaminated land or water. A "pollutant" is any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids. alkalis, chemicals and waste.[5] A "contaminant" is an impurity resulting from the mixture of or contact of a substance with a foreign substance. "Waste" includes materials to be disposed of, recycled, reconditioned or reclaimed.
>
> . . .
>
> **Neglect**. We do not cover any loss caused by your failure to use all reasonable means to protect property before, at, or after the time of a loss.

*Id.* (emphasis added).

The Policy contains a provision entitled "Concealment or fraud[,]" which provides, "We do not provide coverage if you or any covered person has intentionally concealed or misrepresented any material fact relating to this policy before or after a loss." *Id.* at Y-1, dkt. no. 226 at ECF p. 103 ("Fraud Provision"). The Policy also enumerates certain duties of the insured after a loss, including a duty to "protect property" requiring the insured to "take all reasonable means that are necessary to protect property from further loss or damage." *Id.* at Y-4, dkt. no. 226 at ECF p. 106.

The Policy contains the following appraisal provision:

> **Appraisals**
> If you or we fail to agree on the amount of loss, you or we may demand an appraisal of the loss. Each party will select a competent, independent appraiser within 20 days after receiving written request from the other. The two appraisers will select a third, competent appraiser. If they cannot agree on a third appraiser within 15 days, you or we may request that the selection be made by a judge of a court having jurisdiction. Written agreement signed by any two of the three appraisers shall set the amount of the loss. However, the maximum amount we will pay for a loss is the applicable amount of coverage even if the amount of the loss is determined to be greater by appraisal. Each appraiser will be paid by the party selecting the appraiser. Other

[5] A different definition of "pollutant" applies to the Contamination exclusion for "incidental farming", under the exclusion Business Pursuits. *See* Compendium Vol. 1, Ex. A (Policy) at T-16, T-17. In that exclusion, "A 'pollutant' is any solid, liquid, gaseous or thermal irritant ,or contaminant, including smoke *(except smoke from a hostile fire*), vapor, soot, fumes, acids, alkalis, chemicals and waste." *Id.* at T-17, dkt. no. 226 at ECF p. 84 (emphasis added). In their reply on their summary judgment motion, Plaintiffs cited this definition in support of their argument that the Contamination exclusion does not apply to VOCs in their house. Dkt. no. 244 at 8. At oral argument, however, Plaintiffs stipulated that this definition is not applicable here and stated that they had cited it in error.

> expenses of the appraisal and the compensation of the third appraiser shall be shared equally by you and us. We do not waive our rights under this policy by agreeing to an appraisal.

*Id*. at Y-5, dkt. no. 226 at ECF p. 107.

Malloy, Imre & Vaconi Insurance Services ("MIV") is listed in the Policy as "producer" and the Policy documents refer questions related to the Policy to MIV. *See, e.g., id.* at ECF. pp. 6, 8, 10, 16-18.[6]

**2. The Glass Fire and Plaintiffs' Claim**

The Glass Fire occurred on September 27, 2020. Declaration of Thomas Pollack in Support of Plaintiffs' Motion for Partial Summary Judgment ("Pollack Decl."), dkt. no. 225-2, ¶ 2. The fire destroyed the guest house on the Property and, according to Plaintiffs' experts, caused damage to the main house due to smoke that enveloped the house. *Id.* ¶ 2; *see also* Dekel Decl., Ex. 30 ("Crimmins February 14, 2025 Expert Report") at 9, dkt. no. 217 at ECF p. 995 ("The Glass Fire . . . burned through the property and remained in the direct vicinity of the property for eight days, reaching temperatures of 800 - 1,200° C (1,472 - 2,192 °F) at the guest house and coming within feet of the main residence. The smoke lingered and continued to cause damage for weeks.") Plaintiffs also allege the fire destroyed landscaping and resulted in soil contamination on the Property. Pollack Decl. ¶ 2. Plaintiffs subsequently notified Federal of a loss under the Policy. *Id.* ¶ 3. In the years that followed, both sides conducted investigation and testing on the Property to determine the extent of the damage. The adequacy of the investigations and the reliability of the experts' findings on both sides has been (and continues to be) the subject of extensive dispute and much vitriol.

On October 26, 2020, Plaintiffs' attorney sent Federal a letter that addressed, *inter alia*, coverage under the Policy for alternative housing. Declaration of Kurt Brown, Esq. in Support of

---

[6] Plaintiffs ask the Court to take judicial notice of information listed on the website of the California Department of Insurance reflecting that MIV is a licensed insurance broker and is "authorized to transact on behalf of[,]" *inter alia*, Chubb Indemnity Insurance Company, Chubb National Insurance Company and Federal Insurance Company. Dkt. no. 235 (Request for Judicial Notice) & Ex. RRRRR (screenshot of website pages). The Court GRANTS this request under Rule 201 of the Federal Rules of Evidence only as to the fact that this information is reflected on the Department of Insurance Website. *See Rejoice! Coffee Co., LLC. v. Hartford Fin. Servs. Grp., Inc*., No. 20-CV-06789-EMC, 2021 WL 5879118, at *11 (N.D. Cal. Dec. 9, 2021).



United States District Court
Northern District of California

United States District Court
Northern District of California

Defendant Federal Insurance Company's Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Brown Decl."), Ex. 13 (Oct. 26, 2020 Letter), dkt. no. 231 at ECF pp. 229-236 ("the October 26, 2020 Letter"). Under the heading "Timeline for Permanent Housing," counsel stated, in part, as follows:

> You have stated to me that it is Chubb's expectation that your insureds will be back in their home within a few months, which demonstrates either a complete lack of awareness of the severity and extent of the damage to your insureds' property or Chubb's unwillingness to make a realistic assessment of the damage and the timeline for repairs. At this point, your insureds believe that in the best case scenario, they will reoccupy their residence in 1 to 1.5 years, and in the worst case, it will be 4 years. Your insureds do not believe that a true assessment of the scope and extent of damage will be known for 6 months. Once that is known, Chubb and your insureds will need to agree on the repairs to restore the main residence, guest house, other buildings, landscaping, infrastructure, and property to its pre-fire, pristine condition. . . . Once the extent and scope of the damage is known, it will probably then take 6 months to prepare architectural plans and obtain the necessary building permits. Only then can true restoration and/or reconstruction begin. Because of the scale and scope of your insureds' property, that restoration and/or reconstruction process will likely take between 1 and 3 years.

*Id.* at ECF p. 232.

The following year, Plaintiffs sent Federal a sworn Proof of Loss ("POL") signed on August 2, 2021 ("POL 4") claiming loss in the amount of $85,305,580.40 to cover "the expenses for re-building the insureds' home and guest house." Dkt. no. 229 at ECF p. 266; *see also* Dekel Decl., Ex. 70, dkt. no. 217 at ECF pp. 1848-1856. A subsequent POL, signed on August 26, 2021 ("POL 5"), claimed a loss in the amount of $15,054,102 for alternative living expenses under the Policy. Dkt. no. 229 at ECF pp. 274, 276; *see also* Dekel Decl., Ex. 67, dkt. no. 217 at ECF pp. 1807-1823.

The next month, Plaintiffs' counsel sent a letter to Federal dated September 27, 2021 that stated, in part, as follows:

> Chubb has reports prepared by experts retained by your insureds, including a collection of reports prepared by Kaizen Safety Solutions, which explain in detail that soot, char, ash, and associated fire residues (including chemicals, gases, particulates, and fungal spores) have permeated every part of the main house, including the interstitial spaces of the walls and the building materials themselves. Moreover, laboratory analysis of the contaminated building materials by Kaizen

> Safety Solutions demonstrates that "cleaning" will not repair the physical damage to these materials, nor can the contamination be removed from the materials (where removal is even possible) without causing significant additional damage. Therefore, because it is Chubb's obligation under the Policy to repair or replace/rebuild all buildings, infrastructure, and landscaping to their pre-fire condition, your insureds are entitled to total replacement of the physically destroyed and/or contaminated buildings, infrastructure, and landscaping.

Dkt. no. 229 at ECF p. 296 ("the September 27, 2021 Letter").

**3. The Appraisal Proceeding**

On July 14, 2022, the Court ordered an appraisal "of the loss with respect to all manmade structures on the Property, but . . . exclud[ing] soil, landscaping, contents, and loss of use." Order Granting Motion to Compel Arbitration, dkt. no. 47, at 22. A panel consisting of three appraisers ("Appraisal Panel") was appointed – with one appraiser selected by each side and the Court appointing a neutral "umpire" appraiser. *See* dkt. nos. 69-70. On March 28, 2024, following a five-day hearing, from June 20-24, 2023, an appraisal award ("Award") issued. *See* dkt. no. 88-1. In the Award, the Appraisal Panel found the "value of the claimed loss" to be $32,122,214 for the "cost of repairs to return the Man-Made structures to their pre-loss condition as of the Date of Loss" and the period of construction to be 36 months. *Id.* The Award included the following disclaimer:

> This appraisal award is made without consideration of any coverage issues, policy limits, deductible amounts, prior payments, non-covered items, or other provisions of the policy which might affect the insurer's liability. This appraisal award does not establish coverage or the insurer's liability to pay.

*Id.*

Federal subsequently brought a motion to vacate the Award, asserting that the Appraisal Panel exceeded the scope of its authority by "making findings related to causation, namely, the finding that certain damage was caused by the Glass Fire rather than by other causes." Dkt. no. 134, Order Granting in Part and Denying in Part Defendant's Motion to Vacate Appraisal Award and Granting Plaintiffs' Motion to Dismiss ("Appraisal Award Order") at 27. The Court rejected that argument, reasoning as follows:

> Here, the appraisal provision in the Policy provides for an appraisal



United States District Court
Northern District of California

> to determine "the amount of loss." Schaffer Arbitration Motion Decl., ¶¶ 3-4, 7-14; dkt. no. 1-1 (Policy) at ECF p. 104, Y-5. As Homeowners point out, references to a "loss" throughout the Policy are linked to the occurrence of a specific event that occurred at a particular time. See, e.g., dkt. no. 1-1 (Policy) at ECF p. 30 (defining an "occurrence" as "a loss or accident to which this insurance applies occurring within the policy period."; *id.* at ECF p. 31 (under the heading "Payment for a Loss[,]" providing that some coverage is subject to a deductible that "applies to each occurrence"); *id.* at 32 (under the subheading "Payment Basis" in the "Payment for a Loss" section, defining "reconstruction cost" as "the lesser of the amount required at the time of loss to repair, replace, or rebuild, at the same location, your house or any other permanent structure, using like design, and materials and workmanship of comparable kind and quality.") (emphasis added). On the other hand, there is nothing in the Policy that suggests that "loss" means damage to the Homeowner's insured property untethered to any specific event, as Federal contends. Indeed, such an interpretation of the Policy language would be nonsensical.
>
> By extension, the appraisal panel could not have determined the amount "of the loss with respect to all manmade structures on the Property," as it was charged by this Court to do, without identifying the specific occurrence that gave rise to the damage it was appraising, namely, the Glass Fire. Even assuming the panel's appraisal implies that it found that certain facts were true, e.g., that the damage at issue was caused by the Glass Fire, the panel expressly disclaimed making any such findings. In particular, as discussed above, the Appraisal Award contains a disclaimer stating that the award "is made without consideration or any coverage issues, policy limits, deductible amounts, prior payments, non-covered items, or other provisions of the policy which might affect the insurer's liability" and "does not establish coverage or the insurer's liability to pay[.]" As the issue of whether the damage the panel appraised was caused by a covered occurrence or by some other cause is a coverage issue, the panel disclaimed any such finding. Therefore, the findings of the panel do not run afoul of California law. *See Lee v. California Cap. Ins. Co.*, 237 Cal. App. 4th at 1170 ("an appraisal panel may assign a value to items as to which coverage is disputed with the disclaimer that the award does not establish coverage or the insurer's liability to pay"). Accordingly, the Court concludes that the panel did not act improperly to the extent that it appraised the loss as the "[c]ost of repairs to return the Man-Made structures to their pre-loss condition as of the Date of Loss."

*Id.* at 28-29.

Nonetheless, the Court recognized that "under California law, where there are disputes about causation of loss in the context of insurance coverage case, the parties are entitled to have those disputes resolved by the court." *Id.* at 29. Therefore, the Court held that "the causation findings that are embedded in the panel's appraisal award may be challenged before this Court, which is charged with deciding such issues . . . ." *Id.* at 31.

The Court went on to reject Federal's argument that the Panel exceeded the scope of its authority with respect to its finding that the period of restoration (POR) was 36 months. *Id.* at 32. In particular, it concluded that "[g]iven that the panel was charged with determining the amount of the loss . . . and that amount turns, in part, on how long reconstruction will take, this finding does not exceed the scope of the appraisers' authority." *Id.* The Court explained further that the appraisal panel had the authority to make a POR finding for the following reasons:

> Federal also contends *Comprehensive Med. Ctr., Inc. v. State Farm Mut. Auto. Ins.*, 690 F. Supp. 3d 1104 (C.D. Cal. 2023) "illustrates" that POR is a question for the Court and not the appraisal panel. But that case involved a question of how much coverage the insured should receive for business loss and a dispute about the length of the POR used to determine that amount. That case did not address, however, whether an appraisal panel exceeds the scope of its authority by determining, as a factual matter, the POR that should be used to calculate reconstruction costs. The Court also finds unpersuasive Federal's fallback argument that "at minimum, the panel lacked the authority to separately award a POR—an issue the parties never agreed to arbitrate, and which Plaintiffs will deploy to support aspects of their claim (such as living expenses) that likewise fall outside the panel's authority." Reply at 15. Homeowners have not attempted to rely on the POR to establish that they are entitled to any coverage that was not at issue in the appraisal. Nor has either side cited any authority that suggests that the panel's POR finding has any preclusive effect as to such coverage. Therefore, the Court concludes Federal has failed to establish that the POR finding should be vacated.

*Id.* at 33.

**4. The Coverage Determination Letter**

Federal informed Plaintiffs of its coverage determination in a letter dated March 22, 2024. Dekel Decl., Ex. 64 ("Coverage Letter"), dkt. no. 217 at ECF pp. 1781-90. It explained that its review of Plaintiffs' claim proceeded on "several tracks," which its counsel described as follows:

> (i) Federal's review of information provided by the Insureds through the Claim adjustment process and regular correspondence with the Insureds and their representatives, which began in fall 2020 and has continued through this month, (ii) the exchange of information in the litigation initiated by the Insureds, (iii) the exchange of information during the 2023-2024 appraisal of the Insureds' alleged losses to manmade structures on the Property, and (iv) Federal's independent information gathering and reliance on experts.

*Id.* at 1, dkt. no. 217 at ECF p. 1781. Federal "determined that no coverage is afforded to the Insureds for the Claim under [the Policy] for losses allegedly incurred to structures and contents . .



United States District Court
Northern District of California

. on the Property other than those related to the Insureds' guest house, for which Federal has already determined coverage and submitted payment[,]" rejecting the remaining losses asserted by Plaintiffs in their proofs of loss. *Id.* It stated that its determination was based on a "thorough and extensive investigation" into Plaintiffs' claim that included the retention of "highly credentialed experts in industrial hygiene, toxicology, chemistry, hydrogeology, environmental science and risk, and related fields[.]" *Id.*

According to Federal, its experts "conducted extensive analysis of the Property and its Contents, including a review of all testing conducted at the Property, hundreds of photographs of the Property, and other material information" and "uniformly concluded" that

> (i) the main residence does not require rebuilding, contrary to the Insureds' claims; (ii) any chemicals present in the Property are consistent with "background" chemicals commonly found in businesses and residences in Northern California; and (iii) any soot, ash, or char deposited on surfaces or Contents at the Property could have been safely cleaned in 2020 shortly after the Fire, and the Insureds could have safely reoccupied their home.

*Id.* at 2, ECF p. 1782. Federal goes on to cite numerous exclusions in support of its coverage determination, namely, the Neglect exclusion (based on failure to use the $250,000 paid by Federal for remediation to clean the house and its contents), violation of the duty to "protect property after a loss" (based on Plaintiffs' alleged failure to "take any action to prevent further damage to the Property"), the Gradual Loss Exclusion (based on the findings of Federal's experts that certain damage claimed by Plaintiffs to have been caused by the Glass Fire existed prior to the Glass Fire and was the result of wear and tear), the Contamination exclusion (based on the findings of Federal's experts that "testing conducted at and of the insureds' Property identified chemicals commonly found in Northern California"), the exclusion for losses that manifest outside of the policy period (based on the findings of Federal's experts that "certain damages to the Insureds' Property were caused by wear and tear, neglects, or pre-existing contamination), and breach of the implied covenant of good faith and fair dealing (based on the allegation that in their proofs of loss and in their deposition testimony Plaintiffs inflated their losses by tens of millions of dollars). *Id.* at 2-9.

In the Coverage Letter, Federal "reserve[d] its right to supplement its defenses and

United States District Court
Northern District of California

pleadings in this matter upon further discovery in the lawsuit currently pending in the Northern District of California by adding a defense based on the Policy condition for Concealment or fraud, found at page Y-1 of the Policy." *Id.* at 9.

**5. Post-Loss Remediation and Construction**

Following its investigation, Federal paid Plaintiffs approximately $1.25 million to rebuild the guest house, $250,000 for industrial cleaning of the unburned structures at the Property, and more than $1 million to remediate contents. *See* Dekel Decl., Ex. 78, dkt. no. 218 at ECF pp. 141-152 (June 2024 payment summary). Mr. Pollack testified that no efforts have been undertaken to rebuild the guest house because the amount Federal paid was not "anywhere near the amount of money it would take to rebuild the guest house." Dekel Decl., Ex. 6 (T. Pollack Dep.) at 343. He further testified that the only cleaning of the house that has been performed has been limited to "test cleaning" by Plaintiffs' experts. *Id.* at 131-132

**6. Additional Living Expenses**

According to an expert report prepared for Plaintiffs by Marie Ebersbacher, Federal owes Plaintiffs $17,471,535 in unreimbursed ALE for the period October 1, 2020 through February 28, 2025 and monthly ALE beginning March 1, 2025 of $317,374. Dekel Decl., Ex. 34 (February 20, 2025 Report of Marie Ebersbacher), dkt. no. 217 at ECF pp. 1108-1116. These amounts were based on estimates that for the period between October 1, 2020 and February 28, 2025, Plaintiffs' fair rental value for the Property was $7,496,802, the cost to rent furniture was $621,238, the cost to rent and install an art collection comparable to the one on the Property was $4,967,500, the cost to replace Plaintiffs' wine collection would be $821,759 and the cost of renting and curating a rare book collection comparable to the one on the property would be $3,564,236. *Id.* Ebersbacher deducted from her calculation gross rents paid by Federal in the amount of $978,698 for rent paid between October 2020 and December 2023, as well as an additional $137,000 for rent payments for the period December 15, 2023 through June 15, 2024. *Id.* at 5-6. Ebersbacher testified at her deposition that she had not seen evidence that the unpaid ALE amounts were actually incurred by the Pollacks. *Id.*., Ex. 21 (Ebersbacher Dep.), dkt. no. 217 at ECF pp. 679-709.

**B. Procedural Background**

The operative complaint is Plaintiffs' First Amended and Supplemental Complaint, dkt. no. 180 ("FASC"). In the FASC, Plaintiffs assert the following claims: 1) "breach [of] the contract of insurance by refusing and failing to pay benefits due under the Policy including, but not limited to, payments (a) to repair or replace the Property in order to restore it to its pre-loss condition, (b) to repair, replace, or pay the lost value of the contents, as required by the Policy, and (c) for loss of use[;]" 2) declaratory relief seeking "a declaration of the parties' rights and duties under the Policy[;]" 3) breach of the implied covenant of good faith and fair dealing ("bad faith claim"); 4) negligence based on Federal's "inadequate reserve-setting practices" and "failure to ensure adequate policy limits and proper coverage tailored to the Homeowners' needs[;]" and 5) Financial Elder Abuse.

On April 2, 2025, Federal filed its Amended Answer to First Amended and Supplemental Complaint and Counterclaims, dkt. no. 198 ("Amended Answer"). In its Amended Answer, Federal asserts sixteen affirmative defenses, including, as relevant here, defenses based on: 1) failure to protect from further damage (Eighth Affirmative Defense); 2) "exclusions for losses caused by wear and tear or gradual loss, neglect, mold, and contamination[,]" (Tenth Defense); 3) lack of coverage for "losses manifested outside the applicable Policy period[,]" (Fourteenth Defense); 4) Plaintiffs' intentional misrepresentation and concealment of material facts in violation of the Policy's concealment or fraud provision," (Fifteenth Defense); and 5) Plaintiffs' fraud (Sixteenth Affirmative Defense). Federal also asserted counterclaims for breach of contract and fraud. Dkt. no. 198.

Federal's breach of contract counterclaim asserts that Plaintiffs violated the Policy's "concealment or fraud" provision and is based on the following alleged misrepresentations:

a. On or around October 26, 2020, Plaintiffs represented to Federal that "because of the scale and scope of [their] property, [the] restoration and/or reconstruction process will likely take between 1 and 3 years."[7]

b. Plaintiffs submitted sworn statements in proof of loss on or around

[7] Plaintiffs refer to this statement as the "Duration Statement." Plaintiffs' Summary Judgment Motion at 15. The October 26, 2020 Letter can be found in the record at Brown Decl., Ex. 13, dkt. no. 231 at ECF pp. 229-236.

August 2, 2021 and August 26, 2021 seeking $100.3 million in coverage, purportedly representing the claimed cost of demolishing and replacing all the structures on the Property and increased living expenses of $400k a month for a three-year period.[8]

c. On or around September 27, 2021, Plaintiffs asserted Kaizen Safety Solutions had concluded that the Glass Fire caused damage that could not be repaired and thus Plaintiffs were entitled to the total replacement of the structures and landscaping on the Property.[9]

Dkt. no. 198 at ¶ 57; *see also id.,* Counterclaim ¶ 21 (alleging that "on October 26, 2020, Plaintiffs represented to Federal 'that because of the scale and scope of [their] property, [the] restoration and/or reconstruction process will likely take between 1 and 3 years.' "); *id.* ¶ 34 (alleging that "[i]n August 2021, approximately eleven months after the Glass Fire, Plaintiffs submitted to Federal two sworn statements in proof of loss, signed by each of them, totaling more than $100 million. Plaintiffs' proofs of loss were premised on their claim that the entire Property—including the main house, pavilion, and wine room—was so damaged by contamination from smoke and thermal damage caused by the Glass Fire that Plaintiffs were entitled to (i) the full replacement value of the Property—which Plaintiffs pegged at more than $85 million, and (ii) more than $15 million to cover anticipated increases in their standard of living for three years' time."); *id.* ¶ 37 (alleging that "on September 27, 2021, Plaintiffs identified in correspondence to Federal the purported basis for their $100.3 million 'replacement value' insurance claim: testing and conclusions purportedly provided by an industrial hygienist at Kaizen Safety Solutions, Dawn Bolstad-Johnson."); *id.* ¶¶ 44-47 (alleging that Bolstad-Johnson testified at her deposition that she "is not a fire or wildfire-remediation expert"; that she "does not have the background and qualifications to determine whether the main home on the Property could be restored to its pre-fire condition through cleaning and other remediation measures short of a teardown"; that she "never recommended to Plaintiffs that the main house, pavilion, or wine room be completely replaced

[8] Plaintiffs refer to these Proofs of Loss collectively as "Loss Statement." Plaintiffs' Summary Judgment Motion at 15. Defendants refer to them as "POL 4" and "POL 5." They can be found in the record at dkt. no. 229 at ECF pp. 266 and 274; Dekel Decl., Exs. 67 (POL 5) and 70 (POL 4), dkt. no. 217 at ECF pp. 1807-1823, 1848-1856.

[9] Plaintiffs refer to this statement as the "Purported Counsel Statement." Plaintiffs' Summary Judgment Motion at 15. It can be found in the record at dkt. no. 229 at ECF p. 296.

because of Glass Fire damage"; and that she "never told Plaintiffs that the Glass Fire had caused such severe damage that the Property could not be restored to its pre-loss condition through cleaning and other remediation measures short of a demolition.").

Federal alleges in its breach of contract counterclaim that it was "substantially damaged by Plaintiffs' conduct because Federal was forced to investigate Plaintiffs' insurance claim, which was fraudulently presented." *Id.* ¶ 63. In particular, Federal alleges that "[t]he claim required Federal to spend substantial sums to adjust improper claims (including hiring expert consultants and directing those experts to conduct testing they otherwise would not have conducted)." *Id.* It further alleges that Federal has been damaged by Plaintiffs' conduct because it "has issued Plaintiffs nearly $4 million in payments, including years of additional living expenses, based on Plaintiffs' fraudulent claims that they had a valid basis to believe the Glass Fire had rendered their Property uninhabitable and that all the structures on the Property needed to be completely replaced." *Id.*

Similarly, in its fraud counterclaim, Federal alleges that Plaintiffs "falsely represented to Federal that their replacement coverage theory was supported by expert testing and analysis by Kaizen Safety Solutions." *Id.* ¶ 69. Federal goes on to allege that it relied on Plaintiffs' alleged misrepresentations and was damaged as follows:

> 69. Federal justifiably relied on Plaintiffs' misrepresentations and omissions. . . . Federal was obligated under California law to conduct an investigation into Plaintiffs' contamination claim. Consistent with these obligations, Federal accepted Plaintiffs' representations at face value and conducted a thorough investigation into Plaintiffs' claim. Federal learned only recently, during January 2025 depositions, that Plaintiffs' statements regarding their understanding of the alleged inability to repair their Property were false.
>
> 70. Had Federal known that Plaintiffs' 2021 insurance claim was not supported by qualified expert conclusions and was, in fact, fraudulent, Federal would have behaved differently. For example, Federal would not have paid Plaintiffs' post-August 2021 additional living expenses based on Plaintiffs' claim that the Property was uninhabitable. Federal would have investigated Plaintiffs' claim differently and would not have conducted certain testing, such as multiple rounds of air quality assessments, that were necessary to respond to Plaintiffs' replacement coverage theory. And Federal would have denied coverage earlier in the claims adjustment because Plaintiffs' fraud is a material breach of the Policy's concealment or fraud provision, which states that "[w]e do not provide coverage if you or any covered person has

United States District Court
Northern District of California

> intentionally concealed or misrepresented any material fact relating to this policy before or after the loss."
>
> 71. As alleged in more detail above, as a result of Plaintiffs' misrepresentations and omissions, Federal has suffered resulting damage, including because Federal was forced to investigate Plaintiffs' insurance claim, which was fraudulently presented, and because Federal has issued Plaintiffs nearly $4 million in payments on this insurance claim. But for Plaintiffs' fraudulent conduct, Federal would not have issued additional payments on Plaintiffs' fraudulent claims or spent additional sums continuing to adjust Plaintiff's improper claims.
>
> 72. Federal is entitled to restitution of the amounts it paid on Plaintiffs' fraudulent insurance claim under the Policy, which is now void, including without limitation the amounts that Federal paid Plaintiffs for additional living expenses between Plaintiffs' August 2021 proofs of loss and Federal's March 2024 coverage-position determination.
>
> 73. Federal is also entitled to recover (i) the costs that it incurred after August 2021 attempting to replicate and verify the testing conducted by Kaizen Safety Solutions; and (ii) the costs that it incurred investigating and adjusting Plaintiffs' August and September 2021 claims that the Property could not be repaired and needed to be completely replaced.

*Id.* ¶¶ 69-73.

In its Amended Answer, Federal seeks a declaration that: 1) coverage is not available under the Policy for Plaintiffs' claim because the Policy is null and void under the Fraud Provision; and 2) Federal owes no further compensation to Plaintiffs. *Id.*, Prayer for Relief. Federal also seeks "restitution of amounts paid by Federal to Plaintiffs under the Policy" and damages covering "(i) the costs that Federal incurred after August 2021 attempting to replicate and verify the testing conducted by Kaizen Safety Solutions; and (ii) the costs that it incurred investigating and adjusting Plaintiffs' August and September 2021 claims that the Property could not be repaired and needed to be completely replaced." *Id.*

In its summary judgment motion, Federal asks the Court to grant summary judgment in its favor on Plaintiffs' claims for bad faith, negligence and Financial Elder Abuse. It also seeks partial summary judgment on Plaintiffs' breach of contract and declaratory relief claims. Plaintiffs, in turn, bring a summary judgment motion seeking summary judgment in their favor on Federal's affirmative defenses based on failure to protect from further damage (Eighth Affirmative Defense), exclusions for gradual loss, neglect and contamination (Tenth Affirmative Defense) and

United States District Court
Northern District of California

damage incurred outside of the Policy Period (Fourteenth Affirmative Defense). Plaintiffs also seek summary judgment on Federal's counterclaims for breach of contract and fraud, as well as on the Fifteenth and Sixteenth Affirmative Defenses to the extent those defenses are based on the same facts as the counterclaims.

Federal also brings a *Daubert* motion in which it asks the Court to exclude the testimony of the following expert witnesses designated by Plaintiffs: (1) William Mills, in part; (2) Bernard Crimmins, in part; (3) Dawn Bolstad-Johnson, in part; (4) Christopher Nutter, in part; (5) Randy Mandel, in part; (6) Robert Harrison, in full; (7) David Michaels, in part; (8) John Verret, in full; (9) Brian Carl, in full; (10) Kevin Cahill, in full; (11) Charles Miller, in full; and (12) Neal Bordenave, in part.

## III. *DAUBERT* MOTION

### A. Legal Standards Under Rule 702 and *Daubert*

Under Rule 702 of the Federal Rules of Evidence, a witness may offer expert testimony if the following requirements are met:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In determining whether expert testimony meets the requirements of Rule 702, courts follow the approach set forth in *Daubert v. Merrell Dow Pharms., Inc.*, in which the Supreme Court described the relevant inquiry as follows:

> Faced with a proffer of expert scientific testimony, then, the trial judge must determine . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

509 U.S. 579, 590 (1993).

United States District Court
Northern District of California

With respect to the first requirement, that an expert must testify to "scientific knowledge," the Court in *Daubert* explained that "[t]he adjective 'scientific' implies a grounding in the methods and procedures of science . . . [while] the word 'knowledge' connotes more than subjective belief or unsupported speculation . . . [and] 'applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.'" *Id*. (quoting Webster's Third New International Dictionary 1252 (1986)). The Court declined to set forth a definitive test but offered some "general observations" about the types of factors that might be considered in determining whether this requirement is met. *Id*. at 593. These include: 1) whether the methodology can be or has been tested; 2) whether the theory and technique has been subjected to peer review; 3) if a "particular scientific technique" is involved, the known or potential rate of error; and 4) the degree of acceptance in the relevant scientific community. *Daubert*, 509 U.S. at 592-94.

The Ninth Circuit has noted that the "scientific knowledge" requirement is usually met by "[e]stablishing that an expert's proffered testimony grows out of pre-litigation research or that the expert's research has been subjected to peer review." *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 43 F.3d 1311, 1318 (9th Cir. 1995) ("*Daubert II*"). However, when such evidence is not available, the proponent's experts may satisfy this requirement by "explain[ing] precisely how they went about reaching their conclusions and point[ing] to some objective source – a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like – to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field." *Id*. at 1319.

The second requirement under Rule 702, that expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue," "goes primarily to relevance." *Id*. at 591. This is a question of "fit," and "is not always obvious." *Daubert*, 509 U.S. at 591. The Court cautioned that "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Id*. To meet this requirement there must be "a valid scientific connection to the pertinent inquiry." *Id*. In other words, the expert testimony must "logically advance[ ] a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315. This

United States District Court
Northern District of California

requirement is more stringent than the relevancy requirement of Rule 402 of the Federal Rules of Evidence, "reflecting the special dangers inherent in scientific expert testimony." *Jones v. U.S.*, 933 F. Supp. 894, 900 (N.D. Cal. 1996) (citing *Daubert*, 509 U.S. at 591; *Daubert II*, 43 F.3d at 1321 n. 17). In particular, expert testimony " 'can be both powerful and quite misleading because of the difficulty in evaluating it.' " *Id.* (quoting *Daubert*, 509 U.S. at 595 (citation omitted)). Therefore, federal judges should exclude scientific expert testimony under the second prong of the *Daubert* standard unless they are "convinced that it speaks clearly and directly to an issue in dispute in the case." *Id.* (quoting *Daubert II*, 43 F.3d at 1321 n. 17).

"[A] major principle underlying the *Daubert* gatekeeping function is that the trier of fact should not be unduly prejudiced by testimony that is based on foreign concepts." *Volk v. United States*, 57 F. Supp. 2d 888, 896 (N.D. Cal. 1999); *see also Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007) ("In *Daubert* and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court described the district court's 'gatekeeping role,' and required that 'all forms of expert testimony, not just scientific testimony' survive scrutiny under Rule 702.") (quoting *White v. Ford Motor Co*., 312 F.3d 998, 1007 (9th Cir. 2002)).

### B. *Daubert* Rulings[10]

#### 1. William Mills

Dr. William Mills is an environmental scientist and certified industrial hygienist who served an expert report dated April 18, 2025. Dekel Decl., Ex. 43 ("Mills April 18, 2025 Expert Report") at 1, dkt. no. 217 at ECF p. 1481. He offers the following opinions in his report:

1. The Tubbs fire had negligible, if any, impact on the Property.
2. The impact of other[ ] fires, prior to Glass Fire was minimal.
3. Air monitoring and other data shows the Property was heavily impacted by the Glass Fire for at least 10 days.
4. Post-fire indoor air monitoring data of the house on the Property indicates ongoing diurnal cycling of VOCs in 2022, consistent

[10] A number of Plaintiffs' experts retained for trial were also involved in investigating the damage sustained by the Property as a result of the Glass Fire and therefore are both expert witnesses and percipient witnesses. Federal proposed that "the parties agree that any witnesses who are both litigation experts and fact witnesses [would] be deposed during the expert-discovery period as to both their expert opinions and their percipient knowledge." Plaintiffs' Ex. LLL (Oct. 24, 2024 email from Federal's counsel to Plaintiffs' counsel). Plaintiffs agreed to that proposal. Plaintiffs' Opposition to *Daubert* Motion, dkt. no. 239 at 5 n. 6.

with absorption/adsorption of fire smoke components into porous materials in the house.

5. Air monitoring data for the Napa Valley and the Property does not show any significant events impacting the Property between November 2020 and the Crystal Fire in June 2024.
6. The Crystal Fire in June 2024 impacted the Property. Air monitoring data indicates concentrations of fire smoke on the Property similar to those measured for the Marshall Fire in Colorado in December 2022.
7. Determination of soot on surface samples using optical microscopy is not a reliable method for determining this parameter.

*Id.* at 4, ECF p. 1483.

At his deposition, Dr. Mills was asked by Federal's counsel on direct examination to answer several questions about cleaning indoor smoke particles by HEPA vacuuming. *See, e.g.,* Plaintiffs' Ex. CCC (Mills Dep.) at 80, 117, 206, 208; dkt. no. 236-2 at ECF pp. 218, 227, 250. On re-direct, Plaintiffs' counsel asked Dr. Mills to revisit the issue of HEPA cleaning. Dekel Decl., Ex. 16 (Mills Dep.) at 295-97; dkt. no. 217 at ECF pp. 451-53. Federal describes this questioning by Plaintiffs' counsel as an "ambush" and contends the opinions offered by Dr. Mills in response to the questions posed by Plaintiffs' counsel on re-direct should be excluded. *Daubert* Motion at 3. Plaintiffs contend the questions were posed merely for "clarification and completeness" in light of the questions asked on direct. Opposition at 5.

Federal Rule of Civil Procedure 26(a)(2) governs the disclosure of expert testimony. The parties must make their expert disclosures "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). If a party fails to provide information as required by Rule 26(a) they cannot use that information at trial "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). However, "[u]nder the doctrine of curative admissibility, 'the introduction of inadmissible evidence by one party allows an opponent, in the court's discretion, to introduce evidence on the same issue to rebut any false impression that might have resulted from the earlier admission.' " *Nguyen v. Sw. Leasing & Rental Inc*., 282 F.3d 1061, 1067 (9th Cir. 2002) (quoting *United States v. Whitworth*, 856 F.2d 1268, 1285 (9th Cir.1988) (citations omitted)); *see also GSI Tech., Inc. v. United Memories, Inc*., No. 5:13-CV-01081-PSG, 2015 WL 12942201, at *7 (N.D. Cal. Oct. 14, 2015) (experts may "testify on matters not included in their reports if [the other side] opens the door to such testimony during examination of their experts.").



United States District Court
Northern District of California

Here, neither side disputes that the questions at issue elicited opinions that were beyond the scope of the opinions offered by Dr. Mills in his report. Likewise, both sides appear to understand that while experts are generally limited to offering testimony within the scope of their reports, questions by opposing counsel may open the door to opinions not contained in an expert's report. The only dispute appears to be whether Federal's questions on direct did, in fact, open the door to the opinions offered on redirect. *See* Federal Reply at 3 (arguing that the opinions expressed on redirect went beyond the scope of the "narrowly tailored" questions posed by Federal's counsel on direct). The Court declines to rule on this question at this time as it would require it to speculate as to which of Dr. Mills' opinions might be offered at trial and how they might be used. However, the Court cautions Plaintiffs that at trial they will be permitted to question Dr. Mills only in connection with the opinions disclosed in his expert report, *except* to the extent that Federal opens the door to questioning on other issues at trial.[11] Likewise, if Federal asks questions on issues that go beyond the scope of the opinions offered by Dr. Mills in his expert report, the Court will permit Plaintiffs to elicit opinions on that specific subject matter as is necessary for rebuttal.

**2. Bernard Crimmins**

Bernard Crimmins has a background in environmental analytical chemistry and holds a Ph.D. in Marine Estuarine and Environmental Sciences with a specialization in atmospheric chemistry. He testified at his deposition that his work is "centered on analytical chemistry, on actual[ly] understanding the chemical profiles on individual matrices, which would include water[.]" Dekel Decl., Ex.19 (Crimmins Dep.) at 245, dkt. no. 217 at ECF p. 591. His CV reflects that his work has primarily focused on chemical profiles of water and fish. *Id.*, Ex. 46 (Crimmins CV), dkt. no. 217 at ECF pp. 1575-78. He has also conducted research in which he "assess[ed] the sources of combustion aerosol, biomass burning, . . . two stroke engines, essentially, the aerosol that was coming off the Indian subcontinent as part of the 'Indowex' experiment[,]" the goal of which was "to look at PAH profiles, and try to distinguish between what the dominant PAH source was." *Id.,* Ex.19 (Crimmins Dep.) at 40, dkt. no. 217 at ECF p. 515.

[11] Of course, to the extent Dr. Mills testifies as a percipient witness, he may testify as to facts within his personal knowledge regardless of whether they were included in his expert report.



United States District Court
Northern District of California

United States District Court
Northern District of California

Crimmins does not consider himself a "wildfire remediation expert" but instead, describes himself as an expert in "analytical environmental chemist[ry] [who] can help understand wildfire chemistry" and who "understand[s] the chemical principles behind remediation." *Id.* at 53-54, dkt. no. 217 at ECF pp. 528-29. He testified at his deposition that apart from the work he has performed for Plaintiffs, he has never been "brought inside a structure" and asked to "make some recommendations on whether we need to remove or replace parts of [the] structure after exposure to a wildfire." *Id.* at 56, dkt. no. 217 at ECF p. 531. However, he has been asked to "assess the air that is inside the structure" and to opine "what chemicals are actually in a structure." *Id.* He specifically testified that he had been retained on two occasions to assess the source of odors inside structures that were "causing the occupants to get sick." *Id.* at 38, ECF p. 513. In one of those cases, the odor was coming from "the mixing of a phenol based mold removal solution . . . and bleach." *Id.*

Crimmins also testified that he worked in a contract laboratory in the 1990s where he "looked at soil contamination" and that he has conducted research analyzing sediment contamination. He explained that "sediments are essentially soil that have water. So the matrix is very similar, and the work is very similar." *Id.* at 19, ECF p. 72. Although he testified at his deposition that he could not recall publishing any articles addressing *both* soil contamination and remediation, his expert report cites a 2022 article he authored entitled "Semi-Volatile Contaminants in Soils." Dekel Decl., Ex. 30 ("Crimmins February 14, 2025 Expert Report") at 21, dkt. no. 217 at ECF p. 1007.

Crimmins served an expert report dated February 14, 2025. Dekel Decl., Ex. 30 ("Crimmins February 14, 2025 Expert Report") at 1, dkt. no. 217 at ECF p. 987. In his report, Crimmins expresses the following opinions:

> Opinion 1. Fire smoke from biomass and structural fuels contain[s] hundreds of components that can negatively impact structures causing damage.
>
> Opinion 2. The property at 256 North Fork Crystal Springs Rd, Helena, CA has unique characteristics that enhanced the damage caused by the Glass Fire and resulting smoke.
>
> Opinion 3. The Glass Fire produced harmful chemicals and caused

> Toxicological Damage to the property at 256 North Fork Crystal Springs Rd, Helena, CA.
>
> Opinion 4. Investigations for damage caused by wildfire smoke must include an assessment of those constituents of smoke that are both likely to be contained in the smoke (provided there is no source testing) as well as those that are capable of causing Chemical Damage.
>
> Opinion 5. Chemicals produced by the Glass Fire have permeated the structures at the property and permeated the components of those structures (both interior and exterior) causing irreversible Chemical Damage to the structures.

*Id.* at 2, ECF p. 988.

Federal asserts that in light of Crimmins' "lack of particularized experience in wildfire investigation or remediation, he is not qualified to offer opinions on these topics and these opinions should be excluded." *Daubert* Motion at 8 (citing *Falcon v. State Farm Lloyds*, 2014 WL 2711849, at *10 (W.D. Tex. June 16, 2014)). It further contends Crimmins lacks the qualifications to offer the opinions about soil contamination found on page 21 of his expert report or about damage to art, books and furniture, summarized in Opinion 5 and explained at pages 21-22 of his expert report. *Id.* at 11-13. Federal also argues that Crimmins should be precluded from offering testimony about cracking, observing that while Crimmins' March 3, 2023 expert report (produced before Crimmins was designated as an expert) addressed cracking, his more recent report removed all opinions about cracking. *Daubert* Motion at 7 (citing Dekel Decl., Ex. Ex. 29 (March 2023 Rep.) at 17-19; dkt. no. 217 at ECF pp. 963-983). Nonetheless, Crimmins addressed cracking at his deposition in response to the question, "Have you identified any other place on the Pollock-Tabios property, where you would say there is deterioration of surfaces that you can attribute to the Glass Fire?" Plaintiffs' Ex. LL (Crimmins Dep.) at 225, dkt. no. 236-1 at ECF p. 123.

The Court declines to decide at this time whether Crimmins' opinions related to cracking are admissible. Whether his opinions are beyond the scope of his report or are, instead admissible elaboration of his opinions (as Plaintiffs contend), will depend on the specific testimony Plaintiffs seek to offer at trial and therefore, the Court will be in a better position to evaluate any objections Federal may seek to assert as to these opinions at that time.



United States District Court
Northern District of California

The Court rejects Federal's challenges to Crimmins' qualifications to opine about wildfire investigation, soil contamination and damage to the contents of Plaintiffs' house. "The issue of qualifications is governed by Federal Rule of Evidence 702 which contemplates a broad conception of expert qualifications." As the terms of the rule state, an expert may be qualified either by "knowledge, skill, experience, training, or education." *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994). "Moreover, the advisory committee notes emphasize that Rule 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert." *Id.* The Court finds that Cummins has sufficient experience to offer the challenged opinions and therefore DENIES Federal's request to exclude them on the basis that Cummins is not qualified to offer them.

**3. Dawn Bolstad-Johnson**

Dawn Bolstad-Johnson is an industrial hygienist who conducted site investigation at the Property after the Glass Fire and produced a report for Kaizen Safety Solutions LLC dated September 14, 2022. *See generally*, Plaintiffs' Ex. CCCCCC ("Kaizen Report"), dkt. no. 278. She has over 25 years' experience sampling after fires and "was the first to publish a peer-reviewed study on identifying and quantifying airborne toxins immediately after a fire is extinguished." *Id.* at 276-77, dkt. no. 278-2 at ECF pp. 127-28. She conducted testing at the Property over a series of visits between December 11, 2020 and January 2, 2022 using a GASMET device, testing "multiple locations and heights from every room, including closets." Dekel Decl. ¶ 2; Dekel Decl., Ex. 28 (Kaizen Report) at Pollock-Appraisal-000035, dkt. no. 217 at ECF p. 940.[12]

The GASMET is a portable instrument used to detect gases and chemical hazards in the air in real time. Dekel Decl., Ex. 28 (Kaizen Report) at Pollock-Appraisal-000034, dkt. no. 217 at ECF p. 939. Bolstad-Johnson testified that the GASMET comes with library files for up to 50 chemicals that contain the "spectra absorption" of those chemicals. Dekel Decl., Ex. 25 (Bolstad-Johnson Dep.) at 175, dkt. no. 217 at ECF p. 59. For every sample taken with the GASMET, a

[12] Dekel lists the dates of Bolstad-Johnson's visits based on the dates listed in her report. Plaintiffs do not dispute the accuracy of this information

"spectra file" is generated, which is like a "Polaroid picture of what was in the environment." *Id.* at 177, ECF p. 861. The spectra is then converted to an .SPE or .SPEX file using Calcmet software. *Id.* at 181, ECF p. 865.

Bolstad-Johnson testified that her testing process involved repeatedly adjusting the "analytes" in the library she tested for, turning some off and others on, depending on her results, to come up with her final library of analytes. Plaintiffs' Exhibit PP (Bolstad-Johnson Dep.) at 209-211, dkt. no. 236-1 at ECF p. 407. She testified that she did not "keep a record of the time that [she] turned off the analyte or added other analytes" but that "the data is completely reproducible because you have the spectra files." *Id.* at 201, ECF p. 407. The final analytes are listed in the Kaizen Report. Dekel Decl., Ex. 28 (Kaizen Report) at Pollock-Appraisal-000034, dkt. no. 217 at ECF p. 939. According to Plaintiffs, they produced to Federal "the raw data from [Bolstad-Johnson's] GASMET GT5000 Terra FTIR Ambient Air Analyzer ('GASMET') testing . . . and produced hundreds of pages of analysis in conjunction with her final report, including .txt files, excel spreadsheets background data, Aerotrak, P-Trak, and PID data." Plaintiffs' Opposition at 2 (citing Plaintiffs' Ex. EEEEEE, dkt. no. 236-5 at ECF p. 1316; *id.*, Ex. DDDDDD, dkt. no. 236-5 at ECF p. 1313).

Federal contends all of Bolstad-Johnson's opinions based on her GASMET testing should be excluded because she did not "maintain the unaltered results tables and text files generated based on the library—or any record of the 'alterations that were made along the way.'" *Daubert* Motion at 2 (citing Dekel Decl., Ex. 25 (Bolstad-Johnson Dep.) at 186, 199, dkt. no. 217 at ECF pp. 870, 876). Citing its own expert, Federal asserts that it is "significantly prejudiced" by Bolstad-Johnson's failure to preserve these files because it "has no way to know which chemicals Bolstad-Johnson tested for, but eliminated from her report and analysis—including whether those test results showed certain chemicals at non-detectable levels or otherwise support Federal's experts' opinions." *Id.* (citing Que Hee Decl., dkt. no. 224, ¶ 14).

Federal further contends the Court should exclude an opinion expressed in Bolstad-Johnson's rebuttal report stating that she had "personally tested homes in Colorado both before and after remediation efforts and found continued off-gassing of VOCs and other toxic



United States District Court
Northern District of California

United States District Court
Northern District of California

substances." *Id.* at 2-3 (quoting Dekel Decl., Ex. 42 (April 18, 2025 Expert Report of Dawn Bolstad-Johnson) at 6, dkt. no. 217 at ECF p. 1474). Federal also suggests it is asking the Court to exclude, more broadly, "Bolstad-Johnson's opinions based on her investigations of other properties." *Id.* at 3. According to Federal, these opinions should be excluded because Bolstad-Johnson refused to provide any specific information about these remediation efforts and testing based on privacy concerns and therefore it has not been able to meaningfully cross-examine her as to this opinion. *Id.*

The Court rejects Federal's assertion that Bolstad-Johnson's failure to preserve records of the process by which she arrived at the final library of analytes requires exclusion of all of her opinions relating to her GASMET data. It appears to be undisputed that the raw data for the analytes in the library that was used to support Bolstad-Johnson's conclusions in the Kaizen Report, including the spectra, which cannot be altered, were produced to Federal. Federal's contention that it is prejudiced by Plaintiffs' failure to produce data reflecting the preliminary library files that were not used to support the findings of that report is not persuasive.

The Court declines to decide Federal's second challenge, which it concludes is more appropriately addressed by objection at trial. The Court notes that it is not clear whether Federal's objection is limited to a single opinion or is directed at a broader set of opinions. The Court will be better able to evaluate Federal's objection at trial.

**4. Christopher Nutter**

Christopher Nutter is a licensed architect with "extensive experience in forensic analysis of defective construction, evaluation of architectural standard of care claims" who has "provide[d] opinions in disputes involving water intrusion, mold, construction error, design error, [and] product defect and performance[.]" Plaintiffs' Ex. YYYYY (Feb. 20, 2025 Expert Report of Christopher Nutter ("Nutter Expert Report")), CV; dkt. no. 236-4 at ECF p. 961. He is a member of the American Institute of Architects, a nationally certified architect through NCARB, licensed in multiple states including California, and LEED accredited. *Id.*

Nutter was retained by Plaintiffs to review documentation of damage to the structures on the Property, visit the Property and evaluate "the reasonableness and appropriateness of proposed

United States District Court
Northern District of California

cleaning and repair plans;" as well as to review and evaluate "the reasonableness of various scope and cost proposals for reconstruction, repairs, and cleaning of damaged Project elements." *Id.* at 1. Among the opinions he offers in his report are the following:

> 1. Fire consumed the guest house, burned in and around the un-combusted structures, and heated the adjacent ground to combustion temperatures.
>
> 2. Fire created combustion byproducts that circulated around and engulfed the exterior of the Main House, the Pavilion, the Wine Cellar, the Garage, the Outbuildings, and across the Project site, which were then circulated through open vents and by the HVAC system permeating habitable spaces, concealed areas, wall cavities, and attics.
>
> 3. Damage has been documented throughout the interior and exterior of all structures, and within the materials of each of the structures, by experts working for the Insurer and the Homeowners.
>
> 4. Much of the damage is located in areas difficult or impossible to access, including:
>
> a. Within wall cavities, including the framing, insulation, drywall, and sheathing
>
> b. Within the electrical system, including fixtures, outlets, equipment, and low voltage systems
>
> c. Within HVAC equipment, ductwork, and vents
>
> d. Behind and around built-in casework and shelving
>
> e. Within small crevices, such as door hardware and small gaps between building materials, both interior and exterior
>
> f. Within any porous material itself, such as stone, plaster, wood, gypsum, etc., both interior and the damage, leaving significant demolition as the only viable solution for accessing and addressing the damage.
>
> 5. Remediation cannot be achieved by simple surface cleaning due, in part, to the inaccessibility of the damage, leaving significant demolition as the only viable solution for accessing and addressing the damage.
>
> 6. The Insurer's cleaning protocols do not adequately address the documented damage.
>
> 7. The Insurer's cleaning protocols do not adequately address the remediation called for by its own consultants.

*Id.* at 4, ECF p. 931.

Federal contends Nutter is "unqualified to offer opinions on the extent of fire damage and whether it can be remediated[,]" because he concedes that he is not a smoke or fire damage expert or an industrial hygienists and that he "rel[ied] upon the designation by others that something [was] damaged" by fire. *Daubert* Motion at 9 (citing Dekel Decl., Ex. 20 (Nutter Dep.) at 83-84, 176, dkt. no. 217 at ECF pp. 633-34, 650). In particular, Nutter testified that he relied on the information provided by both Plaintiffs' and Federal's experts "who have all identified damage and then [took] that information, relating it to the configuration and particulars of the . . . structures[,]" based on his experience as an architect. *Id.* at 83-84, 90, ECF pp. 633-34, 640.

Federal also argues that Nutter's opinions "regarding wildfire debris in 'concealed spaces' and 'chases and wall cavities' are unsound and lacking any basis[,]" citing Nutter's testimony at his deposition "that he is not aware 'of any single [testing] sample . . . from within a wall cavity or within a chase.'" *Id.* at 16 (citing Dekel Decl., Ex. 20 (Nutter Dep.) at 297-98, dkt. no. 217 at ECF pp. 662-63). Federal also suggests Nutter's opinions concerning wildfire debris in concealed spaces is unreliable because he has testified that he had "no opinion as to 'whether wildfire byproduct can get [through] or pass through insulation in a . . . house or in an attic.'" *Id.* at 16 (citing Dekel Decl., Ex. 20 (Nutter Dep.) at 297-98, dkt. no. 217 at ECF pp. 662-63).

The Court rejects Federal's arguments. Nutter's opinions as to whether the fire damage can be remediated is based on his expertise related to the difficulties of cleaning vs. rebuilding associated with the physical characteristic of the structures, a subject that is well within his expertise. For example, he offers opinions relating to the likely ineffectiveness of cleaning the ductwork in the house due to the fact that it has flexible ducts and "contains numerous folds and small crevices due to the nature of the product's flexibility, which provides areas for fire debris and other combustion byproducts to settle." Plaintiffs' Ex. YYYYY (Nutter Expert Report) at 15, dkt. no. 236-4 at ECF p. 944.

Likewise, Nutter's testimony related to contamination in concealed spaces, including areas of the HVAC system with insulation, was based on how contaminants flow within a structure. *See* Dekel Decl., Ex. 20 (Nutter Dep.) at 298, dkt. no. 217 at ECF pp. 663 (testifying that there were

gaps around the insulation that wildfire debris would have flowed around, following the "path of least resistance"). While Federal is free to challenge Nutter on those opinions, it has not established that they are unreliable for the purposes of Rule 702 and *Daubert.*

**5. Randy Mandel**

Randy Mandel specializes in "biodiversity and restoration ecology including with the remediation of fire-impacted ecosystems, and has approximately 40 years experience in "plant ecology, restoration, remediation, reclamation [and] revegetation." Dekel Decl., Ex. 35 (Feb. 20, 2025 CTEH Technical Memorandum: Estimated Remediation Pricing For The Pollock-Tabios Property In Response To The Glass Fire ("Mandel Report")) at 2, dkt. no. 217 at ECF p. 1121; Plaintiffs' Ex. MM (Mandel Dep.) at 13, dkt. no. 236-1 at ECF p. 156. He was part of a team from Ramboli U.S. Consulting, Inc. ("Ramboli") that produced a May 2023 technical report addressing fire effects and remediation of the Property. Dekel Decl., Ex. 35 (Mandel Report) at 1, dkt. no. 217 at ECF p. 1120. He was subsequently retained by Plaintiffs to provide a report addressing "the cost of implementing remediation recommendations proposed to address the effects of the Glass Fire on the vegetated portions of the Property[,]" "consider[ing] the restoration of the landscape areas and wildland areas of the Property independently due to the different ecological composition of these areas because of past and current land." *Id.*

Mandel offers opinions on a proposed restoration plan, which he opines is consistent with the requirements of the Napa County Soil Standards for Private Debris and Ash Removal (DAR) Cleanup, 2017 Napa Fire Complex. *Id.* The plan addresses "the issues of damaged vegetation, slope instability, and soil contamination." *Id.* at 12, dkt. no. 217 at ECF p. 1131. One of the recommendations of Mandel's report relates to soil removal:

> **Soil Removal**. To help reduce the risk of further impact to health, the surrounding environment, and groundwater, 12-inches of soil will be removed from the landscape area. To permit the excavation of this soil volume, the project will require a grading permit from Napa County, which will include a grading plan as well as additional planning documents such as an erosion and sediment control plan and a stormwater management plan. CEQA and additional permits may be required and will need to be confirmed through subsequent iterations of the Property's restoration/planting plan. Soil will be transported and disposed of at an approved location, most likely outside of the State of California (based on input from the client and



United States District Court
Northern District of California

United States District Court
Northern District of California

> his representatives). Per Napa County ordinance, soil removal can only take place during six months of the year and will require specialized equipment due to the narrow width of the surrounding roads and the Property's driveway, access points, and slope angles. Post-excavation confirmatory soil sampling will be performed to confirm that impacted soil above the regulatory standards has been removed before importing topsoil. In the event it is determined that impacted soil remains, excavation activities and confirmatory soil sampling will continue until it can be verified that soil above regulatory standards has been properly removed.

*Id.* at 14, dkt. no. 217 at ECF p. 1133.

Mandel further explains the basis for his assumption that 12 inches of soil needs to be removed (rather than the 36-inch "worst-case scenario" assumption used by experts retained by Plaintiffs whose remediation cost estimates were higher than Mandel's), stating:

> [G]iven the absence of a comprehensive sampling grid consistent with the requirements of the guidance of the Napa County Soil Standards for Private Debris and Ash Removal (DAR) Cleanup, 2017 NAPA Fire Complex, the guidance provides an alternative to the removal of 36-inches. "The USACE has determined that fire debris related impacts generally do not extend beyond 12" into the native soil. As result of their determination, 12" of soil may be removed from the entire impacted area with no confirmation sampling required." As such, 12" of soil removal will be used as the remediation guidance for the Property, including both the Landscape and Wildland Areas Napa County 2017.

*Id.* at 21, dkt. no. 217 at ECF p. 1140. Likewise, he testified at his deposition that he relied on the opinions of other experts retained by Plaintiffs for their assessment of "human health risk and . . . to tell [him] what's in [the soil], in other words, what the contamination is, the degree of that contamination, and the spread of that contamination, [as well as] the nature of sampling" that was conducted." Plaintiffs' Ex. MM (Mandel Dep.) at 113, dkt. no. 236-1 at ECF p. 181. But "the bottom line," according to Mandel, is "the requirements of the DAR . . . , and that is, if the site has not been fully sampled, then it is very clear what that requirement is, and it's the 12-inch excavation." *Id.* at 113-14, dkt. no. 236-1 at ECF p. 181-82; *see also id.* at 168, dkt. no. 236-1 at ECF p. 194 ("when the rocks burn, when the trees burn, when the ashes formed, there is a potential for contaminants to be both in the soil and in the sediment. And out of an abundance of caution as well as, in this case, in compliance with the requirements of the DAR, it is typical to have it removed.").

United States District Court
Northern District of California

Federal contends Mandel should not be permitted to testify about soil contamination because he concedes he is not a soil contamination expert. *Daubert* Motion at 10 (citing Dekel Decl., Ex. 13 (Mandel Dep.) at 268, dkt. no. 217 at ECF p. 386). It also contends he is not qualified to offer opinions about DAR regulations because he is not a regulatory expert. *Id.* The Court does not find these argument persuasive. First, the primary basis for Mandel's opinion that 12 inches of soil needs to be removed from the Property is the DAR regulations that call for removal of 12 inches of soil when soil testing is incomplete; application of this requirement does not require Mandel to be an expert in soil contamination. Furthermore, to the extent that his opinions reference the findings of other experts in this case with respect to soil contamination, *Daubert* makes clear that "[e]xperts working in specialized, scientific, and uncertain fields regularly 'extrapolate from existing data' and generate novel hypotheses about complex issues." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1026 (9th Cir. 2022) (quoting *Daubert*, 509 U.S. at 592–93)). The fact that Mandel relies on data and opinions of other experts does not render his principles and methodology invalid.[13] Finally, Mandel does not need to be an expert in soil removal regulations to opine about the *implications* of the DAR regulations for remediation of fire impacts to the Property – an area in which Mandel *is* and expert. *See Homyk v. ChemoCentryx, Inc.*, No. 21-CV-03343-JST, 2025 WL 1547625, at *10 (N.D. Cal. May 30, 2025) (permitting doctor to testify "about the medical significance of the FDA's observations and discussions—and not about the regulatory context or implications of the FDA's actions."). Therefore, the Court denies Federal's request to exclude Mandel's opinions on these grounds.

---

[13] Of course, while " '[a] testifying expert may rely on the opinions of non-testifying experts as a foundation for the opinions within the testifying expert's field of expertise[,] Rule 703 . . . is not a license for an expert witness to simply parrot the opinions of *non-testifying* experts.'" *Woods v. City of Hayward*, No. 19-CV-01350-JCS, 2021 WL 4061657, at *19 (N.D. Cal. Sept. 7, 2021) (quoting *Villagomes v. Lab'y Corp. of Am.*, No. 2:08-cv-00387-RLH, 2010 WL 4628085, at *4 (D. Nev. Nov. 8, 2010) (emphasis added); and citing *Aquino v. Cty. of Monterey Sheriff's Dep't*, No. 5:14-cv-03387-EJD, 2018 WL 3548867, at *4 (N.D. Cal. July 24, 2018) ("Accordingly, to the extent that Dr. Roberts' report contains opinions that require qualification as an expert, Defendants cannot introduce them by parroting them through Dr. Levy.")). Thus, while the Court denies Federal's request to exclude Mandel's opinions, Federal may raise objections at trial if it believes that Plaintiffs are attempting to improperly introduce the opinions of non-testifying experts through Mandel.

**6. Robert Harrison**

According to Plaintiffs, Harrison is a "board certified environmental and occupational exposure physician." Opposition at 23. Federal describes him as a "medical doctor." *Daubert* Motion at 14. Neither side cites any evidence of Harrison's area of expertise and Harrison's CV does not appear to be in the record. Nor do the parties appear to have included Harrison's expert report, although it is referenced in his deposition. *See* Dekel Decl., Ex. 24 (Harrison Dep.) at 64, dkt. no. 217 at ECF p. 781. Federal seeks to exclude Harrison's opinion expressed at his deposition that "there [is] probably an increased human health risk due to formaldehyde at this property as compared to whatever human health risk existed due to formaldehyde before the fire." *Daubert* Motion at 14 (citing Dekel Decl., Ex. 24 at 135, dkt. no. 217 at ECF p. 604). It asserts that the causation finding implicit in this opinion (that the Glass Fire caused an increased risk to human health at the Property) is flawed for two reasons.

First, Federal contends, Harrison assumes that formaldehyde "detected in the house between February and December 2021 is 'probably' from the Glass Fire" but he testified at his deposition that he did not know if it was "scientifically plausible for formaldehyde from a September 2020 fire to still be off-gassing from building materials 5 months to 1.3 years later." *Id.* at 15 (citing Dekel Decl., Ex. 24 at 202, dkt. no. 217 at ECF p. 821). Furthermore, Harrison "conceded that he made no findings about formaldehyde levels in the house before the Glass Fire[.]" *Id.* Second, Federal asserts, Harrison's analysis is "not good science" because he "was provided no information about the contents of the house even though he testified that elevated formaldehyde levels could result from off-gassing by synthetic or other materials in the house." *Id.* (citing Dekel Decl., Ex. 24 at 126, 128, dkt. no. 217 at ECF pp. 797, 799).

Plaintiffs counter that there "are facts in the record from Dr. Crimmins that provide the foundational basis for Dr. Harrison's opinion that there is an increased risk of cancer from the Glass Fire." Opposition at 23 (citing Plaintiffs' Ex. MMM (Crimmins Report) at 11, 18, dkt. no. 236-2 at ECF pp. 866, 873). They further assert that his methodology is sound. *Id.* In particular, Harrison relied on findings of both Plaintiffs' own experts and Federal's experts indicating that formaldehyde levels in the house after the Glass Fire were high and compared those to the levels

United States District Court
Northern District of California

of formaldehyde that are typically found in houses, as well as the level he would have expected in a house like Plaintiffs', in which no one was living at the time the measurements were taken. *Id.* at 23-24 (citing Plaintiffs' Ex. GGGGG (April 18, 2025 Expert Report of Dr. Shane Que Hee (Que Hee Rebuttal Report) at 18–19, dkt. no. 236-4 at ECF pp. 279-80).

Because the parties have not supplied Harrison's expert report, the Court declines to decide this dispute at this time. Federal may renew its challenge in its pretrial filings or at trial.

**7. David Michaels**

David Michaels is an epidemiologist who has spent his career in public health. Dekel Decl., Ex. 36 (February 20, 2025 Expert Report of David Michaels ("Michaels Report")) at 1, dkt. no. 217 at ECF p. 1145. He is a professor in the Departments of Environmental and Occupational Health and Epidemiology, at the George Washington University Milken Institute School of Public Health. *Id.* He served as Assistant Secretary for Environment, Safety and Health in the U.S. Department of Energy in the Clinton administration and as Assistant Secretary for the Occupational Safety and Health Administration (OSHA) in the U.S. Department of Labor in the Obama administration. *Id.*

Michaels states that he has "expertise that is directly applicable to understanding the efforts of [Federal], its attorneys, and its consultants in their attempts to create doubt about the impact of smoke and ash on the Pollock and Tabios residence." *Id.* In particular, he states:

> I have written two books and numerous journal articles on how polluters and manufacturers of hazardous products or materials employ mercenary scientists and consulting firms to manufacture uncertainty about the harms of these products. These scientists and firms are often called "product defense" or "doubt science" firms because they attempt to exonerate products which have been implicated in causing damage to the public's health or environment. The objectives of the product defense efforts are to confuse the public, delay public health and environmental regulation, and defeat litigation pursued by individuals who believe they have been hurt by these products. The studies produced by product defense scientists are used to create doubt about scientific evidence base that serves as the foundation of public health and environmental protections.

*Id.* The books Michaels has written on this subject are *Doubt is Their Product: How Industry's Assault on Science Threatens Your Health,* published by Oxford University Press in 2008, and *The Triumph of Doubt: Dark Money and the Science of Deception,* published by Oxford University

Press in 2020. *Id.* at 2, dkt. no. 217 at ECF p. 1146.

Michaels offers the following opinions in his report:

> 1) . . . there is vast epidemiological and toxicological information indicating the components of wildfire smoke and combustion are hazardous and that there is no credible basis on which to say that re-occupation of a home that was engulfed in smoke during a WUI fire is safe absent an assessment of the risk posed by those constituents.
>
> . . .
>
> 2) . . . it is neither appropriate nor valid to use OSHA and ACGIH standards or recommendations to ascertain residential safety.
>
> 3) the reports and conclusions of [Federal] experts are examples of "doubt science."

*Id.* at 3, 5, 7, dkt. no. 217 at ECF pp. 1147, 1149, 1151. Federal challenges the last opinion.

In support of his opinion that Federal's experts are practitioners of doubt science, Michaels points to several specific examples. First, he cites Federal's "Exponent Thermal Damage Report" in which co-author Amir Jokar relied on a definition of "damage" drawn from California Earthquake Authority Guidelines; Michaels opines it is inappropriate to use this definition in "evaluation of thermal damage, or any damage resulting from exposure to fire or smoke[,]" pointing to the "reference document given as the source of the definition." *Id.* at 9, dkt. no. 217 at ECF p. 1153. In particular, he asserts that the "reference document does not address structural or any other type of damage caused by fires or thermal exposure; rather, it contains a clear warning that this particular definition should only be applied to damage caused by earthquakes." *Id.*

Second, Michaels challenges the opinion of Federal's expert Michael Marsden, who "concludes that the levels of toxic substances 'do not exceed California's screening levels and no remediation is required based on relevant screening criteria.'" *Id.* at 10, dkt. no. 217 at ECF p. 1154. According to Michaels, Marsden compared screening levels published by the California Department of Toxic Substances Control (DTSC) Human and Ecological Risk Office (HERO) for individual substances but did "not sum all the levels to provide a more accurate estimation of the risk from those materials[,]" even though "the DTSC asserts that these measurements should be used for screening sites as a whole, not for 'screening out' individual chemicals." *Id.*

Third, Michaels points to the expert report from HRA Environmental Consultants, Inc., in which he contends author Hamid Arabzadeh "makes a series of assertions for which he provides no supporting evidence from the scientific literature." *Id.* at 11, dkt. no. 217 at ECF p. 1155. In particular, Michaels cites Arabzadeh's opinions that "all wildfire related components at the Property can be effectively cleaned" and that "[t]he Main Structure can be remediated through cleaning and returned to its condition prior to the Glass Fire; there is no need to tear down and rebuild." *Id.* at 11-12, dkt. no. 217 at ECF pp. 1155-56. According to Michaels, "Mr. Arabzadeh provides no published studies, or any studies at all, that support those conclusions. Rather, his opinions rely on his mere assertion." *Id.* at 12, dkt. no. 217 at ECF p. 1156.

Michaels goes on to opine that "[t]he business model of many of [Federal's] doubt science experts requires them to provide reports useful to the client – in this case [Federal]." *Id.* According to Michaels:

> This is the basic model of consulting firms that specialize in "litigation support." The consulting firms are hired not to produce accurate scientific and technical work but rather to help the client prevail in litigation. If any of these firms produced reports that reached conclusions that contradicted the arguments the client needed to make in court, the consulting firm would lose clients. If that continued, it would likely go out of business.

*Id.* Michaels opines that "[l]itigation support is a component of the business model several of the consulting firms hired by Federal]," including J.S. Held, Roux Associates and HRA Environmental Consultants, Inc., "and it is a service they promote." *Id.*

To support his opinion as to J.S. Held, Michaels points to the J.S. Held website, which "advertises the firm's skills at helping its clients succeed in commercial litigation[.]" *Id.* at 13, dkt. no. 217 at ECF p.1157. As to Roux Associates, Inc., Michaels asserts that litigation support is one of the "primary services Roux Associates offers its clients" and he points to the qualifications of Michael Marsden, described by Roux as follows:

> He has also worked over the years on numerous litigation cases. For the past several years, Mr. Marsden has worked with many of the major insurance companies such as AIG, CNA, Resolute, Hartford, Great American, Chubb, and the London market evaluating environmental claims at sites across the country. He works with both carriers and counsel to evaluate various aspects of environmental claims including sources and timing of contaminant releases, incurred



United States District Court
Northern District of California

and future cost, and cost allocation.

*Id.* (citation omitted). Similarly, he points to statements on the HRA Environmental Consultants' website indicating that litigation support is one of its "primary services." *Id.*

Federal contends Michaels does not have the "qualifications necessary to critique Arabzadeh, Jokar, and Marsden." *Daubert* Motion at 17-18. As to Jokar, it asserts that "Michaels has no experience with the CEA guidelines and based his critique on a first-time review of the publication." *Id.* at 17, citing Dekel Decl., Ex. 12 (Michaels Dep.) at 276, dkt. no. 217 at ECF p. 314 (testifying that he reviewed the CEA guidelines for the first time when he evaluated Jokar's opinion). As to Marsden, Federal contends Michaels is unqualified to evaluate Marsden's application of DTSC standards because Michaels "is not a hydrologist and has no experience in soil remediation or DTSC standards. *Id.* at 17-18 (citing Dekel Decl., Ex. 12 (Michaels Dep.) at 15, 247-48, dkt. no. 217 at ECF pp. 243, 287-88). As to Arabzadeh, Federal asserts Michaels does not have the expertise to critique Arabzadeh's conclusion that Plaintiffs' home can be effectively cleaned because "Michaels admits he is not an expert in, and has never assessed, how to remediate a smoke-exposed structure; and he has never had any professional engagement related to post-wildfire residential safety." *Id.* at 17, dkt. no. 217 at ECF p. 243.

Federal also argues that Michaels' opinion that "the reports and conclusions of [Federal's] experts are examples of 'doubt science,' because their employers' business model 'requires them to provide whatever finding [is] needed by the client' " is not helpful to the trier of fact because it invades the province of the jury by testifying about the credibility of witnesses. *Id.* at 18 (citing Dekel Decl., Ex. 36 (Michaels Report) at 7-13, dkt. no. 217 at ECF pp. 1151-57). According to Federal, the jury does "not need an expert to tell them that financial motives might influence a witness's opinions, and allowing Michaels to weigh the evidence for them would also be unhelpful and substantially prejudicial under Rule 403." *Id.*

Finally, Federal contends Michaels' methodology is "slapdash[,]" "based on a review of cherry-picked public information, [and] is unreliable and speculative." *Id.* at 19-20.

Plaintiffs reject Federal's challenge, arguing that Michaels' opinions have "a solid foundation in his expertise as an epidemiologist focused on public health as it applies to insurance



United States District Court
Northern District of California

companies downplaying wildfire." Opposition at 17. Thus, they contend, he need not "be an expert in multiple fields to opine on the lack of published studies supporting [Federal's] experts." *Id.*

Plaintiffs further assert that Michaels can assist the trier of fact by educating the jury about "insurance industry practices," which are "directly relevant to Plaintiffs' burden in [proving] a bad faith claim." *Id.* at 18. They contend Federal's reliance on cases holding generally that experts cannot opine on witness credibility are not applicable here, where Plaintiffs are seeking to establish the insurer's bias. *Id.* According to Plaintiffs, "[a]n 'insurer's bias may be shown' where, for example, the 'insurer dishonestly selected its experts' or the 'insurer's experts were unreasonable.' " *Id.* (citing *Hangarter v. Provident Life & Acc. Ins. Co*., 373 F.3d 998, 1010 (9th Cir. 2004)). They contend the court in *Hangarter* "condoned expert testimony that an insurer was biased" and that the testimony Michaels offers about Federal "downplaying the danger of wildfire" is "no different." *Id.* They also point to *Pooshs v. Phillip Morris*, in which "plaintiff's epidemiologist testified about Phillip Morris's marketing and efforts to downplay the smoking dangers." *Id.* (citing *Pooshs v. Phillip Morris USA, Inc*., 287 F.R.D. 543, 553 (N.D. Cal. 2012)). Finally, Plaintiffs contend Michaels' opinions are reliable as he is a top authority on "doubt science" and that Federal's challenge goes to the weight of the evidence rather than its admissibility. *Id.*

The Court concludes that while evidence of insurer bias may be proper where, as here, insurance bad faith is alleged, Plaintiffs have not established that Michaels has the qualifications to opine on that subject here or that his methodology with respect to the specific experts he critiques is reliable.

"The key to a bad faith claim [under California law] is whether or not the insurer's denial of coverage was reasonable." *Hangarter v. Provident Life & Acc. Ins. Co*., 373 F.3d 998, 1009–10 (9th Cir. 2004) (quoting *Amadeo v. Principal Mut. Life Ins. Co*., 290 F.3d 1152, 1161 (9th Cir. 2002) (citations and quotation marks omitted)). The court may decide that an insurer's actions in denying the claim were reasonable as a matter of law "[w]here there is a genuine issue of an insurer's liability under a policy." *Id.* at 1010 (citing *Chateau Chamberay Homeowners Ass'n v.*

*Associated Int'l Ins. Co*., 90 Cal.App.4th 335, 346 (2001)). Such a "genuine dispute" will "generally immunize an insurer from liability," but "a jury's finding that an insurer's investigation of a claim was biased may preclude a finding that the insurer was engaged in a genuine dispute, even if the insurer advances expert opinions concerning its conduct." *Id.* (citation omitted). An insurer's bias may be shown in a variety of ways, including by showing that "[t]he insurer dishonestly selected its experts; . . .. The insurer's experts were unreasonable; or . . . The insurer failed to conduct a thorough investigation." *Id.*

In *Hangarter*, for example, the Court of Appeals found that "the district court did not err in determining that the jury had substantial evidence before it to find that the Defendants engaged in a biased, and thus 'bad faith,' investigation[ ]" where the jury had been presented with evidence that the defendants exhibited bias in selecting and retaining the doctor who conducted the independent medical evaluation. *Id.* at 1011. In particular, evidence was presented to the jury that the defendant had used the same doctor nineteen times in a five-year period and the plaintiff's expert testified that "when an insurer 'use[s] the same [IME] on a continual basis,' the medical examiner becomes 'biased' because they 'lose their independence.'" *Id.* The jury also was presented with "evidence show[ing] that in thirteen out of thirteen cases involving claims for total disability, [the doctor] rejected the insured's claim that he or she was totally disabled." *Id.* In addition, there was evidence that the retention letter sent to the doctor by the defendant was "written by an in-house medical consultant who had never examined Hangarter, [and] claimed that there were no objective findings for a disabling injury." *Id.* The plaintiff's expert testified that "this letter 'bias[ed]' and 'predispos[ed] the doctor' against finding disabling injuries by 'telling him [Defendants'] opinion.' " *Id.*

The Court agrees that Michaels' opinions are similar to the evidence presented in *Hangarter*. Rather than opining about the credibility of Federal's expert witnesses, which would improperly invade the province of the jury, *see United States v. Candoli*, 870 F.2d 496, 506 (9th Cir. 1989) ("An expert witness is not permitted to testify specifically to a witness' credibility or to testify in such a manner as to improperly buttress a witness' credibility"), Plaintiffs offer Michaels' testimony to establish bias, which is, in general permissible. The Court is concerned, however, that

while Plaintiffs contend Michaels will educate the jury about "insurance industry practices," his expertise in the field of doubt science relates to its use by "polluters and manufacturers of hazardous products or materials." Plaintiffs have not established that Michaels' background makes him an expert with respect to the uses of doubt science in the insurance industry. Furthermore, his methodology appears to rely excessively on the mere fact that the consultants retained by Federal focus on their litigation services, without closely examining the specific facts related to these consultants, such as whether they have consistently provided defense side services and whether their opinions have consistently aligned with the position of the insurance company. Therefore, the Court concludes that Plaintiffs have failed to establish that Michaels has the expertise to offer the challenged "doubt science" opinions, which are excluded under Rule 702 and *Daubert*.

**8. John Verret, Brian Carl and Kevin Cahill**

John Verret is an attorney, forensic accountant and former senior counsel and chief economist for the U.S. House Financial Services Committee. Plaintiffs' Ex. PPP (March 26, 2025 Expert Report of John Verret ("Verret Report")) at 2, dkt. no. 236-2 at ECF p. 922. He was retained to analyze whether Federal "has complied with [Generally Accepted Accounting Principles ('GAAP')] with respect to its decision not to reserve for the [Pollacks'] claim and in how the claim was handled, whether any related failure constitutes a 'red flag' indicator of a potential compliance or accounting failure under the federal security laws and GAAP." *Id.* Verret reviewed various materials produced in discovery and concluded that there were "sufficient red flags that suggest a possible failure on Chubb's part to comply with accounting principles and disclosure requirements with respect to Mr. Pollack's claim and consistent with a potential internal control failure[,]" warranting a "thorough investigation." *Id.* at 10, dkt. no. 236-2 at ECF p. 930; *see also* Dekel Decl., Ex. 14 (Verret Dep.) at 74, dkt. no. 217 at ECF p. 416 ("I'm opining with a definitive conclusion that there's sufficient red flags to begin an investigation. But I'm not opining on the final results of that investigation.").

Kevin Cahill and Brian Carl are consultants with FTI Consulting, Inc. Plaintiffs' Ex. RRR (March 26, 2025 Analysis of restoration costs associated with the Glass Fire and Economic



United States District Court
Northern District of California

analysis of Federal's 2020 U.S. wildfire coverage and estimated exposure by FTI Consulting ("FTI Report")) at 2-3, dkt. no. 236-2 at ECF pp. 960-61. FTI Consulting "regularly provides consulting and expert services related to economic loss analysis, insurance claim practices, executive compensation structures, and financial reporting." *Id.* at 2, dkt. no. 236-2 at ECF p. 960. Cahill is an economist with a focus on applied econometrics and labor economics. *Id.* Carl is an economist with an emphasis on finance. *Id.* at 3, dkt. no. 236-2 at ECF p. 961.

Cahill's analysis and opinions are summarized in the FTI Report as follows:

> 12. Dr. Cahill applies standard economic approaches and publicly-available data to reliably quantify a lower bound for the aggregate restoration costs from the Glass Fire. He uses Geographic Information System (GIS) data on the Glass Fire footprint overlayed with Sonoma County and Napa County tax lot data to identify properties that have been adversely affected by the fire . . . . For a control group, he uses properties in these two counties that do not fall within the Glass Fire boundary. A control group is necessary for this type of analysis because it provides a mechanism to take into account confounding factors, including changes in overall market trends.
>
> 13. Using pre- and post-fire sales data for both the treatment and control group, Dr. Cahill estimates a difference-in-differences hedonic regression model that quantifies the percentage reduction in value for properties affected by the Glass Fire. This value takes into account market-level supply and demand factors that extend beyond each individual property. As such, the reduction in value represents a lower-bound estimate of restoration costs.
>
> 14. Dr. Cahill estimates that the aggregate restoration costs for high-value properties within the Glass Fire are at least $335 million. Applying an estimate of Federal's market share for high income properties, and taking into account personal property, Federal's share of the restoration costs associated with the Glass Fire, based on lower-bound estimates, is between $55.0 million and $131.1 million in 2024 dollars. Federal's data on 33 claims associated with the Glass Fire shows a total amount paid equal to $51.3 million . . . . Adjusting for ALE and inflation, Federal's payments for covered losses are lower than what would be expected given actual losses from the Glass Fire.

*Id.* at 5, dkt. no. 236-2 at ECF p. 963. According to the FTI Report, Carl then "estimate[d] Federal's potential exposure from the 2020 Glass Fire and a subset of other 2020 wildfires to be between $62.3 to $125.3 million in 2020 dollars, before accounting for Federal's reinsurance recoveries." *Id.*

Federal contends the opinions of Verret, Cahill and Carl do not "logically advance[] a material aspect" of Plaintiffs' case and therefore should be excluded in their entirety under Rule

United States District Court
Northern District of California

702. *Daubert* Motion at 20-23 (quoting *Daubert*, 43 F.3d at 1315). They also contend these opinions should be excluded under Rule 403 of the Federal Rules of Evidence. Plaintiffs, on the other hand, contend Verret's opinions related to "red flags" are relevant to their bad faith claim and that Cahill and Carl's opinions are relevant to their claim for punitive damages. Opposition at 20-21.

The Court finds that Verret's opinion that there were "red flags" that warranted further investigation will not assist the jury as it is of tangential relevance to Plaintiffs' bad faith claim. In addition, any limited relevance to bad faith will be outweighed by the prejudice that will result from presenting Verret's opinion to the jury. Therefore, Verret is precluded from testifying at trial pursuant to Rules 403 and 702 of the Federal Rules of Evidence. The Court declines to rule on Federal's challenges to the opinions offered by Cahill and Carl at this time as it will be better able to assess the relevance and potential prejudice of these opinions at trial. Should Plaintiffs seek to introduce these opinions at trial, the Court will decide the question following a hearing outside of the presence of the jury.

**9. Neal Bordenave**

Neal Bordenave has worked in the insurance industry since 1988. Dekel Decl., Ex. 32 (February 20, 2025 Insurance Expert Report by Neal Bordenave ("Bordenave Report")), dkt. no. 217 at ECF p. 1032. He is currently the president and CEO of RiskPro Insurance Services, Inc., a California Corporation operating in Chico, California that provides "commercial property and casualty insurance sales, client services, claims services and risk management services." *Id.* He began his career in the insurance industry in 1988, when he was licensed as an insurance agent/broker in California, *id.*, and he has been an insurance agent "most of [his] career." Dekel Decl., Ex. 11 (Bordenave Dep.) at 37, dkt. no. 217 at ECF p. 207. In addition, between 2006 and 2022, he was on the faculty of the College of Business, at California State University-Chico, where he taught courses in Risk Management & Insurance, Corporate Finance and Personal Financial Planning. Dekel Decl., Ex. 32 (Bordenave Report), dkt. no. 217 at ECF p. 1032. He has never worked as a claims adjuster. Dekel Decl., Ex. 11 (Bordenave Dep.) at 36, dkt. no. 217 at ECF p. 206. Nor has he ever been employed directly by an insurance company. *Id.*

United States District Court
Northern District of California

Plaintiffs retained Bordenave "as an insurance underwriting expert to evaluate the scope of insurance coverage promised by Chubb Insurance Group through the insurance policy issued to [Plaintiffs] . . . and the reasonable expectations of coverage based on Chubb's specialization in providing extraordinary insurance coverage for High Value Estate Property throughout the United States." Dekel Decl., Ex. 32 (Bordenave Report), dkt. no. 217 at ECF p. 1029. Among the opinions he offers are the following:

> . . .
>
> 2) With respect to the Pollocks' Napa Valley Estate, Chubb appraised the property and set the Policy's limits based upon such appraisals. In doing so, Chubb undertook an obligation to exercise a level of care in appraising the property to ensure that the Policy limits were adequate to fully insure the whole of the Pollocks' various property and features at the Napa Valley Estate. In my opinion, if the Policy's limits in each category of coverage were inadequate to fully insure the Pollocks' property, including for the Glass Fire loss, that underinsurance would be a consequence of Chubb's failure to adequately underwrite and place appropriate insurance limits. In my opinion, it would have been reasonable for the Pollocks to rely upon Chubb and its agents to correctly appraise the Napa Valley Estate and set Policy limits that were adequate to fully insure the whole of the Pollocks' various property and features at the Napa Valley Estate.
>
> 3) Proper and timely pre-loss underwriting is required when the insurance carrier assumes all responsibility for setting policy limits. Here, Chubb performed nine separate appraisals including an appraisal in 2011, yet Chubb appears to have underinsured the Pollocks' main house (dwelling section A) by almost $10,000,000.
>
> . . .
>
> 5) The Pollocks were, at all times following the Glass Fire loss, entitled to ALE of at least $131,000 - $262,000 per month (i.e., ALE limit divided by 36 months). In the alternative, Chubb had the option to simply buy the Pollocks a house as a settlement of the ALE section of the claim. In fact, the Pollocks made a similar proposal to Chubb: Chubb should buy a like kind home, allow the Pollocks to live there during the period of restoration, and then Chubb, not the Pollocks, would own the property and could recover its investment (essentially recapture the ALE liability). It is not unusual for insurance companies acting in good faith to payout the ALE policy limits in full when, as here, catastrophic insured events make full restoration of the insured property within three years unlikely. It does not appear that Chubb made payments of ALE consistent with either of these approaches.
>
> 6) It is insurance industry custom and practice to advance ALE funds to cover all costs to provide like kind and quality living conditions for the insured following a covered loss. At no time in a catastrophic loss should an insured ever have to advance additional living costs and

> seek reimbursement from the insurer sometime in the future. Chubb does not appear to have complied with this industry custom and practice, and instead it appears to have required that the Pollocks actually incur and pay ALE amounts before Chubb would consider making requested ALE payments.

*Id.* at 1033-34.

Federal contends Bordenave is not qualified to offer Opinions 5 and 6 because he has never worked as a claims adjuster or directly for an insurance company. *Daubert* Motion at 13-14 (citing *Certain Underwriters at Lloyds, London v. Inlet Fisheries, Inc*., 389 F. Supp. 2d 1145, 1154 (D. Alaska 2005), aff'd, 518 F.3d 645 (9th Cir. 2008); *Saarman Constr., Ltd. v. Ironshore Specialty Ins. Co*., 2017 WL 10402392 (N.D. Cal. Jan 5, 2017); *Chimney Homeowners Ass'n v. Brent Ward Ins. Agency, Inc*., 2018 WL 6252269, at *1 (Wash. Super. Aug. 20, 2018)). Plaintiffs supply a declaration from Bordenave expanding upon his qualifications, *see* generally Plaintiffs' Ex. TTTTT (Declaration of Neal Bordenave in Support of Plaintiffs' Opposition to Defendant's Omnibus Motion to Exclude Testimony of Plaintiffs' Experts ("Bordenave Decl."), dkt. no. 236-4 at ECF pp. 660-664), and argue that Bordenave has "broad and extensive knowledge and training about the insurance industry (including about personal/homeowners' lines of insurance)" and therefore is qualified to offer these opinions. Opposition at 14-15.

Federal also contends Bordenave impermissibly seeks to offer legal conclusions in opining that: 1) "[t]he Pollocks were…entitled to ALE of at least $131,000 - $262,000 per month (i.e., the ALE limit divided by 36 months)[,]" (Opinion 5); 2) "Federal undertook a duty to set certain coverage limits by 'apprais[ing] the property and set[ting] the Policy's limits based upon such appraisals[,]' " (Opinion 2); and 3) "Federal violated that duty—the ultimate issue for the jury—and that 'it would have been reasonable for the Pollocks to rely upon [Federal] and its agents to correctly appraise the [property] and set Policy limits that were adequate to fully insure' the property." *Daubert* Motion at 24. Similarly, it contends Bordenave improperly interprets the Policy. *Id.* at 25.

The Court finds that Bordenave does not have expertise that qualifies him to offer Opinions 5 and 6. As the court observed in *Saarman Construction, Ltd, v. Ironshore Specialty Insurance Company*, "Bordenave is an insurance broker by training; he has never worked for an

insurance company. . . . Thus, by definition, he has never performed or participated in claims handling." 2017 WL 10402392 (N.D. Cal. Jan. 5, 2017). In that case, Judge Tigar found that Bordenave was not qualified to offer opinions about insurance company claims handling practices. The Court agrees with Judge Tigar's conclusion and likewise finds here that Bordenave's many years in the insurance industry as an agent does not qualify him to offer Opinions 5 and 6, which concern insurance industry claims adjustment practices.

As to Bordenave's opinions that are not excluded for lack of adequate expertise, discussed above, the Court does not decide at this time whether Bordenave's opinions are impermissible because they constitute legal conclusions that must be excluded. In *Hangarter*, the Ninth Circuit set forth the following principles that govern expert testimony regarding ultimate issues and legal conclusions:

> "It is well-established ... that expert testimony concerning an ultimate issue is not per se improper." *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1066 n. 10 (9th Cir.2002). Indeed, Fed.R.Evid. 704(a) provides that expert testimony that is "otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." That said, "an expert witness cannot give an opinion as to her legal conclusion, *i.e.*, an opinion on an ultimate issue of law." *Mukhtar*, 299 F.3d at 1066 n. 10. Similarly, instructing the jury as to the applicable law "is the distinct and exclusive province" of the court. *United States v. Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir.1993) (citations and quotation marks omitted).

373 F.3d at 1016. Thus, in that case the Court held that an expert's testimony that the defendant insurance company had "deviated from industry standards" was not improper, even though that testimony was offered to show that the insurer acted in bad faith, where the expert did not testify that the defendant had "actually acted in bad faith." Whether Bordenave's testimony crosses the line from opining about industry practices to offering impermissible legal conclusions is a question that can be better assessed at trial.

**10. Charles Miller**

Charles Miller is an insurance expert. Dekel Decl., Ex. 37 (Expert Report of Charles Miller) at 7, dkt. no. 275 at ECF p. 10. Federal contends Plaintiffs violated Rule 26 by producing certain documents upon which he based his opinions just one day before Miller's deposition and asks the Court to exclude all of his opinions under Rule 37 of the Federal Rules of Civil Procedure

United States District Court
Northern District of California

as untimely. *Daubert* Motion at 5-6. Plaintiffs counter that the parties agreed to continue Miller's deposition and therefore Federal was not prejudiced by the late disclosure. Opposition at 6. The Court DENIES Federal's request for discovery sanctions as it has not established prejudice.

Federal also challenges Miller's opinions on the basis that they constitute impermissible legal conclusions. *Daubert* Motion at 25. The Court declines to reach this challenge for the same reasons it defers ruling on Federal's similar challenges with respect to Bordenave, discussed above.

## IV. SUMMARY JUDGMENT MOTIONS

### A. Legal Standards Governing Summary Judgment

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant has made this showing, the burden shifts to the party opposing summary judgment to designate "'specific facts showing there is a genuine issue for trial.'" *Id.* (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."). "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986). The non-moving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

A party need not present evidence to support or oppose a motion for summary judgment in a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable to presentation in an admissible form. *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003). Neither conclusory, speculative testimony in affidavits nor arguments in moving papers

United States District Court
Northern District of California

are sufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979). On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

**B. Legal Standards Governing Interpretation of the Policy**

Interpretation of an insurance policy to determine whether it provides for particular coverage is a question of law and follows the general rules of contract interpretation. *Waller v. Truck Ins. Exchange, Inc*., 11 Cal.4th 1, 18 (1995). "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties." *Id.* "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation." *Id.* (citing Cal. Civ. Code, § 1636). "Such intent is to be inferred, if possible, solely from the written provisions of the contract." *Id.* (citing Cal. Civ. Code § 1639). Thus, judicial interpretation of a contract is controlled by the "clear and explicit" meaning of the provisions of the contract, interpreted in their "ordinary and popular sense," unless the contract language is "used by the parties in a technical sense or a special meaning is given to them by usage." *Id.* (citations omitted).

The California Supreme Court has cautioned that "[a]lthough examination of various dictionary definitions of a word will no doubt be useful, such examination does not necessarily yield the 'ordinary and popular' sense of the word if it disregards the policy's context." *MacKinnon v. Truck Ins. Exch*., 31 Cal. 4th 635, 649 (2003), as modified on denial of reh'g (Sept. 17, 2003) (citing *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1265 (1992)). Instead, the court "must attempt to put itself in the position of a layperson and understand how he or she might reasonably interpret" the policy language. *Id.* (citation omitted).

"A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." *Waller*, 11 Cal. 4th at 18 (citation omitted). "But language in a contract must be interpreted as a whole, and in the circumstances of the case, and

United States District Court
Northern District of California

cannot be found to be ambiguous in the abstract." *Id.* at 18 (citation omitted). "Courts will not strain to create an ambiguity where none exists." *Id.* at 18-19 (citation omitted).

**C. Legal Standards Governing All-Risk Insurance Policies**

"[I]n an action upon an all-risks policy . . . the insured does not have to prove that the peril proximately causing his loss was covered by the policy." *Strubble v. United Servs. Auto. Assn.*, 35 Cal. App. 3d 498, 504 (1973). "This is because the policy covers all risks save for those risks specifically excluded by the policy." *Id.* Thus, the insurer "must prove the policy's noncoverage of the insured's loss—that is, that the insured's loss was proximately caused by a peril specifically excluded from the coverage of the policy." *Id.* "Whereas coverage clauses are interpreted broadly so as to afford the greatest possible protection to the insured [citations], exclusionary clauses are interpreted narrowly against the insurer." *Rsrv. Ins. Co. v. Pisciotta*, 30 Cal. 3d 800, 808 (1982) (internal quotations and citations omitted). "[A]n insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear." *Id.* Thus, "the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language." *Id.* (internal quotations and citations omitted).

**D. Federal's Summary Judgment Motion**

**1. Contentions of the Parties**

a. Motion

Federal argues that partial summary judgment should be entered on Plaintiffs' breach of contract and declaratory relief claims as to three aspects of those claims. Federal's Summary Judgment Motion at 9-12. First, it contends Plaintiffs' claims are barred as to Additional Living Expenses ("ALE") that Plaintiffs did not incur or have not yet incurred and further, that Plaintiffs' ALE coverage is limited to expenses incurred within two years from the date of the loss. *Id.* at 9-11. Second, Federal argues that Plaintiffs are not entitled to any "rebuilding to code" costs because they have done no rebuilding. *Id.* at 11. Third, Federal argues that Plaintiffs are not entitled to soil replacement costs because the Policy provides for "necessary" soil replacement "require[d]" to rebuild or replace the house or other permanent structure and Plaintiffs have not offered any evidence that soil replacement is "necessary" or "required" within the meaning of the

Policy. *Id.* at 11-12.

Next, Federal argues that Plaintiffs' "VOC damage theories" based on evidence of VOCs in the air of the main house and in building materials in the house fail as a matter of law. *Id.* at 12-16. First, to the extent Plaintiffs seek "to replace their house because of alleged loss caused by VOCs in the air inside their main house and wine room[,]" Federal contends Plaintiffs' claims fail because the undisputed facts establish that the VOC levels in the main house are no higher than is typical of VOC levels in residential homes. *Id.* at 12-13. Second, Federal asserts, Plaintiffs have no evidence of VOC levels in the main house prior to the Glass Fire that would allow them to establish that the Glass Fire caused those levels to increase. *Id.* at 13-14. Third, Federal contends Plaintiffs' claims are barred to the extent they are based on VOCs in the air of the main house because VOCs are a "pollutant" under the Policy's Contamination exclusion and therefore, recovery for any damage caused by VOCs is barred under the Policy. *Id.* at 14. Finally, under *Another Planet Entertainment, LLC v. Vigilant Ins. Co.*, 15 Cal.5th 1106 (2024), the mere presence of VOCs in the building materials of Plaintiffs' home is not sufficient to establish physical loss, according to Federal. *Id*. In particular, Federal contends, "Plaintiffs seek coverage for the presence of VOCs and SVOCs in the 'structural matrix' of building materials without identifying any corresponding 'damage' to the property[,]" and thus, their theory of loss fails under *Another Planet*. *Id*. at 15.

Federal further asserts that it is entitled to summary judgment on Plaintiffs' bad faith claim under the "genuine dispute" doctrine, which provides that the court may rule as a matter of law that an insurer's denial of benefits was reasonable where there was "proper cause" for the insurance company to take the position that it did. *Id.* (citing *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co*., 90 Cal. App. 4th 335, 350 (2001); *Brinderson-Newburg Joint Venture v. Pac. Erectors, Inc*., 971 F.2d 272, 282-83 (9th Cir. 1991)). According to Federal, the undisputed evidence establishes that there was a genuine dispute over coverage because it relied on the opinions of experts who reviewed the available evidence and concluded that Plaintiffs' claim was "exaggerated, preexisting, and/or excluded from coverage." *Id.* at 17 (quoting *Vanderloo v. Allstate Northbrook Indem. Co*., 2025 WL 844414, at *10-11 (N.D. Cal. Mar. 17,

2025)). Federal further contends that as a matter of law, its experts were qualified, its investigation was "thorough and complete," its "selection of experts was not biased or dishonest," and that its experts did not act unreasonably. *Id.* at 18-20.

Federal contends Plaintiffs' Elder Abuse claim fails for the same reason its bad faith claim fails because "[i]n the insurance context, an elder abuse claim 'stands and falls' on whether the insurer denied plaintiff's valid claim in bad faith." *Id.* at 20 (quoting *Enciso v. Jackson Nat'l Life Ins. Co.*, 715 F. Supp. 3d 1286, 1294 (C.D. Cal. 2024), aff'd, 2025 WL 1444417 (9th Cir. May 20, 2025)).

Federal also seeks summary judgment as to Plaintiffs' negligence claim, which is pled on two theories: 1) the theory that Federal negligently failed to ensure that Plaintiffs had sufficient coverage, thereby causing losses arising out of their under-insured status, *see* FASC ¶¶ 87-90; and 2) the theory Federal negligently failed to maintain adequate reserves, which resulted in delayed payment and non-payments to Plaintiffs, *id.* ¶¶ 78-84. Motion at 22-25. As to the former, Federal points to the undisputed fact that Plaintiffs purchased the Policy from MIV and had no direct communication with Federal. *Id.* at 22. It contends that under California law, an insurer does not have a "general duty to ensure a policyholder secures adequate coverage" unless it "holds itself out" as an expert on the insurance sought by the policyholder, and the policyholder "reasonably relies" on that expertise. *Id.* (citing *Fitzpatrick v. Hayes*, 57 Cal. App. 4th 916, 927 (1997)). According to Federal, there is no evidence that it held itself out as an expert to Plaintiffs or that Plaintiffs relied on it when they renewed the Policy. *Id.*at 22-23. Instead, Federal points out, Plaintiffs alleged in their state court action against MIV that they relied on MIV's "experience and specialized knowledge" when they purchased the Policy. *Id.* at 23 (citing *Pollock v. MIV Ins. Servs. LLC*, No. 22-cv-1144, Compl. ¶¶ 11, 26, 32, 34 (Cal. Sup. Ct. Napa Cty. Sept. 28, 2022)).

With respect to the theory that Federal failed to maintain adequate reserves, Federal asserts that there is no private right of action to assert a claim to enforce the reserves requirements of the Insurance Code and furthermore, that *Fay Avenue Properties, LLC v. Travelers Property & Casualty Company of America*, 2014 WL 1333669 (S.D. Cal. Apr. 2, 2014), upon which the Court relied in permitting Plaintiffs to amend their complaint, *see* dkt. no. 179 at 12, "merely deemed

loss-reserve evidence discoverable because it was potentially relevant to the bad-faith claim in that case" and did not "suggest[ ] California law imposes claim-specific reserve duties." *Id.* at 24. Federal also argues that this theory fails because Plaintiffs have offered "no evidence that Federal's purportedly inadequate reserves caused Plaintiffs' alleged harm." *Id.* (citing *Soriano v. Countrywide Home Loans, Inc*., No. 09-CV-02415-LHK, 2011 WL 1362077, at *7 (N.D. Cal. Apr. 11, 2011)).

Finally, Federal argues that Plaintiffs' recovery for damage to manmade structures is limited by the Appraisal Award and therefore is capped at $32,122,214.15. *Id.* at 25 (citing Federal Arbitration Act, 9 U.S.C. § 12; *Bernstein v. Travelers Ins. Co*., 2006 WL 2567875, at *4 (N.D. Cal. Sept. 5, 2006)). It argues further that the Policy limits recovery for land to "10% of the amount of the covered loss to your house or other permanent structure" and therefore, "Plaintiffs' recovery for land is . . . capped at 10% of any amount the jury determines is owed for damage to manmade structures caused by the fire, with a ceiling of $3,212,221.42." *Id.* (citing Dekel Decl., Ex. 76 (Policy) at 47771 (B-7), dkt. no. 218 at ECF p. 53).

b. Opposition

Plaintiffs argue that Federal is not entitled to summary judgment on the ALE, "rebuilding to code" or soil replacement costs they seek. Opposition at 3-12. As to whether ALE coverage applies only to expenses that were actually incurred, Plaintiffs reject Federal's suggestion that the ALE they seek is "hypothetical," arguing that the "undisputed facts" reflect that Plaintiffs "*paid* approximately $1.2 million but roughly $250,000 was never reimbursed by Chubb: including, but not limited to, utilities, furnishings, landscaping and irrigation supplies, dog walking services, AV system components, supplies for repairs and maintenance to Plaintiffs' temporary housing, expenses related to art rentals, and expenses related to interior design work." *Id.* at 4 (emphasis in original) (citing Ex. JJJJ (Feb. 20, 2025 Report of Marie Ebersbacher ("Ebersbacher Report")) at 4–8, dkt. no. 236-4 at ECF pp. 391-95). In any event, Plaintiffs contend, the plain language of the Policy provision governing extra living expenses clearly entitles them to "like-kind housing" and does not require Plaintiffs to have actually incurred the extra living expenses as a prerequisite of coverage. *Id.* at 4-7.

Plaintiffs further assert that Federal is not entitled to summary judgment that their ALE coverage is limited to two years under the Policy. *Id.* at 7-9. First, they contend Federal is barred from asserting the two-year limit against Plaintiffs under the doctrine of equitable estoppel, as to which there are factual disputes. *Id.* at 7-8. In particular, Plaintiffs assert Federal "knew that it would only pay Plaintiffs ALE already paid for" but "delayed rejecting Plaintiffs' Proofs of Loss ('POL') in which non-incurred ALE was requested, told the Pollocks that those requests were being considered, and sent mixed messages to Plaintiffs about whether it was issuing 'advances,' for ALE and did not inform Plaintiffs what they would need to do to receive the ALE benefits they contracted for to secure their standard of living while temporarily displaced from their home." *Id.* at 7-8. As a result, Plaintiffs contend, they "waited in good faith for [Federal's] approval, rejection or further instruction, [while] their time to collect incurred ALE to maintain their true standard of living was slipping away." *Id.* at 8. According to Plaintiffs, had they "known the truth, they could have found and paid for more suitable housing that was like-kind to their home, as well as entered into contracts and begun paying to rent the books, art, and wine that are integral to Plaintiffs' standard of living." *Id.*

Plaintiffs also contend that there are material disputes of fact as to whether the "prevention doctrine" applies to the two-year limit. *Id.* According to Plaintiffs, "[t]he prevention doctrine provides that where a party's breach by non-performance contributes materially to the non-occurrence of a [condition] of one of his/her duties, the non-occurrence is excused." *Id.* (citing *Stephens & Stephens XII, LLC v Firemans's Fund Ins. Co*., 231 Cal.App.4th 1131, 1144 (2014)). Plaintiffs argue that Federal's "delayed response regarding whether it would approve Plaintiffs' ALE requests, failure to assist the Pollocks in finding a like-kind home, and failure to inform the Pollocks about any perceived defects in their ALE POLs prevented Plaintiffs from benefiting from . . . the ALE provisions of their Policy" and therefore, "[a]ny ALE deadline should be tolled." *Id.* Plaintiffs assert that they should be paid ALE for "the next three years at a minimum." *Id.*

Second, Plaintiffs argue that the period for ALE coverage was extended to three years under California Insurance Code § 2060(b)(1) (formerly § 2051.5(b)(2)) because a state of

United States District Court
Northern District of California

emergency was declared in Napa County following the Glass Fire and under that section, where there is a covered loss related to a state of emergency,"[a]n insurer shall grant an extension of up to 12 additional months, for a total of 36 months, if an insured acting in good faith and with reasonable diligence encounters a delay or delays in the reconstruction process that are the result of circumstances beyond the control of the insured." *Id.* at 8-9. According to Plaintiffs, that section applies because Federal "delayed reconstruction and thwarted Plaintiffs' actions by misrepresenting Policy benefits to Plaintiffs, failing to provide sufficient funds for rebuilding all damaged structures, and ultimately denying the claim." *Id.* at 9. Plaintiffs also assert they "put forward evidence that they began working with licensed contractors almost immediately to determine (1) the damage to the Main House, Guest House, and other Man-Made Structures, (2) how to proceed with rebuilding, repair or replacement, on a least-cost basis, and later (3) work needed to create an invitation to bid ('ITB') for rebuilding." *Id.* at 9 (citing Plaintiffs' Ex. B at 127–32, dkt. no. 226 at ECF p. 127-132 (Oct. 26, 2020 letter from Plaintiffs' former counsel to Federal re coverage); Ex. F at 156, dkt. no. 226 at ECF p. 156 (Jan. 8, 2021 letter from Plaintiffs' former counsel to Federal re coverage)).

Plaintiffs also reject Federal's assertion that they are not entitled to "rebuilding to code costs" because they have not commenced rebuilding, asserting that the Policy provides for the costs of code compliance not only for rebuilding but also demolition and does not limit coverage based on whether or not the insured rebuilds following a loss. *Id.* In support of their position, they point to the language of the Rebuilding to Code Provision, which "covers 'the necessary cost of conforming to *any* law or ordinance that requires or regulates: **the repair, replacement, or rebuilding** of the damaged portion of your house or other permanent structure' as well as '*demolition*' of the house or any permanent structures." *Id.* (quoting Policy at B-8, B-9, dkt. no. 226 at ECF pp. 41-42) (emphasis added by Plaintiffs). Plaintiffs point out that this provision also specifically provides:

> **If you have a covered total loss to your house and do not replace or rebuild the house at the same location, this coverage will apply** to the house and other permanent structures up to the same amounts of coverage [] that would have applied at your original location.

*Id.* (quoting Policy at B-9, dkt. no. 226 at ECF pp. 42) (emphasis added by Plaintiffs). According

to Plaintiffs, this language means that the Policy provides Rebuilding to Code coverage "*even if the Policyholder does not rebuild*[.]" *Id.* (emphasis in original).

Plaintiffs assert that this reading of the Policy finds further support in California Insurance Code § 2051.5(c)(1), which provides:

> In the event of a total loss of the insured structure, a policy … shall not contain a provision that limits or denies, on the basis that the insured has decided to rebuild at a new location or to purchase an already built home at a new location, payment of the building code upgrade cost.

Cal. Ins. Code § 2501.5(c)(1). Likewise, Plaintiffs contend, the California Insurance Commission "agrees that rebuilding and 'incurring' building code upgrade costs is not a prerequisite to payment[,]" stating:

> Rebuilding in Current Location or Rebuilding or Replacing in a New Location: Existing law requires, in the event of a total loss of the insured structure, that when a policyholder decides to rebuild at a new location or to purchase an already built home at a new location, they are due the full benefits that would have been payable had the policyholder rebuilt the property at the loss location. [. . .] **Existing law also requires payment of building code upgrade benefits (also known as building ordinance and law) associated with rebuilding the property at the loss location even though building code upgrade costs will not be "incurred" at the loss location.**

*Id.* at 10 (quoting Cal. Ins. Comm. Bulletin 2025-2 at 3) (emphasis added by Plaintiffs).

Plaintiffs also reject Federal's assertion that they must "have evidence of the costs of code compliance to replace their structures, beyond 'routine reconstruction.' " *Id.* at 10. According to Plaintiffs, there is no such language in the Policy and it is enough that their guest house "burned to the ground and needs to be rebuilt to current codes, and the Appraisal Panel found that Plaintiffs' Main House, Garage and Wine Cellar likewise need full replacement." *Id.* They also note that they have "evidence of additional costs for code compliance." *Id.* at 10-11 (citing Ex. IIII (McMinn Report) at 31502–06, dkt. no. 236-3 at ECF pp. 58-62).

With respect to soil replacement, Plaintiffs argue that Federal "advances an artificially narrow reading of the Policy to the detriment of their insureds." *Id.* at 11. According to Plaintiffs, both the Debris Removal and Rebuilding to Code provisions in the Policy entitle them to soil replacement. *Id.* at 11-12. Furthermore, Plaintiffs contend they have evidence that soil

replacement is required in order to:

> (1) comply with required Napa County Soil Standards for Private Debris and Ash Removal (DAR) Cleanup, 2017 NAPA Fire Complex (hereinafter "DAR Regulations") for rebuilding structures on the Property (Ex. OOO at 1); (2) comply with required SWPPP (Ex. IIII at 31506); (3) ensure the safety of all individuals present, including the Pollocks, during rebuilding, by preventing exposure to toxic contaminants in the soil (Ex. MMM at 11); (4) to prevent the recontamination of the Main House and Guest House during construction from the toxic elements in the soil tracked in to the home.

*Id.* at 11.

Plaintiffs reject Federal's arguments about their "VOC damage theories," asserting that they have no such damage theories but instead "have a breach of contract claim which is premised in part on damage caused by the inundation of wildfire smoke for days and the resulting presence of numerous toxic combustion-related contaminants found at the property, in the home, and off-gassing from building materials." *Id*. at 17. According to Plaintiffs, Federal's narrow focus on VOCs "ignore[s] the swath of evidence of smoke related chemical damage making the property uninhabitable." *Id.* This evidence is sufficient to establish a triable issue of fact as to whether harmful chemicals, including VOCs, have rendered the house uninhabitable, Plaintiffs assert. *Id.* at 18-19.

Furthermore, Plaintiffs assert, while it is undisputed that VOCs in the main house were not measured pre-fire, they have offered evidence of causation through their expert, Dr. Crimmins, who has opined, *inter alia*, that "[a]nions, VOCs, and acidic pH regions were widely distributed throughout the house illustrating the dispersion of the smoke and components throughout the home[]" and that "fire, heat, and smoke from the Glass Fire caused both visible, microscopic and chemical damage to the property." *Id*. (citing Plaintiffs' Ex. MMM at 16, 23, dkt. no. 236-2 at ECF pp. 871, 878).

Third, Plaintiffs contend Federal's reading of *Another Planet* is overly restrictive and does not bar Plaintiffs' theory of loss. *Id.* Finally, Plaintiffs argue that Federal's reliance on the Contamination exclusion is misplaced as this Court has rejected the same argument in connection with a similar exclusion, finding that "chemicals which are released as the byproduct of, or

incidental to, hostile fires [were] covered by the fire coverage terms of the policy and [did] not fall within the pollution exclusion which [was] limited to the release of pollutants in the context of environmental contamination." *Id.* at 22 (quoting *Grow Grp., Inc. v. N. River Ins. Co.*, 1992 WL 672265, at *4 (N.D. Cal. Aug. 14, 1992)). Plaintiffs further contend the California Supreme Court has found that the pollution exclusion only narrowly applies to "conventional environmental pollution." *Id.* at 22 (citing *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 650-53 (2003), as modified on denial of reh'g (Sept. 17, 2003)).

Plaintiffs also reject Federal's assertion that it is entitled to summary judgment on their bad faith claim. *Id.* at 12-17. First, they assert that the Court cannot decide whether Federal's coverage position is reasonable as a matter of law because Federal "fails to articulate a consistent coverage position." *Id.* at 12. In particular, Plaintiffs contend the Coverage Letter is unclear because on the first page, it states that "there is 'no coverage…for losses…on the Property other than those related to the Insureds' guest house' which it claims to have paid" but on page 8 of the letter Federal "assert[s] that there [is] 'no coverage for [Plaintiffs'] Claim', full stop." *Id.* (citing Dekel Decl., Ex. 64 ("Coverage Letter") at 1, 8, dkt. no. 217 at ECF pp. 1781, 1788). Plaintiffs also point to Federal's current position, set forth in its amended answer, dkt. no. 198, that Plaintiffs are not entitled to any coverage under the Policy's Fraud Provision and must even repay as restitution the amounts already paid to them under the Policy. *Id.*

Furthermore, Plaintiffs contend Federal cannot establish a genuine dispute as to its current position – that the Policy is void due to fraud – because Federal "provides nothing indicating its current coverage position of total non-coverage is supported by experts – or anything in its investigation." *Id.* at 13. Moreover, Plaintiffs assert, Federal's position that there is no coverage due to fraud fails because it is based on "statements that [Federal] cannot reasonably believe are fraudulent[,]" two of which were validated by the Appraisal Panel. *Id.* They also contend Federal did not rely on the statements in the September 27, 2021 Letter "because its cadre of experts had already evaluated Kaizen's reports before Chubb ever received the letter." *Id.* Furthermore, Plaintiffs assert, Federal "had documentation, before it filed its counterclaim for fraud, that Plaintiffs and their attorneys had been informed by experienced construction experts, McMinn and

United States District Court
Northern District of California

Associates, that 'the conclusion has been clear from immediately after the Glass Fire: repair is not possible so the least cost solution is replace/rebuild (for this purpose it is one and the same).' " *Id.* (citing Plaintiffs' Ex. IIII (McMinn Report) at 31498, dkt. no. 236-3 at ECF p. 53).

Plaintiffs also assert that there is "ample evidence" that Federal acted unreasonably in addressing Plaintiffs' claim and therefore acted in bad faith. *Id.* at 13-16 (citing evidence). They argue further that the "genuine dispute" doctrine does not shield Federal from liability and that Federal's reliance on *Fraley v. Allstate Ins. Co*., is misplaced because in that case, the court held only that "even a substantial disparity in [expert] estimates…does not, *by itself*, suggest that the insurer acted in bad faith." *Id.* at 16 (quoting *Fraley*, 81 Cal. App. 4th at 1293) (emphasis added by Plaintiffs). According to Plaintiffs, their bad-faith claims, in contrast, "are not predicated exclusively, or even in substantial part, on differences of opinion between experts, whether it be as to the value of loss or to coverage." *Id.* Nor does "[t]he presence or employment of expert testimony and investigation . . . 'automatically insulate an insurer from a bad faith claim based on a biased investigation[,]' " Plaintiffs assert. *Id.* (quoting *Chateau Chamberay*, 90 Cal. App. 4th at 348).

Plaintiffs argue that Federal's request for summary judgment on their negligence claim also should be denied. *Id.* at 22-23. As to the theory that they purchased a Policy that offered inadequate coverage, Plaintiffs do not challenge Federal's characterization of California law but argue that Federal is liable because, as a factual matter, MIV acted as Federal's agent in selling Plaintiffs the Policy. *Id.* at 22-23. They point to California Department of Insurance records that purportedly identify MIV as an agent for Federal Insurance Company since June 24, 2002. *Id.* at 22 (citing Request for Judicial Notice ("RJN") and Ex. RRRRR, dkt. nos. 235 and 235-1).

As to the theory based on failure to maintain adequate reserves, Plaintiffs suggest this theory is offered to support its bad faith claim rather than its negligence claim and argue that the Court already rejected Federal's argument. *Id.* at 23. They also assert, without citation to evidence, that Federal's "argument regarding the sufficiency of the reserves evidence also lacks merit." *Id.*

Finally, Plaintiffs reject Federal's argument that the Appraisal Award caps the amount they

may be awarded for any alleged damage to manmade structures and for land. *Id.* at 23-25. They argue that Federal's position is incorrect because the Appraisal Panel's award was for actual cash value ("ACV") under California Insurance Code § 2701 whereas Plaintiffs are entitled to replacement cost under the Policy. *Id.*

c. Reply

In its Reply, Federal reiterates its argument that the Policy covers only ALE that was actually incurred, rejecting Plaintiffs' plain language reading of the Policy language. Reply at 1-3. It argues that Plaintiffs' estoppel argument fails because it is undisputed that the Policy limits ALE to two years and under California law, "[e]stoppel cannot be used to create coverage under an insurance policy where such coverage did not originally exist." *Id.* at 3-4 (quoting *Miller v. Elite Ins. Co.*, 100 Cal. App. 3d 739, 755 (1980)). Likewise, it contends the "conceptually equivalent" prevention doctrine does not apply because that doctrine "should not give the insured a benefit under the policy it never had in the absence of the dispute." *Id.* at 4 (quoting *Stephens & Stephens XII, LLC v. Fireman's Fund Ins. Co.*, 231 Cal. App. 4th 1131, 1145-46 (2014)). Furthermore, Federal asserts, when Plaintiffs say they are entitled to ALE for the next three years, at a minimum, they reveal that they are not "seeking 'tolling' or forgiveness for non-compliance with a procedural condition; they are seeking years of supplemental and potentially limitless ALE." *Id.* According to Federal, "[t]here is no precedent for that windfall . . . ." *Id.*

Nor can Plaintiffs rely on a factual dispute related to estoppel, Federal contends, because the undisputed facts show that Plaintiffs were aware as early as December 2020 of Federal's position that ALE reimbursement required invoices showing expenses were actually incurred. *Id.* (citing Dekel Supp. Decl., Ex. 127 at 2, dkt. no. 243 at ECF p. 99 (October 20, 2020 letter from Plaintiffs' counsel acknowledging Federal's "position that [ALE] must be actually incurred"); *id.,* Ex. 120 at 5, dkt. no. 243 at ECF p. 51 (December 17, 2020 letter with similar statements); *id.,* Ex. 125 at 4, dkt. no. 243 at ECF p. 90 (March 12, 2021 letter with similar statements); *id.,* Ex. 128 at 2-3, dkt. no. 243 at ECF pp. 1-3-104 (March 30, 2021 letter with similar statements); Plaintiffs' Ex. IIIII (February 11, 2022 letter from Federal to Plaintiffs' counsel) at 12, dkt. no. 236-4 at ECF p. 382 ("Federal renews its request that you provide any supporting authority for your frequently

repeated statement that 'the Policy does not require that [additional living expenses] be incurred.' As for the living expense claim submitted to date, Federal still lacks sufficient support from the Insureds to support large parts of the claim made under this coverage, and these amounts may or may not be covered."); *id.,* Ex. MMMMM at 14451, dkt. no. 236-4 at ECF p. 483 (March 23, 2022 email from Federal's counsel to Plaintiffs' counsel with similar request)). Therefore, Federal argues, Plaintiffs cannot satisfy the element of estoppel requiring that Plaintiffs were ignorant of the true facts. *Id.* at 5.

Federal also rejects Plaintiffs' reliance on the state of emergency and California Insurance Code § 2060(b)(1) (formerly § 2051.5(b)(2)), arguing that "[t]here can be no 'delays in the reconstruction process' if there is no such process at all." *Id.* According to Federal, Plaintiffs' assertion that they " 'began working with licensed contractors' on, for example, assessing 'damage' and creating an 'invitation to bid[]' " does not help Plaintiffs because Plaintiffs do *not* state that any reconstruction was actually begun. *Id.* Furthermore, Federal asserts, this section of the Insurance Code "makes clear that the extension is intended to apply only to delays akin to those caused by demand problems in the construction industry[,]" of which there is no evidence here. *Id.* at 5-6.

Federal reiterates its position that coverage for "rebuilding to code" is available only where an insured has rebuilt and incurred code compliance expenses. *Id.* at 6. Federal contends Plaintiffs have cited no case authority that supports their position that these expenses are available even if the insured does not rebuild. *Id.* Federal further asserts that while Plaintiffs argue that they have spent money "repairing, replacing or rebuilding the Property[,]" *id.* (citing Opposition at 10 n.5), the evidence Plaintiffs cite shows only that "Plaintiffs hired experts in connection with their insurance claim to assess damage and remediation[,]" not that they have actually rebuilt. *Id.* at 6 & n. 8 (citing Plaintiffs' Ex. XXXXX (Nutter Dep.) at 81, dkt. no. 236-4 at ECF p. 727 (testifying that he had spent about 200 hours performing work related to the Property); *id.*, Plaintiffs' Ex. IIIII (February 11, 2022 letter from Federal to Plaintiffs' counsel) at 14579, dkt. no. 236-4 at ECF p. 372; *id.* Plaintiffs' Ex. IIII (McMinn Report) at 31498, dkt. no. 236-3 at ECF p. 1057); *id.*, Plaintiffs' Ex. QQ (Schmidt Dep.) at 126, dkt. no. 236-1 at ECF p. 488).

Federal observes that Plaintiffs do not address in their Opposition its assertion that coverage of soil removal requires a "nexus" between rebuilding and soil removal under the Policy, of which Plaintiffs present no evidence. *Id.* at 7. Federal further asserts that Plaintiffs' reliance on *general* requirements relating to soil replacement is not sufficient to establish that Plaintiffs are entitled to coverage. It also rejects Plaintiffs' argument that soil removal is covered under the Debris Removal provision, arguing that that provision only covers soil removal "made necessary by a covered loss." *Id.* at 8. Likewise, Federal asserts, "the code-upgrade provision also requires Plaintiffs to show the cost was tied to rebuilding, which they cannot do." *Id.*

With respect to its VOC damages arguments, Federal reiterates the arguments in its motion that Plaintiffs cannot prove increased VOCs in the air inside the house caused by the Glass Fire and rejects Plaintiffs' assertions that they have demonstrated triable issues of fact. Federal also contends Plaintiffs do not dispute that VOCs are "pollutants" under the Contamination exclusions and therefore, that at least damage caused by VOCs that existed prior to the Glass Fire are excluded from coverage under that provision. *Id.* at 8-10. Federal also argues that as to any VOCs in building materials, Plaintiffs have not established a triable issue of physical loss under *Another Planet. Id.* at 10.

With respect to the bad faith claim, Federal rejects Plaintiffs' assertion that there is "ample evidence" of bad faith and argues that even if true, the examples they point to do not establish bad faith. *Id.* at 11-14.

Federal rejects Plaintiffs' arguments relating to the negligence claim. *Id.* at 14-15. As to the underinsurance theory, it rejects Plaintiffs' assertion that MIV was Federal's agent, pointing to allegations in the state court complaint that MIV acted as Plaintiffs' broker and to a statement on MIV's website "describing itself as 'independent' and noting it 'work[s] for you,' not 'an insurance company.'" *Id.* at 14 (citing Dekel Supp. Decl., Ex. 133 (MIV Compl.) ¶¶ 9 ("policy brokered by MIV"), 14, 18, 31, 34, 35), dkt. no. 243 at ECF pp. 216-17, 220-21). Federal contends the document cited by Plaintiffs to show that MIV acts as a licensed agent of Federal is "a hearsay statement about MIV's authority to transact on Federal's behalf that does not qualify for any hearsay exception." *Id.*

As to the loss reserves theory, Federal observes that Plaintiffs pled this theory as part of their negligence claim but now appear to assert it as part of their bad faith claim. *Id.* at 23. According to Federal, "evidence of reserves is inadmissible to prove bad faith." *Id.* (citing *Malkin v. Fed. Ins. Co*., 2023 WL 6967458, at *13 (C.D. Cal. Oct. 20, 2023); *Grant v. Allstate Ins. Co*., 2010 WL 11519538, at *3 (C.D. Cal. July 16, 2010)).

Finally, Federal rejects Plaintiffs' assertion that they can recover *more* than the amount of loss found by the Appraisal Panel for damage to manmade structures because the Award reflects ACV. It incorporates its argument in opposition to Plaintiffs' summary judgment motion on the same issue, in which it asserts:

> Plaintiffs also maintain that the panel was "statutorily obligated" to consider preexisting damage "to generate an [actual cash value] ACV award." Mot. at 7; id. at 4. That is wrong on multiple levels. First, the panel did not determine ACV; it determined replacement cost. The standard-form fire-insurance policy calls for ACV coverage, which entitles policyholders to replacement cost with a deduction for depreciation. *See* Cal. Ins. Code §§ 2071, 10102, 2051. But Plaintiffs' policy provides extended replacement cost coverage, which contains no deduction for depreciation. See Dekel Dec. Ex. 76 (Policy) at Coverage Summary 1, B-2. The appraisal provision in Plaintiffs' policy thus calls for an appraisal not of ACV, but of "the amount of loss," id. at Y-5—which is exactly what Plaintiffs sought in their Motion to Compel Appraisal, see ECF 27 at 2.

Federal's Opposition to Plaintiffs' Summary Judgment Motion, dkt no. 230 at ECF p. 12. Federal asserts that Plaintiffs' position is "absurd," because "[i]f the panel had decided ACV, the appraisal award and entire appraisal process would have no utility here because, as Plaintiffs emphasize, ACV and replacement-cost coverage are different measures of loss and the former 'does not serve to set the extent of [Federal's] obligation' under this Policy." Federal Reply to Plaintiffs' Summary Judgment Motion at 15, dkt. no. 241 at ECF p. 20.

**2. Breach of Contract and Declaratory Relief Claims**

a. Whether ALE Coverage is Limited to Incurred Expenses

As a preliminary matter, the Court notes that Plaintiffs do not dispute that at least some of the ALE they seek was not (or has not been) actually incurred. Therefore, although there appear to be factual disputes as to whether Federal has provided adequate coverage of the ALE Plaintiffs actually incurred, the question of whether ALE that was not (or has not yet been) incurred is an

issue of law that can be properly decided on summary judgment.[14] As set forth below, the Court finds that the ALE provision covers only expenses that are actually incurred.

To determine whether ALE that has not been incurred is covered under the Policy, the Court looks to the ALE provision (quoted above in full), which states, in part: "If a covered loss makes your house or other permanent structure uninhabitable, we cover the reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living." Compendium, Vol. 1, Ex. A (Policy) at B-6, dkt. no. 226 at ECF p. 39. The Court notes that both sides believe that this language is "clear," although their interpretations of the provision are different. Plaintiffs point to the fact that this sentence does not include the word "incurred" even though that word is used repeatedly throughout the Policy, including in the provision governing Forced Evacuation Expenses (quoted above), arguing that this means that the extra living expenses component of ALE need not have been incurred. Federal points to the term "reasonable increase" in this sentence, asserting that it carries with it the requirement that the expenses must have been incurred to be covered. The Court concludes that Federal has the stronger argument.

Although the case authority on this issue is scant, the Ninth Circuit in *United States v. Didier* interpreted a similar policy provision and concluded that it covered only incurred expenses. The ALE policy provision in that case stated:

> If your house cannot be lived in because of a covered loss to your house or, if applicable, to your contents, we cover the reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living. We cover this increase for the reasonable amount of time required to repair, replace or rebuild your house or your contents, or if you permanently relocate, the shortest amount of time required for your household to settle elsewhere. This period of time is not limited by the expiration of this policy.

*United States v. Didier*, No. CR 12-36-M-DWM, 2013 WL 5524592, at *2 (D. Mont. Oct. 4, 2013), rev'd, 585 F. App'x 667 (9th Cir. 2014). The case involved an insured who had purchased a

[14] At oral argument, Federal stipulated that it seeks summary judgment only as to hypothetical expenses that Plaintiffs have not incurred and that disputes about the expenses Plaintiffs have actually incurred can be addressed at trial.

United States District Court
Northern District of California

"white glove" policy from Chubb to insure a mansion that was rendered uninhabitable as a result of a covered loss. *Id.* After Chubb was unable to find suitable alternative housing for the plaintiff, she proposed, through a broker, that a residence owned by a family trust, purportedly belonging to her extended family ("the Rollins property"), be leased as alternative housing, describing the house as being "6900 square feet, with five bedrooms and two bathrooms" and seeking "a base rent of $15,250 per month, a $7,000 security deposit, a $5,000 pet deposit, a $200 application fee, a $1,500 cleaning fee, and a 10% broker fee." *Id.* at 4. After asking the insured to confirm that the Rollins property was not her own property and confirming the broker's role, Chubb approved these alternative living expenses. *Id.* Later, however, it learned that the insured was the trustor, trustee and sole beneficiary of the family trust and that she had "fudged and lied about the Rollins property[,]" which was actually "a cabin of approximately 860 square feet, two bedrooms, no bathrooms, and no indoor plumbing" *Id.* at * 6. As a result, both she and the broker were indicted for mail fraud and convicted. *Id.*

On a motion to set aside the verdict, the district court found that materiality had not been established by the prosecution, reasoning:

> This criminal mail fraud case is missing an essential element: materiality. Chubb Insurance could have written the policy using more precise language, reflecting their obligation to pay only the actual cost of replacement housing. The insurer did not elect to write the policy using that language, instead it predicated its obligation to pay on an ambiguous term generously providing coverage for living expenses based on a standard of living in this case in a 14 bedroom mansion. The United States cannot invoke this ambiguity by attempting to establish fraud in violation of 18 U.S.C. § 1341, effectively making the grand jury and this criminal court an enforcement mechanism for a policy dispute between a carrier and its insured.

*Id.* at *16. The Ninth Circuit reversed, however, finding as follows:

> The district court erred in concluding that no rational trier of fact could have found Didier's misrepresentations material. The insurance policy required the carrier to pay for the "reasonable increase" in Didier's living expenses resulting from a "covered loss." Didier misrepresented that she had incurred an increase in her living expenses by virtue of the covered loss. This was "capable of influencing" the carrier's decision to pay her pursuant to the policy. *United States v. Blixt*, 548 F.3d 882, 888 (9th Cir.2008). *Even if the amount of expenses claimed would have been reasonable had Didier*

> *actually incurred them, the policy requirement of an "increase" made Didier's misrepresentations material.*

*United States v. Didier*, 585 F. App'x at 668 (emphasis added). Although the Ninth Circuit's conclusion in *Didier* as to expenses that were not actually incurred is accompanied by little discussion and may be dicta, the reasoning – which is expanded upon in *Krum v. Chubb Ltd*., No. 23-1262, 2024 WL 3885479, at *4 (10th Cir. Aug. 19, 2024) – appears to be sound.

In *Krum*, the insured had purchased an insurance policy to cover a ski lodge that suffered extensive damage when a fire-suppression sprinkler malfunctioned. *Id.* at *1. The policy contained an additional living expenses provision that stated as follows:

> If a covered loss makes [the] house or other permanent structure uninhabitable during [a] usual vacation occupancy, [Great Northern] cover[s] the reasonable increase in [the insured's] normal living expenses that is necessary to maintain [the] household's usual standard of living, including the boarding of domestic animals not primarily owned or kept for business use.... [Great Northern] cover[s] these extra living expenses for up to 60 days, even if the policy period ends during that time.

2024 WL 3885479, at *4. The insured received $22,500 to cover extra living expenses but argued he was entitled to more. *Id.* The district court granted summary judgment in favor of the insurance company on the issue, finding "no reasonable jury could find that Krum was entitled to additional extra-living-expenses benefits because 'nowhere [did he] identify any evidence that he incurred [a further increase in his normal living expenses] or submit[ ] appropriate verification.' " *Id.* (citation omitted).

On appeal, Krum challenged the district court's reasoning, arguing that "he need not actually incur extra living expenses to obtain such benefits." *Id.* Although the Court of Appeals found that Krum had waived this argument by failing to raise it in the district court, it went on to reject the argument on the merits, citing the Ninth Circuit's ruling in *Didier*:

> The extra-living-expenses provision plainly requires an "increase in [the insured's] normal living expenses" to trigger coverage. . . . And a reasonable increase in such expenses can only occur if the insured incurs—that is, "suffer[s] or bring[s] on oneself"—some financial liability or expense. *Incur*, Black's Law Dictionary (12th ed. 2024); *see also United States v. Didier*, 585 F. App'x 667, 668 (9th Cir. 2014) (interpreting identical policy language as imposing "requirement of an 'increase,' " meaning insured must "actually incur[ ]" increase in normal living expenses to receive benefits under extra-living-

> expenses provision). In other words, if Krum incurred no financial liability, then there was no "increase" in expenses for Great Northern to cover. And because Krum has offered no evidence that he incurred any further increase in normal living expenses, the district court did not err in concluding that no reasonable jury could find Great Northern breached the policy by failing to pay additional extra-living-expenses benefits.

*Id.*

The Court is mindful that the Policy as a whole must be considered in construing the extra living expenses language and that dictionary definitions must not be given undue weight. The Court finds the reasoning in *Krum* to be persuasive, however, and is not persuaded that the failure to expressly state in the Policy's additional living expenses provision that extra living expenses must have been incurred is sufficient to bear the weight Plaintiffs seek to put on it. While it is true that Federal *did* specify that forced evacuation expenses must have been "incurred by you," the Court concludes that the "reasonable increase" in ALE that is covered under the Policy plainly refers to expenses that were actually accrued, as found by the courts in *Didier* and *Krum*.

Nor is the Court persuaded by Plaintiffs' argument that "[i]t is not unusual for insurance companies to pay ALE benefits on a monthly basis based on a calculated determination of the monthly cost to maintain an insured's standard of living, without requiring those expenses *first* be incurred and reimbursed." Opposition at 6 (emphasis added) (citing *Kelsey v. Allstate Ins. Co*., 2005 WL 1773302, *4–5 (N.D. Cal. July 26, 2005); *Martinez v. Fire Ins. Exch*., No. D044348, 2005 WL 3249458, at *2 (Cal. Ct. App. Dec. 2, 2005), as modified on denial of reh'g (Dec. 21, 2005)). Those cases address *when* covered living expenses must be incurred under the policies' additional living expense provisions. The question here is *if* those expenses must be incurred at all. Therefore, those cases are not on point.

Accordingly, the Court finds, as a matter of law, that under the Policy, Plaintiffs are entitled only to ALE that is actually incurred.

b. Whether ALE is Limited to Two Years

Plaintiffs do not dispute that the Policy's plain language limits ALE coverage to a maximum of two years "or a later date if agreed to by [Federal][,]" or that Federal did not, in fact, ever explicitly state that it had waived this policy limitation even though it continued to pay

Plaintiffs' living expenses after the two-year period had expired.[15] Compendium, Vol. 1, Ex. A (Policy) at B-6, dkt. no. 226 at ECF p. 39. They assert, however, that there are factual disputes as to whether the two-year period may be extended under the doctrines of estoppel and prevention and that in any event, because of the state of emergency that was declared at the time of the Glass Fire, the period was extended to three years under California Insurance Code § 2060(b)(1) (formerly § 2051.5(b)(2)). The Court is not persuaded by either argument.

"In the insurance context . . . , estoppel may arise from a variety of circumstances in which the insurer's conduct threatens to unfairly impose a forfeiture of benefits upon the insured." *City of Hollister v. Monterey Ins. Co.*, 165 Cal. App. 4th 455, 488 (2008), as modified on denial of reh'g (Aug. 28, 2008). It is well-established under California law that "[e]stoppel cannot be used to create coverage under an insurance policy where such coverage did not originally exist." *Miller v. Elite Ins. Co*., 100 Cal. App. 3d 739, 755 (1980) (citing *Aetna Casualty & Surety Co. v. Richmond,* 76 Cal.App.3d 645, 652-653 (1977)). However, an insurer may be estopped from asserting a procedural defense to coverage where the requirements of estoppel are satisfied because such an estoppel only "obligates the insurer to pay what it has agreed to pay when its only defense to payment is brought into being by its own inequitable conduct." *City of Hollister*, 165 Cal. App. 4th at 490, as modified on denial of reh'g (Aug. 28, 2008). Similarly, an insurer may be barred from asserting a procedural defense to coverage where its own delay prevented the insured from meeting a procedural requirement under the plan. *Stephens & Stephens XII, LLC v. Fireman's Fund Ins. Co*., 231 Cal. App. 4th 1131, 1146 (2014), as modified on denial of reh'g (Dec. 17, 2014).

For example, in *Spray, Gould & Bowers v. Associated Internat. Ins. Co*., the court found that the insurer was barred from denying coverage based on the insured's failure to file a claim within the 12-month limitations period in the insurance policy because the insurance company had

[15] At oral argument, Federal explained that as a matter of general practice, it pays the insured's living expenses until the coverage letter goes out but claimed that in doing so it does not waive the right to enforce the policy limit by cutting off further living expenses where, as here, the two-year period has expired. It stipulated that it does not seek to "claw back" additional living expenses that it paid to Plaintiffs after the two-year period had expired but simply to avoid any further liability for ALE going forward.

failed to notify the insured of "all benefits, coverage, time limits or other provisions of [the] insurance policy" as required under Cal. Code Regs., tit. 10, § 2695.4, subd. (a). 71 Cal. App. 4th 1260, 1269 (1999). The court reasoned that while violation of the regulation does not give rise to a private right of action, failure to provide the required notice may constitute the kind of inequitable conduct that will justify an estoppel to asserting a procedural forfeiture under an insurance policy, even if the policy provisions are "plain, clear, and conspicuous[,]" because the regulation is intended to ensure "a type of notice, communicated independent of the policy itself, which is calculated to achieve actual rather than constructive knowledge." *Id.* at 1272. The court in *Spray* emphasized that its holding "create[d] no new liability for insurers." *Id.* at 1268.

Similarly, in *City of Hollister v. Monterey Ins. Co*., the court found that the insurer was equitably estopped from asserting forfeiture of coverage based on the insured's failure to meet a 180-day limitations period for a procedural requirement where the insurer did not provide adequate notice of the requirement under California regulations and common law. 165 Cal. App. 4th at 489 -90. As in *Spray*, the court emphasized that "[a]pplication of these regulations in this manner causes no enlargement of an insurer's substantive liabilities[.]" *Id.* at 490.

In *Stephens & Stephens*, the policy provided that the insurer was not required to pay replacement cost "until the lost or damaged property is actually repaired or replaced and unless the repairs or replacement are made as soon as reasonably possible after the loss or damage." 231 Cal. App. 4th at 1136. Otherwise, the insured could receive only the actual, depreciated value of the damaged property, which is often much less than the full replacement cost. *Id.* at 1137-38. When the case went to trial, the insured had not repaired the damage but the jury nonetheless awarded the full replacement cost. *Id.* at 1139. The trial court reversed the verdict on that issue, finding that the plaintiff was required to complete the repairs before it could seek full replacement cost and rejected the insured's argument that it was excused from the repair requirement. *Id.* at 1140.

The court of appeal disagreed, however, finding that under the prevention doctrine, the insured was excused from the requirement that the damage be repaired "as soon as reasonably possible after the loss or damage" because the insurance company's "delayed resolution and denial

of the claim materially hindered [the insured's] ability to plan for the property's repair." *Id.* at 1146. In particular, the court found:

> While there was significant evidence that [the insured] had debated whether to repair, subdivide, or demolish the property, there was also significant evidence that Fireman's Fund's refusal to commit to coverage made it difficult for [the insured] to know what to do with the property. Donald Stephens testified that the company had essentially exhausted its capital in maintaining the property and needed a coverage commitment from Fireman's Fund to proceed. We are satisfied that the uncertainty created by Fireman's Fund's failure to accept coverage sufficiently hindered [the insured's] ability to repair the property to satisfy the prevention doctrine.

*Id.* The court made clear, however, that "a coverage dispute should not give the insured a benefit under the policy it never had in the absence of the dispute--such as the right to receive the replacement cost without actually repairing the damage." *Id.* at 1145-46.

The court in *Stephens & Stephens* went on to reject the insured's argument that the insurer should be estopped from denying coverage because it had "failed to discuss or disclose the policy provisions[,]" finding "no reason to infer that [the insured] was uninformed about its options under the policy" and observing that it was "a sophisticated professional owner of real estate[,]" that "the policy's language [was] clear and unambiguous; and the company was advised by an insurance broker in its dealings with [the insurer]." *Id.* at 1149. Therefore, the court concluded, "substantial evidence was not presented demonstrating that [the insured] was unaware of the repair requirement due to any nondisclosure on the part of [the insurer]." *Id.*

Here, Plaintiffs do not seek to excuse any procedural requirement invoked by Federal to deny coverage. The two-year limit on ALE coverage under the Policy is not a procedural limitations period, in contrast to the facts of *Spray* and *City of Hollister*. Nor does Federal rely on the two-year limit as a basis to deny coverage that would otherwise be available under the Policy, as in *Stephens & Stephens.* Instead, Plaintiffs seek to expand the ALE coverage beyond what is provided for under the Policy. California law does not allow them to do so. Furthermore, to the extent they seek to invoke estoppel as a basis for ALE coverage beyond the two-year limit, the policy language is clear that such coverage is unavailable. Therefore, Plaintiffs in this case, as in *Stephens & Stephens*, cannot establish that they were unaware of that provision, which is a

required element of estoppel.

Plaintiffs' reliance on California Insurance Code § 2060(b)(1) (formerly § 2051.5(b)(2)) is also misplaced. That section provides:

> (b)(1) In the event of a covered loss relating to a state of emergency, as defined in Section 8558 of the Government Code, coverage for additional living expenses shall be for a period of no less than 24 months from the inception of the loss, but shall be subject to other policy provisions. *An insurer shall grant an extension of up to 12 additional months, for a total of 36 months, if an insured acting in good faith and with reasonable diligence encounters a delay or delays in the reconstruction process that are the result of circumstances beyond the control of the insured. Circumstances beyond the control of the insured include, but are not limited to, unavoidable construction permit delays, lack of necessary construction materials, and lack of available contractors to perform the necessary work.* Additional extensions of six months shall be provided to policyholders for good cause.

Cal. Ins. Code § 2060(b)(1) (emphasis added). Plaintiffs argue that there was "good cause" to extend the ALE coverage to three years because Federal "delayed reconstruction and thwarted Plaintiffs' actions by misrepresenting Policy benefits to Plaintiffs, failing to provide sufficient funds for rebuilding all damaged structures, and ultimately denying the claim." They cite no authority, however, suggesting that these types of delays fall within the ambit of the statute. *See* Opposition at 8-9.

To determine what "circumstances beyond the control of the insured" means, the Court considers the examples that follow this phrase in the statute. The California Supreme Court has explained:

> "While the proviso 'including, but not limited to' 'connotes an illustrative listing,' " the "specific examples" listed may restrict the meaning of the defined term. (*People v. Arias* (2008) 45 Cal.4th 169, 181, 182, 85 Cal.Rptr.3d 1, 195 P.3d 103.) This follows from the interpretive canon known as *ejusdem generis*, meaning "of the same kind." (*Id*. at p. 180, 85 Cal.Rptr.3d 1, 195 P.3d 103.) The canon, which " ' "applies whether specific words follow general words in a statute or vice versa," ' " instructs that " 'the general term or category is "restricted to those things that are similar to those which are enumerated specifically." ' " (*Ibid*.) It is based on the following logic: Had the Legislature " 'intended the general words to be used in their unrestricted sense, it would not have mentioned the particular things or classes of things which would in that event become mere surplusage.' " (*Ibid*.; see also *International Federation of Professional & Technical Engineers, Local 21, AFL-CIO v. Superior*



United States District Court
Northern District of California

> *Court* (2007) 42 Cal.4th 319, 342, 64 Cal.Rptr.3d 693, 165 P.3d 488; *Peralta Community College Dist. v. Fair Employment & Housing Com*. (1990) 52 Cal.3d 40, 50–51, 276 Cal.Rptr. 114, 801 P.2d 357; *Dyna-Med, Inc. v. Fair Employment & Housing Com*. (1987) 43 Cal.3d 1379, 1390–1391, 241 Cal.Rptr. 67, 743 P.2d 1323.)

*Brown v. City of Inglewood*, 18 Cal. 5th 33, 43 (2025).

Here, all of the examples in the statute appear to relate to bottlenecks caused by excess demand for rebuilding supplies and services associated with the state of emergency. None of the examples is remotely similar to the reasons for the delay upon which Plaintiffs rely in this case. Therefore, the Court declines to adopt the broad reading of this provision Plaintiffs propose. *See Shawver v. State Farm Gen. Ins. Co*., No. B319252, 2024 WL 1168510, at *11 (Cal. Ct. App. Mar. 19, 2024) (finding that litigation between family members that delayed rebuilding was not a "circumstance beyond the insured's control" within the meaning of the statute and that "[t]he statute's legislative history reflects that the Legislature was concerned that, given the number of wildfires in California in recent years, the construction industry was 'struggling to keep up with construction demand,' causing 'reconstruction delays due to the massive need for debris removal, permitting demand and lack of contractors and materials.' ") (citing Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1772 (2017-2018 Reg. Sess.) as amended Aug. 24, 2018). Accordingly, the Court concludes, as a matter of law, that the 12-month extension on ALE under Cal. Ins. Code § 2060(b)(1) does not apply to Plaintiffs' coverage dispute with respect to the ALE to which they are entitled under the Policy.

For these reasons, the Court finds that Federal is entitled to summary judgment in its favor as to the enforcement of the two-year limit on ALE coverage under the Policy except as to ALE that has already been paid that was incurred more than two years after Plaintiffs filed their claim but before the coverage letter was issued, which Federal has stipulated it does not seek to "claw back."

c. Whether Federal is Entitled to Summary Judgment as to Rebuilding to Code Costs

Federal contends it is entitled to summary judgment in its favor to the extent that Plaintiffs seek Rebuilding to Code costs under the Policy for two reasons. First, it contends the Rebuilding to Code provision provides for such coverage only if Plaintiffs actually rebuild, providing for

coverage only for "the *necessary* cost of conforming to any law or ordinance that requires or regulates" the rebuilding of the property. Motion at 11 (citing Policy at B-8, B-9, dkt. no. 226 at ECF p. 41-42 (emphasis added in Motion)). Because Plaintiffs have not commenced rebuilding, there are no such costs, according to Federal. *Id.* Second, Federal contends Plaintiffs have failed to offer any evidence of the cost of complying with any code provision above and beyond the regular cost of reconstruction. *Id.* The Court agrees.

As a preliminary matter, the Court is not persuaded by Plaintiffs' argument that the Policy and the California Insurance Code provide for Rebuilding to Code coverage even if the insured does not rebuild and therefore does not incur such costs. The language in the Policy and the Insurance Code upon which Plaintiffs rely in support of their position provides only that these costs are available *even if* the insured decides not to rebuild at the same location and therefore incurs these costs at a *different* location. Neither the Policy nor California Insurance Code § 2051.5 provides that Rebuilding to Code costs are available even if they are not incurred at all. Furthermore, such a reading of the Policy would be inconsistent with the Policy language requiring that coverage is available only when such costs are "necessary."

The Court also agrees with Federal that in order to recover under this Policy provision, Plaintiffs are required to offer evidence "substantiating the difference between cost attributed to routine reconstruction and additional cost attributed to compliance with building codes." *See Zois v. XL Specialty Ins. Co.*, No. SACV1401461JVSJCGX, 2015 WL 12656939, at *5 (C.D. Cal. Oct. 15, 2015) (granting summary judgment in favor of insurer on "rebuilding to code" claim on the basis that insured had provide no such evidence and therefore had "not shown an essential element of their claim, namely, the occurrence of additional building costs for code compliance covered by the Policy's Increased Cost of Construction Additional Coverage."). Plaintiffs have not done so. Instead, they point only to evidence that they have "spent money in furtherance of repairing, replacing or rebuilding the Property." *See* Opposition at 10 n. 5 (citing Plaintiffs' Ex. XXXXX at 81:3-17, dkt. no. 236-4 at ECF p. 726) (testimony by Christopher Nutter that he spent approximately 200 hours evaluating cost of repairs); Plaintiffs' Ex. IIIII at Chubb_14579, dkt. no. 236-4 at ECF p. 372 (status update from Federal dated Feb. 11, 2022 stating that "During

United States District Court
Northern District of California

Federal's visit to the Insureds' property on December 29, 2021, the Insureds had their own experts conducting their own testing); Plaintiffs' Ex. IIII at 31498, dkt. no. 236-3 at ECF p. 54 (McMinn Report) (stating that McMinn & Associates was hired to determine the least cost of repair and first visited the Property in October 2020; and describing the "extensive evaluation and testing of their property" by Plaintiffs); and Plaintiffs' Ex. QQ at 126:12-14, dkt. no. 236-1 at 488) (Schmidt testimony re time spent VOC testing at the Property after the Glass Fire)). None of this evidence addresses the cost of code compliance above and beyond the cost of routine reconstruction. Furthermore, Plaintiffs conceded at the hearing that they have no evidence or expert who could provide testimony from which a jury could determine what portion of the Appraisal Award (if any) is attributable to costs related to code compliance. Because Plaintiffs have not demonstrated a genuine issue of fact as to their entitlement to Rebuilding to Code costs, Federal is entitled to summary judgment that no such costs are available to Plaintiffs.

d. Whether Federal is Entitled to Summary Judgment as to Soil Replacement

Federal argues that Plaintiffs are barred from seeking the cost of soil removal and replacement because Plaintiffs have not offered evidence that soil removal is required to rebuild the main house or any other permanent structure, as is required under the Policy's Land provision. As discussed above, that provision provides coverage for up to 10% of the amount of the covered loss to the house or other permanent structure for the cost of "excavation, replacement or stabilization of land under or around [the insured's] house or other permanent structure" that is "require[d]" to "repair, replace[ ], or rebuild[ ]" the house or permanent structure. Compendium Vol. 1, Ex. A (Policy) at B-7, dkt. no. 226 at ECF p. 40. Plaintiffs point to evidence they contend show soil removal is required *generally* but none of the cited evidence links soil removal to rebuilding.

First, Plaintiffs point to page one of the Mandel Report, which they contend offers evidence that soil removal is necessary to comply with Napa County's DAR Regulations, "for rebuilding structures on the Property." Opposition at 11 (Citing Ex. OOO at 1, dkt. no. 236-2 at ECF p. 891). That page of the Mandel Report contains a summary of the opinions in the report, stating that the report "focuses on the cost of implementing remediation recommendations

proposed to address the effects of the Glass Fire on the vegetated portions of the Property." Dkt. no. 236-2 at ECF p. 891. While the DAR Regulations are referenced, there is no suggestion that Mandel considered those requirements specifically as they related to rebuilding in preparing the report. Rather, the report states at page 1:

> The proposed restoration plan is consistent with the requirements of the Napa County Soil Standards for Private Debris and Ash Removal (DAR) Cleanup, 2017 NAPA Fire Complex. While sampling has been done that demonstrates soil contamination, the opinions provided are based on the extensive ash impact area and the Napa DAR requirements. Based on the information reviewed and summarized below, soil removal to a depth of 12-inches is required for both the landscape and wildland area.

*Id*. Indeed, Mandel testified at his deposition that he did not consider whether soil removal "would be necessary for the replacement of the main house or the placement of the guesthouse." Dekel Decl., Ex. 13 (Mandel Dep.) at 260, dkt. no. 217 at ECF p. 381

Plaintiffs also cite to the last page of the McMinn Report, which references the State's Storm Water Pollution Prevention Plan ("SWPP"). Opposition at 11 (citing Ex. IIII at 31506, dkt. no. 236-3 at ECF p. 62). In particular, the report states that the SWPP is "overseen by the state and this property will be subject to all their many requirements, which include preventing any run-off from this site entering any waterway. This will need to be maintained for the entire project duration & after final building completion." Dkt. no. 236-3 at ECF p. 62. While the quoted language mentions rebuilding, however, it does not specifically address soil removal; nor does it establish any connection between any soil removal requirements that might be imposed under the SWPP and the needs of rebuilding. Likewise, Plaintiffs' citation to page eleven of the Crimmins Report, Opposition at 11 (citing Ex. MMM at 11, dkt. no. 236-2 at ECF p. 866), is to no avail as there is no discussion of soil replacement or the need to remove soil in connection with rebuilding there.

In sum, Plaintiffs point only to evidence that soil removal is *generally* required without citing any evidence that the replacement is necessary for rebuilding, which is insufficient to establish coverage under the Land provision. *See Gronik v. Balthasar*, No. 10-CV-0954, 2015 WL 905151, at *8 (E.D. Wis. Mar. 3, 2015) (holding on summary judgment that repairs for beach

erosion were not a covered loss under Chubb policy with similar land provision because there was "no evidence that the repair of a covered loss to the house require[d] the beach erosion-related repairs."). Therefore, Federal is entitled to summary judgment that Plaintiffs are not entitled to coverage for this expense under the Land provision.

Plaintiffs contend, however, that they are also entitled to the cost of soil replacement under the Debris removal and Rebuilding to Code provisions of the Policy. *See id*. at B-8, B-9. As to the former, the court finds that the language of the Policy clearly specifies that coverage is for removal of debris *that results from* the "demoli[tion] [of] damaged covered property." *Id.* at B-8. The removal and replacement of soil due to contamination (rather than demolition) does not fall within the ambit of that provision. Nor have Plaintiffs pointed to any evidence of the cost of soil replacement necessitated by demolition of the main house or any other structure on the Property. Therefore, Federal is entitled to summary judgment that Plaintiffs are not entitled to coverage for this expense under the Debris Removal provision

As to the Rebuilding to Code provision, there is no doubt that that provision provides for coverage of soil replacement *only* to the extent that it is required to rebuild or replace damaged structures. As discussed above, however, Plaintiffs have not offered any evidence to establish the additional costs associated with regulatory compliance as compared to the regular cost of reconstruction. This includes Rebuilding to Code costs related to soil removal.

Therefore, the Court finds that Federal is entitled to summary judgment that no soil replacement coverage is available to Plaintiffs under the Policy.

e. Whether Federal is Entitled to Summary Judgment on "VOC Damages Theories"

Federal's arguments are aimed at VOCs in the air and VOCs in building materials. As a preliminary matter, the Court notes that Plaintiffs' theory of loss is not limited to VOCs in the air or building materials of the house and that their experts have addressed other toxins as well, including formaldehyde. Consequently, Federal's attempt to single out VOCs from those other toxins is of limited utility for streamlining the trial. Even assuming summary adjudication as to VOCs in the air or building materials might properly be addressed separately on summary

judgment, the Court finds that Federal has not established that it is entitled to summary adjudication limited to VOCs here.

i. Whether Coverage is Barred Under Contamination exclusion

The Court considers first whether Plaintiffs are barred from recovering any losses associated with VOCs in the air under the Contamination exclusion.

The starting point for the Court's analysis is the California Supreme Court's decision in *MacKinnon v. Truck Ins. Exch*., 31 Cal. 4th 635 (2003), as modified on denial of reh'g (Sept. 17, 2003). In that case, the court considered whether a pollution exclusion virtually identical to the Contamination exclusions here applied to a claim involving the death of the insured in her apartment after the building owners had pesticides sprayed inside the building and did not warn the insured about the dangerous chemicals in her apartment. 31 Cal. 4th at 639-40. The court reviewed the authority interpreting similar provisions and found that there were two "camps":

> One camp maintains that the exclusion applies only to traditional environmental pollution into the air, water, and soil, but generally not to all injuries involving the negligent use or handling of toxic substances that occur in the normal course of business. These courts generally find ambiguity in the wording of the pollution exclusion when it is applied to such negligence and interpret such ambiguity against the insurance company in favor of coverage. The other camp maintains that the clause applies equally to negligence involving toxic substances and traditional environmental pollution, and that the clause is as unambiguous in excluding the former as the latter.

*Id.* at 642. The court reviewed the historical background of the pollution exclusion, finding that it was developed by the insurance industry in response to environmental laws passed in the 1970s and 1980s that increased insurers' potential exposure due to the "explosion of environmental litigation." *Id.* at 643-45. The Court explained that "[o]ne of the primary arguments for a narrow interpretation of the pollution exclusion is based on [that] history." *Id.* at 645. It continued:

> We would be remiss, therefore, if we were to simply look to the bare words of the exclusion, ignore its raison d'être, and apply it to situations which do not remotely resemble traditional environmental contamination. The pollution exclusion has been, and should continue to be, the appropriate means of avoiding ' "the yawning extent of potential liability arising from the gradual or repeated discharge of hazardous substances into the environment." ' (Emphasis in original.) [Citations.] We think it improper to extend the exclusion beyond that arena."

United States District Court
Northern District of California

*Id.* (citations omitted).

In adopting a narrow interpretation of the pollution exclusion, the court in *MacKinnon* observed that a broader reading of the policy language that simply relied on dictionary definitions of words such as "irritant or contaminant" would lead to "absurd results" as "[v]irtually any substance can act under the proper circumstances as an 'irritant or contaminant.' " *Id.* at 650. Nonetheless, the court found support for its interpretation of the pollution exclusion in the dictionary definitions of "release," "escape," "disperse" and "discharge," none of which would normally apply to the intentional application of pesticides at issue in that case. *Id.* at 651. However, the court found that "[t]he key to this inquiry" "turn[ed] on the meaning of the term 'pollutant.'" *Id.* It explained:

> Because the definitional phrase "any irritant or contaminant" is too broad to meaningfully define "pollutant," we must turn to the common connotative meaning of that term. This position was well articulated by the court in *Regional Bank of Colorado v. St. Paul Fire and Marine Ins. Co*. (10th Cir.1994) 35 F.3d 494, interpreting Colorado law, when considering whether carbon monoxide fumes from a residential heater should be considered pollution: "A reasonable policy holder would not understand the policy to exclude coverage for anything that irritates. 'Irritant' is not to be read literally and in isolation, but must be construed in the context of how it is used in the policy, i.e., defining 'pollutant.' [¶] While a reasonable person of ordinary intelligence might well understand carbon monoxide is a pollutant when it is emitted in an industrial or environmental setting, an ordinary policyholder would not reasonably characterize carbon monoxide emitted from a residential heater which malfunctioned as 'pollution.' It seems far more reasonable that a policyholder would understand it as being limited to irritants and contaminants commonly thought of as pollution and not as applying to every possible irritant or contaminant imaginable." (*Id*. at p. 498, 2d italics added; *accord, Stoney Run Co. v. Prudential–LMI Commercial Ins. Co*. (2d Cir. 1995) 47 F.3d 34, 38; Gill, supra, 686 N.E.2d at p. 999.)
>
> Limiting the scope of the pollution exclusion to injuries arising from events commonly thought of as pollution, *i.e.* environmental pollution, also appears to be consistent with the choice of terms "discharge, dispersal, release or escape." As one court has observed: "The drafters' utilization of environmental law terms of art ('discharge,' 'dispersal,' ... 'release,' or 'escape' of pollutants) reflects the exclusion's historical objective—avoidance of liability for environmental catastrophes related to intentional industrial pollution. (*RSJ, Inc., supra*, 926 S.W.2d at p. 681*; see also Nautilus Ins. Co. v. Jabar, supra*, 188 F.3d at p. 30; *Center for Creative Studies, supra*, 871 F.Supp. at pp. 944–945; *Koloms, supra*, 227 Ill.Dec. 149, 687 N.E.2d at pp. 81–82.) It may be an overstatement to declare that "discharge, dispersal, release or escape," by themselves, are

> environmental law terms of art. But, as discussed above, these terms, used in conjunction with "pollutant," commonly refer to the sort of conventional environmental pollution at which the pollution exclusion was primarily targeted.
>
> Moreover, as discussed above, there appears to be little dispute that the pollution exclusion was adopted to address the enormous potential liability resulting from anti-pollution laws enacted between 1966 and 1980.

*Id.* at 652–53 (2003), as modified on denial of reh'g (Sept. 17, 2003).

The approach set forth in *MacKinnon* was applied in *The Villa Los Alamos Homeowners Assn. v. State Farm Gen. Ins. Co.*, 198 Cal. App. 4th 522, (2011), upon which Federal relies in support of its argument that the VOCs at issue in this case are excluded under the Contamination exclusions. In that case, the court considered whether "the disturbing of asbestos during the scraping of acoustical 'popcorn' ceilings in a three-story, 18–unit residential building, in which asbestos fibers were released into the air, the common area hallways and stairwells, individual units, and out to the common areas and public spaces and a private street outside [the] building, constitute[d] environmental pollution." 198 Cal. App. 4th at 527. Consistent with *MacKinnon*, the court addressed two questions: 1) was asbestos a pollutant within the meaning of the policy; and 2) what was the "causal mechanism" that led to the harm. *Id.* at 536-37. The Court found that asbestos was a "pollutant" and further concluded that the causal mechanism (scraping the ceiling) constituted a "release" under the policy, explaining:

> When asbestos is disturbed by construction and related activities, the result is commonly referred to as a "release" of asbestos, and this description occurs frequently in opinions and statutes. (*See, e.g., Saller v. Crown Cork & Seal Co., Inc.* (2010) 187 Cal.App.4th 1220, 1228, 115 Cal.Rptr.3d 151 ["[p]roducts that incorporate asbestos release asbestos into the air if they are handled in a manner that disturbs them because this causes the asbestos to become airborne"]; *Coalition, supra*, 122 Cal.App.4th at p. 1264, 19 Cal.Rptr.3d 635 [" '[d]isturbances of serpentine or asbestos-containing ultramafic rock can cause asbestos fibers to be released into the ambient air when disturbed... ' "]; Lab.Code, § 6501.8 [defining " 'asbestos-related work' " as "any activity which by disturbing asbestos-containing construction materials may release asbestos fibers into the air"]; Health & Saf.Code, § 25926, subd. (d) [legislative finding that "[w]hen [asbestos] materials deteriorate or become loose, damaged, or friable, they release asbestos fibers into the ambient air"].)

*The Villa Los Alamos Homeowners Assn. v. State Farm Gen. Ins. Co.*, 198 Cal. App. 4th at 537.

Therefore, the court found that the asbestos constituted "environmental pollution" and the exclusion applied. *Id.* at 542.

Federal also cites *Cold Creek Compost, Inc. v. State Farm Fire & Cas. Co*., 156 Cal. App. 4th 1469 (2007) in support of its position. In that case, which involved essentially the same pollution exclusion as in the cases discussed above, the court applied *MacKinnon* to determine whether the exclusion applied to noxious odors from a nearby composting facility. The Court found that it did because the odors constituted "environmental pollution" under *MacKinnon*. *Id.* at 1484. In summarizing *MacKinnon*, the court also observed in passing that the cases cited in *MacKinnon* as examples of cases in which courts read the pollution exclusion narrowly included at least one case in which "toxic smoke emitted from a fire" "presumably did not involve traditional environmental pollution[.]" *Id.* at 1478 (citing *MacKinnon*, 31 Cal. 4th at 642 n. 3).

The Court concludes that the *Villa Los Alamos* and *Cold Creek* cases are distinguishable from the facts here in an important respect. Both involved some *human* activity that directly caused the discharge, release or dispersal of a pollutant. Thus, finding that the pollution exclusion applied in those cases was consistent with *MacKinnon's* guidance that that exclusion should be construed narrowly in light of "the exclusion's historical objective—avoidance of liability for environmental catastrophes related to intentional industrial pollution." 31 Cal. 4th at 653. In contrast, the causal mechanism that caused the VOCs in this case to (allegedly) harm Plaintiffs' property was a fire that was not caused (at least directly) by human activity or any "intentional industrial pollution." *MacKinnon*, 31 Cal. 4th at 653. Thus, while *MacKinnon* is not explicit on this point, it counsels that toxins released by a fire that was not intentionally set – which do not fall within the ambit of the environmental laws that were the impetus for insurers' adoption of pollution exclusions -- are not the sort of pollution that is covered by those exclusions and that likewise, the Contamination exclusion in the Policy does not apply to the VOCs that Plaintiffs contend were released by the Glass Fire and caused damage to their house.

This conclusion finds support in *Wesco Ins. Co. v. Brad Ingram Constr*., No. 22-16584, 2024 WL 243344, at *1 (9th Cir. Jan. 23, 2024). There, the court addressed whether the insurer had a duty to defend where the insured claimed injury from "airborne wildfire debris" and the

policy contained a pollution exclusion like the one above. 2024 WL 243344, at *1. Because the duty to defend is broader than the duty to indemnify, the court did not decide whether the exclusion would actually apply but simply whether there might be coverage. *Id.* at *2. The court took a "cautious" approach because the case involved "dust created or disbursed by a naturally occurring event" and there was no California case on point. *Id.* at *2. The court held, "Given the test in *MacKinnon*, which has not been applied in sufficiently analogous cases, and the fact that the pollution exclusion does not apply unambiguously to the driver's injuries, there existed a potential for coverage under the insurance policy, and Wesco had a duty to defend the litigation." *Id.*

Judge Forrest dissented, however, highlighting the facts of the case and in particular, that "[t]he dust directly resulted from a massive wildfire, but the 'clouds' of particles that allegedly caused injury were created when the dust was disturbed by the wildfire cleanup project." *Id.* at *3. Applying *MacKinnon*, she found that the toxic dust could be a pollutant, noting that California courts (including the court in *Cold Creek*) "have recognized that natural materials can be pollutants." *Id.* She further concluded that in considering the relevant "acts of dispersal or release[,]" "the cleanup project [was] the proper focus" and not "the wildfire" because "the complaint . . . alleges the injury stemmed from the cleanup effort 'stirr[ing] up toxic dust.' " *Id.* Implicit in the analysis of both the majority and the dissent is the assumption that toxic dust released by wildfire or brush fire[16] would not constitute environmental pollution under *MacKinnon* whereas toxic dust released or dispersed as a result of some direct human activity would.

Finally, the Court's conclusion that toxins released by wildfire are not environmental pollution and do not fall under the Contamination exclusion in this case finds support in *Grow*

[16] At the hearing, it became apparent that there is a dispute between the parties as to whether the Glass Fire was a "brush fire" or a "wildfire" under the Policy, an issue that has implications for Policy limits. That dispute was not briefed and is not presently before the Court. Therefore, the Court declines to resolve that dispute at this time. The Court notes, however, that there are frequent references to "wildfire" throughout the parties' briefing. In referencing the parties' arguments the Court has, at times, also used the term "wildfire." In doing so, it does not make any finding as to whether the Glass Fire was, in fact, a brush fire or a wildfire under Plaintiffs' Policy.

United States District Court
Northern District of California

*Grp., Inc. v. N. River Ins. Co.*, No. C 92-2328 SC (ENE), 1992 WL 672265, at *4 (N.D. Cal. Aug. 14, 1992).[17] That case was decided well before *MacKinnon* but in it, Judge Conti applied reasoning that was consistent with *MacKinnon*, reaching the conclusion that the pollution exclusion in that case did not apply to harm caused by the release of toxins due to a fire. *Id.* at * 3-4. Like the *MacKinnon* court, the court in *Grow Group* reasoned that the pollution exclusion was ambiguous as to whether it applied to "pollutants which result from fires" and therefore had to be construed in favor of the insured. *Id.* at *3. The court further observed, "it defies common sense to think that a pollution exclusion could bar coverage for such a basic object of coverage as a fire, particularly since nearly every fire emits, as a by-product, smoke and fumes which may well be toxic, originating as they do from the material which is burning." *Id.* It also noted that the plaintiff had "proffered extrinsic evidence which suggests that the industry, and the drafters of the exclusion, never intended the exclusion to bar coverage for hostile fires." *Id.*

The Court therefore concludes that the VOCs that Plaintiffs claim contaminated their house as a result of the Glass Fire are not environmental pollution under the Contamination exclusion and are not excluded from coverage as a matter of law.

ii. Whether Federal is Entitled to Summary Adjudication that VOCs Rendered Property Unsatisfactory for Future Use or Were Caused by the Glass Fire

As discussed above, Federal contends that with respect to VOCs in the air inside the house, Plaintiffs cannot demonstrate that "post-fire VOC levels rendered their 'then . . . satisfactory' property 'unsatisfactory for future use[ ]' " because the undisputed facts show that the VOC levels in their house after the Glass Fire are no "higher than VOC levels typically found in residential homes that have not been exposed to fire." Motion at 12 (quoting *MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co.*, 187 Cal. App. 4th 766, 779 (2010)). Similarly, it asserts that with respect to the allegation that there are VOCs in the building materials in the house, "the presence of VOCs in building materials . . . is not associated with corresponding physical damage" and therefore is not a covered loss under the California Supreme Court's

[17] Although Plaintiffs cited this case in their Opposition, Federal did not mention it in its Reply brief.

decision in *Another Planet*. *Id.* at 15 (citing *Another Planet*, 15 Cal.5th at 1149). Federal also argues Plaintiffs cannot show that the Glass Fire was the cause of any elevated VOC levels in the house. *Id.* at 13-14. The Court finds that there are disputed facts that preclude summary judgment on the question of whether VOCs caused by the Glass Fire rendered the Property unsatisfactory for future use.

In "modern policies, 'physical loss or damage' is typically the trigger for coverage." *MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co*., 187 Cal. App. 4th 766, 778 (2010). That is true of the Policy in this case as well and thus, Plaintiffs are required to demonstrate "physical loss" to their home to establish coverage under the Policy. *See* Compendium Vol. 1, Ex. A (Policy) at B-4, dkt. no. 226 at ECF p. 37 ("a 'covered loss' includes all risk to your house or other property"). In the context of fire, the court in *MRI* explained:

> Clearly, this threshold is met when an item of tangible property has been "physically altered" by perils such as fire or water. (Ibid.) However, serious questions crop up in instances when the structure of the property itself is unchanged to the naked eye and the insured claims its usefulness for its normal purposes has been destroyed or reduced. (Ibid.) That the loss needs to be "physical," given the ordinary meaning of the term, is "widely held to exclude alleged losses that are intangible or incorporeal, and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property."

*Id.* at 778-79.

Applying this rule, the California Supreme Court found in *Another Planet* that "allegations of the actual or potential presence of COVID-19 on an insured's premises do not, without more, establish direct physical loss or damage to property within the meaning of a commercial property insurance policy." 15 Cal. 5th 1106, 1117 (2024). It noted, however, that "[i]n rare situations, a property may suffer direct physical loss where it is not damaged in a conventional sense, including where a chemical contaminant or noxious odor infiltrates the property and renders it effectively unusable or uninhabitable." *Id.* at 1118. The court explained:

> In such a case, the contaminant or odor may cause direct physical loss, but only where the source of the property's unusability or uninhabitability is sufficiently connected to the property itself. This situation may arise when the effect of the contaminant or odor is so lasting and persistent that the risk of harm is inextricably linked or

connected to the property.

*Id.*

Here, Plaintiffs have presented evidence from their experts that both the air and the building materials in their house are toxic due to chemicals contained in the smoke plume that engulfed their house during the Glass Fire and that the main house is therefore uninhabitable. If they can prove that this is the case, they will have demonstrated physical loss under the Policy and *Another Planet*. While Federal argues that Plaintiffs cannot meet this burden, the parties' experts disagree on a multitude of issues, including the reliability of the measurements taken by both sides' experts of chemicals in the air and building materials, whether the level of contamination in the air is higher than would be expected under all the circumstances and whether that contamination resulted from the Glass Fire or other factors. Therefore, the Court rejects Federal's argument that it is entitled to summary judgment to the extent Plaintiffs seek to ask the jury "to award damages based on Federal's failure to pay for the alleged presence of VOCs and SVOCs" in the house. Motion at 16.

**3. Bad Faith and Elder Abuse Claims**

"The key to a bad faith claim is whether or not the insurer's denial of coverage was reasonable." *Guebara v. Allstate Ins. Co*., 237 F.3d 987, 992 (9th Cir. 2001). "A withholding of benefits may be unreasonable if the insurer: (1) fails to 'give at least as much consideration to the interests of the insured as it gives to its own interests'; (2) fails to fully investigate the grounds for denying a claim; (3) 'ignores evidence available to it which supports the claim'; (4) conducts the investigation in a biased manner; or (5) denies benefits 'on a basis unfounded in the facts known to the insurer, or contradicted by those facts.' " *Vanderloo v. Allstate Northbrook Indem. Co.,* No. 23-CV-04964-EKL, 2025 WL 844414, at *9 (N.D. Cal. Mar. 17, 2025) (quoting *Wilson v. 21st Century Ins. Co*., 42 Cal. 4th 713, 720-21 (2007)).

"Under California law, a bad faith claim can be dismissed on summary judgment if the defendant can show that there was a genuine dispute as to coverage." *Guebara*, 237 F.3d at 992. The contours of this doctrine were set forth in *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co*., in which the court explained:

> It is . . . clear that [the existence of a genuine dispute] may be resolved as a matter of law in a proper case. " '[A] court can conclude as a matter of law that an insurer's denial of a claim is not unreasonable, so long as there existed a genuine issue as to the insurer's liability.' [Citation.] The 'genuine dispute' doctrine may be applied where the insurer denies a claim based on the opinions of experts. [Citations.]" (*Fraley v. Allstate Ins. Co*., . . . 81 Cal.App.4th at p. 1292 . . .) In *Fraley*, a case that involved a dispute over the cost of repairs to the insureds' fire damaged home, with each side relying on the differing opinions of their respective experts, the court held "[w]here the parties rely on expert opinions, even a substantial disparity in estimates for the scope and cost of repairs does not, by itself, suggest the insurer acted in bad faith." (*Id*. at p. 1293 . . .).
>
> While many, if not most, of the cases finding a genuine dispute over an insurer's coverage liability have involved legal rather than factual disputes, we see no reason why the genuine dispute doctrine should be limited to legal issues. (*See, e.g., Guebara v. Allstate Ins. Co*. (9th Cir.2001) 237 F.3d 987, 993–994; *Phelps v. Provident Life and Acc. Ins. Co*. (C.D.Cal. 1999) 60 F.Supp.2d 1014, 1021–1022; *Allstate Ins. Co. v. Madan* (C.D.Cal.1995) 889 F.Supp. 374, 381.) That does not mean, however, that the genuine dispute doctrine may properly be applied in every case involving purely a factual dispute between an insurer and its insured. This is an issue which should be decided on a case-by-case basis. (*Guebara v. Allstate Ins. Co.,* supra, 237 F.3d at p. 994).
>
> As the *Fraley* court emphasized, where an insurer, for example, is relying on the advice and opinions of independent experts, then a basis may exist for invoking the doctrine and summarily adjudicating a bad faith claim in the insurer's favor. (*Fraley v. Allstate Ins. Co*., *supra,* 81 Cal.App.4th at p. 1293 . . . ; *Guebara v. Allstate Ins. Co*., *supra*, 237 F.3d at p. 994.) We concur, however, with the caveat advanced by the *Guebara* court. It cautioned that an expert's testimony will not automatically insulate an insurer from a bad faith claim based on a biased investigation. It suggested several circumstances where a biased investigation claim should go to jury: (1) the insurer was guilty of misrepresenting the nature of the investigatory proceedings (see *Tomaselli v. Transamerica Ins. Co*. 25 Cal.App.4th 1269, 1281, . . . [allowing a bad faith claim to go to the jury where an insurance company without any evidence of fraud forced an insured to submit to an examination under oath, dissuaded the insured from having an attorney present, and misled the insured about the purpose of the examination]); (2) the insurer's employees lied during the depositions or to the insured; (3) the insurer dishonestly selected its experts; (4) the insurer's experts were unreasonable; and (5) the insurer failed to conduct a thorough investigation. (*Guebara v. Allstate Ins. Co*., *supra*, 237 F.3d at p. 996.)

90 Cal. App. 4th 335, 347–49 (2001), as modified on denial of reh'g (July 30, 2001).

Here, Plaintiffs' bad faith claim is based on more than simply a disagreement among experts acting in good faith with respect to coverage, in contrast to *Fraley*. Rather, Plaintiffs point

to evidence that Federal's investigation was biased; that it failed to fully investigate the claim and ignored evidence; that it withheld data and misrepresented facts; that it misrepresented policy terms and withheld money owed; that it used unqualified consultants; that it used the wrong standard for damage, treating smoke as the equivalent of dust, and tailoring its investigation to that standard to avoid finding damage; and that it provided insufficient detail in its Coverage Letter to gain a tactical advantage over Plaintiffs. *See* Opposition at 14-15. While Federal asserts that all of this evidence "crumbles" upon scrutiny, the Court finds that there are factual disputes as to whether Federal acted reasonably that preclude summary judgment as to the bad faith claim and therefore as to the Elder Abuse claim as well.

**4. Negligence Claim**

Plaintiffs have advanced two theories of negligence. With respect to the underinsurance theory, Federal's challenge hinges on the question of whether MIV acted as a broker or an agent when Plaintiffs purchased the Policy from them. On that question, the evidence is mixed. Plaintiffs have presented evidence that MIV is licensed by the Department of Insurance to do business on behalf of Federal, *see* Plaintiffs' Ex. RRRRR, dkt. no. 235-1,[18] whereas Federal points to Plaintiffs' allegations in the state court case against MIV referring to MIV as a "broker" and to a statement on MIV's website. Because there appears to be a fact question as to whether MIV acted as an agent of Federal when it sold the Policy to Plaintiffs, the Court finds that summary judgment on this claim is not appropriate.

As to the loss reserves theory, Plaintiffs do not point to any specific evidence that Federal denied its claim based on inadequate loss reserves. Therefore, the Court GRANTS summary judgment in favor of Federal on this claim to the extent it is based on a loss reserves theory.

---

[18] As stated above, the Court grants Plaintiffs' request for judicial notice as to the *fact* that this information is reflected on the Department of Insurance Website. Although Federal challenges this evidence as hearsay, the cases it cites merely support the proposition that "judicial notice of matters of public record is limited to the existence and authenticity of a document; the veracity and validity of the contents remain open to dispute." *LifeScan Scotland, Ltd. v. Shasta Techs., LLC*, No. 5:11-CV-04494 EJD, 2012 WL 2979028, at *5 (N.D. Cal. July 19, 2012) (citation omitted); *Elliott v. Mortg. Elec. Registration Sys., Inc.*, No. 12-CV-4370 YGR, 2012 WL 12965955, at *2 (N.D. Cal. Dec. 7, 2012) (same).

**5. Damages Limit**

The parties are in agreement that the award of the Appraisal Panel is binding (at least, to the extent the Panel acted within the scope of its authority) under the Federal Arbitration Act. The only dispute as to whether the Award places a cap on Plaintiffs' recovery for damage to manmade structures (and by extension, on land under the Policy's Land provision) turns on whether the Award measured replacement cost (as Federal contends) or ACV (as Plaintiffs contend). The Court finds that Federal is correct that the award established replacement cost rather than ACV and therefore, places an upper limit on Plaintiffs' recovery for damage to manmade structures and land.

Plaintiffs point to California Insurance Code §§ 2701 and 2501 in support of their position. Section 2701 is California's Standard Form Insurance Policy, which provides coverage for "actual cash value of the property at the time of the loss." Cal. Ins. Code § 2071. Section 2051 of the California Insurance Code further provides:

> Under an open policy that requires payment of actual cash value, the measure of the actual cash value recovery, in whole or partial settlement of the claim, for either a total or partial loss to the structure or its contents, shall be the amount it would cost the insured to repair, rebuild, or replace the thing lost or injured less a fair and reasonable deduction for physical depreciation based upon its condition at the time of the injury or the policy limit, whichever is less. A deduction for physical depreciation shall apply only to components of a structure that are normally subject to repair and replacement during the useful life of that structure.

Cal. Ins. Code § 2051. But there is no dispute that the Policy here deviates from the standard policy to the extent that it covers replacement cost.

Moreover, replacement cost is what the Panel evaluated. In particular, the costs itemized in the Appraisal Award relate to the costs of rebuilding Plaintiffs' house and there is no indication that the Panel made any deduction for depreciation. *See* Dekel Decl., Ex. 2 (Appraisal Award), dkt. no. 217 at ECF pp. 33-58. Plaintiffs understood this when they stated in their opposition to Federal's motion to vacate the award, "The award reflects the Panel's conclusion that damage from the Glass Fire to all manmade structures requires a rebuild, and that the cost for that restoration is $33,170,429.58, valued at the time of the loss in 2020." Dkt. no. 113 at ECF p. 9.

Therefore, the Court rejects Plaintiffs' position that it may recover more than the Panel awarded for damage to manmade structures on this ground. Instead, Plaintiffs' recovery for damage to manmade structures may not exceed $32,122,214.15 and its recovery for damage to land may not exceed $3,212,221.42.

**E. Plaintiffs' Summary Judgment Motion**

**1. Contentions of the Parties**

a. Motion

In their partial summary judgment motion, Plaintiffs asks the Court to hold, as a matter of law, that: 1) the Award issued by the Appraisal Panel in this matter (dkt. no. 88-1) "properly accounted for the pre-existing condition of the man-made structures at Plaintiffs' property as of September 27, 2020" and therefore, Federal's fourteenth affirmative defense (asserting Plaintiffs' claims are barred in whole or in part because their losses were at least partly due to wear and tear that manifested outside the applicable Policy period) fails as a matter of law and the Contamination and Gradual Loss exclusions do not apply; 2) the Glass Fire that started on September 27, 2020 was the efficient proximate cause of the physical damage identified by the Appraisal Panel in its Award and therefore, neither the Neglect exclusion nor the Failure to Protect provision bars coverage; 3) Federal's counterclaims for breach of contract and fraud – as well as their Fifteenth and Sixteenth Affirmative Defenses to the extent they are based on the same facts -- fail as a matter of law. Plaintiffs' Summary Judgment Motion at 1.

In support of the first argument, Plaintiffs point to this Court's conclusion in upholding the Award that while Federal may challenge any causation findings "embedded" in the Appraisal Award, the "panel did not act improperly to the extent that it appraised the loss as the '[c]ost of repairs to return the Man-Made structures to their pre-loss condition as of the Date of Loss.'" *Id*. at 4 (citing dkt. no. 134, Appraisal Award Order, at 29). According to Plaintiffs, "the Award specifically finds that the cost of those repairs was, on an actual cash value ('ACV') basis, $32,122,214.15), and that the 'Period of actual Construction' for effecting that remedy was 36 months." *Id.* Thus, Plaintiffs assert, it is "plain" that the Panel made findings as to:

> (1) the existence of the Property; (2) its quality and condition as



United States District Court
Northern District of California

> of September 27, 2020 (including any damage, wear, tear, etc.); (3) the existence and extent of damage on or after September 27, 2020 (through the date of the evidence or the Panel's inspections); (4) the remedy required to address that damage; (5) an appraisal of the estimated ACV cost of effecting that remedy, including deductions for depreciation and pre-existing conditions pursuant to Cal. Ins. Code §§ 2051 and 2071; and (6) the estimated period of restoration to effectuate that remedy.

*Id.* at 5. According to Plaintiffs, none of these findings are findings of causation. *Id.* Furthermore, Plaintiffs contend, "[t]he Award makes it plain that the 'cleaning' repeatedly advocated by Chubb was rejected in favor of a rebuild of the manmade structures." *Id.*

Plaintiffs contend "California law is clear that appraisers may make determinations of both pre-loss and post-loss condition[.]" *Id.* at 6 (citing *Lee v. California Cap. Ins. Co*., 237 Cal. App. 4th 1154, 1172 (2015); *Safeco Ins. Co. v. Sharma*, 160 Cal. App. 3d 1060, 1066 (1984); *Comprehensive Med. Ctr., Inc. v. State Farm Mut. Auto. Ins. Co*., No. LA CV17-07672 JAK (JPRX), 2019 WL 12536808, at *5 (C.D. Cal. June 11, 2019)). They further contend the Ninth Circuit has "expressly recognized that assessing the pre-existing damage of property does not entail findings of causation." *Id.* (citing *Knapp v. Allstate Ins. Co*., 134 F.3d 378 (9th Cir. 1998)). Furthermore, Plaintiffs assert, "assessing the pre-loss quality and condition (including preexisting damages) is . . . statutorily mandated" under Cal. Ins. Code § 2071 (appraisers must "appraise the loss, stating separately actual cash value [ACV] and loss to each item"). *Id.* To satisfy this requirement, Plaintiffs contend, the appraisal panel must determine "the cost to repair/replace damaged property 'less a fair and reasonable deduction for physical depreciation based upon its condition at the time of the injury.' " *Id.* (quoting Cal. Ins. Code § 2051 (emphasis added)). Thus, Plaintiffs assert, the Appraisal Panel accounted for the pre-loss condition of the Property in performing the statutory obligations discussed above. *Id.* at 7. Moreover, they contend, the issue of the pre-loss condition of the Property was extensively briefed in the appraisal proceeding and therefore, Federal's "current attempts to re-argue preexisting wear and tear, contamination, or deferred maintenance, etc. are inappropriate." *Id.*

Next, Plaintiffs assert that the "efficient proximate cause" of the destruction of the guest house and damage to the main house was the Glass Fire and therefore, they are entitled to summary judgment that the loss is a covered loss under their all-risk policy. *Id.* at 9. In particular,

they argue that neither the Gradual Loss Exclusion nor the Contamination Exclusion can preclude coverage, for the loss as assessed by the Panel took into account the pre-existing condition of the Property, as discussed above. *Id.* at 9-10. They argue further that as to the Contamination Exclusion, Federal argued "extensively during the Appraisal proceedings that any contamination was present at background levels, and that there was no damage from the fire itself." *Id.* at 10. Therefore, they contend, "[t]o the extent that the Panel considered 'contamination' issues in assessing the damage and remedy (it may not have), and given its $32 million award, it can only have found either (1) there was a change in the presence of those chemicals at the Property from September 27, 2020 to immediately after, and that such change contributed to the physical damage to the Property; or (2) there was no such change, and therefore would be no remediable damage to which the Exclusion might apply." *Id.*

Plaintiffs also argue that Federal's reading of the Contamination Exclusion is inconsistent with California law for the same reasons they oppose summary judgment in favor of Federal on this issue, discussed above. *Id.* at 10-11.

In addition, Plaintiffs argue that there is no evidence that the post-loss exclusions based on Neglect and Failure to Protect Property bar coverage as the Panel's "award of a 'replacement' remedy obviates these exclusionary provisions" and Federal has "explicitly argued against there being . . . any post-loss damage to the Property." *Id.* at 12. Plaintiffs argue further that there is no dispute that the Glass Fire "set the loss in motion" and "[u]nder California law, this is decisive: when a loss is caused by a combination of covered and excluded perils, the entire loss is covered if the efficient proximate cause (or 'predominant cause') is covered." *Id.* at 12 (citing *Garvey v. State Farm Fire & Casualty Co*., 48 Cal. 3d 395, 403-404 (1989) and Cal. Ins. Code § 530). Although this is ordinarily an issue of fact, this issue can be decided as a matter of law because there is no evidence of post-loss damage to the Property, Plaintiffs assert. *Id.* at 13. They point to the testimony of several of Federal's experts that "the Property can still be 'fully remediated' with cleaning, even now – making it clear that there is no additional damage from neglect or failure to protect." *Id.* at 13-14 (citations omitted). They also contend Federal's expert Kevin Salvagni "testified that there was no damage at the Property between the date of the Glass Fire and the date

of the Crystal Fire (June 5, 2024), well after the Award." *Id.* at 13 (citing dkt. no. 229 at ECF p. 444 (Salvagni Dep. at 188)).[19] Thus, Plaintiffs assert, Federal's "attempt to employ these exclusions in this case would effectively render illusory the 'all risk' nature of the Policy and nullify California's efficient proximate cause doctrine." *Id.* at 14.

Plaintiffs contend *Malkin v. Federal Ins. Co*., 562 F.Supp.3d 854 (C.D. Cal. 2022) supports this conclusion. *Id.* In that case, according to Plaintiffs, the court found that an exclusion for Structural Movement, Surface Water, and Earth Movement did not apply where water overflowed into and beneath the home because the drain was clogged by ash from a wildfire. *Id.* The court found that "the ash clogging the drain was the 'most important' cause of the loss, rendering those exclusions unenforceable under the efficient proximate cause doctrine." *Id.* Likewise, Plaintiffs contend, it is undisputed here that the Glass Fire destroyed the guest house and damaged the main house and there is no evidence that anything else could be the most important cause of the damage to the Property. *Id.* at 15. Therefore, Plaintiffs assert, the Court should find, as a matter of law, that the Glass Fire was the efficient proximate cause of the damage and that the loss is therefore covered. *Id.*

Plaintiffs also seek summary judgment as to Federal's counterclaims for breach of contract and fraud. *Id.* at 15-16. Plaintiffs contend Federal's counterclaims fail as to the Duration Opinion (Amended Answer, Counterclaim ¶ 57(a)) and the Loss Statement (Amended Answer, Counterclaim ¶ 57(b)) because both are true, citing the Appraisal Panel's conclusion that the main house needed to be replaced and that the time needed to do so is 36 months; and citing the reports

[19] Salvagni's testimony was as follows:

> Q. Well, there was damage in the Glass Fire, and then there was a Crystal Fire. Was there any damage that you assessed at the property that occurred between the Glass Fire and the Crystal Fire?
>
> Salvagni: Not that I'm aware of.
>
> Q. None, right?
>
> Salvagni: Right.

Dkt. no. 229 at ECF p. 444.

United States District Court
Northern District of California

of McMinn Associates and Total Concepts "estimat[ing] that the repair cost for the man-made structures, including estimated costs for the necessary landscaping, hardscaping, and land remediation (which includes foundation work and was not assessed by the Panel) as well as code upgrades covered under the Policy would cost $85,305,580.40." *Id.* at 16-17 (citing Proof of Loss signed August 2, 2021, dkt. no. 229 at ECF pp. 266-271).

As to the Purported Counsel Statement (Amended Answer, Counterclaim ¶ 57(c)), Plaintiffs contend Federal misrepresents the statement made by their counsel in the September 27, 2021 Letter:

> [Federal] claims that Plaintiffs asserted that "Ms. Bolstad Johnson had concluded" three separate things: (1) that soot, ash, and other fire byproducts "have permeated every part of the main house, including the interstitial spaces of the walls and the building materials themselves"; (2) that Kaizen's laboratory analysis of various building materials "demonstrates that 'cleaning' will not repair the physical damage" to them, and that removal of contamination would cause "significant additional damage" ; and (3) that "Therefore, because it is [Federal's] obligation under the Policy to repair or replace/rebuild all buildings, infrastructure, and landscaping to their pre-fire condition, your insureds are entitled to total replacement of the physically destroyed and/ or contaminated buildings, infrastructure, and landscaping." [Dkt. 198 at 26:27-27:11 (¶ 38)].
>
> In its Counterclaim, [Federal] places all three of these statements within the quotation marks used to indicate what "Ms. Bolstad-Johnson had concluded." *Id.* This directly misrepresents the September Letter which (correctly) ascribes the first two statements to the Plaintiffs' expert reports, particularly the Kaizen Report and the Building Materials Report (defined immediately below). But the third statement is not attributed to anyone, let alone Kaizen or Ms. Bolstad-Johnson; it is the assertion of counsel regarding what is owed under Chubb's Policy based on (among other things) the previous two statements. This is, of course, what "therefore" typically means.

*Id.* at 17.

Furthermore, Plaintiffs assert that the first two statements in the September 27, 2021 Letter are consistent with the findings in the Kaizen Report and Kaizen's February 26, 2021 Building Materials Addendum (the "Building Materials Report"), both of which were attached to the September 27, 2021 Letter. *Id.* at 18 (citing dkt. no. 226 at ECF p. 172 (Kaizen Report) and *id.,* ECF p. 464). In particular, Plaintiffs point to the following statements in the Kaizen Report:

> Because of the house's unique construction as an actual French

> Chateaux, the walls are on average about 22" thick. The depth of this space would allow chemicals and particulates associated with fire to enter into these wall cavities and potentially remain trapped.
>
> * * * *
>
> Based on the sample data, every porous material, including building materials and contents, that is capable of absorbing chemicals generated from the fire is presumed to be contaminated. All building materials used in the construction and contained within the buildings tested are presumed to have similar concentrations of the gases identified in the living spaces and coating of smoke, soot or char.

*Id.* (quoting Kaizen Report, dkt. no. 226 at ECF pp. 175, 247). They also point to the following statements in the Building Materials Report:

> Exterior plaster samples show evidence of carbon/soot deposits that are impossible to wash off with soap and water.
>
> * * * *
>
> Slate roofing tiles showed varying levels of discoloration. This material is very porous and per the attached lab report nearly impossible to remove the contamination from the porous surface.

*Id.* (quoting Building Materials Report, dkt. no. 226 at ECF p. 467). Plaintiffs contend that in light of this evidence, Federal cannot establish that counsel's representations about what Plaintiffs' experts had told them were false. *Id.* at 19. They emphasize that Federal's allegation of falsity "lies not in repairability, nor Plaintiffs entitlement to replacement" but rather is based on Federal's claim that the "statement is false because Kaizen allegedly never drew such conclusions[.]" *Id.* at 16 n. 10.

As to the third statement in the September 27, 2021 Letter, Plaintiffs contend the statement cannot be actionable as fraud because it is a "mere statements of opinion, including legal conclusions drawn from a true state of facts." *Id.* (quoting *Seeger v. Odell*, 18 Cal.2d 409, 414 (1941); and citing *Smith v. Brown*, 59 Cal.App.2d 836, 838 (1943) (no recovery where alleged statements are "expressions of opinion or statements of law, based upon facts known to both")). Moreover, Plaintiffs contend, counsel's opinion in the September 27, 2021 Letter was supported by both the findings of McMinn Associates and the findings of Federal's expert, Kevin Salvagni. *Id.* at 19 (citing June 3, 2021 McMinn Report, dkt. no. 229 at ECF p. 24; May 19, 2023 Expert Report of Kevin Salvagni, dkt. no. 229 at ECF p. 393). In particular, Plaintiffs point to the

United States District Court
Northern District of California

following statement in the McMinn Report:

> We have and did consider, and others have proposed, that remediation is a possibility. This would entail, as a minimum, removing all interior and exterior finishes down to the underlying framing and would include removal of the entire roof, all doors and windows, sheathing, all mechanical systems and so on.
>
> This is not dissimilar to Shakespeare's proverbial removal of a "pound of flesh." The theory sounds initially feasible. In practice, performing all that work with surgical precision; without contaminating the remaining structures, then upgrading the existing, twenty-year-old framing to comply with the new and far more rigorous building codes, seismic standards and so forth, in such a way as to not diminish, weaken or otherwise impair the overall integrity of the structure? This will prove to be close to impossible. It would also need to include and then confirm: by sampling and laboratory testing, that all fire residues and contamination have been removed—even where they have permeated wood framing: at holes and cuts, buried intersections and assemblies, and at all nail penetrations. Considering the main residence has over a million such nail penetrations, this makes Shakespeare's surgical proposal seem easy by comparison.
>
> The cost of this approach—as is true of all remodels, compared to demolition and building from new—will far exceed the actual replacement cost of new construction. Hence, having considered this option in some detail, we have determined it is neither a feasible, viable, or economically realistic option. As a result, we have moved on to the only long term, permanent solution: the demolition and replacement of all existing structures, including the main residence.

Dkt. no. 229 at ECF p. 24. Plaintiffs also point to Salvagni's opinion that "[t]here would be no cost savings associated with a selective demolition and removal of the Main Structure exterior building envelope and interior cladding down to the studs and rebuild." Dkt. no. 229 at ECF p. 393, Section 1.2.1(4).[20]

---

[20] Salvagni provided the following cost estimates in his report:

1) Demolition through footers with ground-up rebuild of the Guest House: $2,575,723.
2) Demolition through footers with ground-up rebuild of the Main Structure, Pavilion, Garage/Wine Storage, Swimming Pool, and return hardscape and landscape to pre-loss condition: $31,966,027.
3) Remove and reconstruct exterior cladding (stucco and slate roofing) and return hardscape and landscape to pre-loss condition: $8,757,383.

*Id.* at ECF pp. 392-93, Section 1.2.1. In this context, he offered the opinion quoted above, that "[t]here would be no cost savings associated with a selective demolition and removal of the Main Structure exterior building envelope and interior cladding down to the studs and Rebuild." *Id.* at ECF p. 393, Section 1.2.1(4). However, he also found the rebuild cost estimate of $125 million offered by Plaintiffs' expert Christopher McMinn to be "grossly inflated,

United States District Court
Northern District of California

Plaintiffs also argue that counsel's opinion in the September 27, 2021 Letter is protected by the litigation privilege because it was made in anticipation of litigation. *Id*. at 18-20. Plaintiffs point to the statement in the letter by their counsel that they had "serious concerns about the manner in which [Federal] [was] handling their claim and believe[d] that [Federal's] conduct [was] in violation of California law" and the further statement that this had "caused substantial and material harm to [Plaintiffs]." *Id.* at 20 (quoting September 27, 2021 Letter, dkt. no. 229 at ECF p. 304). According to Plaintiffs, these statements by Plaintiffs' attorney constituted "specific threats of legal liability." *Id.* Furthermore, they contend, "Plaintiffs' counsel at the time had been putting in significant effort working the case up for over a year, and there had been extensive discussions regarding the drafting of a complaint and the timing of the filing of legal claims." *Id.* (citing Pollock Decl. ¶ 18). They assert that "it was only two weeks later that Plaintiffs began incurring legal costs for the actual drafting of a Complaint that would ultimately be filed in December 2021 after several months of (very expensive) work." *Id.* (citing Pollack Decl. ¶ 23).

Finally, Plaintiffs contend Federal's counterclaims fail because Federal cannot prove damage, reliance or substantial prejudice resulting from Plaintiffs' alleged misrepresentations. *Id.* at 20-25 According to Plaintiffs, Federal claims that it incurred investigative costs and policy payments based on their alleged misrepresentations but Federal's payment of these costs was not a result of any reliance on their allegedly fraudulent statements. *Id.* at 21 (citing dkt. no. 198 (Amended Answer) at 31-32, Counterclaim ¶¶ 63, 70-71, 73)). First, Plaintiffs assert, to the extent that Federal claims it paid Plaintiffs' living expenses based on the allegedly fraudulent statement that they had "a valid basis to believe the Glass Fire had rendered their Property uninhabitable and that all the structures on the Property needed to be completely replaced[,]" that claim fails because "the undisputed facts establish that Plaintiffs did present qualified expert opinion that the Property was uninhabitable." *Id.* at 21. In particular, they contend, "[t]he Kaizen Report could not be clearer: 'Based on the observations and analysis of the samples collected, **it is recommended that this residence not be occupied in its current condition**.'" *Id.* (quoting

---

unreliable and unreasonable." *Id.* at ECF p. 393, Section 1.2.2.

Kaizen Report at 76, dkt. no. 226 at ECF p. 247) (emphasis added by Plaintiffs)).

According to Plaintiffs, Federal "may disagree with Kaizen, question its methodology, or even discount Ms. Bolstad-Johnson's qualifications" and also "has the discretion to assume bad faith risk and just deny the claim if it thinks the evidence isn't sufficient" but it "cannot say (because it is indisputably false) . . . that Plaintiffs' uninhabitability claim was not based on an expert recommendation submitted to Chubb in support of Plaintiffs' claim." *Id.* Plaintiffs also note that as of June 2021 they were being told by their construction experts "that given the extent and nature of the damage, it was less expensive to replace than to attempt to remediate." *Id.* at 22 (citing McMinn Report, dkt. no. 229 at ECF p. 24).

Next, Plaintiffs argue that Federal cannot claim that it incurred investigative costs in reliance on their statements because it had an independent duty to investigate Plaintiffs' claim. *Id.* at 22 (citing Cal. Code Regs. tit. 10, § 2695.7; *Egan v. Mut. of Omaha Ins. Co*., 24 Cal.3d 809, 819 (1979)). This duty, Plaintiffs contend, "including a duty to investigate the possibility of Plaintiffs' home being a total loss – was triggered long before any supposedly fraudulent statements." *Id.* They point to the October 26, 2020 letter from their attorney informing Federal that " 'in the best case scenario, they will reoccupy their residence in 1 to 1.5 years, and in the worst case, it will be 4 years,' but that the full scope of the damage would likely not be known for at least six months." *Id.* (quoting October 26, 2020 Letter, dkt. no. 226 at ECF p. 129).

Plaintiffs further assert that Federal understood that it would need to conduct such an investigation, sending a response to the October 26, 2020 Letter on November 13, 2020 in which it stated "that 'a realistic assessment of the damage requires [Federal] to consider all available information,' and that it would need to determine the composition of fire by-products before addressing remedies." *Id.* (quoting November 13, 2020 email from Federal's Steve Mortenson to Plaintiffs' attorney, dkt. no. 226 at ECF p. 135-136). This point was reiterated a week later, according to Plaintiffs. *Id.* (citing November 18, 2020 email from Steve Mortenson to Plaintiffs' attorney stating, "As we pointed out in our November 9, 2020 letter, it is premature to discuss what kind of remediation process will be necessary in order to remove remaining combustion byproducts. Once we all know the composition of the byproducts, Chubb's experts and/or other

retained professionals will recommend a remediation process. Once a process has been identified, a strategy can be developed for testing the process[,]" dkt. no. 226 at ECF p. 139.).

According to Plaintiffs, when Federal reversed its position a month later, informing them in December 2020 that the "Main House should be vacuumed, power-washed, deodorized, and the insulation replaced because of smoke damage[,]" Plaintiffs "expressly rejected Chubb's washing remedies as inadequate" in letters dated January 8, 2021 and March 1, 2021, and sent Federal copies of the Kaizen Report and the Building Materials Report on March 1, 2021. *Id.* at 22-23 (citing dkt. no. 226 at ECF pp. 146 (Federal's December 17, 2020 letter), 153, 155 (Plaintiffs' January 8, 2021 letter), 165 (Plaintiffs' March 1, 2021 Letter)). Moreover, they contend, Federal acknowledged that more investigation would be required when it informed Plaintiffs on March 11, 2021 that it could not respond to their request that the house be shrink-wrapped because Federal was "in the process of reviewing the [B]uilding [M]aterials [R]eport attached to [Plaintiffs'] March 1, 2021 letter, which [Plaintiffs] contend[ed] demonstrate[d] that Federal's proposal to power wash the building would not be effective." *Id.* (quoting March 12, 2021 letter from Federal to Plaintiffs, dkt. no. 229 at ECF p. 5).

According to Plaintiffs, they continued to inform Federal of their position that merely cleaning the Main House was an inadequate remedy, supplying a detailed itemization of construction costs with their Fourth POL, submitted to Federal in August 2021, and estimates from CBIZ Forensic Consulting Group in support of their Fifth POL, submitted later that month. *Id.* at 23-24 (citing dkt. no. 229 at ECF pp. 266, 274-276). Plaintiffs contend Federal "knew exactly" what their experts' reports said and that it had "engaged in a *deep* evaluation of the credibility of the reports' claims" but nevertheless on August 26, 2021 "made a blanket demand for documents relevant to the proof of loss, claiming that it could not 'accept or deny' the claim until its experts completed their analysis of the materials submitted in support[,]" indicating that it understood that "more investigation was needed." *Id.* (citing dkt. no. 229 at ECF p. 281). Plaintiffs emphasize that Federal was already in possession of reports from their experts at this time and furthermore, that Plaintiffs were "not required by law or the Policy to generate any expert reports at all, much less one specifically supporting a remedy; Plaintiffs were [only]

required to submit a proof of loss and cooperate by providing materials requested by the insurer[,]" which they did. *Id.* at 24 (citing Policy at Y-4). Plaintiffs assert that they provided their experts' reports to Federal "months in advance of the allegedly fraudulent statements, and Chubb undertook an extensive review of those materials that Chubb admits was still in progress as of January 31, 2025." *Id.* (citing Amended Answer, dkt. no. 198 at 15 (Third Affirmative Defense)). In sum, Plaintiffs argue, Federal's "investigation was not 'reasonable reliance' on Plaintiffs' statements; it knew exactly what the reports said and it cannot now complain that it was misled as to their content or that it was lured into performing the investigation it claimed from the outset that it needed to complete before taking a position on the appropriate remedy." *Id.* at 24-25.

Finally, Plaintiffs argue that Federal cannot avoid coverage based on their alleged failure to comply with the Policy's Fraud Provision. *Id.* at 25. According to Plaintiffs, that provision is a procedural requirement rather than a substantive requirement and under California law, insurers can only avoid liability based on violation of such a requirement where they can establish that they have suffered "actual and substantial prejudice" as a result of the alleged misrepresentation or concealment. *Id.* (citing *Silicon Valley Bank v. New Hampshire Ins. Co*., 203 F.Supp.2d 1152, 1159 (C.D. Cal 2002) (citing *Ins, Co. of the State of Pa. v. Assoc. Int'l Ins. Co*., 922 F.2d 516, 423 (9th Cir. 1990); *Clemmer v. Hartford Ins. Co*., 22 Cal.3d 865, 882 (1978))). Plaintiffs assert that Federal cannot meet this requirement for the same reasons it cannot establish reliance and damages, discussed above. *Id.*

b. Opposition

Federal argues that Plaintiffs' summary judgment motion should be denied in full. First, it contends the Court should reject Plaintiffs' argument that the Panel decided causation and therefore, that they are entitled to summary judgment that no pre- or post- loss exclusions apply. Opposition at 1-9. Federal points out that in denying Federal's motion to vacate the arbitration award, the Court rejected Federal's argument that the panel impermissibly decided causation and observed that to the extent an appraisal award contains "embedded" causation findings, those findings may be challenged in court. *Id*. at 2-3 (citing dkt. no. 134 at 30-31). Thus, Federal contends, Plaintiffs' summary judgment' motion "flouts every aspect of [the Court's] holding . . .

[,] ask[ing] the Court to treat the award as containing valid embedded causation determinations" and precluding Federal from challenging them. *Id*. at 3. Federal further asserts that Plaintiffs' motion is contrary to California law, which "is clear that informal, off-the-record appraisals may not resolve coverage disputes." *Id.* (citations omitted).

According to Federal, "[t]he Court and parties from the start understood that, under California law, the panel's role was strictly limited to determining the extent and not the cause of damage, because causation is a (if not the) principal coverage dispute in this case." *Id.* at 4. To the extent that Plaintiffs point to the fact that pre-existing damage was briefed and argued before the Appraisal Panel, Federal contends it was merely preserving its rights as to those issues. *Id.* at 5 (citing Federal's pre-appraisal brief, dkt. no. 116-1, Ex. 20 at 2 n.1).

Federal rejects Plaintiffs' assertion that the Panel did not make any causation findings, arguing that if "the panel made a finding about the property's condition immediately before [the date of the Glass Fire] and its condition sometime after that date, the sum total of those findings would isolate damage caused by the fire (and anything that occurred alongside/after it) and exclude any pre-fire cause of damage[,] . . .[which] is a causation finding[.]" *Id.* at 6.

Federal also rejects Plaintiffs' assertion that Federal was required under the insurance code to appraise ACV and that that is what it did. *Id.* at 7-8. According to Federal:

> The standard-form fire-insurance policy calls for ACV coverage, which entitles policyholders to replacement cost with a deduction for depreciation. *See* Cal. Ins. Code §§ 2071, 10102, 2051. But Plaintiffs' policy provides extended replacement cost coverage, which contains no deduction for depreciation. See Dekel Dec. Ex. 76 (Policy) at Coverage Summary 1, B-2. The appraisal provision in Plaintiffs' policy thus calls for an appraisal not of ACV, but of "the amount of loss," *id*. at Y-5—which is exactly what Plaintiffs sought in their Motion to Compel Appraisal, *see* ECF 27 at 2.

*Id.* at 7. Furthermore, Federal asserts, "[t]he record is replete with evidence that Plaintiffs understood the appraisal would evaluate full replacement costs, not ACV." *Id.* at 7-8 & n. 3 (citing dkt. no. 27-5 at 3 ("Plaintiffs defining 'amount of loss' for guesthouse as '[c]ost to replace,' plus land-related and code-upgrade costs 'necessary to replace'"); dkt. no. 50 at 2 ("Plaintiffs identifying issues for panel as 'scope of damage' to objects and 'cost to replace [them]'); Brown Decl. Ex. 1 at 15 ("Plaintiffs arguing under 'Policy and settled California law,' panel must 'focus .

. . on the scope of damage and the cost to rebuild the property at the time of the loss'"); dkt. no. 113 at 23 (similar)).

Federal argues that there are disputed issues of fact with respect to the applicability of both pre- and post-loss Policy exclusions. *Id.* at 9-16. As to the pre-loss exclusions (Gradual Loss and Contamination), both require a finding of what *caused* the loss, Federal contends, which must be decided by the jury. *Id.* at 9. Federal also argues that Plaintiffs read the Contamination provision too narrowly, as discussed above. *Id.* at 9-10.

As to the post-loss exclusions, Federal asserts that Plaintiffs misrepresent the record and that there is, in fact, substantial evidence that Plaintiffs failed to adequately protect their property after the fire, including refusing to engage in any cleaning efforts and intentionally leaving "all the air filters in the property unchanged for years after the fire as the HVAC continued to run and circulate air in the home." *Id.* at 11 (citing Brown Decl. Ex. 5 (Pollock Dep.) at 338:9-340, dkt. no. 231 at ECF pp. 110-112; Dekel Decl., Ex. 6 (Pollack Dep.) at 128:14-22, 131:6-132:24, 342:3-343-25, dkt. no. 217 at ECF pp. 102, 105-106, 148-49). Federal contends even Plaintiffs' expert Dawn Bolstad-Johnson found that "this refusal to clean had consequences: in a 2022 report, Bolstad-Johnson stated she 'observed [during a December 2021 site visit] several physical changes showing deterioration or damage to the buildings on the property since the previous site visit in December 2020.' " *Id.* (citing Brown Decl., Ex. 10 at 12, dkt. no. 231 at ECF p. 183).

Federal further contend that Plaintiffs are incorrect as to their assertion that this evidence does not matter because the Glass Fire was the "predominant and proximate cause" of the damage to their Property. *Id.* at 11-16. First, it argues that the proximate cause doctrine does not apply because that doctrine applies when loss is caused by a combination of covered and excluded risks but here, the Protect Property provision is not an exclusion but rather, "a contractual condition, non-compliance with which 'void[s] coverage entirely'—regardless of the cause of the alleged loss." *Id.* at 12 (citing *Malkin v. Fed. Ins. Co*., 2023 WL 6965003, at *4 (C.D. Cal. Oct. 20, 2023); *Gilbert v. Infinity Ins. Co*., 186 F. Supp. 3d 1075, 1086 (C.D. Cal. 2016)).

With respect to the Neglect Exclusion, Federal notes that it asserts this exclusion based on both pre- and post-loss neglect but that Plaintiffs address only the latter. *Id.* As to post-loss

neglect, Federal argues that Plaintiffs also "misappl[y] the efficient-proximate-cause doctrine." *Id.* According to Federal, "[t]hat doctrine applies only where 'two or more *distinct* perils' caused the damage 'for which coverage is sought,' *De Bruyn v. Superior Ct.*, 158 Cal. App. 4th 1213, 1222-23 (2008) (emphasis added [by Federal]), not where damage has a single cause, see *Pyramid Techs.*, 752 F.3d at 820." *Id.* at 12-13. Here, Federal contends, fire damage and neglect of fire damage are not distinct and therefore, the efficient proximate cause doctrine does not apply. *Id.* at 13 (citing *Finn v. Continental Insurance Co.*, 218 Cal. App. 3d at 71).

Even if the efficient proximate cause doctrine applied, however, there are factual disputes that preclude summary judgment as to the Neglect Exclusion, Federal contends. *Id.* at 14. As to Plaintiffs' reliance on Salvagni's deposition testimony in support of their assertion that there was no damage to the Property after the Glass Fire, Federal argues that Plaintiffs take Salvagni's testimony out of context; in particular, Federal "retained Salvagni after the 2024 Crystal Fire to 'review damages and perform a cost estimate to repair [Crystal Fire] damage[ ].'" *Id.* (citing Brown Decl. Ex. 4 (Salvagni Dep.) at 92:2-9, dkt. no. 231 at 67). According to Federal, "[g]iven the limited scope of that assignment, it is no wonder Salvagni acknowledged there was not 'any damage *that [he] assessed* at the property that occurred between the Glass Fire and the Crystal Fire.'" *Id.* (quoting Brown Decl. Ex. 4 (Salvagni Dep.) at 188:5-14, dkt. no. 231 at ECF p. 72 (emphasis added by Federal)). In addition, Federal contends, several of its experts hired to evaluate fire damage found evidence of harm resulting from Plaintiffs' failure to protect their property. *Id.* at 15-16.

Federal also rejects Plaintiffs' assertion that they are entitled to summary judgment on Federal's fraud and breach of contract counterclaims. *Id.* at 16-25. It contends Plaintiffs' request for summary judgment on these claims asks the Court to "revisit" its order finding sufficient facts to warrant permitting Federal to assert these additional counterclaims. *Id.* at 16; *see also* dkt. no. 197 (April 1, 2025 Order Granting Motion for Leave to File Amended Pleading). According to Federal, Plaintiffs have yet to "identif[y] a single qualified expert willing to say their home needs to be completely replaced because of the Glass Fire." Opposition at 17. On the other hand, Federal contends, there is substantial evidence that Plaintiffs lied when they represented to Federal

that the main house needed to be completely replaced, that they were entitled to coverage of over $1 million and that rebuilding would take approximately three years. *Id.* at 18-20.

With respect to the statement in the September 27, 2021 Letter (referred to by Plaintiffs as the Purported Counsel Statement), Federal argues that the California litigation privilege does not apply as to the breach of contract counterclaim because "[t]he California litigation 'privilege applies only to tort causes of action,' not to breach-of-contract claims." *Id.* at 20 (quoting *Mattco Forge, Inc. v. Arthur Young & Co*., 5 Cal. App. 4th 392, 406 (1992)). Furthermore, Federal asserts, "[e]ven with respect to Federal's fraud counterclaim, the litigation privilege does not apply because the September [27,] 2021 statement is not contained in prelitigation correspondence." *Id.* at 21 (citing *Mezzetti v. State Farm Mut. Auto. Ins. Co*., 346 F. Supp. 2d 1058, 1066 (N.D. Cal. 2004); *Edwards v. Centex Real Est. Corp*., 53 Cal. App. 4th 15, 34-35 (1997)). According to Federal, "[a]t most, the privilege's applicability raises fact questions that must be decided by the jury. *Id.* (citing *Golden Eye Media USA, Inc. v. Trolley Bags UK Ltd*., 525 F. Supp. 3d 1145, 1237 (S.D. Cal. 2021)).

Federal further contends the statement in the September 27, 2021 Letter was false. *Id.* at 22-24 (citing evidence). It argues, as a preliminary matter, that Plaintiffs' "ever-evolving characterization of the basis for the statement is grounds itself to deny summary judgment and find that the jury must resolve credibility issues underpinning Federal's counterclaims." *Id.* at 22 (citing *Swafford v. IBM Corp*., 408 F. Supp. 3d 1131, 1144 (N.D. Cal. 2019)). According to Federal, "[i]n March, they claimed the statement did not represent Bolstad-Johnson's expert findings, but rather their own conclusion 'that the main home could not be remediated by "cleaning"' drawn from 'Plaintiffs' own knowledge and experience' as a lawyer and poet" whereas Plaintiff now "claim that it was simply 'the assertion of counsel regarding what is owed under [Federal's] policy.' " *Id.* (citing dkt. no. 194 at 11; Motion at 17). Furthermore, Federal contends, the only "reasonable interpretation" of the statement in the September 27, 2021 Letter that the Main House would need to be rebuilt was that it was based on the report of Bolstad-Johnson. *Id.* at 23. However, the undisputed evidence establishes that Bolstad-Johnson "*never* recommended that the property be replaced[,]" Federal asserts. *Id.* (emphasis in original).

United States District Court
Northern District of California

Federal also rejects Plaintiffs' reliance on the Building Materials Report, arguing that "[n]othing in [that report][21]—which is not supported by a declaration from Bolstad-Johnson or SEMTEC and is thus inadmissible—concluded that building materials on the property could not be cleaned, including through washing." *Id.* at 24. According to Federal:

> The [Building Materials Report] was based on testing of 22 building samples by SEMTEC laboratories. Far from concluding that cleaning was "insufficient," SEMTEC found that numerous building materials were either undamaged or could be cleaned or "easily washed off." *See, e.g.*, Brown Dec. Ex. 9 (SEMTEC Rep.) at 3 (plaster sample "clean and without any visible darkening or other indications of fire debris"); *id*. at 7 ("discoloration" on interior plaster sample "easily washed off with water/detergent/soft brush"); *id*. at 9 (exterior plaster sample "lightly sanded" and successfully cleaned). The [Building Materials Report] even says that there was "no observed penetration of carbon or soot into the texture layers of the interior walls," ECF 226 Ex. J [Building Materials Report] at 20, and that "[i]n all cases where discoloration was noted, it was limited to the surface," without "any measurable penetration." Brown Dec. Ex. 9 (SEMTEC Rep.) at 12. The [Building Materials Report] itself ultimately concludes that "[f]urther evaluation should be completed…to determine the next steps to fully remediate the fire damage (repair, replace or rebuild)." ECF 226 Ex. J at 20 (emphasis added).

*Id.*

Finally, Federal argues that there is sufficient evidence to establish damages, reliance and prejudice resulting from Plaintiffs' alleged breach of contract and fraud and that these questions must be decided by the jury. *Id.* at 24-25. Federal asserts that reliance is considered a question of fact under California law and furthermore, that it "unquestionably relied upon and was prejudiced and damaged by Plaintiffs' misrepresentations." *Id.* In particular, it points to evidence that it incurred "$568,965.35 engaging additional experts to investigate Plaintiffs' fraudulent claims—including industrial hygiene expert Hamid Arabzadeh, analytical chemistry expert Dr. Shane Que Hee, and physician and toxicologist Dr. Timur Durrani" after it had "already hired industrial hygienists and a physician to investigate Plaintiffs' insurance claim before Plaintiffs' fall 2021 POLs." *Id.* at 25. According to Federal, it would not have hired these additional experts had it not

[21] Federal refers to this report as an Addendum. The Court uses the title adopted by Plaintiffs to avoid confusion. Whatever the short form, the document can be found at docket no. 226 at ECF pp. 464-502.

been "for Plaintiffs' representations that Bolstad-Johson's testing required total replacement of the property." *Id.* (citing Brown Decl., Ex. 12 (Federal's Second Amended Initial Disclosures, dated April 11, 2025), dkt. no. 231 at ECF pp. 226-27; Jaeger Decl. ¶ 2,[22] dkt. no. 231 at ECF pp. 207-208).

Federal argues further that it "paid Plaintiffs more than $4 million, including nearly $1 million to live in rental properties rather than remediate and return to the property, plus a $250,000 payment to clean that Plaintiffs never used for that purpose." *Id.* (citing Dekel Decl. Ex. 78 (Payment Spreadsheet) at 2, dkt. no. 218 at ECF p. 143). According to Federal, had it "known in fall 2021 that no qualified expert had ever told Plaintiffs the property must be replaced, Federal would have denied Plaintiffs' replacement claim then and would not have paid more than two additional years' worth of additional living expenses to Plaintiffs." *Id.* (citing Jaeger Decl. ¶ 3[23], dkt. no. 231 at ECF p. 208). Therefore, it asserts, the Court should reject Plaintiffs' assertion that they are entitled to summary judgment based on lack of reliance.

---

[22] Daniel Jaeger states in his declaration that he is claim manager for Federal's Special Investigative Unit and has been designated as Federal's corporate representative as to its counterclaims against Plaintiffs. Jaeger Decl., dkt. no. 232, ¶ 1. He states:

> Federal suffered substantial harm as a result of Plaintiffs' representations that their home was irreparably damaged by the Glass Fire and that their claim for replacement of the property was supported by testing and conclusions from an industrial hygienist qualified to make such determinations. In reliance on Plaintiffs' representations, Federal incurred at least $568,965.35 to engage additional experts to investigate Plaintiffs' total-replacement claim, including $492,604.50 paid to industrial hygiene expert Hamid Arabzadeh, $51,777.15 paid to analytical chemistry expert Dr. Shane Que Hee, and $24,583.70 paid to physician and toxicology expert Dr. Timur Durrani. Were it not for Plaintiffs' misrepresentations in presenting their total-replacement claim, Federal would not have retained these experts.

*Id.* ¶ 2.

[23] Jaeger states in paragraph 3:

> Further, if Plaintiffs had not represented to Federal during Federal's investigation of Plaintiffs' claim that a qualified expert determined that their property must be replaced due to Glass Fire damage, Federal would have reached a coverage determination shortly after Plaintiffs' submission of their August 2021 proofs of loss and denied Plaintiffs' total-replacement claim at that time. Plaintiffs' misrepresentations forced Federal to continue investigate Plaintiffs' claim until March 2024, however, and to continue paying Plaintiffs' additional living expenses for more than two additional years in reliance on these representations.

Jaeger Decl. ¶ 3.

c. Reply

In their Reply, Plaintiffs contend Federal is merely trying to "relitigate" what has already been decided by the Appraisal Panel. Reply at 1. Plaintiffs reject Federal's assertion that they are relying on a finding of causation by the Panel, emphasizing that "[t]he Panel did *not* determine causation; it correctly and properly determined the extent of the loss, by personal inspection, hearing testimony, and reviewing evidence." *Id.* at 2 (emphasis in original). Moreover, it asserts, the Appraisal Panel determined ACV, as required by law, and not the amount of "extended replacement cost coverage," which would have required the Panel to make coverage determinations in violation of California law. *Id.* at 3. In particular, according to Plaintiffs, "[u]nder California law, 'an appraiser has authority to determine only a question of fact, namely the actual cash value or amount of loss of a given item.' " *Id.* (quoting *Comprehensive Med. Ctr., Inc. v. State Farm Mut. Auto. Ins. Co*., 2025 WL 416814, at *1 (9th Cir. Feb. 6, 2025)).

Plaintiffs reject Federal's assertion that the Appraisal Panel may not evaluate "pre-loss condition . . . by 'tethering that determination to the moment right before a covered event." *Id.* at 6 (citing Opposition at 6). They assert that the Court rejected the same argument when it declined to vacate the Award, observing in its Order "that there is nothing in the Policy that suggests that 'loss' means damage to the Homeowner's insured property untethered to any specific event, as Federal contends." *Id.* at 6 (quoting dkt. no. 134, Appraisal Award Order, at 28). They go on to reiterate their position that the Gradual Loss and Contamination Exclusions are incompatible with the findings of the Appraisal Panel and further, that the Contamination Exclusion is inapplicable here. *Id.* at 7-8.

Plaintiffs also contend Federal is incorrect in its assertion that the efficient proximate cause doctrine does not apply to the Neglect Exclusion because the damage from the Glass Fire and the alleged neglect that followed resulted from a single peril. *Id.* at 8-9. According to Plaintiffs, "[w]ildfires and neglect can occur completely independent of each other" and therefore, these perils "are 'conceptually distinct: that is, they could each, under some circumstances, have occurred independently of the other and caused damage.'" *Id.* at 9 (distinguishing *Finn v. Cont. Ins. Co*., 218 Cal. App. 3d 69 (1990)). Furthermore, Plaintiffs contend, neither the Neglect nor the

Contamination Exclusion applies under the efficient proximate cause doctrine given that Federal has admitted that the Glass Fire caused damage to the structures on the Property. *Id.* at 9-11. Moreover, they assert, there is no evidence of post-loss damage. *Id.* at 11-12.

Plaintiffs reiterate their assertion that they are entitled to summary judgment on the fraud and breach of contract counterclaims. *Id.* at 12-15. First, as to the Duration and Loss Statements made in their August 2021 POLs, Plaintiffs contend that the Appraisal Panel's conclusions as to the time it would take to rebuild and the amount it would cost are findings of fact that establish that these statements were true and therefore cannot be the basis for any breach of contract or fraud claim against Plaintiffs. *Id.* at 12-13. Plaintiffs point out that Federal asked the Court to vacate the Appraisal Panel's finding that rebuilding would take 36 months but the Court refused that request, concluding that this finding was a factual finding necessary to calculate reconstruction costs. *Id.* at 13 (citing dkt. no. 134, Appraisal Award Order, at ECF p. 33).

Plaintiffs argue further that Federal is incorrect in its assertion that at the time Plaintiffs made the Loss Statement asserting that the Main House would need to be rebuilt, " 'not a single expert had recommended their property be replaced.'" *Id.* at 14 (quoting Federal Opposition at 18). In fact, Plaintiffs assert, "Chris McMinn, a local construction expert, testified at deposition that he told Tom Pollock, at or around October 10, 2020, that he did not think anything could be done to decontaminate the structures on the Property." *Id.* (citing Strauss Decl., Ex. 1 (McMinn Dep.) at 302-304, dkt. no. 258 at ECF p. 79). According to Plaintiffs, "[a]t the time of the Glass Fire, Mr. McMinn had approximately 52 years of construction experience, familiarity with California building codes, and had conducted more than six thousand building inspections, over the last 43 years." *Id.* (citing McMinn Decl., dkt. no. 245, ¶ 4 & Ex. 1 (McMinn CV)). Furthermore, Plaintiffs contend, Federal received a copy of McMinn's draft report, dated June 21, 2021, in which McMinn stated:

> We have subsequently determined that it is physically impossible to remove all of those contaminating and toxic residues from this surviving residence, either at the exterior, or throughout the interior.
>
> . . .
>
> In conclusion, although we have explored and considered potential

> remediation (see below) the only practical solution to achieve full and complete remediation and removal of all contaminating fire residues, will be to demolish and remove all the existing structures, excavate the subgrade until sampling of all remaining underground exposed surfaces test negative for toxic residues.

*Id.* (quoting McMinn Report, dkt. no. 228 at ECF pp. 23-24). Plaintiffs further contend they had a "raft of experts" who were specialists in their individual fields and had "recommended replacement of their individual components of the Property." *Id.* at 14 (citing dkt. no. 194 (Plaintiffs' Opposition to Defendant's Motion for Leave under FRCP 15 And 16 to File an Amended Pleading) and supporting declarations).

With respect to the Purported Counsel Statement, Plaintiffs assert that Federal "does not even bother to try and defend the misleading quoting and factual mischaracterization of Ms. Haskett's letter, in favor of a new basis for 'falsehood,' [or] that Plaintiffs have provided more than one basis supporting that no false statement was ever made by Ms. Haskett." *Id.* at 15. Plaintiffs contend Federal has no authority for the proposition that there can be a triable issue of fact "when a party has multiple bases for which a statement is, in fact true." *Id.* According to Plaintiffs, their attorney "said they had experts they were relying on for their information regarding the contamination on their Property" and the evidence establishes that "they did." *Id.* Furthermore, they contend, "Bolstad-Johnson has opined, both in her written reports and has testified in deposition that she did not believe the Property could be cleaned [of] its toxic contaminants, and it was not habitable." *Id.* (citing generally Bolstad-Johnson Decl., dkt. no. 246,[24] and "Exhibits thereto, including Rebuttal Report, at 4, 5, & 10").

Finally, Plaintiffs assert Federal has offered no evidence of intent to defraud, reliance, damages or substantial prejudice and therefore, that they are entitled to summary judgment on

---

[24] This document contains Bolstad-Johnson's February 20, 2025 Expert Report (Exhibit 1, beginning at ECF p. 3) and her April 18, 2025 Expert Rebuttal Report (Exhibit 2, beginning at ECF p. 1307). The Court declines Plaintiffs' invitation to review these documents generally to find support for this claim; rather, it considers only the page numbers specifically identified in this respect. On page 4 of her rebuttal report, Bolstad Johnson states: "Chemical contamination from the Glass Fire has fundamentally altered the Pollacks' property, rendering it impossible to restore the structures to their pre-loss condition through current professional cleaning techniques." She expresses similar opinions on pages 5 and 10 of that report. Plaintiffs do not provide a citation to support their assertion that Bolstad-Johnson offered similar testimony in her deposition.

Federal's counterclaims. Plaintiffs also contend the Jaeger Declaration is inadmissible because it lacks foundation and is not based on personal knowledge. *Id.* n. 9. Plaintiff's assert:

> Being designated as a 30(b)(6) witness does not provide that foundation. Mr. Chris Lassiter, Chubb's primary adjuster on Plaintiffs' claim, testified in deposition that he made all decisions relating to all aspects of the Pollocks claim, with input from . . . Corey Everett. ECF 226 Lassiter Dep. 114-117 Mr. Jaeger did not claim to speak with Mr. Lassiter prior to penning this declaration. Further, the declaration is impermissibly speculative, self-serving, and provides no back up documentation so it lacks reliability. It should be excluded. At a minimum . . . the declaration violates FRE 602, 701 and FRCP 56(c)(4).

*Id.*

**2. Whether Pre-Loss Exclusions are Barred by Appraisal Award**

Plaintiffs argue that the pre-loss exclusions invoked by Federal for damage to the main house that existed *before* the Glass Fire are barred by the Appraisal Panel's Award, which measured ACV and therefore took into account the structure's condition as of the date of the Glass Fire pursuant to California Insurance Code §§ 2051 and 2071. As discussed above, however, the Court finds that the Panel's award measured replacement cost rather than ACV. Furthermore, as the Court found when it addressed Federal's motion to vacate the Award, "the disputes related to causation are for the Court (or Jury) and remain to be decided." Dkt. no. 134 at 34.

The Court notes that when Federal sought to vacate the Appraisal Award, it argued (as do Plaintiffs here) that by evaluating the loss with reference to the date of the Glass Fire, it made a determination of causation. *See* dkt. no. 102 at ECF p. 22. The Court rejected that argument on the grounds that the Award contained a disclaimer that it did not establish coverage, finding that under *Lee v. California Cap. Ins. Co*., 237 Cal. App. 4th at 1170, the panel did not exceed its authority. *See* dkt. no. 134 at ECF p.3, 29. But it hard to deny the logic of this argument as it is but a small inferential step to conclude that the damage to structures on the Property as compared to their condition just before the Glass Fire was the damage *caused by* the Glass Fire. As the Court found when it denied Federal's motion to vacate, to the extent such a causation finding is embedded in the Appraisal Award, Federal is entitled to revisit that finding at trial. This means that Federal is entitled to present to the jury evidence relating to whether pre- and post-loss

exclusions bar some or all of Plaintiffs' claimed loss even if the Panel's award implicitly found that they did not. This includes Federal's defenses that the loss claimed by Plaintiffs was caused by gradual deterioration and wear and tear that pre-dated the Glass fire, and/or by pre- and post-fire neglect and failure to take reasonable measures to protect the Property.

The Court also rejects Plaintiffs' reliance on *Knapp v. Allstate Ins. Co*., 134 F.3d 378 (9th Cir. 1998) for the proposition that "assessing the pre-existing damage of property does not entail findings of causation." Plaintiffs' Summary Judgment Motion at 6. In that unpublished case, the Ninth Circuit rejected the plaintiffs' argument that "the appraisal umpire exceeded his powers in issuing an estimate based on a determination that much of the damage was preexisting, because such a determination impermissibly resolve[d] a question of coverage." 134 F.3d 378 (9th Cir. 1998). The court reasoned:

> The case upon which the Knapps rely, *Safeco Ins. Co. v. Sharma*, 160 Cal.App.3d 1060 (1984), is inapposite because, there, the insured item was stolen, not damaged, so that appraisers improperly speculated on what property was insured. That did not occur here. Moreover, the district court's order directed the appraisers "to determine the amount of loss incurred at Plaintiffs' Newhall property as a result of the January 17, 1994 Northridge earthquake in accordance with the terms of Allstate's policy." Accordingly, the panel did not exceed its authority by appraising the value of the earthquake damage.

*Id.* In other words, the district court expressly authorized the appraiser to address causation and found *Sharma* to be distinguishable. In contrast, the Court here has concluded that under *Sharma*, "the causation findings that are embedded in the panel's appraisal award may be challenged before this Court, which is charged with deciding such issues . . . ." Dkt. no. 134 at ECF pp. 30-31.

Therefore, the Appraisal Panel's Award does not preclude Federal from litigating the applicability of the pre-loss exclusions it cites in support of its denial of coverage. As discussed above, the Court does find the Contamination Exclusion is inapplicable for a different reason, namely, that that exclusion is limited to conventional environmental pollution. However, as to the remaining pre-loss exclusions (the exclusions for damage incurred outside of the Policy Period and for Gradual Loss), Federal has demonstrated that there are material disputes of facts.

Therefore, the applicability of those exclusions must be decided by the jury.[25]

### 3. Whether Post-Loss Exclusions are Barred Under Efficient Proximate Cause Doctrine

The California Supreme Court has held that "[I]n determining whether a loss is within an exception in a policy, where there is a concurrence of different causes, the efficient cause—the one that sets others in motion—is the cause to which the loss is to be attributed, though the other causes may follow it, and operate more immediately in producing the disaster." *Sabella v. Wisler*, 59 Cal. 2d 21, 31–32 (1963) (quoting 6 Couch, Insurance (1930) § 1466). Thus, for example, in *Sabella*:

> [N]egligent construction of a sewer line led to its rupture, which in turn resulted in settling of the plaintiff's house in the uncompacted fill on which it stood. Settling was excluded from the plaintiff's broad peril policy, but negligent construction of the sewer was not. The Supreme Court held the loss was covered because the faulty pipe was its "efficient proximate cause."

*Finn v. Cont'l Ins. Co*., 218 Cal. App. 3d 69, 71 (1990) (citing *Sabella*, 59 Cal.2d at 26, 30-31).

In contrast, the Court in *Finn* found that the efficient proximate cause doctrine did not apply, explaining that "[i]n *Sabella*, and in the cases applying it, the two perils were conceptually distinct: that is, they could each, under some circumstances, have occurred independently of the other and caused damage." *Id.* at 72. In *Finn*, a break in a pipe led to seepage of water under the insured's house for many months, which in turn caused settling and damage to the foundation. *Id.* at 71. The insured's all-risk policy contained an exclusion for gradual seepage, but the insured argued that the efficient proximate cause was a sudden break in her pipe, which was a covered risk, and therefore that the seepage exclusion did not apply. *Id.* The court rejected her argument:

> [Plaintiff's] argument is premised on viewing the leakage and the break as two conceptually distinct events, linked only causally. But "leakage" and "seepage" necessarily imply some break or gap in the thing leaking. Thus the verb "leak" is defined, "to enter or escape

[25] This does not mean Federal may revisit at trial factual determinations made by the Appraisal Panel that do *not* implicate causation. Thus, for example, to the extent the jury rejects Federal's defenses based on pre- or post-loss exclusions and finds that the damage to the main house caused by the Glass Fire required a complete rebuild of the house, Federal is bound by the Appraisal Panel's conclusions as to the cost of rebuilding.

> through a hole, crevice, or other opening usu. by a fault or mistake." (Webster's New Internat. Dict. (3d ed. 1961) p. 1285.) "Seep" means "to flow or pass slowly through fine pores or small openings." (Op. cit. supra, at p. 2056.)
>
> The *Sabella* analysis has no application here because leakage and broken pipes are not two distinct or separate perils. In *Sabella*, and in the cases applying it, the two perils were conceptually distinct: that is, they could each, under some circumstances, have occurred independently of the other and caused damage. (See, e.g., *Sauer v. General Ins. Co.* (1964) 225 Cal.App.2d 275, 278 [37 Cal.Rptr. 303] [leakage of water from plumbing system (covered peril) and sinking of earth (excluded peril)]; *Premier Ins. Co. v. Welch* (1983) 140 Cal.App.3d 720, 725 [189 Cal.Rptr. 657] [negligent installation of sewer (covered peril) and saturation of earth in heavy rain (excluded peril)].) In the present case there are not two conceptually distinct perils. Leakage or seepage cannot occur without a rupture or incomplete joining of the pipes. This case involved not multiple causes but only one, a leaking pipe.

*Id.* at 72.

Here, in contrast to *Finn*, the two perils that allegedly caused damage to the Property -- wildfire and neglect – are "conceptually distinct" because there is nothing inherent in them that renders them a single peril. Therefore, the Court finds that summary judgment on this basis is inappropriate.

Plaintiffs' reliance on *Malkin v. Fed. Ins. Co.*, 562 F. Supp. 3d 854, 861 (C.D. Cal. 2022) is misplaced. *See* Plaintiffs' Summary Judgment Motion at 14. In that case, ash resulting from the Thomas Fire clogged the home's drainage system, causing water to overflow into and under the home and leading to differential settlement of the house and associated damage. 562 F. Supp. 3d at 858-59. The insurer denied coverage for this loss under the homeowners' all-risk policy, citing exclusions for settlement and ground water, among others, and sought summary judgment that the exclusions precluded coverage as a matter of law. *Id.* at 864. The Court, however, found under a stipulated set of facts related to causation, that the policy's exclusions did "not as a matter of law preclude coverage if plaintiff's theory of causation [was] proven correct." *Id.* at 865. In that case, the question of whether the Thomas Fire was, in fact, the proximate cause of the claimed damage was put to the jury and Federal was permitted to argue to the jury that the exclusions applied. *See* Brown Decl., Ex. 18 (*Malkin* Jury Instructions), dkt. no. 231 at ECF pp. 263-270; *id.* Ex. 19 (*Malkin* Verdict Form), dkt. no. 233-2. Likewise, in this case these questions should be

decided by the jury.[26]

**4. Whether Plaintiffs are Entitled to Summary Judgment on Federal's Breach of Contract and Fraud Counterclaims**

As discussed above, Federal's breach of contract and fraud counterclaims are based on three statements that it alleges were false at the time they were made: the Duration Opinion, the Loss Statement and the Purported Counsel Statement. The Court finds that these counterclaims fail based on the undisputed facts in the record.

a. The October 26, 2020 Letter Duration Opinion

First, to the extent that Federal's claim is based on the Duration Opinion in counsel's October 26, 2020 Letter, the Court finds no evidence the statement in that letter was false at the time it was made, as is required to prevail on its fraud and breach of contract counterclaims. The Court notes that Federal's theory of falsity as to all three statements is that the statements "were false at the time they were made, because Plaintiffs knew that no qualified expert had concluded that the Property needed to be completely replaced because of Glass Fire damage." Dkt. no. 198 (Amended Answer), Counterclaim ¶ 58. In the October 26, 2020 Letter, however, counsel's estimate of the time it would take to restore the main house is not based on *any* conclusions as to whether the main house would need to be rebuilt or if, instead, it could be restored without a complete rebuild. *See generally* dkt. no. 231 at ECF pp. 229-236.

To the contrary, the letter explicitly leaves that question open, stating that the "insureds do not believe a true assessment of the scope and extent of damage will be known for 6 months" and opining that after "damage assessment" was "complete" and the parties had "agree[d] on the repairs to restore the main residence . . ." it would take at least another six months to draw up plans and obtain permits and "[o]nly then [could] true *restoration and/or reconstruction* begin."

[26] The Court rejects Plaintiffs' argument that there is no evidence of post-loss damage. While Plaintiffs point to the testimony of Kevin Salvagni that there was no damage to the Property between the Glass Fire and the Crystal Fire, Federal has pointed to the testimony of industrial hygienist Enrique Medina and Plaintiffs' expert Dawn Bolstad-Johnson indicating that delay in cleaning the main house resulted in deterioration in the condition of the structure. *See* Federal Opposition at 15-16 (citing evidence). Therefore, the Court concludes that there are disputes of material fact relating to whether there was post-loss damage to the Property.

*Id.* at 232-233 (emphasis added). This statement does not imply that demolition and a complete rebuild of the main house is *required*. Thus, it is entirely clear that the estimated duration of restoration work of one to three years in the October 26, 2020 Letter was not based on any misrepresentation as to what Plaintiffs' experts may or may not have told them about whether the main house would need to be demolished and rebuilt.

Likewise, while an opinion may give rise to a fraud claim if it is "based on or implies the existence of facts which are nonexistent," *Seeger v. Odell*, 18 Cal. 2d 409, 414 (1941), the fact that Federal contends was misrepresented – that Plaintiffs' experts had advised them that the main house needed to be rebuilt – is simply nowhere to be found in the October 26, 2020 Letter, even by implication.

b. The August 2021 POLs

Federal also bases its counterclaims on the August 2021 POLS to the extent that the estimated loss stated in those POLs was premised on Plaintiffs' belief that the main house could not be remediated and restored through cleaning and would have to be demolished and rebuilt. As to these statements, Federal's counterclaims are based on the theory that Plaintiffs intentionally misled Federal because they did not have a "valid basis" to believe that the main house needed to be completely rebuilt. The Court finds, however, that the undisputed evidence establishes that at the time these statements were made, Plaintiffs had, in fact, been advised by their experts that the damage to the main house was so severe that remediation could only be achieved by demolishing the existing structure and replacing the main house.

In particular, Plaintiffs have offered uncontroverted testimony that Christopher McMinn, a construction expert with extensive experience restoring and rebuilding smoke and fire-damaged structures, first visited the Property on October 10, 2020 to inspect the damage to the main house from the Glass Fire and concluded the smoke-damage was too extensive to address through removal of the contaminants, testifying at his deposition:

> . . . I went inside the house, and I looked at all the ash that was deposited. And then I went up to the attic, and there's ash throughout the attic. And at that point, I explored briefly, and I saw that the attic has these large openings, which penetrate all the way down to the first floor, because it has double cavity walls, and those had been full of



United States District Court
Northern District of California

> smoke. And I think I had been told that the house had been in the smoke plume for over a week. And that's when I realized, and I think I told [Mr. Pollack] at the time, I don't think there's anything we can do to remove all these contaminants, based on my experience over the last 40 years.

Strauss Decl., Ex. 1 (McMinn Dep.) at 302, dkt. no. 258 at ECF p. 79); *see also* McMinn Decl., dkt. no. 245, ¶ 4 & Ex. 1 (McMinn CV) (reflecting that Mr. McMinn's experience includes "[w]ild fire and structure fire cost analysis of decontamination and demolition protocols, repair and replacement of both damaged and destroyed structures, site and related issues.").

Furthermore, on June 3, 2021, Mr. McMinn provided Plaintiffs with a report, based on at least eight additional site visits, in which he reached the same conclusion, stating:

> . . . exhaustive investigations after the fire, with sampling and meticulous laboratory analysis of material samples, taken from both the exterior and interior surfaces, including plaster, drywall, framing, masonry, ducting, wiring, appliances and so forth, have sought to establish and rigorously define, not only the extent of the fire damage, but the possibility of remediation, repair, or the more drastic measure of outright replacement. These investigations are still ongoing, although the bulk of the laboratory results are now available, and have been thoroughly documented. These documents include Kaizen Safety Solutions' 291page report, a pending final metallurgical report and other investigations still in progress, covering the related issues of structural engineering, sub grade and slope soil stability, to be followed by stabilization analysis, along with investigation and removal of sub grade fire contamination and so on.
>
> However, while all these investigations are both essential, ongoing and entirely relevant as a foundation to define the overall scope and options as they relate to remediation, repair or replacement, *the focus of this report and analysis* is to determine, as accurately as possible, the actual real-world costs to restore all of the buildings, structures and especially the main residence, guest house and pavilion, to the condition they were in right before the fire.
>
> Therefore, we have reviewed and drawn upon the results of the above noted investigations, with this goal in mind. One prevailing conclusion drawn from Kaizen's inspections and analysis is that the main residence is permeated throughout with both potential and actual toxic fire residues. Their certified industrial hygienist: Dawn Bolstad-Johnson, MPH, CIH, CSP, FAIHA has determined the building is not safe to enter or inhabit without either full respiratory masks— or complete removal of all contaminants.
>
> Consequently, we have explored—exhaustively--the possibility and practicability of removing all fire and smoke residues, wherever they have penetrated all the remaining structures. We have accessed and utilized our extensive prior experience with fire remediation, heat damage and chemical residue contamination from wild fire and



United States District Court
Northern District of California

> structure fire combustion products. We have subsequently determined that it is *physically impossible* to remove *all* of those contaminating and toxic residues from this surviving residence, either at the exterior, or throughout the interior. This would include their presence in all cavity walls, in conduits, in ducting, inside equipment, within appliances, within any and all porous materials, (which would include but not be limited to stucco, plaster, limestone, tile, wood, wiring, veneers, fabrics and so forth). This would apply equally to the accessory buildings, including the pavilion, outside barbecue, exterior patios, garage, wine cellar and the adjacent site structures, including hardscape, landscape, statuary and all related installations.
>
> In conclusion, although we have explored and considered *potential remediation* . . . the only practical solution to achieve full and complete remediation and removal of all contaminating fire residues, will be to demolish and remove all the existing structures, excavate the sub grade until sampling of all remaining underground exposed surfaces test negative for toxic residues.

McMinn Report at 5-6, dkt. no. 228 at ECF pp. 23-24 (emphasis in original).

Because this evidence is uncontroverted, Federal cannot prevail on its counterclaims to the extent they are based on alleged misrepresentations in the POLs. Therefore, Plaintiffs are entitled to summary judgment on Federal's counterclaims to the extent they are based on the POLs.

c. The September 27, 2021 Letter

Federal also asserts in its counterclaims that Plaintiffs engaged in fraud and breached their contractual obligation not to make false or misleading statements related to their claim because "[o]n or around September 27, 2021, Plaintiffs asserted Kaizen Safety Solutions had concluded that the Glass Fire caused damage that could not be repaired and thus Plaintiffs were entitled to the total replacement of the structures and landscaping on the Property." Amended Answer, Counterclaim ¶ 57(c). The plain language of the September 27, 2021 Letter, however, establishes that this allegation is incorrect. In particular, while accurately reciting the findings in the Kaizen Report that "soot, char, [and] ash… have permeated every part of the main house, including the interstitial spaces of the walls and the building materials themselves[,]" the September 27, 2021 Letter does *not* state (contrary to Federal's allegations) that *Kaizen Safety Solutions* had concluded that the main house had to be replaced. Rather, it is evident that that conclusion is an opinion of counsel based on the findings set forth in the Kaizen Report. Furthermore, as discussed above, while an opinion may be sufficient to support a fraud claim, the undisputed facts establish that this particular opinion accurately reflected the findings of the McMinn Report, discussed

above, in which Mr. McMinn found – based in part on the findings in the Kaizen Report – that the contamination of the main house could be addressed only by demolishing and rebuilding. Therefore, the undisputed facts establish that Federal cannot prevail on its counterclaims to the extent they are based on the September 27, 2021 Letter.

In sum, Federal's counterclaims and related affirmative defenses (the Fifteenth and Sixteenth Affirmative Defenses) fail as a matter of law and therefore are dismissed with prejudice.[27]

## V. CONCLUSION

For the reasons stated above, the Motions are GRANTED in part and DENIED in part. No later than **August 26, 2026**, the parties shall meet and confer and file a joint case management conference statement that includes a proposed schedule for the remainder of the case. The parties shall also include, in the joint statement, an agreed upon statement of the legal and factual issues that remain to be tried. A Further Case Management Conference will be held by Zoom webinar on **September 2, 2026 at 2:00 p.m.**

**IT IS SO ORDERED.**

Dated: July 16, 2026

JOSEPH C. SPERO
United States Magistrate Judge

[27] The Court does not reach Plaintiffs' argument that these claims fail because the conclusions of the Appraisal Panel establish that the allegedly false statements made by Plaintiffs were, in fact, true. Nor does it reach Plaintiffs' argument that the statements in the September 27, 2021 Letter are subject to the litigation privilege.



United States District Court
Northern District of California